ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
                                                    :
UNITED STATES OF AMERICA                            :
                                                    :
        -v.-                                        :        **SEALED INDICTMENT**
                                                    :
ALEXANDER MASHINSKY and                             :        23 Cr.
RONI COHEN-PAVON,                                   :
                                                             **23 CRIM     347**
                Defendants.
------------------------------------------------------------------- x

## Overview

1.      From at least in or about 2018 through in or about June 2022, ALEXANDER

MASHINSKY, the defendant, orchestrated a scheme to defraud customers of Celsius Network

LLC and its related entities (collectively, "Celsius"), the cryptocurrency company he founded, and,

together with Celsius's Chief Revenue Officer, RONI COHEN-PAVON, the defendant, and other

Celsius employees, orchestrated a scheme to inflate the price of Celsius's proprietary token, CEL.

In the first scheme, MASHINSKY misled customers about core aspects of Celsius's business,

including the success and profitability of Celsius and the nature of the investments that Celsius

made with customer funds.  In sum and substance, MASHINSKY portrayed Celsius as a modern-

day bank, where customers could safely deposit crypto assets and earn interest.  In truth, however,

MASHINSKY operated Celsius as a risky investment fund, taking in customer money under false

and misleading pretenses and turning customers into unwitting investors in a business far riskier

and far less profitable than what MASHINSKY had represented.  In the second scheme,

MASHINSKY, COHEN-PAVON, and other Celsius employees illicitly manipulated the price of

CEL, thereby causing the public to purchase CEL at inflated prices, which personally benefitted

MASHINSKY and COHEN-PAVON because they were secretly selling their own CEL at prices that they knew did not reflect the token's true market value.

2.     Celsius was a crypto asset platform that, among other things, allowed its customers to earn returns on their crypto assets in the form of weekly "rewards" payments, to take loans secured by their crypto assets, and to custody their crypto assets. Celsius billed itself as the "safest place for your crypto" and urged potential customers to "unbank" themselves by moving their crypto assets to Celsius. ALEXANDER MASHINSKY, the defendant, directly marketed Celsius to retail customers located in the United States and abroad. Throughout his tenure as Chief Executive Officer ("CEO") of Celsius, MASHINSKY repeatedly made public misrepresentations regarding core aspects of Celsius's business and financial condition in order to induce retail customers to provide their crypto assets to Celsius and continue to use Celsius's services. MASHINSKY misrepresented, among other things, the safety of Celsius's yield-generating activities, Celsius's profitability, the long-term sustainability of Celsius's high rewards rates, and the risks associated with depositing crypto assets with Celsius.

3.     ALEXANDER MASHINSKY, the defendant, aggressively promoted Celsius through media interviews, his own Twitter account, and Celsius's website. MASHINSKY's most common method of public communication, though, was his weekly "Ask Mashinsky Anything" sessions, or "AMAs," in which he would speak in a live broadcast directly to the Celsius community and take questions about Celsius from customers and prospective customers. Celsius then posted recordings of these AMAs to Celsius's website and YouTube channel, where they continued to be publicly available. MASHINSKY made so many false and misleading statements in the AMAs that Celsius employees from multiple departments began to review the AMAs after they had aired, flag false and misleading statements by MASHINSKY, and, at times, edit

2

MASHINSKY's misrepresentations out of the recorded versions of the AMAs posted to the internet. But, despite warnings from other Celsius employees, MASHINSKY continued to misrepresent the nature of Celsius's core business activities on live broadcasts. Moreover, neither MASHINSKY nor Celsius ever issued corrections to notify the public and those who had watched the live recorded versions of the AMAs that certain of MASHINSKY's statements were untrue or misleading.

4.        As ALEXANDER MASHINSKY, the defendant, falsely portrayed Celsius as a safe and secure institution, Celsius's customer base grew exponentially. Many of those customers were retail investors rather than large institutions. By in or about the fall of 2021, Celsius had grown to become one of the largest crypto platforms in the world, purportedly holding approximately $25 billion in assets at its peak.

5.        Under the direction and leadership of ALEXANDER MASHINSKY, the defendant, Celsius also launched its own native crypto token, CEL, through an initial coin offering ("ICO") in or about 2018 designed to raise money to fund Celsius's operations. During and after this ICO, MASHINSKY falsely claimed that Celsius had sold all the CEL tokens that it had made available for sale to the public during the ICO for a total raise of $50 million. In reality, Celsius failed to sell more than one-third of the 325 million CEL tokens it had made available for sale and only raised approximately $32 million through the ICO.

6.        After the CEL token ICO, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others working at Celsius orchestrated a yearslong scheme to mislead customers and market participants regarding the market value and interest in CEL such that Celsius's assets would appear more valuable than they were and so that MASHINSKY and COHEN-PAVON were able to sell CEL at inflated prices. They did so by manipulating the price

3

of CEL through causing Celsius to spend hundreds of millions of dollars purchasing CEL in the open market with the objective of artificially supporting and inflating the price of CEL. At various times during MASHINSKY's tenure, MASHINSKY, COHEN-PAVON, and their co-conspirators also caused Celsius to use its own customer deposits to fund these market purchases of CEL in order to prop up CEL's price, without disclosing this fact to Celsius's customers.

7. To further the scheme to manipulate CEL, ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements concerning the nature of Celsius's market activity and the extent to which Celsius itself was responsible for artificially supporting and inflating the price of CEL, thus making it appear that there was broader market interest in CEL than actually existed. While MASHINSKY at various points publicly stated that Celsius was purchasing CEL in the market to pay customers their weekly CEL rewards, in reality and as MASHINSKY knew, Celsius purchased volumes of CEL well in excess of the amount required to pay weekly CEL rewards. These excess purchases of CEL were directed by MASHINSKY, RONI COHEN-PAVON, the defendant, and their co-conspirators in order to artificially support the price of CEL. In certain instances, MASHINSKY and other Celsius executives also personally purchased CEL for the purpose of artificially supporting CEL's price.

8. Artificially inflating the price of CEL allowed ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and other Celsius executives to sell their own CEL holdings for a substantial profit. MASHINSKY personally reaped approximately $42 million in proceeds from his sales of CEL, and COHEN-PAVON personally reaped at least $3.6 million in proceeds from his sales of CEL. At various times, MASHINSKY made false and misleading public statements about his own sales of CEL, claiming that he was not selling CEL, when, in reality, he was taking advantage of the upward price manipulation he had orchestrated by

4

contemporaneously selling huge quantities of his CEL on the market, including, on occasion, to Celsius itself.

9.     By in or about mid-2022, due at least in part to the fraud perpetrated by ALEXANDER MASHINSKY, the defendant, Celsius was already in a dire financial situation. Celsius was in such a weakened position that it could not withstand the drop in crypto asset prices that occurred beginning in or about May 2022—including, specifically, the drop in the price of CEL—and the resulting surge in Celsius customer withdrawals. ALEXANDER MASHINSKY, the defendant, nevertheless continued to publicly tout the safety of Celsius and encourage customers to continue to deposit crypto on the Celsius platform, even as MASHINSKY himself withdrew almost all his non-CEL personal crypto deposits, worth millions of dollars, from the Celsius platform. On or about June 12, 2022, Celsius announced that it was halting all customer withdrawals from the Celsius platform.   At that time, hundreds of thousands of Celsius customers—many of whom were retail investors—still had approximately \$4.7 billion worth of crypto assets on the Celsius platform, none of which they could access. On or about July 13, 2022, Celsius filed for Chapter 11 bankruptcy.

## Background on Celsius and the Defendants

10.     At all times relevant to this Indictment, ALEXANDER MASHINSKY, the defendant, was the CEO of Celsius. In or about February 2018, MASHINSKY and a co-founder incorporated Celsius Network Inc. in Delaware and Celsius Network Limited in the United Kingdom ("U.K."). Celsius was initially headquartered in the U.K. but moved its headquarters to Hoboken, New Jersey in 2021. Celsius also had an office in Manhattan, where many of its senior officers worked. In or about March 2018, Celsius launched its platform and began accepting crypto assets from customers. Beginning during the COVID pandemic, Celsius employees

5

predominantly worked from their homes. MASHINSKY predominantly worked from his Manhattan apartment and sometimes held meetings with Celsius executives there.

11.     RONI COHEN-PAVON, the defendant, is an attorney who was previously a partner at a prominent overseas law firm and joined Celsius as the Chief Revenue Officer in or about 2020. COHEN-PAVON was part of the inner circle of ALEXANDER MASHINSKY, the defendant, at Celsius and was one of the most senior executives at the company. COHEN-PAVON, like MASHINSKY, was a significant holder of CEL, having been provided a large amount of CEL upon joining Celsius, including, in part, to compensate him for legal services he had previously provided to Celsius prior to formally joining Celsius as an employee.

12.     Celsius's primary public offering was its "Earn" program, through which Celsius offered a platform for customers to provide their cryptocurrency assets to Celsius to invest. In exchange for providing their crypto assets, including Bitcoin, to Celsius, customers were told that they would earn returns through Celsius's investment of those assets. Celsius marketed the Earn program to the public as a profit-making opportunity. Celsius pooled customer assets and deployed them through retail lending, institutional lending, investments, exchange trading, and other profit-seeking strategies. Celsius advertised that these deployment strategies would generate yield, and Celsius would then pay customers weekly interest, or "rewards" based on the purported yield that Celsius was earning. The core marketing pitch to Earn program investors, which ALEXANDER MASHINSKY, the defendant, repeated in multiple forums, was that Celsius could generate yield for its customers by safely lending their crypto assets to institutions, but unlike banks—which kept most of the profits from investing customer deposits for themselves—Celsius would return the majority of the profits back to its customers.

6

13.     In addition to its Earn program, Celsius offered retail investors a "Custody" program and a "Borrow" program. Custody account holders simply could use the Celsius platform to store their cryptocurrency assets. Celsius offered its Borrow customers retail loans pursuant to which the customer would receive either fiat currency or stablecoins in exchange for posting crypto assets as collateral with Celsius. Celsius required its retail loans to be fully collateralized and many were over-collateralized. Once the loans were repaid under the terms of the loan agreement between the Borrow customer and Celsius, Celsius was obligated to return the collateral to the borrower.

14.     Celsius also launched CEL, its own native crypto token, in or about 2018. Earn customers could receive their weekly rewards in CEL rather than in other crypto assets. There was also a secondary market for CEL through which investors could buy and sell CEL. Celsius pooled the proceeds from the sale of CEL to the public for general use in Celsius's business operations. ALEXANDER MASHINSKY, the defendant, and Celsius touted CEL as an investment and MASHINSKY encouraged the public to purchase CEL, including by repeatedly promoting the fact that the price of CEL was increasing. MASHINSKY and Celsius also, at times, equated the value of CEL with the overall strength of Celsius's business and with the positive future prospects for Celsius.

## MASHINSKY's Misrepresentations Regarding Celsius's Business

15.     Throughout his time as CEO of Celsius, ALEXANDER MASHINSKY, the defendant, frequently made public statements about Celsius's financial condition and operations, including during weekly AMAs hosted by MASHINSKY, through MASHINSKY's Twitter account, and through frequent public interviews and appearances. In these public statements, MASHINSKY regularly made false and misleading statements about core aspects of Celsius's

7

financial condition and business operations in order to suggest that Celsius was a safe and low-risk investment opportunity for retail crypto customers, when the truth was the opposite. Among other misrepresentations, MASHINSKY made false and misleading statements regarding (i) the amount of money Celsius raised through its ICO; (ii) Celsius's profitability, the sustainability of its rewards rates, and the percentage of its revenue it returned to customers; (iii) Celsius's market-neutral trading strategy; (iv) Celsius's uncollateralized loans; (v) institutional counterparty defaults; (vi) the degree to which Celsius had clarity or comfort from regulators regarding the viability of its business model; (vii) the safety of customer assets; and (viii) Celsius's solvency and liquidity in the days and weeks leading up to the June 12, 2022 "Pause" on customer withdrawals that portended Celsius's filing for bankruptcy shortly thereafter.

*MASHINSKY's Misrepresentations Regarding ICO Success*

16.     The efforts of ALEXANDER MASHINSKY, the defendant, to deceive the public about the reliability and profitability of Celsius's model began near its inception. One of Celsius's first steps after formation was to launch its token, CEL, through an ICO in order to raise money and fund Celsius's operations and other initiatives. The size of the capital raise was relevant to Celsius's customers both because it increased the amount of cash the company had on hand to make good on its promised payments to customers and because it signaled the market's belief in the financial health and long-term viability of the business model. As is described in further detail below, MASHINSKY repeatedly misrepresented how much money Celsius had raised in connection with the ICO, and then caused Celsius to engage in an elaborate series of self-dealing and deceptive transactions designed to paper over MASHINSKY's false statements and make his false statements appear true.

8

17.     In or about March of 2018, Celsius offered CEL for sale to the public through an ICO. The features of the CEL token and the terms applicable to sales of CEL to the public were described in a "whitepaper" publicly issued by Celsius. Under the terms of the whitepaper, Celsius would create 700 million CEL tokens, with Celsius retaining 325 million CEL tokens for itself in its treasury, making 325 million CEL available for sale to the public, and retaining the remaining 50 million but releasing them if and when the CEL price hit certain benchmarks. Celsius set a "hard cap," or maximum sale amount, of $50 million for the ICO, including any sales that occurred during the pre-sale period. Per the terms of the CEL whitepaper, any tokens that went unsold during the pre-ICO period and ICO period would be "burned," i.e., permanently destroyed and taken out of circulation, thereby reducing the overall float of CEL.

18.     Contemporaneous with and after the ICO, ALEXANDER MASHINSKY, the defendant, falsely and publicly stated that Celsius had raised the full $50 million, meaning that Celsius had sold all the CEL tokens it had made available for sale to the public through the ICO. In reality, and as MASHINSKY knew, Celsius had fallen far short of its goal and raised only approximately $32 million through the ICO. A substantial portion of the CEL available for sale— approximately 117 million of 325 million tokens—had not been sold.

19.     Rather than correct his misrepresentations about the amount of money raised from the ICO, ALEXANDER MASHINSKY, the defendant, and others at Celsius working at his direction, engaged in an elaborate effort to make MASHINSKY's false claims appear true by arranging for an entity controlled by MASHINSKY to enter into a token sale agreement to purchase "up to $18,000,000" worth of CEL, corresponding to 117 million tokens—the approximate number of tokens that had gone unsold. The token sale agreement required MASHINSKY's entity to remit payment for the tokens within 90 days, or by approximately the

9

end of June 2018.  But neither MASHINSKY nor the entity that he controlled ever paid for the tokens, and in June 2018 the 117 million CEL tokens remained unsold.  Under the terms of the whitepaper, the 117 million unsold CEL tokens should have been burned, but Celsius neither burned the tokens nor publicly disclosed that it was deviating from the terms of its own whitepaper and thus fundamentally altering CEL's value proposition.

20.     In or about late 2019, with the public still unaware that the ICO was never fully funded and that more than one-third of the available CEL tokens had gone unsold, Celsius and ALEXANDER MASHINSKY, the defendant, yet again attempted to provide cover for MASHINSKY's misrepresentations.  This time, Celsius converted the token sale agreement into a "loan agreement" under which Celsius gave an entity controlled by MASHINSKY a loan against the 117 million CEL that MASHINSKY's entity had never even purchased.  Under the terms of the loan agreement, Celsius held the 117 million tokens as collateral against the loan, and MASHINSKY's entity was permitted to sell the tokens on the secondary market and transfer the proceeds of those sales to Celsius as partial repayment on the loan.  Executives at Celsius expressed concerns to MASHINSKY and others that this "loan agreement" was really just a free option for MASHINSKY to purchase CEL if the token price went above the ICO sale price, and a senior executive resigned in part because of his objection to this self-dealing transaction.  A month later, Celsius and MASHINSKY's entity executed yet another loan agreement that superseded the prior agreement.  This superseding loan agreement required MASHINSKY to post additional collateral in the form of his equity interest in Celsius and required that he repay the loan in full within 48 months.

21.     Ultimately, ALEXANDER MASHINSKY, the defendant, neither repaid the loan nor consummated the purchase of the 117 million unsold CEL.  Instead, in or about April 2020,

Celsius decided to retain the 117 million CEL and place those tokens in Celsius's treasury, effectively nullifying the prior loan agreement and doubling down on Celsius's violation of the terms of its own whitepaper. Initially, Celsius maintained the 117 million tokens in a segregated account and placed restrictions on Celsius's use of these tokens. In or about December 2020, however, Celsius removed any such restrictions regarding the use of the 117 million tokens, effectively returning the 117 million tokens to Celsius's treasury for use at Celsius's discretion.

22. In the end, neither ALEXANDER MASHINSKY, the defendant, nor any entity subject to his control, ever had to satisfy the purported loan agreements, and the 117 million CEL went unsold. Neither MASHINSKY nor Celsius ever disclosed that, contrary to the representations made publicly by MASHINSKY, 117 million CEL made available during the ICO had not been sold, or that Celsius had violated the terms of its whitepaper by returning these tokens to the treasury rather than destroying the unsold tokens and taking them out of circulation. Nor did MASHINSKY or Celsius ever correct MASHINSKY's prior false public statements that Celsius had raised $50 million through the ICO.

23. ALEXANDER MASHINSKY, the defendant, fully understood that Celsius had, in truth and in fact, raised only approximately $32 million in connection with the CEL token ICO and that a portion of the tokens available for sale had gone unsold. Nevertheless, throughout his tenure as Celsius's CEO, MASHINSKY publicly and repeatedly claimed, falsely, that Celsius had raised $50 million in connection with the CEL token ICO. Indeed, as late as in or about November 2021, MASHINSKY continued to falsely claim in public statements that Celsius had raised $50 million from the ICO.

*MASHINSKY's Misrepresentations Regarding Profitability and Revenue-Sharing*

24. ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading statements about one of the core tenets of Celsius's overall business model and the

11

sustainability of that business—that Celsius was profitable and that the high reward rates that Celsius paid to its customers on a weekly basis reflected its earnings. The extent to which Celsius was profitable was relevant and material to customers' decisions to invest in the Earn program, since Celsius' profitability would determine whether Celsius could make good on its promised yields and whether customers would be able to recover their assets if they decided to withdraw from the program. The profitability of the platform also informed Earn customers' decisions about how to receive the return on their investment. Some customers elected to receive the profits from their investments in CEL rather than in Bitcoin or other widely traded cryptocurrencies because they believed MASHINSKY's claims that Celsius was profitable and because the value of CEL was supposed to be a proxy for the overall strength and health of Celsius. Similar considerations informed the trading decisions of purchasers of CEL. Customers of Celsius's Borrow program chose to commit their collateral to Celsius in exchange for loans based on an assessment of the risk to which their collateral would be subject during the pendency of the loan. That risk assessment was informed by MASHINSKY's statements about the profitability of the platform.

25.     Yet representations made by ALEXANDER MASHINSKY, the defendant, about Celsius's profitability were false. In reality, and as MASHINSKY knew, Celsius did not earn enough yield to support the high weekly reward rates paid to customers and Celsius was an unprofitable company for much of its existence. Internally, MASHINSKY regularly discussed with other Celsius executives that the company had serious financial problems—including that the company was not profitable and not able to generate sufficient yield on its customers' assets to support its high reward rates. But publicly, at the same time these concerns about profitability and sustainability were being raised inside Celsius, MASHINSKY presented Celsius as a profitable

and financially stable company that was a safe and secure place for customers to earn yield on their crypto assets.

26.    ALEXANDER MASHINSKY, the defendant, also falsely claimed that Celsius returned 80 percent of its revenues back to Celsius customers in the form of the weekly rewards payments, retaining the remaining 20 percent of its revenues to fund its operations and as profit. This representation was false.  In truth, and as MASHINSKY knew, for the vast majority of Celsius's existence, Celsius did not even perform a calculation when setting its rewards rates to determine what 80 percent of revenue would be.  Instead, Celsius determined its rewards rates primarily based on marketing concerns, looking at its competitors' rates and trying to beat them. As a result, Celsius's weekly rewards rates bore little relationship to Celsius's revenue streams. Sometimes, Celsius's rewards to customers fell well below 80 percent of its revenues—rendering MASHINSKY's claims that Celsius was sharing 80 percent of its revenues with its customers false.  But across Celsius's existence, Celsius's rewards payments were well in excess of 80 percent of its revenues, making its high rewards rates unsustainable in the long-term.  Internal Celsius data presented to MASHINSKY, other Celsius executives, and Celsius's Board of Directors showed that Celsius's reward payments for 2021 represented approximately 120 percent of its revenue.  In other words, Celsius paid out far more in rewards than it had even earned in revenues, while telling customers that the high rewards were not subsidized and were based on Celsius's profitable business model.  Despite being repeatedly warned by other Celsius employees and executives that Celsius's rewards rates were too high and not sustainable because Celsius was not generating enough yield to support them, MASHINSKY resisted lowering rewards rates and continued to publicly claim that Celsius's rewards rates were determined based on the yield it generated, which, as MASHINSKY knew, was false.

27.     In non-public contexts, ALEXANDER MASHINSKY, the defendant, and other Celsius executives described  the relationship between rewards and yield in terms that were almost the exact opposite of the false and misleading statements MASHINSKY made in public to customers and potential customers.  For example, on or about June 9, 2021, RONI COHEN-PAVON, the defendant, stated that the 80 percent return claim was a "marketing statement" and that Celsius's customers have "zero exposure" to any vagaries in the amount of yield Celsius could generate.  In the same conversation, MASHINSKY said that Celsius "pay[s] out of our balance sheet if we cannot create yield" and characterized the rewards rates as a "balance sheet liability to all these retail lenders," rather than as a percentage of revenue, as he publicly claimed. MASHINSKY further admitted that for "most of" 2019, Celsius had "paid more than 100 percent," calling it an example of "where we tried to build our community and effectively take the loss." MASHINSKY never made similar acknowledgments to the public; instead, he routinely and falsely stated, for example, that "we're only paying what we earn."

28.     ALEXANDER   MASHINSKY,   the   defendant,   misrepresented   Celsius's profitability and how Celsius supported its high rewards payments throughout his tenure as CEO. For example, in or about May 2020, while he was being presented with internal financial data that showed that Celsius was not profitable, had not been profitable in 2019, and that "[e]xpenses are way more than revenue," MASHINSKY falsely stated to the public in his AMAs that "Celsius is profitable right now, and we announced we were profitable for 2019, we're profitable month to month."  Similarly, in or about 2022, after MASHINSKY had been repeatedly presented with financial data showing that Celsius was not profitable and that the yield that Celsius was earning deploying customers' assets was inadequate to support its high rewards rates, MASHINSKY still continued to falsely claim in his public statements that Celsius's reward rates

14

were based on its investment earnings and that its rates were sustainable, including, for example claiming: "Remember, we get institutions to pay us so we can pay you. When in history have institutions paid the average person anything? They don't like it, believe me, they hate paying us that yield. Right. And then we take most of it and deliver it to you."

29.     Celsius also suffered huge and undisclosed losses that were fundamentally inconsistent with its public claims of profitability, as ALEXANDER MASHINSKY, the defendant, was well aware. These losses at times cut so far into any purported profits that Celsius was generating that Celsius effectively had to use other customers' deposits to continue to pay out its unsustainably high rewards rates. For example, in or about early 2021, MASHINSKY and other Celsius executives discovered that Celsius had a sizable "hole" in its balance sheet representing an asset-liability mismatch caused primarily by a shortfall of hundreds of millions of dollars' worth of Bitcoin. This hole had been caused, at least in part, by Celsius making large purchases of CEL using Bitcoin deposited by its customers. Had these customers requested withdrawals of the Bitcoin they had deposited, Celsius would have had insufficient Bitcoin available to satisfy redemption demands. Celsius had to replace these missing customer crypto assets by purchasing them in the market, but because the price of Bitcoin had risen substantially, Celsius suffered a sizable loss in the process. Multiple Celsius employees and executives brought the asset-liability mismatch to MASHINSKY's attention during the first half of 2021. Nonetheless, MASHINSKY continued to claim publicly during this time: "We are profitable. . . . The yield that is generated is actual yield. It's not subsidized. It's not paid with either investors' money or some tokens that you printed or whatever."

30.     Even as Celsius's financial condition deteriorated from in or about late 2021 through Celsius's "Pause" in June 2022, ALEXANDER MASHINSKY, the defendant, continued

to misrepresent Celsius' profitability.  For example, Celsius's Chief Financial Officer informed MASHINSKY in late April 2022, "we are hemorrhaging $7.5mm pre-tax losses each week" and that Celsius ran "a real risk of not returning to profitability quickly enough."  During 2022, MASHINSKY repeatedly discussed with other Celsius executives that Celsius needed a strategy to get back to profitability or "break even."  In early May 2022, an internal presentation to Celsius's Board of Directors referenced that Celsius had suffered a pre-tax loss of approximately $800 million in 2021.  Despite regular discussions about the fact that Celsius was not profitable in 2022 and was not earning sufficient yield to support its high rewards rates, MASHINSKY nevertheless continued to publicly claim that Celsius was in a strong financial position and earned the purported "yield" that it distributed to customers through its rewards.  For example, in an AMA on or about March 4, 2022, MASHINSKY falsely stated: "Celsius is trying to do something very simple.  Okay?  How about we charge borrowers 9 percent and pay users 7 percent?  Right?  So most of the yield goes to the community or to the coin owners."  Other Celsius executives scrubbed the statement from the recording of the AMA that was later posted to Celsius's website.

*MASHINSKY's Misrepresentations Regarding Celsius's Purportedly Market-Neutral Strategy*

31.    In his public statements, ALEXANDER MASHINSKY, the defendant, repeatedly and falsely claimed that Celsius earned yield by deploying customers' crypto assets in a safe and secure manner.  MASHINSKY regularly downplayed the risks that Celsius's customers were exposed to by investing their crypto assets with Celsius by assuring them that Celsius was not making so-called "directional bets"—that is, gambling on the future value of cryptocurrencies by taking long or short positions in various crypto assets—but instead was earning yield with Celsius customer funds through a market-neutral strategy that did not depend on the prices of particular crypto assets rising or falling.  In fact, as MASHINSKY well knew, Celsius was not market-neutral

and was regularly using customer coins to take risky bets on the future value of various crypto assets, often at MASHINSKY's express direction. Certain of these bets resulted in significant losses of Celsius customers' assets.

32.     For example, in or about the spring of 2019, Celsius took a short position in Bitcoin at the direction of ALEXANDER MASHINSKY, the defendant, based on MASHINSKY's personal view that the price of Bitcoin would decrease. In or about 2021, once Celsius opened accounts on another cryptocurrency exchange, Celsius specifically created subaccounts called "Directional1" and "Directional2," which were for the purpose of taking directional risk. On another occasion in or about July 2021, MASHINSKY told a Celsius trader "[w]anted your team to try and use momentum trading to get rid of more [Grayscale Bitcoin Trust] and ETHE" and added that "[i]f markets are crashing or running up and you can sell the security and then use the price gaps to buy cheaper then go ahead and do it." The trader responded to MASHINSKY, "What's the biggest loss you accept? No matter how we structure those momentum trades we would take a directional bet." An internal Celsius presentation from in or about February 2022 noted, "Directional trading was a widespread practice before September 2021 and was known and accepted by senior management, including risk. It was presented and discussed in ExCo [Executive Committee], ALCO [Assets and Liabilities Committee), and RC [Risk Committee] and there is extensive supporting evidence."

33.     In or about 2022, ALEXANDER MASHINSKY, the defendant, continued to order Celsius to engage in directional trading. In or about January 2022, MASHINSKY knew that Celsius's trading desk had taken directional bets that exceeded its own risk limits. That month, MASHINSKY himself took control of Celsius's trading at one point and directed that Celsius's traders take a large directional bet in Bitcoin, overruling concerns raised by others at Celsius,

including Celsius's risk department.  Internal WhatsApp messages between Celsius employees during this period show that employees were concerned about this trading, with one asking, "seems like Alex is unilaterally trading large positions of our book? . . . So at what point do we seek outside intervention to get the thing under control."  The trading that MASHINSKY directed in late January 2022 ultimately caused a large loss to Celsius of tens of millions of dollars.

34.     Even after the events of late January 2022, ALEXANDER MASHINSKY, the defendant, continued to falsely state that Celsius did not engage in directional trading.  For example, as late as in or about April 2022, even after years of undisclosed directional trading within Celsius, much at MASHINSKY's own direction, MASHINSKY stated during a CNBC interview, "We are what you call a delta-neutral strategy. . . . Celsius doesn't bet on the market going up or down."

*MASHINSKY's Misrepresentations Regarding Uncollateralized Loans*

35.     In his public statements, ALEXANDER MASHINSKY, the defendant, also repeatedly misrepresented other core aspects of Celsius's business in an effort to falsely assure customers that their crypto assets would be deployed in a safe and secure manner.  MASHINSKY repeatedly publicly claimed that one of the primary ways that Celsius earned yield using customers' assets was by offering loans using customers' assets to large, credible institutional counterparties, as well as by offering retail loans.  MASHINSKY repeatedly and falsely claimed that all of the loans extended by Celsius were either fully or partially collateralized and that Celsius did not offer uncollateralized loans to counterparties, which MASHINSKY touted as evidence that Celsius earned yield using Celsius customers' assets in a conservative, safe, and secure fashion that did not place customers' assets at undue risk of loss.

18

36.     But in reality, as ALEXANDER MASHINSKY, the defendant, knew, at the very same time MASHINSKY made these statements, uncollateralized loans made up a substantial and growing percentage of Celsius's institutional loan portfolio.   MASHINSKY was regularly presented with granular information regarding Celsius's uncollateralized loans in meetings with other Celsius executives, including, at regular meetings of Celsius's Risk Committee. MASHINSKY also knew that Celsius's uncollateralized loans represented a substantial portion of its institutional lending business.  For example, a November 28, 2021 Risk Committee presentation reflected that Celsius had a total of approximately $1.8 billion in unsecured loans across 21 separate clients, which represented approximately 39 percent of Celsius's institutional loan portfolio.

37.     ALEXANDER MASHINSKY, the defendant, had been warned by other Celsius employees not to make false statements regarding the fact that Celsius did not offer uncollateralized loans.  For example, in or about November 2021, a Celsius executive who specifically dealt with regulatory issues wrote to MASHINSKY regarding the upcoming publication of an interview with MASHINSKY in a magazine.  In a draft of the article, MASHINSKY was quoted as saying, "[o]ne way the company protects funds is by always requiring its borrowers to put up more than 100 percent of the value of their loan in collateral in another asset."  With respect to this statement, the Celsius executive emailed MASHINSKY, in bold, "**this is not true, and we can not say that**."   Nevertheless, despite this and other admonitions, MASHINSKY continued to claim that Celsius was not offering uncollateralized loans.  For example, during an April 2022 interview with CNBC, MASHINSKY was specifically asked if Celsius was offering uncollateralized loans, and MASHINSKY falsely responded that

Celsius's institutional business had "under collateralized, but we don't offer any non-collateralized loans."

*MASHINSKY's Misrepresentations Regarding Counterparty Defaults*

38.     ALEXANDER MASHINSKY, the defendant, in an attempt to portray Celsius's lending practices and due diligence process as conservative and sound, repeatedly and falsely claimed that Celsius had never had an institutional borrower default on a loan.  In reality, and as MASHINSKY knew, multiple institutional borrowers had defaulted on their loans from Celsius by the time that MASHINSKY was publicly stating otherwise.

39.     From at least in or about early 2021, ALEXANDER MASHINSKY, the defendant, became aware of an institutional borrower defaulting on its loan from Celsius.  MASHINSKY was involved in numerous conversations and meetings where this default was referenced.  Also in or about early 2021, MASHINSKY learned that a second counterparty defaulted on its loan from Celsius, which resulted in Celsius sending a demand letter to the counterparty notifying it of the default.  Nevertheless, MASHINSKY publicly stated on numerous occasions after he had full knowledge of these institutional defaults that Celsius had never had any such defaults.  Indeed, MASHINSKY touted the fact that Celsius had had no institutional counterparties default as evidence of Celsius's superior lending practices.  By way of example, in an AMA on or about July 9, 2021, MASHINSKY stated, "We manage risk appropriately and again, I say that every week, this week is a great time to say it, we did not have any institutional defaults."

*MASHINSKY's Misrepresentations Regarding Regulatory Clarity*

40.     In his effort to induce retail crypto asset users to deposit their crypto assets with Celsius, ALEXANDER MASHINSKY, the defendant, also repeatedly and falsely assured the public that Celsius had clarity and guidance from government regulators, when in fact, Celsius did

not have any such clarity and was under substantial regulatory scrutiny in multiple jurisdictions both in the United States and abroad.

41.     For example, ALEXANDER MASHINSKY, the defendant, is quoted in a published interview in or about December 2021 as falsely stating, "The regulators looked into us and said these guys know what they're doing." Similarly, in or about April 2022, MASHINSKY falsely stated during an AMA that "there's not—no legal issues at least with the services that Celsius provides or so," which statement was subsequently edited out of the recorded version of the AMA posted by Celsius online. In truth and in fact, MASHINSKY knew that Celsius faced substantial regulatory issues and did not have regulatory approval of its business. By late 2021, after the United States Securities and Exchange Commission (the "SEC") commenced an investigation of Celsius, MASHINSKY was expressly discussing with RONI COHEN-PAVON, the defendant, that Celsius should reach a settlement with the SEC. Similarly, MASHINSKY was present for a meeting with foreign regulators in or about June 2021 during which the regulators informed Celsius that Celsius's business model did not comply with local law.

*MASHINSKY's Misrepresentations Regarding Liquidity*

42.     ALEXANDER MASHINSKY, the defendant, repeatedly falsely represented that Celsius's customers were assured that Celsius would always have enough assets on hand to meet customer's withdrawal demands. MASHINSKY contrasted Celsius from traditional banks in this regard, falsely claiming that Celsius could not be subject to a "run on the bank." For example, in or about April 2021, MASHINSKY stated in an AMA: "So a run on the bank—normally, because banks have fractional reserves, they lend 20, 30, 50 times more than the money they have, there is a run on the bank. A run on the bank cannot happen at Celsius because Celsius never lends more than what it has, right? We cannot do legally, we're not allowed to create money or do fractional

21

reserves, so at any moment we always have enough coins and enough collateral and so on to return all the assets to all of our users."  MASHINSKY further falsely claimed during this same AMA that Celsius had a daily process by which it ensured that "we have more coins than what we owe the community" and that no traditional bank could make such an assurance "because they never have enough assets to return for you if there is a run on the bank."

43.     Even before Celsius's bankruptcy proved the falsity of the claims by ALEXANDER MASHINSKY, the defendant, it was clear from Celsius's internal financial analyses that Celsius did not have more assets than deposits such that it could satisfy a demand for all customer assets.  For example, the company's audited financials from February 2020 showed that Celsius did not have enough tangible assets to cover all customer deposits, and that Celsius could only be said to have enough assets to cover deposits if it included "intangible assets" such as CEL, the value of which was speculative at best.  MASHINSKY had access to the audited financials and was involved in the process relating to their preparation.

*MASHINSKY's Misrepresentations Leading Up to the June 12, 2022 "Pause"*

44.     ALEXANDER MASHINSKY, the defendant, continued to misrepresent the financial health of the Celsius platform in the weeks leading up to the June 12, 2022 "Pause" on withdrawals.  As a result of the volatility in the crypto markets in or about early May 2022 and the weeks that followed, Celsius customer withdrawals increased substantially.   In his public statements, MASHINSKY continued to assure Celsius customers that Celsius was in a strong financial position and had sufficient liquidity to meet all customer withdrawal demands.

45.     In the lead up to the June 12, 2022 "Pause," ALEXANDER MASHINSKY, the defendant, also sought to allay Celsius customers' concerns about the solvency of the platform by publicly stating that he, like Celsius's customers, held a huge amount of his own wealth on the

Celsius platform and was keeping his assets with Celsius. During an AMA on or about May 27, 2022, for example, MASHINSKY stated, "we all have our money in the same platform. I have millions of dollars of my money on the platform as well. And obviously, we're in it together."

46.     What ALEXANDER MASHINSKY, the defendant, did not tell Celsius's customers was that, in fact, in the last days and weeks, he had withdrawn a significant portion of his non-CEL assets from Celsius's platform. On or about May 10, 2022, MASHINSKY held millions of dollars' worth of crypto assets on Celsius's platform excluding his CEL holdings. On or about May 15, 2022, MASHINSKY withdrew approximately $2.9 million worth of non-CEL crypto assets from his Celsius accounts. And on or about May 27, 2022, the same day that MASHINSKY said "we're in it together," MASHINSKY withdrew an additional approximately $5.1 million worth of non-CEL crypto assets from his Celsius accounts. By on or about May 27, 2022, MASHINSKY had removed almost all of his non-CEL crypto assets from the Celsius platform, leaving MASHINSKY with only approximately $1 million worth of non-CEL assets on Celsius's platform by the end of May 27, 2022.

47.     Indeed, ALEXANDER MASHINSKY, the defendant, was internally discussing with other Celsius executives that Celsius was in trouble. For example, a June 2, 2022 slide deck entitled "Business Outlook—Restructuring, Capital and Liquidity Update" stated: "Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints. The current business model is not sustainable." Days later, on or about June 7, 2022, Celsius issued a blog post entitled "Damn the Torpedoes, Full Speed Ahead." The blog post falsely stated, among other things, that "Celsius has the reserves (and more than enough ETH) to meet obligations, as dictated by our comprehensive liquidity risk management framework."

## The CEL Manipulation Scheme

48.     A core feature of Celsius's business was its native cryptocurrency token, CEL. Celsius's whitepaper—which laid out the basic concept for Celsius's business model and the CEL token—described CEL as "the backbone of the Celsius Network." After the CEL token's creation in or about 2018 and throughout his tenure as CEO of Celsius, ALEXANDER MASHINSKY, the defendant, frequently discussed CEL in public and equated the value of CEL with the strength of Celsius's overall business. MASHINSKY encouraged the public to purchase CEL and "HODL"— an acronym for "hold on for dear life." As the price of CEL began to rise, MASHINSKY touted the rise in CEL's price as evidence that Celsius was a strong and growing business. In his public statements, MASHINSKY also encouraged customers of Celsius's Earn program to elect to receive their rewards in CEL rather than receiving rewards in the form of other crypto assets. At MASHINSKY's direction, Celsius incentivized Celsius Earn customers to receive their weekly rewards in CEL by, at times, offering higher reward rates to customers who chose to receive rewards in CEL rather than in other crypto assets.

49.     Over time, CEL became crucial to Celsius's overall illusion of financial health, particularly after Celsius, at the urging of ALEXANDER MASHINSKY, the defendant, made the decision to add the CEL held in the company's treasury to Celsius's balance sheet. But while MASHINSKY touted CEL as an investment opportunity to the public and frequently cited CEL's rising price, in reality, and unbeknownst to market participants and to Celsius's customers, MASHINSKY, along with RONI COHEN-PAVON, the defendant, and certain other Celsius employees and executives, orchestrated a scheme to manipulate the price of CEL by causing Celsius to conduct massive purchases of CEL, without disclosing its identity as the purchaser, in the open market to artificially support and artificially inflate the price of the CEL. A portion of

24

this CEL purchasing was carried out using customer assets and resulted in further strain on Celsius's already weak financial situation, but MASHINSKY nonetheless persisted in his plan to divert Celsius's assets into inflating the price of CEL.

50.     ALEXANDER MASHINSKY, RONI COHEN-PAVON, the defendants, and their co-conspirators, artificially inflated the price of CEL to achieve multiple objectives. First, because MASHINSKY frequently equated the price of CEL with the strength of Celsius's business, artificially inflating the price of CEL allowed MASHINSKY to publicly tout Celsius's future prospects to the public. Second, artificially inflating the price of CEL allowed MASHINSKY, COHEN-PAVON, and other Celsius executives to sell their own personal CEL holdings for a substantial profit, with MASHINSKY reaping approximately $42 million in proceeds from his sales of CEL, and COHEN-PAVON reaping at least $3.6 million in proceeds from his sales of CEL. Third, artificially inflating the price of CEL allowed Celsius—which held hundreds of millions of CEL in its treasury—to present a stronger balance sheet. Fourth, inflating the price of CEL made it more likely that lenders would accept CEL as collateral from Celsius.

*MASHINSKY Causes Celsius to Increase CEL Purchases to Artificially Inflate the Price*

51.     One of the core features of CEL was that Celsius would purchase in the market a portion of the CEL it owed customers in weekly rewards, rather than simply distributing the CEL that Celsius had in its treasury to users as rewards. But in or about 2018 and through much of 2019, Celsius conducted relatively limited market purchases of CEL. CEL's price remained low during this period, and by the end of October 2019, CEL was trading at approximately $0.05 per token.

52.     Beginning in or about November 2019, however, ALEXANDER MASHINSKY, the defendant, and others at Celsius began discussing internally how to execute Celsius's market

purchases of CEL to maximize the price impact on CEL. In or about May 2020, MASHINSKY explained in an internal email to certain others at Celsius, "Our job is to protect CEL," and further stated, "[i]t's a win win scenario, the only we loose [sic] is if CEL price drops a lot and people get nervous and keep selling. We can protect against this scenario."

53. While for a period of time up until mid-2020 Celsius left open how much CEL it would buy in the market to fulfill weekly rewards versus pay from its treasury, on or about June 19, 2020, ALEXANDER MASHINSKY, the defendant, publicly committed that Celsius would "stop using the treasury to pay interest to our community" and would start "buying almost everything, almost 100 percent . . . . almost 100 percent from the markets." But while MASHINSKY had publicly committed that Celsius would purchase in the market the amount of CEL necessary to pay customers their weekly CEL rewards, beginning in or about July 2020, Celsius, at MASHINSKY's direction and with MASHINSKY's knowledge, began to conduct market purchases of CEL well in excess of the amount of CEL it needed to pay customers their weekly rewards, thereby misleading the public and market participants as to how active Celsius was in the market for CEL. The purpose of this undisclosed excess buying was to artificially support and inflate the price of CEL.

54. At times ALEXANDER MASHINSKY, the defendant, personally gave directives that Celsius should conduct market purchases of CEL in excess of the CEL necessary to pay customers their weekly CEL rewards in order to support the price. For example, in or about July 2020, MASHINSKY directed that Celsius should be prepared to conduct large market purchases of CEL to support CEL's price in light of an anticipated negative news article about Celsius that was expected to be published imminently. On the date that MASHINSKY expected the article to be published, MASHINSKY, using WhatsApp, directed another Celsius executive with trading

26

authority to purchase CEL in excess of what was necessary to fulfill Celsius's weekly rewards obligations if the CEL price "drops a lot." On the date that the article was ultimately published, Celsius—consistent with MASHINSKY's directive—conducted large purchases of CEL and the price of CEL remained relatively stable as a result.

55.     Between in or about late July 2020 and the end of 2020, Celsius purchased more CEL in the market than was necessary to pay weekly CEL rewards, every single week. During this period, Celsius was a net purchaser in the market of approximately 22 million CEL tokens in excess of the amount of CEL necessary to fulfill its weekly rewards obligations, representing approximately three times more CEL than Celsius needed to pay customers their weekly CEL rewards. These excess purchases—which bore no relation to Celsius's distribution of weekly rewards of CEL—were designed to artificially support and inflate the price of CEL. The strategy orchestrated by ALEXANDER MASHINSKY, the defendant, and his co-conspirators was effective, and the price of CEL rose dramatically from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.

56.     During the period between in or about July 2020 and the end of 2020, ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements regarding the nature and extent of Celsius's CEL market activity, falsely representing that Celsius was purchasing CEL in the market primarily to fulfill its weekly CEL rewards obligations, and not revealing that Celsius was actually buying CEL well in excess of the amounts needed for weekly rewards to artificially support the price. For example:

        a.      During an AMA on or about September 11, 2020, ALEXANDER MASHINSKY, the defendant, touted the fact that CEL's price was increasing, stating: "CEL token is just rocketing and it's all organic demand. There's no market making or manipulation or wash

27

trading or anything." MASHINSKY further stated during this same AMA that CEL had one of the highest trading volumes of any crypto token, which MASHINSKY said "tells you that the community is much larger, much more stable and is a HODLer community." While MASHINSKY claimed that the dramatic price increase in CEL was due to "organic" demand, in reality, and as MASHINSKY knew, the price increase was due to Celsius's own massive market purchases.

b.    Similarly, on or about November 26, 2020, MASHINSKY sent a tweet from his Twitter account that falsely equated the amount of CEL that Celsius would purchase in the market with how much CEL Celsius users were going to receive in weekly CEL rewards, stating in relevant part: "I bought #CEL token at $2.05 if you were waiting for the price of @CelsiusNetwork token to tank it just did. We just published our total assets, do the math how much $CEL we will need to buy next week all time record users, deposits and Celsians earning in CEL."

*MASHINSKY Personally Purchases CEL to Manipulate the Price of CEL*

57.    In addition to causing Celsius to purchase huge volumes of CEL for the purpose of artificially supporting and inflating CEL's price, at times ALEXANDER MASHINSKY, the defendant, personally purchased CEL using his own accounts and wallets in order to manipulate CEL's price.

58.    For example, on or about October 21, 2020, ALEXANDER MASHINSKY, the defendant, communicated with a trader working for Celsius regarding a large market selloff that was occurring in the CEL market. When MASHINSKY learned that Celsius did not have a substantial amount of funds available in its accounts with centralized exchanges to purchase enough CEL to artificially support the CEL price during the selloff, MASHINSKY proposed

personally buying CEL to artificially support the price.  MASHINSKY asked the trader to provide

him with trading instructions, including asking "what size swap orders for ETH will have the most

impact." After advising that he had swapped 100 ETH for CEL, MASHINSKY told the trader,

"[l]et's see if we need more."  Later that day, the Celsius trader advised MASHINSKY, "CEL

$1.30 . . . you saved the day Alex."  Another Celsius executive thanked MASHINSKY for

supporting the price of CEL during the selloff, and MASHINSKY advised this executive, "I

bought 300 ETH in three orders. [The trader] gave me the instructions [smiley emoji]."  In total,

on or about October 21, 2020, MASHINSKY net purchased approximately 149,000 CEL, which

represented the second largest amount of CEL that MASHINSKY ever purchased in the market.

      59.    ALEXANDER MASHINSKY, the defendant, purchased CEL in the market on

other occasions in or about 2020 and 2021 for the purpose of artificially manipulating the price of

CEL, particularly during periods when large selloffs of CEL were occurring.

*MASHINSKY's False Public Statements in Early 2021*

      60.    By early 2021, the price of CEL had increased dramatically to approximately over

$6.50 per token. ALEXANDER MASHINSKY, the defendant, understood that this dramatic price

increase was the result of Celsius's own market purchases that had artificially inflated the price.

The rising price of CEL meant that Celsius would have to spend more money every week

purchasing CEL to fulfill weekly rewards.  This caused MASHINSKY to instruct another Celsius

executive and a Celsius trader to temporarily cease purchasing CEL in the market to fulfill weekly

rewards until the price dropped by at least 30 percent.  Even though MASHINSKY had publicly

committed that Celsius would purchase all the CEL it needed to fulfill weekly rewards in the

market, on or about January 3, 2021, he instructed a Celsius trader "we will be paying all CEL

from treasury until further notice.  Please stop buying any CEL for the weekly interest unless it drops 30% or more from the $6.70 levels."

61.     In fact, despite giving this directive to cease purchasing CEL in the market, ALEXANDER MASHINSKY, the defendant, continued to publicly state that Celsius was buying all the CEL it needed to fulfill weekly rewards in the market.  For example, MASHINSKY falsely stated in an AMA on or about January 8, 2021, that "we all know more users, more deposits, means we're earning more interest, which means we have to be buying more CEL tokens."  On or about February 19, 2021, MASHINSKY again falsely stated that Celsius's market purchases were driven by how much Celsius customers were earning in CEL, stating, "when they earn more in CEL what does it mean? We have to go and buy more CEL in the markets."

62.     During an AMA on or about March 19, 2021, ALEXANDER MASHINSKY, the defendant, again misrepresented the nature and extent of Celsius's market activity and artificial control over the CEL price, stating: "We obviously want CEL token to go higher in price, but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that."  MASHINSKY further falsely stated during this AMA: "I think 56.5% of [Celsius users] are earning in CEL. Those are the drivers. That's what's driving adoption and demand—creates demand for the CEL token. Those are the biggest drivers compared to buyers and sellers."  In truth, MASHINSKY knew that Celsius's own purchasing—including purchases well in excess of what was necessary to fulfill its weekly CEL rewards obligations—was the primary driver of the inflated price of CEL.

63.     After ALEXANDER MASHINSKY, the defendant, and other Celsius executives discovered the "hole" in Celsius's balance sheet in or about March 2021—which had been, in part, precipitated by Celsius's large market purchases of CEL using customer assets—Celsius

temporarily stopped buying CEL in the market altogether between in or about late March 2021 through mid-April 2021.  MASHINSKY did not disclose the discovery of the "hole," nor did he disclose that Celsius had discovered it was using customers' assets to purchase CEL in the market. Moreover, MASHINSKY did not disclose that Celsius had temporarily stopped buying CEL, which rendered false his prior representations that Celsius would purchase every week in the market the CEL it required to pay customers their weekly CEL rewards.

*MASHINSKY, COHEN-PAVON, and Others Continue the CEL Token Manipulation Scheme*

64.     Beginning in or about mid-April 2021 and continuing through the end of 2021, Celsius resumed buying huge quantities of CEL token in the market well in excess of what Celsius required to fulfill its customers weekly CEL rewards in order to artificially support and inflate the price of CEL.  In total for 2021, Celsius was a net purchaser in the market of approximately 82 million CEL tokens, while Celsius only distributed approximately 26.5 million CEL in rewards to its customers in 2021.  In other words, Celsius purchased over triple the volume of CEL that it required to fulfill weekly rewards.  Celsius spent approximately $416 million in 2021 alone purchasing CEL in the market, whereas Celsius's CEL rewards obligations were only approximately $144 million worth of CEL.

65.     During this time period, ALEXANDER MASHINSKY, the defendant, continued to make false and misleading public statements in which he linked Celsius's purchases of CEL in the market with the amount of CEL that Celsius needed to distribute to its customers as rewards. In reality, the amount of CEL that Celsius purchased in the market was far in excess of the amount needed to pay weekly rewards and was simply driven by the objective of MASHINSKY, RONI COHEN-PAVON, the defendant, and their co-conspirators to artificially support the CEL price. For example:

a.      MASHINSKY falsely stated during an AMA on or about December 10, 2021, "So we continue to buy CEL tokens for the community every week based on how much you want to earn. So again, the more you earn in CEL, the more we have to buy." While MASHINSKY acknowledged during this same AMA that, at times, Celsius purchased more CEL than was necessary to pay Celsius users their weekly CEL rewards, he falsely claimed that most of Celsius's purchases in the market were "to pay the community, to pay the people who earn in CEL" and that Celsius only "once in a while" conducted CEL purchases above and beyond what was needed for CEL rewards. In reality, Celsius's purchases in excess of the amount required for weekly CEL rewards was the majority of Celsius's purchases in 2021. Such excess purchasing did not merely occur "once in a while."

b.      On or about January 7, 2022, MASHINSKY again falsely claimed that the amount of CEL Celsius purchased in the market was based on and determined by how much CEL users were earning in CEL, stating, "[t]he piece of how much we buy CEL has nothing to do with Celsius — Celsius doesn't decide how many CEL tokens to buy and then how many of them to burn." MASHINSKY added, "[t]he more of you earn in CEL the more of you can direct how much we buy and how much we burn."

66.      While ALEXANDER MASHINSKY, the defendant, was externally messaging that Celsius's purchasing in the market was simply a function of how much CEL it needed to distribute to its users, behind the scenes MASHINSKY was frequently discussing the need to purchase CEL to artificially support CEL's price. Beginning in or about September 2021, MASHINSKY placed RONI COHEN-PAVON, the defendant, in charge of managing and directing Celsius's weekly purchases of CEL in the market. COHEN-PAVON directed Celsius to purchase CEL in excess of its weekly rewards obligations in order to artificially support the price of CEL, and frequently

communicated with MASHINSKY about Celsius's efforts to artificially manipulate the price of CEL. For example:

       a.      On or about October 30, 2021, as the price of CEL was dropping, MASHINSKY and COHEN-PAVON discussed in a WhatsApp communication their efforts to support the price of CEL. MASHINSKY complained to COHEN-PAVON that "every day we have all time record new users joining Celsius yet CEL [p]rice is going down" and further noted "[t]he price will not take care of itself if everyone will just get scared and sell." COHEN-PAVON responded:

> We're not just sitting and watching the price. We're on it all week and even now [another Celsius executive] and I are live with the market maker. The issue is that people are selling and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions (~8M a week and even more until February 2020) just to keep it where it is. This week we spent 'only' $4M (on top of the rewards) and the price is still going down.

MASHINSKY later stated in this same WhatsApp conversation to COHEN-PAVON, "Does doge coin value real? How about the $5B for Solana. Everyone knows what these tokens are and want to buy them because they think price is going up." COHEN-PAVON further advised MASHINSKY that COHEN-PAVON and certain other Celsius executives "bought [CEL] from our personal money to support the price."

       b.      On or about December 10, 2021, MASHINSKY requested in a WhatsApp communication that COHEN-PAVON provide him with data on how much CEL Celsius had purchased in 2021. COHEN-PAVON later provided MASHINSKY a chart summarizing Celsius's market activity for the year, which, according to COHEN-PAVON, showed that Celsius "bought 23M [million] extra tokens." The chart that COHEN-PAVON provided showed that Celsius's total weekly rewards obligations in CEL for the year to date had been approximately 24.7 million

CEL tokens, and that Celsius had been a net purchaser of approximately 47.8 million CEL tokens that year, even when accounting for the activities of Celsius's over-the-counter ("OTC") desk. COHEN-PAVON thus provided MASHINSKY with a clear summary showing how Celsius had purchased CEL in massive volumes far in excess of the amounts Celsius required to fulfill its weekly CEL rewards to customers. Indeed, according to the summary chart COHEN-PAVON provided to MASHINSKY, Celsius had been a net purchaser of essentially double the CEL tokens that it required to distribute weekly CEL rewards to customers, even when accounting for Celsius's OTC desk, which itself had sold large amounts of CEL.

        c.     On or about December 11, 2021, COHEN-PAVON advised MASHINSKY in a WhatsApp communication that "[a]s of now, no one is buying in the market except for us." COHEN-PAVON further told MASHINSKY in this same WhatsApp communication, "[w]e spent $20M in the last 36 hours (16M to buy out [a known large CEL token holder] and 4M to support in the market). And this is after we're going up and the entire market is going down, people are still selling."

        d.     On or about January 1, 2022, MASHINSKY asked COHEN-PAVON in a WhatsApp communication, "do we need CEL above 5 or we ok?" COHEN-PAVON responded "it was not simple to get it where it is."

*Efforts to Manipulate CEL in 2022*

        67.     In or about 2022, Celsius's market purchases of CEL were substantially lower than they were in 2021, with Celsius only purchasing modestly more CEL than it required to fulfill weekly CEL rewards. Once Celsius's market purchases began to decrease, the price of CEL began to drop. Consistent with an overall drop in crypto prices in early- to mid-May 2022, the price of CEL continued to decrease. ALEXANDER MASHINSKY, the defendant, sought to artificially

support the price of CEL as the selling of CEL in the market increased.  On or about May 12, 2022, MASHINSKY wrote to RONI COHEN-PAVON, the defendant, "let's defend CEL here so we don't loose [sic] all our users."  On or about May 12, 2022, MASHINSKY gave a directive to a Celsius trader that Celsius could purchase up to $5 million worth of CEL to support the price of CEL, and during that week Celsius purchased approximately three times more CEL than it required to distribute weekly CEL rewards to its customers.

68.     In the immediate lead-up to the June 12, 2022 "Pause," ALEXANDER MASHINSKY, the defendant, also considered, but ultimately did not pursue, a plan to further manipulate the price and availability of the CEL token through a "short squeeze" in CEL.

*MASHINSKY's False and Misleading Statements Regarding His CEL Sales*

69.     As ALEXANDER MASHINSKY, the defendant, was causing Celsius to artificially inflate the price of CEL, he was personally selling large volumes of his own holdings in CEL.  MASHINSKY reaped approximately $42 million in proceeds from these sales.

70.     ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements regarding his own personal CEL trading activity, including, in certain instances, claiming that he had not been selling CEL when, in truth and in fact, he had been selling large volumes of his CEL prior to and immediately following these statements.  By way of example:

a.     On or about September 8, 2019, MASHINSKY stated on his Twitter account, "I did not sell any CEL. I buy more every week. Look at that balance of 77m CEL and remember what we told you when it is at $10 a CEL."  In reality, MASHINSKY conducted no purchases of CEL during the period immediately preceding and after making this public statement. To the contrary, MASHINSKY was selling CEL during this period.  On or about August 22

through August 23, 2019, MASHINSKY sold approximately 292,000 CEL, and from or about September 19 through or about September 23, he again sold another 382,000 CEL. MASHINSKY had, in fact, not purchased CEL in the market at all prior to his September 8, 2019 statement.

        b.      On or about November 13, 2020, MASHINSKY stated during an AMA, "CEL token should be at more than $2.00 right now" and "if you think you missed the party because CEL is up a few thousand percent, you know, again, this is not investment advice, I'm not telling you to buy CEL, but I am not selling." In reality, MASHINSKY was a net seller of approximately 280,000 CEL in the week leading up to and including on or about November 13, 2020, and he then went on to net sell approximately another 307,000 CEL in the days that followed the November 13, 2020 AMA.

        c.      On or about November 5, 2021, MASHINSKY addressed "rumors" during an AMA that he had been selling CEL, stating that he actually bought "something like 30,000 CEL token last few days. If you think I'm selling, I'm not selling, I'm buying." In fact, while MASHINSKY had net purchased approximately 29,000 CEL the day prior to the November 5, 2021 AMA, MASHINSKY had been a net seller of CEL in the thirty days leading up to the AMA, net selling approximately 247,000 CEL.

        71.      The large sales of CEL by ALEXANDER MASHINSKY, the defendant, violated Celsius's trading policy, which MASHINSKY had signed in or about July 2020. That policy forbade Celsius executives and directors from selling CEL in excess of $20,000 per day or $50,000 per week. Yet, on numerous occasions, MASHINSKY sold CEL in the market well in excess of these limits and in direct contravention of the trading policy he had signed. Furthermore, Celsius executives at various points warned MASHINSKY that he was in violation of Celsius's policies through his sales, yet he continued to sell large volumes of his personal CEL holdings nevertheless.

**Statutory Allegations**

**COUNT ONE**
**(Securities Fraud)**

The Grand Jury charges:

72.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

73.     From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, to induce investors to purchase an interest in Celsius's Earn Program and to acquire CEL token, MASHINSKY made false and misleading statements about Celsius's financial condition and operations.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT TWO
### (Commodities Fraud)

The Grand Jury further charges:

74.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

75.     From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, willfully and knowingly, directly and indirectly, used and employed, and attempted to use and employ, in connection with a swap, a contract of sale of a commodity in interstate commerce, and for future delivery on and subject to the rules of a registered entity, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 180.1, by: (1) using and employing, and attempting to use and employ, a manipulative device, scheme, and artifice to defraud; (2) making, and attempting to make, an untrue and misleading statement of a material fact and omitting to state a material fact necessary in order to make the statements not untrue and misleading; and (3) engaging, and attempting to engage in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, MASHINSKY engaged in a fraudulent scheme to induce investors to sell their Bitcoin to Celsius in exchange for an interest in Celsius's Earn Program, by making false and misleading statements about Celsius's financial condition and operations.

(Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal
Regulations, Section 180.1; and Title 18, United States Code, Section 2.)

## COUNT THREE
### (Wire Fraud)

The Grand Jury further charges:

76.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

77.     From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MASHINSKY engaged in a fraudulent scheme to induce investors and borrowers to provide their assets to Celsius as part of Celsius's Earn and Borrow programs, to induce investors to receive their rewards payments from Celsius in CEL, and to induce investors to purchase CEL in the market, by making false and misleading statements about Celsius's financial condition and operations, including using interstate wires, some of which transited through the Southern District of New York.

(Title 18, United States code, Sections 1343 and 2.)

## COUNT FOUR
### (Conspiracy to Manipulate the Price of CEL)

The Grand Jury further charges:

78.     The allegations contained in paragraphs 1 through 71 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

79.     From at least in or about 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly, did combine, conspire, confederate, and agree together and with each other to commit offenses against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; market manipulation, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff; and wire fraud, in violation of Title 18, United States Code, Section 1343.

80.     It was a part and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly, directly and indirectly, by use of a means and instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, would and did use and employ, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token.

40

81.     It was further apart and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, willfully and knowingly would and did, directly and indirectly, by the use of the mails and a means and instrumentality of interstate commerce, and of a facility of a national securities exchange, and for a member of a national securities exchange, effected, alone and with one and more other persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, and in connection with a security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a series of transactions in CEL in order to artificially raise the price of CEL and induce others to purchase CEL.

82.     It was further apart and an object of the conspiracy that ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States code, Sections 1343, to wit, MASHINSKY and COHEN-PAVON agreed to and did engage in a scheme to defraud investors in CEL token by manipulating the market for CEL token, making false and misleading statements about Celsius's market activity in CEL, and making false and misleading statements about MASHINSKY's own sales of CEL token.

Overt Acts

83.     In furtherance of the conspiracy and to effect the illegal objects thereof, the

following overt acts, among others, were committed in the Southern District of New York and

elsewhere:

a.      On or about July 14, 2020, ALEXANDER MASHINSKY, the defendant,

instructed another co-conspirator not named herein by electronic message to cause Celsius to

purchase CEL token in the market in order to artificially manipulate the price of CEL.

b.      On or about October 21, 2020, MASHINSKY personally purchased CEL in

the market in order to artificially support the price of CEL.

c.      On or about October 30, 2021, MASHINSKY and RONI COHEN-PAVON,

the defendant, discussed by electronic message a plan to artificially manipulate the price of CEL.

d.      On or about January 7, 2022, MASHINSKY made false and misleading

public statements regarding Celsius's market purchases of CEL.

e.      On or about November 5, 2021, MASHINSKY made false and misleading

public statements regarding his own sales of CEL.

(Title 18, United States Code, Section 371.)

## COUNT FIVE
### (Fraudulent Scheme to Manipulate the Price of CEL)

The Grand Jury further charges:

84.     The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are

hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

85.     From at least in or about 2019 through at least in or about June 2022, in the Southern

District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON,

the defendants, willfully and knowingly, directly and indirectly, by use of a means and

42

instrumentality of interstate commerce and of the mails, and a facility of a national securities exchange, used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 by: (a) employing a device, scheme, and artifice to defraud; (b) making an untrue statement of a material fact and omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in an act, practice, and course of business which operated and would operate as a fraud and deceit upon a person, to wit, MASHINSKY and COHEN-PAVON engaged in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token.

(Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Section 240.10b-5; and Title 18, United States Code, Section 2.)

## COUNT SIX
### (Market Manipulation of CEL Token)

The Grand Jury further charges:

86.     The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

87.     From at least in or about 2019 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, willfully and knowingly would and did, directly and indirectly, by the use of the mails and a means or instrumentality of interstate commerce, and of a facility of a national securities exchange, and for a member of a national securities exchange, effected, alone and with one and more other persons, a series of transactions in a security registered on a national securities exchange, a security not so registered, and in connection with a security-based swap or security-

43

based swap agreement with respect to such security creating actual or apparent active trading in such security, and raising and depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others, to wit, MASHINSKY and COHEN-PAVON engaged in a series of transactions in CEL in order to artificially raise the price of CEL and induce others to purchase CEL.

(Title 15, United States Code, Sections 78i(a)(2) and 78ff; and Title 18, United State Code, Section 2.)

## COUNT SEVEN
### (Wire Fraud — CEL Token Manipulation)

The Grand Jury further charges:

88.    The allegations contained in paragraphs 1 through 71, and 83 of this Indictment are hereby repeated, re-alleged, and incorporated by reference as if fully set forth herein.

89.    From at least in or about 2018 through at least in or about June 2022, in the Southern District of New York and elsewhere, ALEXANDER MASHINSKY and RONI COHEN-PAVON, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, MASHINSKY and COHEN-PAVON engaged in a scheme to defraud investors in CEL token by artificially manipulating the market for CEL token and through making false and misleading statements about Celsius's purchases of CEL token and making false and misleading statements about MASHINSKY's own sales of CEL token, including using interstate wires, some of which transited through the Southern District of New York.

(Title 18, United States code, Sections 1343 and 2.)

44

## FORFEITURE ALLEGATIONS

90.     As a result of committing the offenses alleged in Counts One and Three through Seven of this Indictment as to ALEXANDER MASHINSKY, the defendant, and as a result of committing the offenses alleged in Counts Four through Seven as to RONI COHEN-PAVON, the defendant, the defendants shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28 United States Code, Section 2461(c), any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

91.     If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

   a.     cannot be located upon the exercise of due diligence;

   b.     has been transferred or sold to, or deposited with, a third person;

   c.     has been placed beyond the jurisdiction of the Court;

   d.     has been substantially diminished in value; or

   e.     has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and

Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the

defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney