UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ALEXANDER MASHINSKY and RONI
COHEN-PAVON,

Defendants.

Case No. 23 Cr. 347 (JGK)

**ORAL ARGUMENT REQUESTED**

**DEFENDANT ALEXANDER MASHINSKY'S MEMORANDUM OF LAW IN SUPPORT
OF HIS MOTION TO DISMISS COUNTS TWO AND SIX OF THE INDICTMENT AND
MOTION TO STRIKE SURPLUSAGE**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for Alexander Mashinsky*

**TABLE OF CONTENTS**

STATEMENT OF FACTS ...............................................................................................1

        A.     Background ...............................................................................................1
        B.     Summary of the Charges.........................................................................1

POINT I        THE COMMODITIES FRAUD CHARGED IN COUNT TWO SHOULD BE
DISMISSED AS REPUGNANT TO AND INCONSISTENT WITH THE
SECURITIES FRAUD CHARGED IN COUNT ONE.........................................2

     I.      Relevant Facts Regarding "Earn" Program Allegations ...................................3
     II.     Legal Standard ...............................................................................................4
     III.    The Commodities Fraud Count Is Repugnant To The Securities Fraud Count......5
        A.     Unprecedented Overlapping Charges ...........................................5
        B.     Inconsistent Charging of "the Whole" and "the Parts" of
the Earn Program ...............................................................................6
        C.     The Commodities Fraud Count Should Be Dismissed .............................9

POINT II      COUNT SIX SHOULD BE DISMISSED FOR LACK OF FAIR NOTICE ........11

     I.      Relevant Facts Regarding Alleged Manipulation ...................................12
     II.     The Constitution Demands "Fair Warning" That Proscribed Conduct Was
Criminal ...............................................................................................13
     III.    Mr. Mashinsky Had *No* Warning, Let Alone a Fair One, That Open-Market
Transactions Could Be Criminally Manipulative ...................................14
        A.     The Evolution of Section 9(a)(2): Language of the Statute.....................15
        B.     The Evolution of Section 9(a)(2): Guidance from the Supreme Court......16
        C.     The Evolution of Section 9(a)(2): The Government's Intent-Only
Theory of Manipulation ...............................................................18
     IV.    In The Absence Of Any Notice Of Potential Criminal Penalties, The Court Should
Dismiss Count Six.........................................................................................22
        A.     Void for vagueness ...............................................................23
        B.     Rule of lenity.........................................................................24
        C.     Bar on novel prosecutions.........................................................25

POINT IV     THE COURT SHOULD STRIKE SURPLUSAGE

     I.      Applicable Law...............................................................................................26
     II.     Discussion ...............................................................................................26

CONCLUSION...............................................................................................................28

## TABLE OF AUTHORITIES

### CASES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007) ................................................................................ 19, 20

*CFTC v. Wilson*,
   Case No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) .......................... 18

*Crane Co. v. Westinghouse Air Brake Co.*,
   419 F.2d 787 (1969) ................................................................................ 16, 17, 24

*Dunn v. United States*,
   442 U.S. 100 (1979) ................................................................................ 13

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ................................................................................ 17

*Grayned v. City of Rockford*,
   408 U.S. 104 (1972) ................................................................................ 11

*In re Voyager Digital Holdings, Inc.*,
   649 B.R. 111 (S.D.N.Y. 2023) ................................................................................ 5

*Johnson v. United States*,
   576 U.S. 591 (2015) ................................................................................ 16

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ................................................................................ 16

*Mannix v. Phillips*,
   619 F.3d 187 (2d Cir. 2010) ................................................................................ 23, 24

*Marine Bank v. Weaver*,
   455 U.S. 551 (1982) ................................................................................ 8

*McBoyle v. United States*,
   283 U.S. 25 (1931) ................................................................................ 13, 23

*S.E.C. v. Lek Sec. Corp.*,
   726 F. Supp. 3d 49 (S.D.N.Y. 2017) ................................................................................ 20

*S.E.C. v. Masri*,
   523 F. Supp. 2d 361 (S.D.N.Y. 2007) ................................................................................ 20, 22

*S.E.C. v. Ripple Labs, Inc.*,
   20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ................................ 7, 8, 9

*S.E.C. v. Telegram Grp. Inc.*,
   448 F. Supp. 3d 352 (S.D.N.Y. 2020) ................................................................................ 7

*S.E.C. v. Terraform Labs Pte.Ltd.*,
   23-cv-1346 (JSR), 2023 WL 4858299 (S.D.N.Y. July 31, 2023) ................................................................................ 8

*S.E.C. v. Terraform Labs Pte.Ltd.*,
  23-cv-1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ............................. 9

*S.E.C. v. Unique Financial Concepts, Inc.*,
  196 F.3d 1195 (11th Cir. 1999) ................................................................. 6

*S.E.C. v. Vali Mgmt. Partners*,
  Case No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ........................... 19, 20

*S.E.C. v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ................................................................................ 6

*Santa Fe Industries, Inc. v. Green*,
  430 U.S. 462 (1977) ........................................................................... 11, 17

*Set Capital LLC v. Credit Suisse Group AG*,
  996 F.3d 64 (2d Cir. 2021) .................................................................. 19, 20

*Skilling v. United States*,
  561 U.S. 358 (2010) ............................................................................... 23

*Tcherepnin v. Knight*,
  389 U.S. 332 (1967) ................................................................................ 7

*United States v. Aleynikov*,
  737 F. Supp. 2d 173 (S.D.N.Y. 2010) ....................................................... 10

*United States v. Alfonso*,
  143 F.3d 772 (2d Cir. 1998) ..................................................................... 4

*United States v. Cantrell*,
  612 F.2d 509 (10th Cir. 1980) .................................................................. 4

*United States v. Coburn*,
  439 F. Supp. 3d 361 (D.N.J. 2020) ........................................................ 4, 9

*United States v. Conde*,
  309 F. Supp. 2d 510 (S.D.N.Y. 2003) ....................................................... 4

*United States v. Gilbert*,
  Case No. S80 Cr. 493 (CSH), 1981 WL 1662 (S.D.N.Y. July 23, 1981) .......... 21, 25

*United States v. Gilbert*,
  668 F.2d 94 (2d Cir. 1981) ..................................................................... 20

*United States v. Heicklen*,
  858 F. Supp. 2d 256 (S.D.N.Y. 2012) ...................................................... 10

*United States v. Hernandez*,
  980 F.2d 868 (2d Cir. 1992) ..................................................................... 4

*United States v. Kane*,
  Case No. 23 Cr. 20172 (KMW), 2023 WL 8277602 (S.D. Fla. Nov. 30, 2023) ....... 6

*United States v. Lanier*,
520 U.S. 259 (1997) ................................................................................................... passim

*United States v. Miller*,
26 F. Supp.2d 415 (N.D.N.Y. 1998) ........................................................................ 26

*United States v. Mulder*,
273 F. 3d 91 (2d Cir. 2001) ..................................................................................... 26

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991) ..................................................................................... 22

*United States v. Palo*,
Case No. 16 Cr. 23, 2017 WL 6594196 (W.D. Pa. Dec. 26, 2017) ..................... 4, 11

*United States v. Pirro*,
212 F.3d 86 (2d Cir. 2000) ..................................................................................... 4, 10

*United States v. Rajaratnam*,
Case No. 12 Cr. 211 (NRB), 2014 WL 1554078 (S.D.N.Y. April 17, 2014) ....................... 4, 9

*United States v. Reed*,
20-cr-500 (JGK), 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ........................... 4, 9

*United States v. Rybicki*,
354 F.3d 124 (2d Cir. 2003) ..................................................................................... 16

*United States v. Scarpa*,
913 F.3d 993 (2d Cir. 1990) ..................................................................................... 26

*United States v. Stein*,
456 F.2d 844 (2d Cir. 1972) ..................................................................................... 21

**STATUTES**

15 U.S.C. § 78i ................................................................................................... 15, 21, 23

**RULES**

Fed. R. Crim. P. 7 ..................................................................................................... 4, 27

**REGULATIONS**

17 C.F.R. § 180.1 ..................................................................................................... 10

Pursuant to Rules 7(c), 7(d), and 12(b)(3)(B) of the Federal Rules of Criminal Procedure, and the United States Constitution, defendant Alexander Mashinsky respectfully submits this Memorandum of Law in support of his pretrial motions to: 1) dismiss Count Two of the Indictment; 2) dismiss Count Six of the Indictment; and 3) strike as surplusage all references to Celsius's bankruptcy.  For the reasons set forth below, Mr. Mashinsky's motions should be granted.

## STATEMENT OF FACTS

### A.     Background

Alexander Mashinsky is one of three co-founders and the former CEO of Celsius Network LLC, which has operated Celsius's cryptocurrency-based finance platform since 2018. The platform was primarily a lending platform in which customers either: (i) "provide[d]" crypto assets for Celsius to deploy in the market, earn yield, and then pay customers weekly "reward" (interest) rates (the "Earn" program), ECF No. 1 at ¶ 12, or (ii) obtained loans from Celsius using cryptocurrency as collateral (the "Borrow" program).  *Id.* at ¶ 13.[1]

### B.     Summary of the Charges

On or about July 11, 2023, a grand jury in the Southern District of New York returned a seven-count indictment (ECF No. 1, "Indictment") against Mr. Mashinsky and Roni Cohen-Pavon ("Cohen-Pavon"), Celsius's former lawyer and Chief Revenue Officer.  The Indictment alleges that Mr. Mashinsky engaged in two criminal schemes.

The first scheme is based on several categories of alleged misrepresentations that Mr. Mashinsky made that supposedly misled customers about "core aspects of Celsius's business."

---

[1] The Indictment refers to Celsius's "Custody" program, *see* ¶ 13, but does not appear to allege any wrongdoing in connection with that service.

*See* Indictment, at ¶¶ 1, 15; 73; 75; 77.  This scheme forms the basis for Counts One, Two, and Three of the Indictment, charging Mr. Mashinsky with securities fraud, in violation of Title 17, C.F.R. § 240.10b-5 (Count One); commodities fraud, in violation of Title 17, C.F.R. §180.1 (Count Two); and wire fraud, in violation of Title 18, U.S.C. §§ 1343 and 2 (Count Three).

As to the second scheme, the Indictment alleges that Mr. Mashinsky, Cohen-Pavon, and other unidentified Celsius employees "orchestrated a scheme to inflate the price of Celsius's proprietary token, CEL." *Id.* at ¶ 1.  The second scheme forms the basis for Counts Four, Five, Six, and Seven, which charge Mr. Mashinsky with conspiracy, in violation of Title 18, U.S.C. § 371 (Count Four); securities fraud, in violation of Title 15, U.S.C. §§ 78j(b) and 78ff, Title 17 C.F.R. § 240.10b-5 and Title 18 U.S.C. § 2 (Count Five); market manipulation, in violation of Title 15, U.S.C. §§ 78i(a)(2) and 78ff and Title 18 U.S.C. § 2 (Count Six); and wire fraud, in violation of Title 18, U.S.C. §§ 1343 and 2 (Count Seven).  *Id.* at ¶¶ 79; 83; 85; 87; 89.

## POINT I

### THE COMMODITIES FRAUD CHARGED IN COUNT TWO SHOULD BE DISMISSED AS REPUGNANT TO AND INCONSISTENT WITH THE SECURITIES FRAUD CHARGED IN COUNT ONE

Count One charges Mr. Mashinsky with securities fraud based on allegations that in order "to induce investors to purchase an interest in Celsius's Earn Program and to acquire CEL token, MASHINSKY made false and misleading statements about Celsius's financial condition and operations." *Id.* at ¶ 73.  Count Two charges Mr. Mashinsky with commodities fraud based on allegations that "MASHINSKY engaged in a fraudulent scheme to induce investors to sell their Bitcoin to Celsius in exchange for an interest in Celsius's Earn Program, by making false and misleading statements about Celsius's financial condition and operations." *Id.* at ¶ 75.  Both Counts One and Two are focused on the Earn Program.  Therefore, the same contracts, transactions, and alleged scheme are charged as both securities fraud and commodities fraud.

It is inconsistent and illogical to view the Earn Program as a security for purposes of Count One, and a commodity for purposes of Count Two. It is not clear if the government intends to argue that Celsius's Earn Program constituted the purchase of a security and the sale of a commodity at the same time, or if the government has charged commodities fraud to protect against the risk that the Earn Program does not meet the *Howey* test for investment contracts. In either case, the government cannot have it both ways and the appropriate remedy is dismissal of one of the counts. As set forth below, Count Two, the commodities fraud count, should fall.

## I.   Relevant Facts Regarding "Earn" Program Allegations

According to the Indictment, Celsius's "primary public offering" was the Earn Program, in which customers were allegedly told that in exchange for "providing" cryptocurrency assets to Celsius, they would earn returns through Celsius's investment of those assets. *Id.* at ¶ 12. The Indictment alleges that Celsius "pooled customer assets and deployed them through retail lending, institutional lending, investments, exchange trading[2], and other profit-seeking strategies." *Id.* Celsius allegedly advertised that its deployment strategies would earn yield, and Celsius would then pay customers weekly interest, or "rewards." *Id.*

According to the Indictment, Mr. Mashinsky marketed the Earn Program by stating that Celsius could generate yield for customers by safely lending their crypto assets to institutions. *Id.* Mr. Mashinsky allegedly claimed that unlike banks—which kept most of the profits from investing customer deposits for themselves—Celsius would return the majority of the profits back to its customers. *Id.* Celsius investors could elect to receive the fruits of their investment in the same cryptocurrency deposited in Earn, or at times, in exchange for a higher yield, in Celsius's own crypto token, CEL. *See id.* at ¶ 48.

---

[2] Celsius did not operate, and has never operated, its own trading exchange.

## II.    Legal Standard

Under the Sixth Amendment, "[a] defendant unquestionably enjoys the right to 'be informed of the nature and cause of the accusation' against him."  *United States v. Pirro*, 212 F.3d 86, 98 (2d Cir. 2000) (dissent, quoting U.S. Const. amend. VI).  Federal Rule of Criminal Procedure 7 requires that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  While an indictment "is sufficient if it contains the elements of the offense charged and *fairly* informs a defendant of the charge against him," *United States v. Reed*, 20-cr-500 (JGK), 2022 WL 597180, at *2 (S.D.N.Y. Feb. 28, 2022) (citing *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (emphasis added))), the notice provided by an indictment must be *fair*.  *See United States v. Hernandez*, 980 F.2d 868, 871 (2d Cir. 1992).

An indictment may be defective when it contains internally inconsistent allegations.  *See, e.g., United States v. Rajaratnam*, Case No. 12 Cr. 211 (NRB), 2014 WL 1554078, at *7 (S.D.N.Y. April 17, 2014) (reserving decision on motion to dismiss after finding two counts in the indictment "internally inconsistent"); *see United States v. Coburn*, 439 F. Supp. 3d 361, 381 (D.N.J. 2020) (describing examples of repugnant allegations warranting dismissal to include "stark contradictions, generally factual in nature—allegations that an event both did and did not occur"); *see United States v. Palo*, Case No. 16 Cr. 23, 2017 WL 6594196, at *7 (W.D. Pa. Dec. 26, 2017) (ordering government to elect counts to be tried where indictment "charges defendant with fraud and false statements based on performance and non-performance of the same procedures"); *see United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) (dismissing count and noting that "[a]n indictment is defective if it contains logically inconsistent counts") (citing *United States v. Cantrell*, 612 F.2d 509, 511 (10th Cir. 1980)).

In this district, a proper remedy for a repugnant indictment containing internally

inconsistent allegations is dismissal of the inconsistent count.  *See Rajaratnam*, Case No. 12 Cr.

211 (NRB), ECF No. 55 (Order dismissing Counts Four and Seven of the Indictment) (S.D.N.Y.

May 6, 2014).

## III.    **The Commodities Fraud Count Is Repugnant To The Securities Fraud Count**

### A.    **Unprecedented Overlapping Charges**

The legal landscape surrounding cryptocurrencies is uncertain, at best.  As one

bankruptcy judge in this district recently wrote:

> "I also am aware that Voyager operated, and Binance.US currently operates, in a
> regulatory environment that at best can be described as *highly* uncertain. There are
> firms that operate as cryptocurrency brokers or exchanges, and have done so for
> several years, without being subject to clear and well-defined regulatory
> requirements. Regulators themselves cannot seem to agree as to whether
> cryptocurrencies are commodities that may be subject to regulation by the CFTC,
> or whether they are securities that are subject to securities laws, or *neither*, or even
> on what criteria should be applied in making the decision. This uncertainty has
> persisted despite the fact that cryptocurrency exchanges have been around for a
> number of years."

*In re Voyager Digital Holdings, Inc.*, 649 B.R. 111, 119 (S.D.N.Y. 2023) (emphasis added).

Notably, the bankruptcy court never suggested the simultaneous characterization as a security

and commodity as a possibility among the many potential available options.

Against this backdrop of uncertainty, there is a dearth of criminal cases charging a single

vehicle or program as both securities fraud and commodities fraud.  The civil cases offer little

more.  Mr. Mashinsky knows of no statutory authority or judicial precedent to support the view

that the government can simultaneously charge the same contracts, the same transactions, and the

same schemes as both securities fraud and commodities fraud.  At best, there is out-of-circuit

*dicta* from one appellate court asserting that Congress intended for the SEC and the CFTC to

have concurrent jurisdiction over commodity pools (*see S.E.C. v. Unique Financial Concepts,*

*Inc.*, 196 F.3d 1195, 1202 n.8 (11th Cir. 1999)), but there is nothing in the Indictment—let alone a factual allegation—connecting the Earn Program to that provision of the Commodities Exchange Act.

The lack of precedent to charge the same conduct as criminal securities fraud and criminal commodities fraud merits dismissal of either the securities or commodities fraud count.

**B.     Inconsistent Charging of "the Whole" and "the Parts" of the Earn Program**

The Indictment reaches the perverse result of charging securities fraud in Count One and commodities fraud in Count Two by charging "the whole" of the Earn Program in one instance (Count One) and "the parts" of the Earn Program in the other (Count Two).  The result is illogical and contrary to law, rendering the Indictment legally flawed and fatally inconsistent.

Defendants commonly challenge whether a transaction meets the test for an "investment contract" established by the Supreme Court in *S.E.C. v. W.J. Howey Co.  See, e.g., United States v. Kane*, Case No. 23 Cr. 20172 (KMW), 2023 WL 8277602, at *3-4 (S.D. Fla. Nov. 30, 2023).  In *Howey*, the Supreme Court ruled that an "investment contract" means "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party[.]"  328 U.S. 293, 298-299 (1946).  The Court noted that the test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."  *Id.* at 299.  Applying that flexible definition, the Court found that the "transactions in this case clearly involve investment contracts as so defined."  *Id.* at 299.  The Court did not break down or analyze the transactions as separate component parts.

Fast-forward 75 years and courts in this district have taken the same approach in the cryptocurrency context.  In *S.E.C. v. Telegram Grp. Inc.*, Judge Castel noted the flexibility of the Supreme Court's *Howey* test and its subsequent directive that "'form should be disregarded for substance and the emphasis should be on economic reality.'"  448 F. Supp. 3d 352, 365 (S.D.N.Y. 2020 (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)).  Judge Castel rejected the defendant's argument "that there are two distinct sets of transactions at issue in this case, one subject to the securities laws and one that is not."  *Id.* at 367.  The court ruled instead that the two transactions should be "viewed in their totality for the purpose of the *Howey* analysis[,]" and specifically noted the Supreme Court's decision to "analyze[] the entirety of the parties' interaction, finding that the whole scheme comprised a single investment contract, and, therefore, a security."  *Id.*

Judge Castel similarly rejected the defendants' attempt to distinguish between the tokens at issue and the underlying contractual arrangements: "Telegram . . . contends that, at launch, Grams would be commodities, not securities, because Grams would be used consumptively . . . . The Court rejects Telegram's characterization of the purported security in this case.  While helpful as a shorthand reference, the security in this case is not simply the Gram, which is little more than alphanumeric cryptographic sequence."  *Id.* at 379.

In *Ripple Labs*, Judge Torres also adopted *Howey*'s fundamental distinction between an "investment contract" and the "subject" of that investment contract.  Judge Torres reached that conclusion after finding that the "plain words of *Howey* make clear that 'an investment contract for purposes of the Securities Act means a *contract, transaction*[,] *or scheme*[,]'" even though "the subject of a contract, transaction, or scheme is not necessarily a security on its face."  *S.E.C. v. Ripple Labs, Inc.,* 20 Civ. 10832 (AT), 2023 WL 4507900 at *7 (S.D.N.Y. July 13, 2023).  To

support that analysis, Judge Torres cited to *Telegram* and ruled that even though "XRP, as a digital token, is not in and of itself a 'contract, transaction[,] or scheme' that embodies the *Howey* requirements of an investment contract . . . the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP." *Id.* at *8 (citing *Marine Bank v. Weaver*, 455 U.S. 551, 560 n.11 (1982) ("Each transaction must be analyzed and evaluated on the basis of the content of the instruments in question, the purposes intended to be served, and the factual setting as a whole.")).

Most recently, in *S.E.C. v. Terraform Labs Pte. Ltd.*, Judge Rakoff drew the same distinction between the standalone tokens sold by Terraform and the investment protocols in which those tokens were deployed for customers. Even though those tokens, "might not then have been, by themselves, investment contracts[,]" Judge Rakoff "decline[d] to erect an artificial barrier between the tokens and the investment protocols with which they are closely related for the purpose of [the *Howey*] analysis." 23-cv-1346 (JSR), 2023 WL 4858299 at *12 (S.D.N.Y. July 31, 2023) (emphasis added).

After denying the defendants' motion to dismiss, Judge Rakoff granted the SEC's motion for summary judgment and once again rejected the defendants' attempt to distinguish between Terraform's tokens and its investment protocols:

> "Defendants make much of the fact, undisputed by the SEC, that UST on its own was not a security because purchasers understood that its value would remain stable at $1.00 rather than generate a profit. But, beginning in March 2021, holders of UST could deposit their tokens in the Anchor Protocol, which defendants' efforts developed and which Kwon himself publicly announced would generate 'by far the highest stablecoin yield in the market' . . . . The above undisputed evidence clearly demonstrates that UST *in combination with the Anchor Protocol* constituted an investment contract."

23-cv-1346 (JSR), 2023 WL 8944860 at *13-14 (S.D.N.Y. Dec. 28, 2023) (emphasis added).

8

Mr. Mashinsky is not challenging at this stage whether Celsius's Earn Program is an investment contract that satisfies the *Howey* test.  To the contrary, on a motion to dismiss the Court must assume all factual allegations in an indictment as true.  *See Reed*, 2022 WL 597180, at *1.  Accordingly, the Court may assume for purposes of this motion that what is alleged in Count One (the Earn Program) is a security based on the application of a global assessment of tokens and the broader contracts, transactions, and schemes in which they were invested.  *See Telegram*, *Ripple Labs*, and *Terraform*.[3]  But the aforementioned courts in this district have held that defendants may not avoid *Howey*'s application by breaking down an alleged investment scheme into its component parts.  *See e.g.*, *Ripple Labs,* 2023 WL 4507900, at *8 ("the Court examines the totality of circumstances surrounding Defendants' different transactions and schemes involving the sale and distribution of XRP.").

The government should be held to the same standard.  Count Two, as pleaded, considers Bitcoin as a standalone commodity, and not, as the law requires, as part of the totality of the Earn Program consisting of tokens and transactions.  This is exactly the kind of analytical slicing that the aforementioned cases prohibit.

### C.    The Commodities Fraud Count Should Be Dismissed

The remedy for repugnant, inconsistent counts is dismissal of a count.  *See Rajaratnam*, 2014 WL 1554078, at *6*; see also Coburn*, 439 F.Supp.2d at 381 (describing an indictment as warranting dismissal where it involves "stark contradictions, generally factual in nature—allegations that an event both did and did not occur").  Next, the question is whether Count One or Count Two is the inconsistent count that should be dismissed.  Count Two is flawed standing

---

[3] To be clear, factual distinctions between Celsius and the defendants in these cases is not an issue before the Court at this time.

alone.  Inconsistencies with Count One simply exacerbate the need for the dismissal of Count Two.

Count Two analyzed on its own does violence to the facts alleged in the Indictment.  To constitute commodities fraud, customers' deposits of Bitcoin into the Earn Program must be a "contract of *sale* of any commodity[.]"  Title 17 C.F.R. § 180.1 (emphasis added).  The Indictment contains no factual allegations that could support such a theory.  To the contrary, the Indictment alleges that customers "***provide[d]*** their cryptocurrency assets to Celsius to invest." Indictment at ¶ 12 (emphasis added).  The Indictment repeatedly refers to Bitcoin as a deposit or investment.  *See, e.g., id.* at ¶ 24 ("Some customers elected to receive the profits from their investments in CEL rather than in Bitcoin…"); *see also id.* at ¶ 29 ("using Bitcoin deposited by its customers").

Despite the repeated references to "provide," "deposit," "invest," the charging language in paragraph 75 of the Indictment conveniently re-characterizes the same activity as "sell[ing]," consistent with the statutory language applicable to Count Two.  This crafty alteration – unsupported, and in fact, contradicted by the facts in the Indictment – merits dismissal of Count Two.  *See United States v. Heicklen*, 858 F. Supp. 2d 256, 275 (S.D.N.Y. 2012) (dismissing jury tampering indictment that tracked statutory language after reviewing language of pamphlets handed out by the defendant and finding indictment's factual allegations insufficient as a matter of law); *see also United States v. Aleynikov*, 737 F. Supp. 2d 173, 194 (S.D.N.Y. 2010) (dismissing unauthorized computer access charge that tracked statutory language where government's factual concession meant the indictment "fail[ed] to allege the essential facts constituting the offense charged.") (quoting *Pirro,* 212 F.3d at 91)).

When analyzed along with Count One, it becomes even more apparent that Count Two should be dismissed.  Count One assumes cryptocurrency is being "invested" in the Earn Program, consistent with the other facts alleged.  Count Two assumes cryptocurrency is being "sold" under the same Earn Program.  This will foster confusion at trial and force Mr. Mashinsky to defend against factually inconsistent allegations.  *See Palo*, 2017 WL 6594196, at *6 (citations omitted).

Given Count Two's inconsistency with Count One and the facts alleged in the Indictment, Count Two should be dismissed.

## POINT II

### COUNT SIX SHOULD BE DISMISSED FOR LACK OF FAIR NOTICE

Mr. Mashinsky next requests that the Court dismiss Count Six of the Indictment on the ground that he lacked fair notice that the conduct charged was a violation of criminal law.  As the Supreme Court has explained, "because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal."  *United States v. Lanier*, 520 U.S. 259, 267 (1997).  Count Six fails this test and must be dismissed.

The Supreme Court pronounced nearly fifty years ago that market manipulation is "virtually a term of art when used in connection with securities markets" and that the term "refers generally to practices such as wash trades, matched orders, or rigged prices."  *See Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476 (1977).  Section 9(a)(2) of the Securities

Exchange Act, and the paucity of criminal prosecutions under that statute since 1934, provided no notice to Mr. Mashinsky that bona fide, open-market transactions with real counterparties could constitute criminal manipulation simply because of "manipulative intent."

Undeterred, the government decided to invent a criminal offense out of what was, according to the only available precedent, a civil regulatory violation. Indeed, in recent briefing before another court in this district, the government's only authority for its theory of prosecution were civil SEC enforcement actions and private securities fraud lawsuits. We are unaware of a single criminal case since the enactment of Section 9(a)(2) that provided the constitutionally mandated notice to Mr. Mashinsky that such alleged conduct constituted a crime.

## I.      Relevant Facts Regarding Alleged Manipulation

With respect to the so-called "CEL Manipulation Scheme," the Indictment alleges that Mr. Mashinsky, Cohen-Pavon, and other unnamed Celsius executives and employees "orchestrated a scheme to manipulate the price of CEL by causing Celsius to conduct massive purchases of CEL, without disclosing its identity as the purchaser, *in the open market* to artificially support and artificially inflate the price of the CEL." Indictment, at ¶ 49 (emphasis added). The Indictment alleges that Mr. Mashinsky, Cohen-Pavon, "and others" manipulated the price of CEL token "through causing Celsius to spend hundreds of millions of dollars purchasing CEL *in the open market* with the objective of artificially supporting and inflating the price of CEL." *Id.* at ¶ 6 (emphasis added).

Although the Indictment alleges an objective of "artificially support[ing]" and "artificially inflat[ing]" the price of CEL, (*id.* at ¶ 49), there is no allegation in the Indictment that Celsius ever bought CEL at anything other than the then-current market price for the token. Further, there is no allegation of improper trading practices such as wash trades, matched orders,

or rigged prices.  The Indictment identifies three open-market purchases of CEL that Mr.

Mashinsky was allegedly involved in personally.  *Id.* at ¶¶ 54; 58; 67.  Other than those

purchases, the Indictment alleges that *Celsius*—and not Mr. Mashinsky—purchased more CEL

token than was needed for customer rewards throughout the second half of 2020 and 2021.  *Id.* at

¶¶ 55; 64.  Further, the Indictment explicitly alleges that it was *Cohen-Pavon*—and not Mr.

Mashinsky—who "directed Celsius to purchase CEL in excess of its weekly rewards

obligations[.]"  *Id.* at ¶ 66.

## II.   The Constitution Demands "Fair Warning" That Proscribed Conduct Was Criminal

The Fifth Amendment to the Constitution prohibits the government from depriving

anyone of "life, liberty, or property, without due process of law."  U.S. Const. amend. V.  Due

process mandates that criminal defendants have the right to fair notice that their conduct was

prohibited by a statute.  *Dunn v. United States*, 442 U.S. 100, 112 (1979) ("[F]undamental

principles of due process . . . mandate that no individual be forced to speculate, at peril of

indictment, whether his conduct is prohibited.").

The Supreme Court has pronounced with equal clarity that the Fifth Amendment requires

a statute to make clear that violative conduct exposes a person to criminal consequences.  *See*

*McBoyle v. United States*, 283 U.S. 25, 27 (1931) ("[I]t is reasonable that a fair warning should

be given to the world in language that the common world will understand, of what the law

intends to do if a certain line is passed."); *Lanier*, 520 U.S. at 267 ("In each of these guises, the

touchstone is whether the statute, either standing alone or as construed, made it reasonably clear

at the relevant time that the defendant's conduct was criminal.").

The Supreme Court has established that there are "three related manifestations" of the Fifth

Amendment's fair warning requirement: (i) the vagueness doctrine, which bars enforcement of a

statute that either "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application"; (ii) the rule of lenity, which ensures fair warning by resolving ambiguity in a criminal statute so it applies only to conduct clearly covered; and (iii) the due process bar on courts "applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope[.]" *Lanier*, 520 U.S. at 266 (internal citations omitted).

The Court should dismiss Count Six because the government's interpretation of Section 9(a)(2) in this case violates all three fair warning requirements.

## III.   Mr. Mashinsky Had *No* Warning, Let Alone a Fair One, That Open-Market Transactions Could Be Criminally Manipulative

The Indictment makes clear that the government's theory of market manipulation in this case is that Mr. Mashinsky criminally violated Section 9(a)(2) through transactions "in the open market" in which Celsius purchased more CEL token than it needed for customers' weekly rewards, and that this was done with the objective of artificially increasing the price of CEL. Indictment, at ¶¶ 6, 49.[4]

Consistent with this market manipulation theory, at Cohen-Pavon's guilty plea allocution, the government described the elements of a violation of Section 9(a)(2) as follows:

> "We understand that it has three elements: First, that the defendant, through a series of transactions either created actual or apparent trading in the security or raised or depressed the price of the security or aided and abetted the same; second, that the defendant acted for the purpose of inducing the purchase or the sale of the security by others; and, third, that the defendant acted willfully and with a manipulative purpose."

---

[4] Indeed, the government recently confirmed during a telephonic meet-and-confer with the defense its view that the dividing line between lawful open-market transactions and criminal market manipulation is merely whether the individual executing the transactions did so with "manipulative intent"—*i.e.*, with the wrong state of mind.

ECF No. 32, Hearing Tr. at 28:21-29:3 (Sept. 13, 2023). That is, according to the government, it is criminal for someone to (i) purchase securities in the open market, (ii) raising the price of that security, (iii) for the purpose of inducing purchases of the security by others, as long as it is (iv) done with manipulative intent.

To evaluate the government's market manipulation theory against the Due Process Clause, it is necessary to consider the origin of Section 9(a)(2) and its subsequent evolution so that the government's interpretation of the statute can be considered in the proper context.

### A.      The Evolution of Section 9(a)(2): Language of the Statute

Beginning with the language of the statute, Section 9(a)(2) makes it unlawful for any person to use the mails or any means or instrumentality of interstate commerce:

> "To effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, any security not so registered, or in connection with any security-based swap or security-based swap agreement with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others."

15 U.S.C. § 78i(a)(2). According to the plain language of the statute, therefore, the following conduct constitutes criminal market manipulation: (i) a series of transactions in a security, (ii) creating actual active trading, (iii) for the purpose of inducing the purchase or sale of the security by others. The plain language of the statute does not require "apparent" active trading, which at least hints at manipulative conduct, or even raising or depressing the price of the security, whether artificially or otherwise. Nor is there any "manipulative intent" element in the language of the statute.

Instead, according to this statute, it is a crime for a person to purchase a security on more than one occasion for the purpose of inducing others to buy or sell the security. Even adding in the "raising or depressing the price" element does nothing to save what is an unconstitutionally

vague statute.[5]  *See Johnson v. United States*, 576 U.S. 591, 595 (2015) ("Our cases establish that the Government violates this guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."); *Kolender v. Lawson*, 461 U.S. 352, 353-58 (1983) (finding statute "as it has been construed" unconstitutionally vague and noting that a "[w]here the legislature fails to provide such minimal guidelines, a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'") (citations omitted).

### B.    The Evolution of Section 9(a)(2): Guidance from the Supreme Court

The Supreme Court has provided guidance to narrow the statute's overly broad scope. But even there, the guidance was provided in private securities fraud lawsuits and not in the context of criminal applications of the statute.  In *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (1969), the Court held that Section 9(a)(2) contained a "manipulative purpose" requirement, even though no such language appears in the statute.  *Id.* at 794.  The Court noted that Section 9(a)(2) "does not condemn extensive buying or buying which raises the price of a security in itself[,]" but instead was aimed to "prevent[] an individual from dominating the market in a stock for the purpose of conducting a one-sided market at an *artificial* level for its own benefit and to the detriment of the investing public."  *Id.* (emphasis added).  The Court held that the defendant's conduct constituted a *civil* violation of the statute because it "took affirmative steps to conceal from the public its own secret sales off the market at the same time it

---

[5] The Second Circuit has held that a criminal defendant may only bring an "as applied" challenge to the constitutionality of a statute, as opposed to a facial challenge.  *See United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003).

was dominating trading[,]"—that is, the defendant had engaged in undisclosed matched orders. *Id.* at 795.

A few years later, in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), the Supreme Court again provided a judicial gloss on Section 9(a)(2), albeit in the context of a private civil lawsuit under Section 10(b) of the Exchange Act. In doing so, the Court discussed the legislative history of the Exchange Act, and specifically a congressional report entitled "Manipulative Practices." *Id.* at 205. In that report, the Court noted that Congress discussed "specific practices that were considered so inimical to the public interest as to require express prohibition such as 'wash' sales and 'matched' orders, and of other practices that might in some cases serve legitimate purposes, such as stabilization of security prices and grants of options." *Id.* The Court noted that "[t]hese latter practices were left to regulation by the Commission." *Id.* The Court defined "wash" sales as "transactions involving no change in beneficial ownership and "matched" orders as "orders for the purchase sale of a security that are entered with the knowledge that orders of substantially the same size, at substantially the same time and price, have been or will be entered by the same or different persons[.]" *Id.* at 205 n. 25.

The following year, in *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462 (1977), the Court interpreted the scope of "manipulation" under the securities laws, although once again in the context of a private 10b-5 lawsuit. The Court noted that "'[m]anipulation' is 'virtually a term of art when used in connection with securities markets[,]'" quoting *Hochfelder*, and ruled that the "term refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." *Id.* at 476. In providing that definition of manipulation, the Court cited to Section 9(a), noting that it "prohibit[ed] *specific* manipulative practices." *Id.* (emphasis added).

17

Reading these Supreme Court precedents as a whole, the unmistakable takeaway is that market manipulation requires both manipulative *conduct* (wash sales, matched orders, or rigged prices) **_and_** manipulative *intent*.  That is, there is no support in these cases for the proposition that simple, bona fide, open-market trading can become manipulative as long as it is conducted with manipulative intent.[6]  It also bears repeating that the so-called "manipulative purpose" or "manipulative intent" element does not appear in the language of the statute.

### C.    The Evolution of Section 9(a)(2): The Government's Intent-Only Theory of Manipulation

Despite the Supreme Court's clear directive that market manipulation is a term of art in the securities laws that refers to specified conduct such as wash sales, matched orders, and rigged prices, the government has decided here that criminal manipulation also includes open-market transactions with real counterparties on the other side that are entered into with a still-undefined "manipulative intent."  The government's position begs the question as to where it came up with such a theory.

The government recently took this same position in *United States v. Hwang*, Case No. 22 Cr. 240 (AKH), another market manipulation prosecution under Section 9(a)(2).  In that case, the defendant moved to dismiss the Section 9(a)(2) charges on the ground that the statute failed to provide "sufficient notice that trading solely to impact a stock's price is illegal."  Case No. 22 Cr. 240 (AKH), ECF No. 48 (Brief in Support of Defendants' Pretrial Motions), at 63 (S.D.N.Y. Dec. 2, 2022).  The government opposed the motion, and argued, as it has here, that open-market

---

[6] In fact, Judge Sullivan already rejected this very theory of market manipulation under the Commodities Exchange Act in *CFTC v. Wilson*, Case No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14-15 (S.D.N.Y. Nov. 30, 2018) (describing as "tautological" and "circular" the CFTC's theory that because the defendants had the intent to affect prices, that meant the prices were illegitimate, therefore artificial, and therefore manipulated).

transactions become criminally manipulative when performed with the wrong state of mind: "[T]he Second Circuit's decisions . . . mak[e] clear that open-market transaction[s] executed with manipulative intent suffices to prove market manipulation." *Id.*, ECF No. 53 (Govt. Opposition to Defendants' Omnibus Pretrial Motions, hereinafter, "Hwang Br."), at 28 (S.D.N.Y. Jan. 22, 2023) (citing *S.E.C. v. Vali Mgmt. Partners*, Case No. 21-453, 2022 WL 2155094, at *1-2 (2d Cir. June 15, 2022); *Set Capital LLC v. Credit Suisse Group AG*, 996 F.3d 64, 77 (2d Cir. 2021); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 100 (2d Cir. 2007)).

Judge Hellerstein denied the defendants' motion in *Hwang*, citing to the Second Circuit's decisions in *Set Capital* and *ATSI Commc'ns*. Case No. 22 Cr. 240 (AKH), ECF No. 66 (Order on Pretrial Motions), at 3 (S.D.N.Y. March 23, 2023). Notably, both of those decisions were in the context of private securities fraud lawsuits, not even SEC regulatory enforcement actions, and not criminal prosecutions. In fact, as discussed below, the government's opposition brief in *Hwang* did not cite a single criminal precedent where a court has adopted the theory that manipulative intent is the only dividing line between lawful open-market transactions and criminal manipulation. Nor has the defense been able to identify a single criminal case prior to *Hwang* that has adopted that theory.

In *Hwang*, the government argued that "the Second Circuit has squarely rejected the argument that some form of deceit or misrepresentation beyond the intent to create an artificial price is required." Hwang Br. at 24. The government claimed that "the past thirty years of development in the law" made clear that "open-market transaction[s] executed with manipulative intent suffices to prove market manipulation[,]" (*id.* at 28), but critically, none of the cases cited by the government to support that proposition was a criminal prosecution.

19

*Vali Mgmt. Partners* was a June 15, 2022 summary order from the Second Circuit in a civil SEC enforcement action.  The Court approved a jury instruction in line with the government's market manipulation theory but cited exclusively to civil securities fraud lawsuits to support its decision.  2022 WL 2155094, at *1.  One of those cases was *Set Capital*, also cited by the government in *Hwang*, in which the Second Circuit interpreted the "manipulative act" element of a private securities fraud lawsuit under Section 10(b).  996 F.3d at 77.  Once again, the Court cited exclusively to civil precedents to support its view of the law.  And finally, *ATSI Commc'ns* was again a private securities fraud lawsuit in which the Second Circuit interpreted market manipulation under Section 10(b).  493 F.3d at 100.  The Court cited to no criminal precedents to support a theory that manipulative intent is the dividing line between lawful open-market conduct and criminal market manipulation.[7]

The government's brief in *Hwang* did cite to two criminal prosecutions, *United States v. Gilbert* and *United States v. Stein*, but neither of them comes close to providing notice that the conduct alleged in the Indictment carried potential criminal consequences under Section 9(a)(2).  Hwang Br. at 35.  In the first, *United States v. Gilbert*, the Second Circuit affirmed a Section 9(a)(2) conviction based on a defendant's "elaborate series of wash sales and matched orders."  668 F.2d 94, 95 (2d Cir. 1981).  That prosecution was therefore consistent with the clear civil guidance provided by the Supreme Court, but said nothing about an open-market theory that hinges solely on a defendant's so-called "manipulative intent."

---

[7] In *Hwang*, the government also cited to *S.E.C. v. Lek Sec. Corp.*, 726 F. Supp. 3d 49, 64 (S.D.N.Y. 2017) and *S.E.C. v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007), but neither of those cases cited to any precedent suggesting that such conduct could be criminal under Section 9(a)(2).  Hwang Br., at 25-26.  In *Masri*, Judge Holwell rightfully commented that, "it is hornbook criminal law that one is not punished solely for a criminal state of mind (mens rea), but only where one's action is prohibited as well (actus rea)."  523 F. Supp. 2d at 367, n.11.  The government's market manipulation theory in this case disregards this fundamental principle.

In fact, the district court's decision in *Gilbert* suggests that Section 9(a)(2) is limited to the specified categories of manipulative conduct listed in Section 9(a)(1).  Consistent with the Supreme Court's view, that section is limited to wash sales and matched orders only.  15 U.S.C. § 78i(a)(1).  The district court in *Gilbert* stated that the dividing line between the two sections of 9(a) is that Section 9(a)(1) requires only a single transaction, while Section 9(a)(2) requires a "series of transactions" of the type listed in 9(a)(1).  *United States v. Gilbert*, Case No. S80 Cr. 493 (CSH), 1981 WL 1662, at *3 (S.D.N.Y. July 23, 1981) ("Thus subsections (a)(1) and (2) create separate and distinct offenses.  The distinction lies in the number of transactions necessary to sustain a conviction under (a)(2) . . . [T]he Government must prove a 'series of transactions' having [the] illicit characteristics of [(a)(1)] to sustain its charge under (a)(2).").

Nor does *United States v. Stein* provide any support for the government's manipulation theory in this case.  *Stein* did not address that theory, and instead affirmed a Section 9(a)(2) conviction in which the defendants purchased small amounts of stock "through different brokers and in different names, and by offering to brokers secret compensation to induce them to promote sales of [the stock]."  456 F.2d 844, 845 (2d Cir. 1972).  The use of nominees and secret commissions bears no relationship to the conduct alleged in the Indictment, and provides no notice that undefined "manipulative intent"—not even discussed by the Second Circuit in *Stein*—suffices as the dividing line between lawful conduct and criminal manipulation.

The only criminal case cited by the government in *Hwang* that even addresses its market manipulation theory under Section 9(a)(2) in fact supports Mr. Mashinsky's position.  Hwang Br. at 28.  But even that case, *United States v. Mulheren*, was a prosecution under Rule 10b-5, not Section 9(a)(2).  In *Mulheren*, the Second Circuit considered an appeal from a defendant who argued that the government failed to prove that he purchased stock "for the sole purpose of

21

raising the price at which it traded on the NYSE, rather than for his own investment purposes." 938 F.2d 364, 366 (2d Cir. 1991).  The court commented that it "harbor[ed] doubt about the government's theory of prosecution," but ultimately did not decide whether it was a correct view of the law under Rule 10b-5.  *Id.*  Instead, the court reversed the defendant's conviction after finding insufficient evidence of the charged crimes.  *Id.*

The court described the government's theory of prosecution as follows: "when an investor, who is neither a fiduciary nor an insider, engages in securities transactions in the open market with the sole intent to affect the price of the security, the transaction is manipulative and violates Rule 10b-5."  *Id.* at 368.  The court repeated its "misgivings about the government's view of the law," but assumed without deciding that an investor may be convicted under Rule 10b-5 based on that theory.  *Id.*  Even if such a decision were sufficient to provide notice to the public, *Mulheren* was not a Section 9(a)(2) prosecution.  But in any case, the Second Circuit expressly declined to adopt the government's theory of open-market manipulation as a correct statement of the law.

## IV.    In The Absence Of Any Notice Of Potential Criminal Penalties, The Court Should Dismiss Count Six

What the government in *Hwang* called the "development in the law" over the past thirty years actually proves a due process violation.  Even assuming the precedents cited by the government in *Hwang* provided constitutionally sufficient notice, they would have alerted Mr. Mashinsky that his alleged conduct could have subjected him to *civil* penalties, but nothing approaching a felony conviction and imprisonment.  The government cannot simply graft those civil precedents onto the criminal law out of expediency; the Fifth Amendment and "hornbook criminal law" forbids it.  *Masri*, 523 F. Supp. 2d at 367, n.11.

Instead, in the absence of any prior notice that open-market transactions conducted with undefined "manipulative intent" could have subjected Mr. Mashinsky to criminal conviction and the deprivation of his liberty, the government's market manipulation charge in Count Six should be dismissed.  *See McBoyle*, 283 U.S. 25 at 27 (requiring fair warning "of what the law intends to do if a certain line is passed"); *Lanier*, 520 U.S. at 267 (requiring a statute to make reasonably clear "that the defendant's conduct was criminal").

Each of the three manifestations of the Fifth Amendment's fair warning doctrine requires dismissal of that count.  *Lanier*, 520 U.S. at 266.

### A.    Void for vagueness

The vagueness doctrine bars enforcement of a statute that either "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application."  *Id.*  The doctrine follows a two-part test requiring criminal statutes to define the offense: "'[1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement.'"  *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *Skilling v. United States*, 561 U.S. 358, 402-03 (2010)).

As noted above, Section 9(a)(2), by its terms, could be read to criminalize a series of securities transactions creating actual trading in the security for the purpose of inducing the purchase or sale of such security by others.  Not only is that plainly non-criminal conduct, it does not even include as an element the "core misconduct" supposedly covered by the statute.  *Skilling*, 561 U.S. at 408.  That is, despite passing a statute entitled "Manipulation of security prices," 15 U.S.C. § 78i, Congress did not require price manipulation as a necessary element of a violation of Section 9(a)(2), at least according to the plain language of the statute.

Even adding in the non-mandatory "raising or depressing the price of such security" language from Section 9(a)(2) still does not reach what is supposed to be the core misconduct covered by the statute.  *See Crane Co.,* 419 F.2d at 794 (Section 9(a)(2) "does not condemn extensive buying or buying which raises the price of a security in itself.").  Instead, only by adding in an undefined "manipulative intent" element, which the Supreme Court did in an appeal from a private civil lawsuit, does the language of the statute even start to reach price manipulation.  But so-called "manipulative intent" appears nowhere in the language of the statute either, nor is that term defined with the "sufficient definiteness" demanded by the Fifth Amendment.  *Mannix*, 619 F.3d at 197.

As to the second vagueness element, this case itself demonstrates that Section 9(a)(2) encourages arbitrary and discriminatory enforcement.  *Id.*  Neither the language of the statute nor any judicial precedent provides law enforcement authorities with any guidance for when a civil violation of the statute becomes criminal.  Indeed, the fact that the government in this case proceeded on a market manipulation theory that originates solely from civil enforcement actions and private lawsuits is enough to establish that the statute encourages arbitrary enforcement.  There is nothing in the law that provided notice to Mr. Mashinsky or anyone else so they could understand the dividing line between conduct that the courts have said is a civil violation, at most, and a criminal indictment jeopardizing their liberty.

Accordingly, the Court should dismiss Count Six under the vagueness doctrine.

## B.    Rule of Lenity

For the same reasons, the Court should apply the rule of lenity to resolve the statute's ambiguity in favor of Mr. Mashinsky.  The rule of lenity instructs that courts should resolve ambiguities in criminal statutes so they apply only to conduct that is "clearly covered."  *Lanier*,

520 U.S. at 266.  However, for the reasons discussed above, even the most generous reading of

Section 9(a)(2) and its precedents demonstrates that the only conduct "clearly covered" is either

entirely lawful, or at most, a civil violation.  In the alternative, the Court should limit Section

9(a)(2) to the categories of conduct listed in Section 9(a)(1) and that form the basis of the three

seminal market manipulation decisions from the Supreme Court.  *See Gilbert*, 1981 WL 1662, at

*3.  In either case, the rule of lenity also demands the dismissal of Count Six.

### C.    Bar on novel prosecutions

Finally, due process bars courts from "applying a novel construction of a criminal statute

to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within

its scope[.]"  *Lanier*, 520 U.S. at 266.  As noted above, the government's theory of market

manipulation in this case can only be described as a "novel construction of a criminal statute"

since no court of which we are aware—other than *Hwang*—has held that bona fide open-market

transactions become criminal when they are conducted with "manipulative intent."  That is how

the government described the charges during a meet-and-confer with the defense, that is how the

government described the elements of Section 9(a)(2) during Cohen-Pavon's plea allocution, and

that is how the government argued the law to Judge Hellerstein in *Hwang*.  There should be no

doubt of how the government is applying Section 9(a)(2) to Mr. Mashinsky.  Its novel

construction does not comport with due process.

For the foregoing reasons, Mr. Mashinsky respectfully requests that the Court dismiss

Count Six of the Indictment under the Due Process Clause of the Fifth Amendment.

## POINT III

## THE COURT SHOULD STRIKE SURPLUSAGE

Defendant Alexander Mashinsky respectfully moves this Court, pursuant to Rules 7(c)(1) and 7(d) of the Federal Rules of Criminal Procedure and other applicable law, to strike as surplusage references within the Indictment to the Celsius bankruptcy.

### I.   Applicable Law

Rule 7(c)(1) of the Federal Rules of Criminal Procedure requires that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1).  Pursuant to Rule 7(d), "[u]pon the Defendant's motion, the court may strike surplusage from the indictment."  Fed. R. Crim. P. 7(d).  The rule "introduces a means of protecting the Defendant against immaterial or irrelevant allegations in an indictment…which may, however, be prejudicial."  Fed. R. Crim. P. 7, 1944 Advisory Comm. Note; *see also United States v. Miller*, 26 F. Supp. 2d 415, 420 (N.D.N.Y. 1998) ("The purpose of Rule 7(d) is to protect the defendant against prejudicial allegations of irrelevant facts").  The decision to strike language from an indictment is within the discretion of the trial court.  *Id.*

While applied as an exacting standard, such motions will be granted "where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial."  *United States v. Mulder*, 273 F. 3d 91, 99-100 (2d Cir. 2001) (quoting *United States v. Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990).

### II.   Discussion

The Indictment makes several references to Celsius's bankruptcy filing:

- "**On or about July 13, 2022, Celsius filed for Chapter 11 bankruptcy**." Indictment at ¶ 9 (emphasis added).

- "(viii) Celsius' s solvency and liquidity in the days and weeks leading up to the June 12, 2022 'Pause' on customer withdrawals **that portended Celsius's filing for bankruptcy shortly thereafter."** *Id.* at ¶ 15 (emphasis added).

- "**Even before Celsius's bankruptcy proved the falsity of the claims by ALEXANDER MASHINSKY, the defendant,** it was clear from Celsius's internal financial analyses that Celsius did not have more assets than deposits such that it could satisfy a demand for all customer assets." *Id.* at ¶ 43 (emphasis added).

These allegations are true surplusage.

First, the Celsius bankruptcy filing is *outside* the Indictment period, which covers conduct between 2018 and June 2022.  Celsius did not file bankruptcy until July 13, 2022.  *See Id.* at ¶ 9.  Second, a corporate bankruptcy filing is irrelevant to Mr. Mashinsky's conduct or state of mind on any of the charges he faces — conspiracy, securities fraud, wire fraud, and commodities fraud.  Third, the term "bankruptcy" carries with it stigma and connotations of dishonor, recklessness and blameworthiness that are unfairly prejudicial to a criminal defendant.  Fourth, a corporate decision to declare bankruptcy is a complicated mix of legal, economic, financial and business considerations that cannot and should not be placed at the feet of Mr. Mashinsky.  Fifth, loss is not an element of any of the charged crimes, and a bankruptcy filing does not speak to financial harm, loss, or economic injury.  Sixth, the gratuitous references to bankruptcy are unnecessary to clarify anything in the Indictment and can therefore be redacted without causing any prejudice to the government's case.  Seventh, the surplusage leaves the prejudicial misimpression that Celsius failed, when in fact the bankruptcy court has already issued an opinion supporting Celsius's plan to exit bankruptcy.  *See In re: Celsius Network LLC, et al.,* 22-bk-10964-mg, Doc. No. 3972 (Nov. 9, 2023).

Accordingly, references to Celsius's bankruptcy should be stricken from the Indictment. For the same reasons, the government should be precluded from introducing evidence of the Celsius bankruptcy during trial.

## CONCLUSION

For the foregoing reasons, Mr. Mashinsky respectfully requests that the Court: (i) dismiss Count Two (Commodities Fraud) as repugnant to and inconsistent with Count One (Securities Fraud); (ii) dismiss Count Six (Market Manipulation) for lack of fair notice; and (iii) strike as surplusage all references in the Indictment to Celsius's bankruptcy.

Dated: New York, New York
      January 12, 2024

MUKASEY YOUNG LLP

 /s/ Marc L. Mukasey      
Marc L. Mukasey
Torrey K. Young
Michael F. Westfal

570 Lexington Avenue, Suite 3500
New York, NY 10022
Tel: (212) 466-6400
Email: marc.mukasey@mukaseylaw.com

*Counsel for Alexander Mashinsky*

28