UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x
                                     :

UNITED STATES OF AMERICA      :

                                     :

              - v. -             :                  23 Cr. 347 (JGK)

                                     :

ALEXANDER MASHINSKY,       :

                                     :

                Defendant.     :

                                     :

------------------------------------------------------x

 

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO MASHINSKY'S PRETRIAL MOTIONS**

 

DAMIAN WILLIAMS
United States Attorney
Southern District of New York

 

Adam S. Hobson
Allison Nichols
Assistant United States Attorneys

- Of Counsel –

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND .................................................................................................................... 1

    A.   Overview of the Fraudulent Schemes ............................................................... 1

    B.   The Indictment .................................................................................................. 6

ARGUMENT ........................................................................................................................ 7

    I.   The Motion to Dismiss Count Two Should Be Denied ..................................... 7

    A.   Applicable Law ................................................................................................. 8

    B.   Relevant Facts .................................................................................................. 9

    C.   Discussion ...................................................................................................... 11

    II.   Count Six Properly Alleges Market Manipulation and Should Not Be Dismissed ........... 17

    III.   The Motion to Strike Surplusage Must Be Denied ......................................... 24

    A.   Applicable Law ............................................................................................... 24

    B.   References to Celsius's Bankruptcy Filing Are Relevant and Not Prejudicial .............. 25

CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ............................................................................................ 21

*Blockburger v. United States,*
    284 U.S. 299 (1932) ....................................................................................................... 14

*CFTC v. McDonnell,*
    287 F. Supp. 3d 213–29 (E.D.N.Y.) .......................................................................... 11, 13

*CFTC v. Reynolds, No. 19 Civ. 05631*
    (MKV), 2021 WL 796683 (S.D.N.Y. Mar. 2, 2021) .................................................... 13

*Chiarella,*
    588 F.2d at 1368 n.16 ..................................................................................................... 22

*Costello v. United States,*
    350 U.S. 359 (1956) ......................................................................................................... 9

*Crane Co. v. Westinghouse Air Brake Co.,*
    419 F.2d 787 (2d Cir. 1969) ........................................................................................... 18

*Devonbrook, Inc. v. Lily Lynn*
    (Lilywear), Inc., No. 70 Civ. 4687, 1977 WL 921 (S.D.N.Y. Jan. 10, 1977) ................... 27

*Lek Sec. Corp.,*
    376 F. Supp. 3d ............................................................................................................... 18

*Maynard v. Cartwright,*
    486 U.S. 356 (1988) ........................................................................................................ 19

*S.E.C. v. Vali Magmt. Partners,*
    No. 21-453, 2022 WL 2155094 (2d Cir. June 15, 2022) ................................................ 21

*SEC v. Malenfant,*
    784 F. Supp. 141 (S.D.N.Y. 1992) ........................................................................... 18, 18

*SEC v. Ripple Labs, Inc., No.*
    20 Civ. 10832 (AT), 2023 WL 4507900 (S.D.N.Y. July 13, 2023) ............................... 16

*SEC v. Telegram Grp. Inc.,*
    448 F. Supp. 3d 352 (S.D.N.Y. 2020) ............................................................................ 16

*SEC v. Terraform Labs Pte. Ltd., No.*
    23 Civ. 1346 (JSR), 2023 WL 8944860 (S.D.N.Y. Dec. 28, 2023) ........................... 15, 16

*Set Capital LLC v. Credit Suisse Grp.,*
    996 F.3d 64 (2d Cir. 2021) ............................................................................................. 21

*United States v. Bin Laden,*
    91 F. Supp. 2d 600 (S.D.N.Y. 2000) .............................................................................. 24

*United States v. Bongiorno*, No. 05 Cr. 390
(SHS), 2006 WL 1140864 (S.D.N.Y. May 1, 2006) ........................................ 23

*United States v. Caglar*, No. 08 Cr. 232
(CFD), 2009 WL 2169232 (D. Conn. July 20, 2009) .................................... 29

*United States v. Coffey*,
361 F. Supp. 2d 102 (E.D.N.Y. 2005) ............................................................ 25

*United States v. Conde*,
309 F. Supp. 2d 510 (S.D.N.Y. 2003) ............................................................ 9

*United States v. Daugerdas*,
837 F.3d 212 (2d Cir. 2016) ........................................................................... 8

*United States v. Daugerdas*, No. 09 Cr. 581
(WHP), 2010 WL 4967878 (S.D.N.Y. Nov. 22, 2010) ............................... 28

*United States v. Dawkins*,
999 F.3d 767 (2d Cir. 2021) ...................................................................... 17, 9

*United States v. DeFabritus*,
605 F. Supp. 1538 (S.D.N.Y. 1985) ......................................................... 25, 28

*United States v. Eisenberg*, No. 23 Cr. 10
(AS), 2023 WL 8720295 (S.D.N.Y. Dec. 18, 2023) .................................. 20, 23

*United States v. Hatfield*, No. 06 Cr. 550
(JS), 2009 WL 2182593 (E.D.N.Y. July 22, 2009) ...................................... 14

*United States v. Hunt*, No. 05 Cr. 395
(DAB), 2006 WL 2613754 (S.D.N.Y. Sept. 6, 2006) ............................... 20, 23

*United States v. Juwa*,
508 F.3d 694 (2d Cir. 2007) ........................................................................... 9

*United States v. Masotto*,
73 F.3d 1233 (2d Cir. 1996) ........................................................................... 11

*United States v. Maxwell*,
534 F. Supp. 3d 299 (S.D.N.Y. 2021) ...................................................... 25, 29

*United States v. Milani*,
739 F. Supp. 216 (S.D.N.Y. 1990) ................................................................. 19

*United States v. Mostafa*,
965 F. Supp. 2d 451 (S.D.N.Y. 2013) ........................................................... 25

*United States v. Mulder*,
273 F.3d 91 (2d Cir. 2001) ............................................................................ 25

*United States v. Mulheren*,
938 F.2d 364 (2d Cir. 1991) .......................................................................... 18

iii

*United States v. Phillips*,
   --- F. Supp. 3d ----, 2023 ....................................................................... 19, 22

*United States v. Rajaratnam, No. 13 Cr. 211*
   (NRB), 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) ................................. 13, 9

*United States v. Reed*,
   639 F.2d 896 (2d Cir.1981) ...................................................................... 14

*United States v. Reed, No. 20 Cr. 500*
   (JGK), 2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ........................... 11, 13, 23

*United States v. Regan*,
   937 F.2d 823 (2d Cir. 1991) ...................................................................... 22

*United States v. Royer*,
   549 F.3d 886 (2d Cir. 2008) .................................................................. 21, 22

*United States v. Russo*,
   74 F.3d 1383 (2d Cir. 1996) ...................................................................... 23

*United States v. Rybicki*,
   354 F.3d 124 (2d Cir. 2003) ...................................................................... 19

*United States v. Scarpa*,
   913 F.3d 993 (2d Cir. 1990) .................................................................. 25, 25

*United States v. Stein*,
   456 F.2d 844 (2d Cir. 1972) .................................................................. 18, 22

*United States v. Torres, No. 20 Cr. 608*
   (DLC), 2021 WL 1947503 (S.D.N.Y. May 13, 2021) ..................................... 8

*United States v. Turoff*,
   652 F. Supp. 707–14 (E.D.N.Y.) ............................................................. 28-29

*United States v. Ulbricht, No. 14 Cr. 68*
   (KBF), 2014 WL 5410049 (S.D.N.Y. Oct. 24, 2014) ..................................... 11

*United States v. Velastegui*,
   199 F.3d 590 (2d Cir. 1999) .................................................................. 20, 8

*United States v. Walters*,
   910 F.3d 11 (2d Cir. 2018) ......................................................................... 9

*United States v. Wedd*,
   993 F.3d 104 (2d Cir. 2021) ............................................................... 13, 17, 8

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the pretrial motion of Alexander Mashinsky, the defendant, seeking to (1) dismiss Count Two, which charges the defendant with commodities fraud, as inconsistent Count One, which charges the defendant with securities fraud; (2) dismiss Count Six, which charges the defendant with market manipulation, for lack of fair notice that the conduct was illegal; and (3) strike the Indictment's references to Celsius's bankruptcy as surplusage.  The motions should be denied in their entirety.

## BACKGROUND

### A.  Overview of the Fraudulent Schemes

In 2018, Alexander Mashinsky founded Celsius Network LLC and its related entities (collectively, "Celsius"), which he marketed as a modern-day bank for crypto assets.  (Ind. ¶ 1). He portrayed Celsius as a safe place for customers to deposit crypto assets and earn interest, and Celsius grew to be one of the largest crypto platforms in the world, at one point purportedly holding $25 billion in assets.  (Ind. ¶¶ 1, 4).  But from the start, Mashinsky operated Celsius through fraud. He lied to investors about Celsius's profitability and business practices, taking in customer money under false and misleading pretenses and turning customers into unwitting investors in a business far riskier and less profitable than what Mashinsky had represented.  (Ind. ¶ 1).  And he used hundreds of millions of dollars of Celsius's money to orchestrate a yearslong scheme to manipulate Celsius's proprietary token, CEL, so that he could sell his personal CEL holdings at artificially inflated prices.  (Ind. ¶ 6).  At least in part as a result of Mashinsky's fraud, by May 2022, Celsius was in a dire financial situation, and on June 12, 2022, Celsius halted all customer withdrawals from its platform—but not before Mashinsky had first withdrawn almost all his own non-CEL crypto assets.  (Ind. ¶ 9).  A month later, Celsius filed for bankruptcy.  *Id.*

1

Mashinsky's frauds at Celsius involved two interrelated criminal schemes, one involving false and misleading statements to Celsius's customers to induce them to invest their crypto assets with Celsius, and one involving manipulative trading in CEL token that was achieved by selling other assets, including Bitcoin, for CEL.  (Ind. ¶ 1, 29).

In the misrepresentation scheme, Mashinsky induced crypto investors to invest their crypto assets with Celsius, which purportedly would use those assets to generate yield through safe, low-risk investment strategies, and then distribute a portion of that yield back to the investors in the form of weekly "rewards" payments.  (Ind.  ¶ 2).  Celsius referred to this rewards system as the "Earn Program."  (Ind. ¶ 12).  Throughout his tenure as Chief Executive Officer of Celsius, Mashinsky repeatedly made public misrepresentations regarding core aspects of Celsius's business and financial condition—including the safety of Celsius's yield-generating activities, Celsius's profitability, the long-term sustainability of Celsius's high reward rates, and the risks associated with depositing crypto assets with Celsius—in order to induce retail customers to provide their crypto assets to Celsius and continue to use Celsius's services.  (Ind. ¶ 2).[1]

In the manipulation scheme, Mashinsky and others at Celsius worked for years to artificially inflate the price of CEL token.  CEL token was Celsius's own native crypto token, which it launched in 2018 to raise money to fund Celsius's operations.  (Ind. ¶ 5).  Mashinsky was a large holder of CEL token and stood to benefit from its price increasing.  (Ind. ¶ 50).  Celsius and Mashinsky encouraged investors in its Earn Program to receive their weekly rewards in CEL token and touted CEL as an investment.  (Ind. ¶ 14).  But the price of CEL nonetheless remained

---

[1] Because Mashinsky's pretrial motions focus primarily on the manipulation scheme rather than the misrepresentation scheme, the manipulation scheme is also the focus of this factual summary. But the Indictment provides considerable detail about Mashinsky's misrepresentations, including in paragraphs 15 through 47.

2

low, and by the end of October 2019, CEL was trading at approximately $0.05 per token.  (Ind. ¶ 51).

To inflate the price of CEL and make the token appear more valuable than it was, Mashinsky and others at Celsius proceeded to spend hundreds of millions of dollars purchasing excess CEL in the market, including through sales of commodities such as Bitcoin, without disclosing this fact to investors.  (Ind. ¶ 6, 29).  At times, Mashinsky even caused Celsius to carry out these purchases using customer assets, which resulted in further strain on Celsius's already weak financial situation.  (Ind. ¶¶ 7, 49).  Between late July 2020 and the end of 2020, Celsius purchased more CEL than was needed to pay weekly CEL rewards every single week—in other words, Celsius purchased CEL at levels far in excess of what was publicly represented by Celsius and Mashinsky.  (Ind. ¶ 55).  During this period, Celsius was a net purchaser in the market of approximately 22 million CEL tokens in excess of the amount of CEL necessary to pay rewards, which represented approximately three times more CEL than Celsius needed to pay rewards.  *Id.*  These excess purchases—which bore no relation to Celsius's distribution of weekly rewards of CEL—were designed by Mashinsky to artificially support and inflate the price of CEL.  *Id.*  As a result, the price of CEL rose dramatically from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.  *Id.*

By early 2021, the price of CEL had increased to approximately $6.50 as a result of Celsius's market purchases.  (Ind. ¶ 60).  After a temporary pause in excess purchases, in about mid-April 2021 Celsius resumed buying huge quantities of CEL token, far in excess of what was required to fulfill weekly rewards.  (Ind. ¶ 64).  It continued these excess purchases through the end of 2021.  *Id.*  In total for 2021, Celsius was a net purchaser of approximately 82 million CEL tokens, which was over three times the volume of CEL needed to fulfill weekly rewards.  *Id.*

Celsius spent approximately $416 million in 2021 alone purchasing CEL in the market, whereas Celsius's CEL rewards obligations were only approximately $144 million worth of CEL.  *Id.*

Some of Celsius's excess CEL purchases were conducted to support CEL's price in advance of anticipated negative news about Celsius.  (Ind. ¶ 54).  For example, in July 2020, Mashinsky directed others to be prepared to conduct large market purchases of CEL to support CEL's price in light of an anticipated news article that was expected to be critical of Celsius.  *Id.* On the date Mashinsky expected the article to come out, he directed another Celsius executive with trading authority to purchase CEL in excess of what was necessary to fulfill the weekly rewards if the CEL price "drops a lot."  *Id.*  On the date that the article was ultimately published, Celsius did in fact conduct large purchase of CEL, and the price of CEL remained relatively stable as a result.  *Id.*  At other times, Mashinsky coordinated with a trader working at Celsius to use Mashinsky's personal funds to make purchases timed to prop up the price of CEL in the face of large market selloffs, asking that trader, for example, "what size swap orders for ETH will have the most impact."  (Ind. ¶ 58).

To further the scheme to manipulate CEL, Mashinsky repeatedly made false and misleading public statements concerning the nature of Celsius's market activity and the extent to which Celsius itself was responsible for artificially supporting and inflating the price of CEL, thus making it appear that there was a broader market interest in CEL than actually existed.  (Ind. ¶ 7). While Mashinsky at various points publicly stated that Celsius was purchasing CEL in the market to pay customers their weekly CEL rewards, in reality, Mashinsky directed Celsius to purchase volumes of CEL well in excess of the amount required to pay weekly CEL rewards.  *Id.*  In certain circumstances, Mashinsky and other Celsius executives also personally purchased CEL for the purpose of artificially supporting CEL's price.  *Id.*  For example, on September 11, 2020,

Mashinsky put out a video statement touting the fact that CEL's price was increasing and stating: "CEL token is just rocketing and it's all organic demand.  There's no market making or manipulation or wash trading or anything."  (Ind. ¶ 56(a)).  As Mashinsky knew, the price increase in CEL was not due to "organic" demand, but was due to Celsius's own massive market purchases. *Id.*  In March 19, 2021, Mashinsky put out a statement about the CEL price, saying, "We obviously want CEL token to go higher in price, but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that. . . . I think 56.5% of [Celsius users] are earning in CEL.  Those are the drivers.  That's what's driving adoption and demand—creates demand for CEL token.  Those are the biggest drivers compared to buyers and sellers."  (Ind. ¶ 62).

While Mashinsky was externally messaging that Celsius's purchasing in the market was simply a function of how much CEL it needed to distribute to its users, behind the scenes Mashinsky was frequently discussing the need to purchase CEL to artificially support CEL's price. (Ind. ¶ 66).  On October 30, 2021, as the price of CEL was dropping, Mashinsky and co-defendant Roni Cohen-Pavon discussed in a WhatsApp communication their efforts to support the price of CEL.  (Ind. ¶ 66(a)).  Mashinsky told Cohen-Pavon that "[t]he price will not take care of itself if everyone will just get scared and sell."  *Id.*  Cohen-Pavon responded, "We're not just sitting and watching the price.  We're on it all week and even now [another Celsius executive] and I are live with the market maker.  The issue is that people are selling and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions (~8M a week and even more until February 2020) just to keep it where it is.  This week we spent 'only' $4M (on top of the rewards) and the price is still going down."  *Id.*  Later in the same WhatsApp conversation, Mashinsky wrote, "Does doge coin value real?  How about the $5B for Solana.

Everyone knows what these tokens are and want to buy them because they think price is going up." *Id.*

In early 2022, Celsius reduced how much excess CEL it purchased, and the price of CEL began to drop as a result.  (Ind. ¶ 67).  But as the price dropped lower and lower, Mashinsky directed Cohen-Pavon, "let's defend CEL here so we don't loose [sic] all our users."  That same day, Mashinsky gave a directive to a Celsius trader that Celsius could purchase up to $5 million worth of CEL to support the price of CEL.  *Id.*  Celsius did in fact purchase approximately three times more CEL than was needed for its weekly rewards that week.  *Id.*  Moreover, Mashinsky was directing Celsius to spend its money propping up the price of CEL at a time when it was in such dire financial condition that it was just a few weeks from pausing all customer withdrawals, and two months from declaring bankruptcy.

Artificially inflating the price of CEL allowed Mashinsky to sell his own CEL holdings for a substantial profit.  (Ind. ¶ 8).  Mashinsky personally reaped approximately $42 million in proceeds from his sales of CEL.  *Id.*  At times, Mashinsky falsely claimed to the public that he was not selling CEL, when in reality he was taking advantage of the upward price manipulation he had orchestrated by contemporaneously selling huge quantities of his CEL on the market.  *Id.* These sales violated Celsius's insider trading policy, which Mashinsky had signed, and which forbade him from selling CEL in excess of $20,000 per day or $50,000 per week.  (Ind. ¶ 71).

### B.  The Indictment

On July 11, 2023, Mashinsky and Cohen-Pavon were charged in a seven-count Indictment. The Indictment charged Mashinsky with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count One"); commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and

13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1 ("Count Two"); and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Three").  Counts One through Three related to the misrepresentation scheme and named only Mashinsky.   In addition, the Indictment charged Mashinsky and Cohen-Pavon each with conspiracy to commit securities fraud, market manipulation, and wire fraud through the manipulating of the price of CEL, in violation of Title 18, United States Code, Section 371s and 1343; Title 15, United States Code, Sections 78i(a)(2), 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Four"); engaging in a fraudulent scheme to manipulate the price of CEL token, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Five"); market manipulation of CEL token, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff ("Count Six"); and wire fraud in connection with the manipulation of CEL token, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Seven").

On September 13, 2023, Cohen-Pavon pled guilty to Counts Four through Seven of the Indictment, which related to his participation in Mashinsky's scheme to manipulate the price of CEL.  Cohen-Pavon's plea was pursuant to a cooperation agreement.

## ARGUMENT

## I.    The Motion to Dismiss Count Two Should Be Denied

The Indictment's detailed factual allegations far exceed the minimal requirement that it track the language of the relevant statutes.  That is all that is required and is more than enough to defeat Mashinsky's motion.  Nonetheless, Mashinsky challenges Count Two on the ground that it is fatally inconsistent with Count One.  Notably, in connection with his motion, Mashinsky does not assert that the Indictment fails to apprise him of the specific crimes with which he is charged,

allow him to prepare his defense, or protect him from double jeopardy; he does not dispute that the Earn Program constitutes an investment contract, as charged in connection with Count One; and he does not argue that Bitcoin is not a commodity, as alleged in connection with Count Two. Mashinsky's challenge, rather, primarily arises from a misreading of the Indictment itself and a misapprehension of relevant case law.  The Court should deny the motion.

### A.    Applicable Law

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the . . . law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1); *United States v. Torres*, No. 20 Cr. 608 (DLC), 2021 WL 1947503, at *3 (S.D.N.Y. May 13, 2021). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021) (internal quotation marks and alteration omitted).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime."  *Id*.  That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime."  *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true."  *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999).  The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits."  *Costello v. United*

8

*States*, 350 U.S. 359, 363 (1956).

These limitations exist because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) (internal citations omitted). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021) (internal citations omitted). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018) (internal citations omitted).

An indictment may be defective if it contains logically inconsistent counts. *See, e.g.*, *United States v. Rajaratnam*, No. 13 Cr. 211 (NRB), 2014 WL 1554078, at *6 (S.D.N.Y. Apr. 17, 2014) (finding repugnant an indictment that attributed the same purchase of shares to two different defendants). Significantly, charges are only fatally inconsistent if they are "mutually exclusive." *United States v. Conde*, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) (citing to *United States v. Eason*, 434 F. Supp. 1217, 1221 (W.D. La. 1977) (finding indictment repugnant where defendant had been "placed in the untenable position of either offering no defense or seeing his defense to one count prove the Government's case on another")).

## B.    Relevant Facts

As alleged in the Indictment, Celsius's primary public offering was its Earn Program, through which Celsius offered a platform for customers to provide their cryptocurrency assets to Celsius to invest. (Ind. ¶ 12). Customers were promised that, in exchange for providing their crypto assets, including Bitcoin, to Celsius, they would earn returns through Celsius's investment

of those assets.  (Ind. ¶ 12).  Celsius marketed the Earn Program to the public as a profit-making opportunity.  (Ind. ¶ 12).  Celsius pooled customer assets and deployed them through retail lending, institutional lending, investments, exchange trading, and other profit-seeking strategies. (Ind. ¶ 12).  Celsius advertised that these deployment strategies would generate yield, and Celsius would then pay customers weekly interest, or "rewards" based on the purported yield that Celsius was earning.  (Ind. ¶ 12).  The core marketing pitch to Earn Program investors, which Mashinsky repeated in multiple forums, was that Celsius could generate yield for its customers by safely lending their crypto assets to institutions, but unlike banks—which kept most of the profits from investing customer deposits for themselves—Celsius would return the majority of the profits back to its customers. (Ind. ¶ 12).  The extent to which Celsius was profitable was relevant and material to customers' decisions to invest in the Earn Program, since Celsius' profitability would determine whether Celsius could make good on its promised yields and whether customers would be able to recover their assets if they decided to withdraw from the program.  (Ind. ¶ 24).

Celsius also launched CEL, its own native crypto token, in or about 2018.  (Ind. ¶ 14). Earn customers could receive their weekly rewards in CEL rather than in other crypto assets.  (Ind. ¶ 14).  There was also a secondary market for CEL through which investors could buy and sell CEL.  (Ind. ¶ 14).  Celsius pooled the proceeds from the sale of CEL to the public for general use in Celsius's business operations.  (Ind. ¶ 14).  Mashinsky and Celsius touted CEL as an investment and Mashinsky encouraged the public to purchase CEL, including by repeatedly promoting the fact that the price of CEL was increasing.  (Ind. ¶ 14).  Mashinsky and Celsius also, at times, equated the value of CEL with the overall strength of Celsius's business and with the positive future prospects for Celsius.  (Ind. ¶ 14).  Mashinsky encouraged Earn customers to elect to receive their rewards in CEL rather than receiving rewards in the form of other crypto assets.  (Ind. ¶ 48).

At Mashinsky's direction, Celsius incentivized Earn customers to receive their weekly rewards in CEL by, at times, offering higher reward rates to customers who chose to receive rewards in CEL rather than in other crypto assets.  (Ind. ¶ 48).  Some Earn customers elected to receive the profits from their investments in CEL rather than in Bitcoin or other widely traded cryptocurrencies because they believed Mashinsky's claims that Celsius was profitable and because the value of CEL was supposed to be a proxy for the overall strength and health of Celsius.  (Ind. ¶ 24).

Count One of the Indictment charges Mashinsky with securities fraud for making false and misleading statements about Celsius's financial condition and operations in order "to induce investors to purchase an interest in Celsius's Earn Program and to acquire CEL token."  (Ind. ¶ 73).  Count Two of the Indictment charges Mashinsky with commodities fraud for making false and misleading statements about Celsius's financial condition and operations in order "to induce investors to sell their Bitcoin to Celsius in exchange for an interest in Celsius's Earn Program." (Ind. ¶ 75).

### C.   Discussion

#### 1.   Counts One and Two Do Not Contain Repugnant Allegations

Mashinsky first challenges Counts One and Two on the grounds that the charges contain repugnant allegations.  Although Mashinsky accurately quotes from the Indictment, Br. 7-8, his argument proceeds to miscast the allegations in the Indictment as asserting that the Earn program itself is both a security and a commodity.  Br. 8.[2]  This is not so.  Rather, the Indictment alleges

---

[2] Though the Court need not decide the issue, because Mashinsky mischaracterizes the Indictment here, the Government does not concede that it would be fatally logically inconsistent for an indictment to raise such alternative theories of liability.  "An indictment is not defective simply because it charges a defendant with alternative offenses."  *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2014 WL 5410049, at *4 (S.D.N.Y. Oct. 24, 2014) (quoting *Whitfield v. Ricks*, No. 01 Civ. 11398 (LAK), 2006 WL 3030883, at *12 (S.D.N.Y. Oct. 24, 2006)).  Moreover, the Government is entitled to present alternative theories to a jury.  *See United States v. Masotto*, 73 F.3d 1233,

that Mashinsky's scheme to defraud, among other things, "induce[d] investors to purchase an interest in Celsius's Earn Program" (Count One), including by "induc[ing] investors to sell their Bitcoin to Celsius in exchange for an interest in Celsius's Earn Program" (Count Two).  (Ind. ¶¶ 73, 75).  These allegations are neither internally inconsistent nor at odds with the factual allegations in the detailed Indictment.  The Indictment alleges that the Earn Program is a security: Celsius and Mashinsky promised customers that, in exchange for providing crypto assets, including Bitcoin, to Celsius, they would earn returns through Celsius's pooling and investment of those assets.  (Ind. ¶ 12).  Mashinsky concedes that the Indictment adequately alleges that Earn program is a security. Br. 14.  Mashinsky's fraudulent misstatements and omissions in connection with the Earn Program thus are properly charged as securities fraud, as charged in Count One.

Mashinsky's conduct also constitutes commodities fraud, as alleged in Count Two, because his criminal scheme involved "a manipulative and deceptive device and contrivance" in connection with "a contract of sale of a commodity in interstate commerce," in violation of Section 6(c)(1) of the Commodities Exchange Act ("CEA") and Rule 180.1 of the Code of Federal Regulations. Mashinsky does not dispute that the Indictment sufficiently tracks the statutory language and provides notice of the charge against the defendant and the elements of the offense.  *Wedd*, 993

---

1241 (2d Cir. 1996) ("When the jury is properly instructed on two alternative theories of liability, as here, we must affirm when the evidence is sufficient under either of the theories." (citing *Griffin v. United States*, 502 U.S. 46 (1991))).

And, as to cryptocurrencies specifically, "several agencies may have concurrent regulatory authority in the cryptocurrency space."  *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022).  "The jurisdictional authority of CFTC to regulate virtual currencies as commodities does not preclude other agencies from exercising their regulatory power when virtual currencies function differently than derivative commodities." *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228–29 (E.D.N.Y.), *adhered to on denial of reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018).

F.3d at 120.  And, just as he does not dispute that Earn is a security, Mashinsky does not argue

that Bitcoin is not a commodity; any such argument would be contrary to settled law.  *See, e.g.*,

*United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022)

("[U]nder the plain language of the CEA, cryptocurrencies fall within the definition of

commodities."); *CFTC v. McDonnell*, 287 F. Supp. 3d 213, 228 (E.D.N.Y.), *reconsideration*

*denied*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018) ("Virtual currencies can be regulated by CFTC as a

commodity."); *CFTC v. Reynolds*, No. 19 Civ. 05631 (MKV), 2021 WL 796683, at *5 (S.D.N.Y.

Mar. 2, 2021) (same) (collecting cases).  Rather the main thrust of Mashinsky's argument appears

to be based on a misreading of the plain language of Count Two.  He seems to suggest that the

mere mention of the Earn Program in the Count Two charging language must mean that the

Indictment is somehow alleging that Earn is both a security and a commodity, even though the

language—which Mashinsky himself quotes—demonstrates that is not so.  Instead, Count Two

charges that Mashinsky fraudulently induced investors to sell Celsius Bitcoin in exchange for an

interest in the Earn program.

　　　　The cases Mashinsky cites addressing the dismissal of repugnant, inconsistent counts of an

indictment are no help, as each address situations, not found here, involving starkly contradictory

allegations.  In fact, far from supporting Mashinsky's position, these cases illustrate why

Mashinsky's argument fails.  In *Rajaratnam*, for example, the court indicated it would grant the

defendant's motion to dismiss counts that inconsistently charged different defendants with the

purchase of the same shares, which the court determined could not be reconciled by a coherent

aiding and abetting theory of liability.  2014 WL 1554078, at *6.  By contrast, here, a conviction

on Count One would not compel an acquittal on Count Two, or vice versa.  A jury could determine,

for example, that Mashinsky's false statements induced investors to purchase interests in Earn

program, a security, through, among other means, the sale of Bitcoin to Celsius, which would compel convictions on both Counts One and Two. A hypothetical jury could determine that Earn is not an investment contract, which would be fatal to Count One, but leave Count Two unaffected. A hypothetical jury could determine that Mashinsky's false statements were not material, which would compel acquittals on both Counts One and Two. The various possible permutations, which are by no means limited to these three examples, show that Counts One and Two are not contradictory. In other words, whether a jury finds the factual allegations as to Counts One and Two proven beyond a reasonable doubt will be based on its determinations as to the elements of each of those crimes. The charges are not impermissibly contradictory, nor, in fact, contradictory at all.

Finally, it is worth noting that Mashinsky's conduct with respect to the Earn Program also gives rise to a wire fraud charge (Count Three), and yet Mashinsky makes no argument, because there is none, that somehow that count is contradictory with any others. Because Mashinsky's fraud scheme involved the use of an interstate wire, it constituted wire fraud; because Mashinsky's fraud scheme was in connection with the purchase or sale of a security (the Earn Program), it constituted securities fraud; and because Mashinsky's fraud scheme was in connection with a contract of sale of a commodity (Bitcoin), it constituted commodities fraud. There is nothing inconsistent or even unusual about that result. [3]

---

[3] Although Mashinsky does not style his argument as a claim that Counts One and Two are multiplicitous, that label may be a better description of his claim than repugnancy, though still entitling him to no relief. Defendants often raise multiplicity arguments where, as here, an indictment charges that the same or similar conduct violated multiple statutes. "However, a single act can violate two statutes." *United States v. Hatfield*, No. 06 Cr. 550 (JS), 2009 WL 2182593, at *2 (E.D.N.Y. July 22, 2009). The test for whether the same act or transaction can appropriately be charged as two separate statutory offenses is whether each statute requires proof of a fact that the other does not. *Blockburger v. United States*, 284 U.S. 299, 304 (1932). "[W]hen the *Blockburger* test for multiplicity has been satisfied, and there is no evidence of congressional intent

2.        Cryptocurrency Cases Do Not Support Mashinsky's Position

Next, Mashinsky argues that interpretations of *Howey* in the cryptocurrency context support his argument that the Indictment is impermissibly inconsistent.  Br. 11-14.  These cases simply do not support the conclusion Mashinsky asks this Court to reach, namely that his concession that Earn constitutes a security forecloses him from being appropriately charged with commodities fraud in the same Indictment and as a result of his conduct with respect to the same overarching scheme to defraud Celsius's customers.

In *SEC v. Terraform Labs*, Judge Rakoff found on summary judgment that four of Terraform's crypto assets were investment contracts for the purposes of federal securities laws. *SEC v. Terraform Labs Pte. Ltd.*, No. 23 Civ. 1346 (JSR), 2023 WL 8944860, at *13 (S.D.N.Y. Dec. 28, 2023).  Mashinsky emphasizes that in that case the SEC did not dispute that one of the Terraform tokens, UST, a stablecoin permanently pegged to a $1.00 price, on its own did not constitute a security, but Judge Rakoff nonetheless found that it was when viewed "in combination with" Terraform's "Anchor Protocol," which, in short, involved an investment of money, expectation of profits, common enterprise, and efforts of others.  Br. 13; *Terraform Labs*, 2023 WL 8944860, at *13-14 (citing *Howey*, 328 U.S. at 300).  But the fact that the *Terraform Labs* court determined that a stablecoin not at issue in this case constituted a security in the context of an investment protocol also not at issue in this case has absolutely no bearing on whether Counts One and Two of this Indictment, concerning alleged securities and commodities not at issue in the

---

to the contrary, authority to impose cumulative penalties is presumed to be intended." *United States v. Reed*, 639 F.2d 896, 906 (2d Cir.1981) (citation omitted). Here, there can be no reasonable dispute that Counts One and Two each require proof of a fact that the other does not; for example, Count One requires proof of a security and Count two requires proof of a commodity. Accordingly, there is no multiplicity issue.

*Terraform Labs* case, involve fatally contradictory allegations.    Moreover, the more closely analogous questions—whether UST met the definition of a commodity under the CEA, and whether Terraform's solicitation of UST as part of its Anchor Protocol program violated Section 6(c)(1) of the CEA—were neither raised nor decided in *Terraform Labs*.  Likewise, *Terraform Labs* is silent on the treatment of Bitcoin, which Terraform accepted as payment from purchasers of its LUNA token.  2023 WL 8944860, at *2.

Similarly, the fact that two other courts have found that investment schemes involving cryptocurrency assets likely met the *Howey* test for investment contracts, *see SEC v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 379 (S.D.N.Y. 2020); *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832 (AT), 2023 WL 4507900, at *11 (S.D.N.Y. July 13, 2023), simply has no bearing on whether Mashinsky may be charged with violating Section 6(c)(1) of the CEA.

> 3.    Count Two Adequately Alleges the "Contract of Sale of any Commodity"

Finally, Mashinsky argues that Count Two must be dismissed because customer *deposits* of Bitcoin on Celsius's platform are not contracts of sale as defined in the Code of Federal Regulations.  Br. 14-15.  The Indictment alleges that Mashinsky committed commodities fraud by making false and misleading statements about Celsius's financial condition and operations in order "to induce investors to sell their Bitcoin to Celsius in exchange for an interest in Celsius's Earn Program."  (Ind. ¶ 75).

Mashinsky cites no legal authority for the proposition that the CEA permits fraudulent schemes in connection with the sale of commodities so long as the fraudster is the *buyer*, rather than the *seller*, of the commodity.  Such a reading is at odds with the definition of "contract of sale" in the CEA, which "includes sales, purchases, agreements of sale or purchase and agreements to sell or purchase."  17 C.F.R. § 1.3.  Mashinsky does not dispute that the Indictment sufficiently

16

tracks the statutory language and provides notice of the charge against the defendant and the elements of the offense. *Wedd*, 993 F.3d at 120. To the extent that Mashinsky argues that the transfers of customer Bitcoin were not in connection with the making of a contract of sale of a commodity, this is a factual argument not appropriate to be resolved at this stage. *Dawkins*, 999 F.3d at 780.

## II. Count Six Properly Alleges Market Manipulation and Should Not Be Dismissed

Likewise unavailing is Mashinsky's motion to dismiss Count Six of the Indictment, which charges that he violated Section 9(a)(2) of the Exchange Act by "engaging in a series of transactions in CEL in order to artificially raise the price of CEL and induce others to purchase CEL." Mashinsky argues that "in the absence of any prior notice that open-market transactions conducted with undefined 'manipulative intent' could have subjected Mr. Mashinsky to criminal conviction and the deprivation of his liberty, the government's market manipulation charge in Count Six should be dismissed." (Br. at 22).

Section 9(a)(2) provides, in relevant part: "It shall be unlawful for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce . . . [t]o effect, alone or with 1 or more other persons, a series of transactions in any security registered on a national securities exchange, [or] any security not so registered, . . . creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." 15 U.S.C. § 78i(a)(2). The "central purpose of [S]ection 9(a) is not to prohibit market transactions which may raise or lower the price of securities, but to keep an open and free market where the natural forces of supply and demand determine a security's price." *SEC v. Malenfant*, 784 F. Supp. 141, 144 (S.D.N.Y. 1992) (citations omitted); *see also, e.g.*, *United States v. Stein*, 456 F.2d 844, 850 (2d Cir. 1972) ("The purpose of

the statute is to prevent rigging of the market and to permit operation of the natural law of supply and demand.").  "Section 9(a)(2) was considered to be 'the very heart of the act' and its purpose was to outlaw every device 'used to persuade the public that activity in a security is the reflection of a genuine demand instead of a mirage.'"  *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787, 794 (2d Cir. 1969) (quoting 3 Loss, Securities Regulation 1549-55 (2d ed. 1961)).[4]

Accordingly, to establish a violation of Section 9(a)(2), first, the Government must prove that the defendant, through a series of transactions, either created actual or apparent active trading in a stock or raised or depressed the price of a stock.  *See Stein*, 456 F.2d at 850; *Malenfant*, 784 F. Supp. at 144.  Second, the Government must prove that the defendant acted for the purpose of inducing the purchase or sale of the security by others.  *See United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991); *Malenfant*, 784 F. Supp. at 144.  Third, the Government must prove that the defendant acted willfully and with a manipulative purpose.  *See Crane Co.*, 419 F.2d at 794; *Lek Sec. Corp.*, 376 F. Supp. 3d at 62.  There is therefore no additional element of deceptive conduct beyond the scheme to create apparent or active trading with a manipulative purpose, and no safe harbor for open-market transactions.

Mashinsky claims Count Six is constitutionally infirm due to lack of fair notice that it was illegal to manipulate the price of CEL token through open-market transactions.  He packages this challenge under the interrelated doctrines of unconstitutional vagueness, the rule of lenity, and the

---

[4] In contrast to Section 9(a)(1), which "explicitly forbids several common types of market manipulation, known as matched orders and wash sales, that involve fictitious transactions and do not result in any change of beneficial ownership," Section 9(a)(2) "more broadly prohibits securities transactions that create actual or apparent active trading in such security, or raise or depress the price of such security, for the purpose of inducing the purchase or sale of such security by others."  *Masri*, 523 F. Supp. 2d at 366 (alterations and quotation marks omitted).  Section 9(a)(2) was designed to cover not just longstanding techniques such as match orders and wash trades, but novel techniques as well, because "[m]anipulative schemes may not be allowed to succeed solely because they are novel."  *Crane Co.*, 419 F.2d at 793.

bar on novel prosecutions.  These challenges are both premature and foreclosed by the well-established Second Circuit law giving Mashinsky notice that open-market transactions made with a manipulative purpose constitute market manipulation.

Due Process challenges based on lack of fair notice are as-applied challenges that "must await the conclusion of the trial." *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990). As the Supreme Court has explained, "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, and hence may be overcome in any specific case where reasonable persons would know that their conduct is at risk." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003) ("Panel opinions of this Court have repeatedly held that when, as in the case before us, the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only 'as applied,' i.e., in light of the specific facts of the case at hand and not with regard to the statute's facial validity." (quotation marks and citation omitted)).

The law is thus clear that Mashinsky's fair-notice challenges are premature and must await conclusion of the trial.  In fact, similar vagueness and novelty challenges to the anti-manipulation provision of the Commodities Exchange Act have been denied as premature when brought before the fully developed factual record that results from trial.  *See United States v. Phillips*, --- F. Supp. 3d ----, No. 22 Cr. 538 (LJL), 2023 WL 5671227, at *13 (S.D.N.Y. Sept. 1, 2023) ("[T]he Court requires full factual development at trial before it can determine whether the CEA and wire fraud statutes failed to provide Defendant fair warning that his conduct was prohibited by law, as required by the Due Process Clause."); *United States v. Eisenberg*, No. 23 Cr. 10 (AS), 2023 WL 8720295, at *7 (S.D.N.Y. Dec. 18, 2023) ("Consistent with *Phillips* and other authorities, the Court declines to resolve Eisenberg's vagueness challenge at this time.").

19

But even if Mashinsky's constitutional challenges were addressed now, they would fail. Section 9(a)(2)'s language unambiguously proscribes engaging in a series of transactions "creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others." That is, engaging in transactions "raising or depressing the price" of the security is included in the language of the statute itself. In fact, creating actual or apparent active trading or raising or depressing the price of a security is an element of the offense. *Stein*, 456 F.2d at 850; *Malenfant*, 784 F. Supp. at 144. A scheme wherein the defendant buys a security, raising the security's price, with the purpose of causing others to purchase or sell, as alleged in the Indictment, is the very heartland of Section 9(a)(2).[5]

Nor can Mashinsky express surprise that his conduct was prohibited by law. As alleged in the Indictment, at a time when Mashinsky knew that CEL's price increase was due to Celsius's massive undisclosed purchases of CEL token, he falsely denied this fact to the public, stating, "CEL token is just rocketing and it's all organic demand. There's no market making or manipulation or wash trading or anything." (Ind. ¶ 56(a)). Mashinsky's statement shows that he understood that the law prohibits a wide variety of manipulative conduct, beyond just wash trading.

Even in the context of Section 10(b) of the Securities Exchange Act, which requires that the defendant engaged in a scheme to defraud (an element not required under Section 9(a)(2)), the

---

[5] One of Mashinsky's fair-notice challenges is based on the rule of lenity, but the rule of lenity is a canon of statutory construction that "applies only when, after consulting traditional canons of construction, we are left with an ambiguous statute." *United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999); *see also United States v. Hunt*, No. 05 Cr. 395 (DAB), 2006 WL 2613754, at *9 (S.D.N.Y. Sept. 6, 2006) ("Because the statute in question [15 U.S.C. §§ 78j(b) and 78ff] is not ambiguous, the Court finds the rule of lenity is inapplicable."). Mashinsky does not meet this threshold requirement because he does not identify any provision of the text of Section 9(a)(2) that is, in fact, ambiguous.

Second Circuit has repeatedly held that open-market transactions can constitute market manipulation, further putting Mashinsky on notice that such transactions were illegal.  The Second Circuit has expressly held that "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent."  *Set Capital LLC v. Credit Suisse Grp.*, 996 F.3d 64, 76 (2d Cir. 2021).  This means that "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007); *accord S.E.C. v. Vali Magmt. Partners*, No. 21-453, 2022 WL 2155094, at *1-2 (2d Cir. June 15, 2022) (holding that "certain open-market transactions may constitute manipulative activity when accompanied by manipulative intent").  The Second Circuit has held that open-market transactions can violate Section 10(b) in both the civil and criminal context.  *See United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (explaining that the Court of Appeals sustains convictions under Rule 10b-5 where defendants seek to artificially affect the prices of securities).

In light of the many precedents holding that open-market transactions can constitute market manipulation, including in violation of Section 9(a)(2), Mashinsky does not argue that the statute itself is constitutionally deficient but instead argues that "[n]either the language of the statute nor any judicial precedent provides law enforcement authorities with any guidance for when a civil violation of the statute becomes criminal."  Br. at 24.  In other words, Mashinsky does not dispute that he had reason to know that the alleged conduct violated the securities laws, but rather that he did not know he could be held criminally liable for those violations.  But contrary to Mashinsky's position, both the statute and judicial precedent are clear that a civil violation of the statute becomes criminal when the violation is carried out with criminal intent, and therefore Mashinsky's acknowledgment that open-market transactions may trigger civil liability under Section 9(a)(2) is

effectively a concession that the statute *does* provide fair notice.  *See* 15 U.S.C. § 78ff (criminal penalties arise where person "willfully violates any provision of this chapter"); *Stein*, 456 F.2d at 850-51 (affirming criminal conviction under 9(a)(2) and holding that efforts to "peg" or "stabilize" stock price in contravention of SEC rules "was manipulation, pure and simple," under 15 U.S.C. § 78i(a)(2)); *cf. Chiarella*, 588 F.2d at 1368 n.16 ("It is well-established that, except for issues of intent and burden of proof, criminal and civil liability under the securities laws are coextensive."). There is nothing vague or unsettled about this basic principle of criminal law.

Nor is a prosecution for securities fraud based on open-market transactions novel.  As previously discussed, within this Circuit, there have been multiple criminal prosecutions for market manipulation involving manipulative conduct that was otherwise legal, including open-market transactions.  *See, e.g.*, *United States v. Regan*, 937 F.2d 823, 829 (2d Cir. 1991) (open market trades designed to depress the price of a stock can constitute criminal violations of Exchange Act Rule 10b-5); *United States v. Royer*, 549 F.3d 886, 900 (2d Cir. 2008) (Rule 10b-5 violated where "the defendants sought to artificially affect the prices of various securities" through, among other things, open market trades); *United States v. Hwang*, 22 Cr. 240 (AKH) (S.D.N.Y. March 23, 2023) (ECF Doc. 66 at 3) (denying motion to dismiss market manipulation claims based on open-market transactions under both Section 10(b) and Section 9(a)(2)); *United States v. Phillips*, --- F. Supp. 3d ----, 2023 WL 561227 at *13 (S.D.N.Y. Sept. 1, 2023) (denying motion to dismiss market manipulation claims based on open-market transactions under Commodities Exchange Act because "[t]he Second Circuit . . . has rejected the notion that open-market trades that are conducted with willing counterparties cannot be manipulative."); *United States v. Eisenberg*, 23 Cr. 10 (AS), 2023 WL 8720295 at *7 (S.D.N.Y. Dec. 18, 2023) (denying motion to dismiss claim of market manipulation under the Commodities Exchange Act where the defendant

argued that "all he did was engage in open-market trades that no one would understand to be unlawful."). The judicial precedents were clear that the alleged conduct was illegal and can give rise to criminal penalties.

Moreover, even if there were no prior interpretive decisions from the courts, "in light of the clear language of the relevant statutes, additional clarity from interpretive decisions is not required." *United States v. Reed*, No. 20 Cr. 500 (JGK), 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022); *see also Hunt*, 2006 WL 2613754, at *9 ("As to the question of due process, Defendant knew that certain acts violated the NYSE rules, therefore, these rules provided him with notice of his illegal conduct. . . . The fact that the acts allegedly committed by Defendant were treated as minor violations by the NYSE does not change the fact that as alleged in the Indictment, Defendant's actions constituted securities fraud."); *United States v. Russo*, 74 F.3d 1383, 1390 (2d Cir. 1996) ("Novel or atypical methods should not provide immunity from the securities laws.") (quoting *Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 11 n.7 (1971)); *United States v. Bongiorno*, No. 05 Cr. 390 (SHS), 2006 WL 1140864, at *9 (S.D.N.Y. May 1, 2006) ("The fact that the statute does not spell out the exact type of fraud alleged here is irrelevant.") (denying motion to dismiss securities fraud claim based on rule of lenity)). There is no reasonable dispute that the conduct alleged in the Indictment violated the clear terms of Section 9(a)(2), and nothing more is required for fair notice.

Finally, even if it were proper to evaluate Mashinsky's fair notice claims at this stage of the case, and even if Mashinsky were correct that he lacked fair notice that open-market transaction without additional deceptive conduct was illegal—neither of which is the case—Mashinsky's arguments would still fail because the Indictment alleges deceptive practices in addition to the open-market transaction. The Indictment alleges that, "[t]o further the scheme to manipulate CEL,

23

ALEXANDER MASHINSKY, the defendant, repeatedly made false and misleading public statements concerning the nature of Celsius's market activity and the extent to which Celsius itself was responsible for artificially supporting and inflating the price of CEL, thus making it appear that there was broader market interest in CEL than actually existed." (Ind. ¶ 7). It alleges that "while MASHINSKY had publicly committed that Celsius would purchase in the market the amount of CEL necessary to pay customers their weekly CEL rewards, beginning in or about July 2020, Celsius, at MASHINSKY's direction and with MASHINSKY's knowledge, began to conduct market purchase of CEL well in excess of the amount of CEL it needed to pay customers their weekly rewards, thereby misleading the public and market participants as to how active Celsius was in the market for CEL." *Id.* ¶ 53. And it alleges that Mashinsky engaged in specific deceptive techniques to deceive market participants, including timing trades in CEL in order to defend CEL's price against negative news (Ind. ¶¶ 54, 58) and coordinating with a Celsius trader to time and structure CEL purchases in a way that "'will have the most impact.'" *Id.* ¶ 58. Accordingly, Mashinsky's manipulative acts go well beyond open-market purchases of CEL.

## III. The Motion to Strike Surplusage Must Be Denied

### A. Applicable Law

"Although the Federal Rules of Criminal Procedure grant the Court authority to strike surplusage from an indictment, it has long been the policy of courts within the Southern District to refrain from tampering with indictments." *United States v. Bin Laden*, 91 F. Supp. 2d 600, 621 (S.D.N.Y. 2000). "Motions to strike surplusage from an indictment will be granted only where the challenged allegations are not relevant to the crime charged <u>and</u> are inflammatory or prejudicial." *United States v. Scarpa*, 913 F.3d 993, 1013 (2d Cir. 1990) (emphasis added). "[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how

24

prejudicial the language is, it may not be stricken." *Id.*; *see also United States v. Mulder*, 273 F.3d 91, 99 (2d Cir. 2001). "Given this exacting standard, such motions [to strike] are rarely granted." *United States v. Coffey*, 361 F. Supp. 2d 102, 123 (E.D.N.Y. 2005).  And when motions are made, courts typically defer rulings until trial.  *See, e.g.*, *United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021) ("Courts in this District generally delay ruling on any motion to strike until after the presentation of the Government's evidence at trial, because that evidence may affect how specific allegations relate to the overall charges.").

    In setting forth allegations in a charging instrument, the Government is not limited to an enumeration of the bare elements of a crime; instead, a charging instrument may be used to provide background to the charged criminal conduct, and to describe the circumstances, means, and methods, of an offense.  *See United States v. Mostafa*, 965 F. Supp. 2d 451, 466 (S.D.N.Y. 2013). With that in mind, courts in this District have consistently been reluctant to police, through motions to strike, the particular terminology that that Government has selected to use in describing the offense.  In *United States v. Stein*, for example, Judge Kaplan declined to strike allegedly "inflammatory and loaded terms" in an indictment, such as "tax haven," "phony," and "concoct." 429 F. Supp. 2d 633, 647 (S.D.N.Y. 2006).  That court explained that, "[w]hile defendants doubtless wish that the government had employed less colorful and prejudicial language," the terms would not be stricken.  *Id.*; *see also United States v. DeFabritus*, 605 F. Supp. 1538, 1546-47 (S.D.N.Y. 1985) (refusing to strike the phrase "slush fund" even though there were words "less prejudicial . . . that may be used to characterized the alleged accumulation of cash").

### B.    References to Celsius's Bankruptcy Filing Are Relevant and Not Prejudicial

    Despite the reluctance in this District to tamper with indictments, Mashinsky asks this Court to edit the Indictment by removing three references to the fact that Celsius has filed for

bankruptcy.  Mashinsky raises what he styles as seven objections to these references to bankruptcy proceedings, each of which can be characterized as an argument either relating to relevance or prejudice.  Br. 32.  Neither argument has merit, and this Court should deny the motion.

First, the facts surrounding Celsius's bankruptcy filing are relevant to the charged crimes. The Indictment alleges that on June 12, 2022, Celsius froze customers' ability to withdraw their cryptocurrency assets from the platform following a rash of customer withdrawals amid serious liquidity concerns.  (Ind. ¶¶ 44-47).  This event, termed the "Pause," was not a pause but a permanent injunction, as Celsius filed for bankruptcy only one month later without restoring customers' ability to access their own crypto assets and deposits.  (Ind. ¶ 9).  At the time of the Pause, hundreds of thousands of Celsius customers had approximately $4.7 billion worth of crypto assets on the Celsius platform.  (Ind. ¶ 9).

False and misleading statements regarding "Celsius's solvency and liquidity in the days and weeks leading up to the June 12, 2022 'Pause' on customer withdrawals that portended Celsius's filing for bankruptcy shortly thereafter" (Ind. ¶ 15) are explicitly alleged as one category of material misrepresentations Mashinsky made as part of the schemes to defraud charged in Counts One through Three of the Indictment (Ind. ¶¶ 44-47).  The Indictment alleges that Mashinsky's willfully and knowingly false and misleading statements "sought to allay customers' concerns about the solvency of the platform" (Ind. ¶ 45)—and thus fraudulently induce them to leave their assets invested with Celsius—even as Celsius executives internally acknowledged that "[t]he current business model is not sustainable" (Ind. ¶ 47) and as Mashinsky protected himself by withdrawing millions of dollars' worth of his own assets from the very platform he assured customers was solvent (Ind. ¶ 46).  The fact that Celsius filed for bankruptcy such a short time after Mashinsky offered investors false and misleading reassurances about the safety of their assets

is, contrary to Mashinsky's argument, directly relevant and probative of Mashinsky's state of mind at the time that he made the false statements.

In other words, the Indictment does not refer to the bankruptcy proceedings devoid of context. The general proposition that subsequent events can be probative of a prior state of mind, *see, e.g.*, *Devonbrook, Inc. v. Lily Lynn (Lilywear), Inc.*, No. 70 Civ. 4687, 1977 WL 921, at *5 (S.D.N.Y. Jan. 10, 1977) ("Evidence of . . . subsequent events is admissible to prove a prior state of mind or intent."), is particularly true here, where the Indictment alleges a course of conduct that culminated in Celsius's filing for bankruptcy. The evidence at trial will show that Mashinsky lied repeatedly over a period of years about Celsius's financial stability, profitability, and liquidity, and the risks to which its customers and investors were exposed. The fact that Celsius first stopped allowing customers to withdraw their assets to prevent a "run" and then filed for bankruptcy shortly thereafter are only two examples among many cited in the Indictment proving that Mashinsky's claims about Celsius's profitability, safety, liquidity, and riskiness were not true.

Furthermore, Mashinsky made additional misrepresentations not explicitly quoted in the Indictment that the Government expects will be evidence of the fraudulent schemes charged in Counts One through Three. For example:

- On or about November 26, 2019, Mashinsky said: "These are your coins, not our coins. Whatever you put in, if you put in one Bitcoin, you will be withdrawing one Bitcoin . . . It's always your Bitcoin. Always your Ether. Always your CEL Token."

- On or about July 24, 2020, MASHINSKY said: "[W]hen you give us bitcoin it's not like it's ours, right? It's yours legally. It is still your bitcoin. The only thing we do is when you lend us your bitcoin, we lend them to people who pay us interest. When they return them, it goes back to the wallet and it's still yours from that wallet."

- On March 25, 2021, MASHINSKY wrote on Twitter that "all coins are returned to their owners even in the case of bankruptcy."

These statements reassuring customers that their assets still belonged to them and could be returned at any time, even in the event of a bankruptcy, were not true, and gave investors and customers a false impression of the risk of investing or depositing assets with Celsius.  Moreover, the evidence will establish that these and similar misstatements were material to investors' decisions.

Mashinsky is also wrong to argue that the three references to the bankruptcy proceedings should be stricken on the grounds that they are inflammatory and prejudicial.  Br. 32.  For one, if an allegation in the Indictment is relevant to the charge, "then regardless of how prejudicial the language is, it may not be stricken."  *Scarpa*, 913 F.2d at 1013.  Because the references to the fact that Celsius filed for bankruptcy are relevant to describing the conduct alleged in the Indictment, Mashinsky's motion should be denied without a prejudice inquiry.  *See, e.g.*, *Stein*, 429 F. Supp. 2d at 647 (refusing to strike language characterizing defendant's conduct); *DeFabritus*, 605 F. Supp. at 1546-47 (same).  Mashinsky offers only tepid, cursory claims that bankruptcy proceedings are confusing, complicated, and carry unspecified "stigma," and provides no support for any of these assertions.  Br. 32.  Any concern that jurors would draw incorrect or impermissible conclusions about the import of bankruptcy proceedings could be addressed in a limiting instruction.  *See, e.g.*, *United States v. Daugerdas*, No. 09 Cr. 581 (WHP), 2010 WL 4967878, at *2 (S.D.N.Y. Nov. 22, 2010) (holding that "a limiting instruction to the jury is the most appropriate safeguard against potential prejudice" Where defendant had argued that the reference to his prior employment and Arthur Andersen "may unfairly prejudice the jury by connecting him to the infamous Enron scandal" but, among other things, the court found that "it will be difficult to avoid any reference to Arthur Andersen at trial); *United States v. Turoff*, 652 F. Supp. 707, 713–14 (E.D.N.Y.), *supplemented*, 691 F. Supp. 607 (E.D.N.Y. 1987) (limiting "instructions will guarantee that the jury understands with what the defendants are and are not charged, but the

defendants are not entitled to preclude the government from pleading and proving conduct that is relevant to the defendants' alleged crimes"); *United States v. Caglar*, No. 08 Cr. 232 (CFD), 2009 WL 2169232, at *2 (D. Conn. July 20, 2009) (denying motion to strike alleged surplusage and noting that "at trial the Court can craft a limiting instruction to shield against possible prejudice").

In the alternative, the Court should delay ruling on the motion until after the presentation of evidence at trial. *See United States v. Maxwell*, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021). As previously noted, Mashinsky made at least one prior misstatement explicitly discussing the event of a bankruptcy. The Government anticipates that there will be other evidence at trial that refers to the bankruptcy proceedings, potentially including testimony from former Celsius executives about the events leading up to the Pause and the declaration of bankruptcy and the differences between internal discussions and public-facing statements during this time period; testimony from investors who relied on Mashinsky's false statements in the lead-up to the Pause or on his false statements regarding what would happen to their assets in the event of a bankruptcy; and Mashinsky's own statements offered as part of the bankruptcy proceedings, including an affidavit he filed and a letter he wrote to debtors' counsel explaining his version of events. In light of this relevant and admissible evidence, after the presentation of the Government's case at trial, the Court will be even better positioned to deny Mashinsky's surplusage motion.

## <u>CONCLUSION</u>

Accordingly, the Government respectfully requests that the Court deny the defendant's pretrial motions in their entirety.

Dated:  New York, New York
        January 26, 2024                     Respectfully submitted,

                                             DAMIAN WILLIAMS
                                             United States Attorney

                                     By: _____/s_____
                                             Adam S. Hobson
                                             Allison Nichols
                                             Assistant United States Attorneys