UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ALEXANDER MASHINSKY and RONI
COHEN-PAVON,

                    Defendants.

Case No. 23 Cr. 347 (JGK)

**ORAL ARGUMENT REQUESTED**

**DEFENDANT ALEXANDER MASHINSKY'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION TO PRESERVE THE TESTIMONY OF
<u>MATERIAL WITNESSES RESIDING OUTSIDE THE UNITED STATES</u>**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for Alexander Mashinsky*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...................................................................................1

FACTUAL BACKGROUND .................................................................................3

I.     Summary Of Market Manipulation Charges (Counts Four Through Seven).....................5

       A.     Premise of Alleged Manipulation Scheme..................................................5
       B.     Alleged Manipulation from Late July 2020 through December 2020....................5
       C.     Alleged Manipulation in 2021 ................................................................6
       D.     Alleged Manipulation in 2022 ...............................................................7

II.    Summary Of Fraud Charges (Counts One Through Three)................................................7

       A.     Alleged Misrepresentations Regarding ICO Success .............................................7
       B.     Alleged Misrepresentations Regarding Profitability and Revenue-Sharing...........8
       C.     Alleged Misrepresentations Regarding Celsius' Purportedly
              Market-Neutral Strategy ...........................................................................8
       D.     Alleged Misrepresentations Regarding Uncollateralized Loans............................9
       E.     Alleged Misrepresentations Regarding Counterparty Defaults .............................10
       F.     Alleged Misrepresentations Regarding Regulatory Clarity...................................10
       G.     Alleged Misrepresentations Leading Up to the June 12, 2022 "Pause" ................10

III.   OVERVIEW OF PROPOSED WITNESSES ...................................................................11

       A.     Roni Cohen-Pavon....................................................................................11
       B.     Daniel Leon...............................................................................................12
       C.     Johannes Treutler ......................................................................................13
       D.     Ron Sabo ..................................................................................................14
       E.     Yaron Shalem ...........................................................................................15
       F.     Yarden Noy ..............................................................................................15

ARGUMENT ...............................................................................................................16

I.     TESTIMONY FROM THE PROPOSED WITNESSES IS WARRANTED BY
       EXCEPTIONAL CIRCUMSTANCES AND IS IN THE INTEREST OF JUSTICE .......16

Legal Standard ............................................................................................................16

       A.     Each of the Witnesses is Unavailable to the Defense ..........................................17
       B.     Each of the Witnesses is Material to Mr. Mashinsky's Defense ..........................19
              1.     Summary of Defenses....................................................................21
                     a.   Market Manipulation Charges ................................................21
                     b.   Fraud Charges......................................................................24
              2.     Materiality of Witnesses.................................................................27
                     a.   Roni Cohen-Pavon................................................................27
                     b.   Daniel Leon..........................................................................36

   c. Johannes Treutler ................................................................39

   d. Ron Sabo ........................................................................43

   e. Yaron Shalem ................................................................46

   f. Yarden Noy ....................................................................48

 C. The Government Has Offered No Basis to Overcome the Failure of Justice Presumption ........................................................................52

CONCLUSION AND RELIEF REQUESTED ........................................................53

# TABLE OF AUTHORITIES

## CASES

*California v. Green*,
399 U.S. 149 (1990) ............................................................................................ 1

*United States v. Alexandre*,
22 Cr. 326 (JPC), 2022 WL 9843495 (S.D.N.Y. Oct. 17, 2022) ...................................... *passim*

*United States v. Banki*,
10 Cr. 08 (JFK), 2010 WL 1459442 (S.D.N.Y. April 6, 2010) ........................................ *passim*

*United States v. Bankman-Fried*,
S6 22-cr-0673 (LAK), 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023) ..................... 32, 34, 36, 48

*United States v. Bronston*,
321 F. Supp. 1269 (S.D.N.Y. 1971) ........................................................................ 19

*United States v. Coburn*,
19-120 (MEF), 2024 WL 3648083 (D.N.J. Aug. 2, 2024) .......................................... 1, 27, 42

*United States v. Dunseath,*
Case No. 98-cr-493 (JGK), 1999 WL 165703 (S.D.N.Y. March 25, 1999) ........................... 17

*United States v. Drogoul*,
1 F.3d 1546 (11th Cir. 1993) .............................................................................. 52

*United States v. Fargesen*,
21 Cr. 602 (LAP), 2022 WL 4110303 (S.D.N.Y. Sept. 8, 2022) .................................... *passim*

*United States v. Fleet Mgmt. Ltd.*,
07 Cr. 279, 2007 WL 2463364 (E.D. Pa. Aug. 28, 2007) ............................................. *passim*

*United States v. Grossman*,
03 Cr. 1156 (SHS), 2005 WL 486735 (S.D.N.Y. Mar. 2, 2005) ..................................... 17, 19

*United States v. Johnpoll*,
739 F.2d 702 (2d Cir. 1984), *cert. denied* 469 U.S. 1075 (1984) .................................. 16, 17

*United States v. Little*,
No. 12 Cr. 647 (ALC), 2014 WL 1744824 (S.D.N.Y. Apr. 23, 2014) ................. 17, 18, 19, 20

*United States v. Menendez*,
23 Cr. 490 (SHS), 2024 WL 2214906 (S.D.N.Y. May 16, 2024) .................................... 17, 18

*United States v. Mohamed*,
18-cr-603 (ARR), 2020 WL 1545522 (E.D.N.Y. Apr. 1, 2020) ................................................ 2

*United States v. Salim,*
    855 F.2d 944 (2d Cir. 1988) ................................................................ 20

*United States v. Scully*,
    877 F.3d 464 (2d Cir. 2017) ................................................................ 32

*United States v. Singleton,*
    460 F.2d 1148 (2d Cir. 1972) .............................................................. 17

*United States v. Vilar*,
    568 F. Supp. 2d 429 (S.D.N.Y. 2008) ................................................. 19

*United States v. Wey*,
    15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017) ...................................... *passim*

**STATUTES**

28 U.S.C. § 1783(a) ................................................................................ 18

**OTHER AUTHORITIES**

5 J. Wigmore, Evidence § 1367 (J. Chadbourn rev. 1974) ........................................ 1

**RULES**

Fed. R. Cr. P. 15(a)(1) ........................................................................... 16

Pursuant to Rule 15 of the Federal Rules of Criminal Procedure and 28 U.S.C. § 1783(a), defendant Alexander Mashinsky respectfully submits this Memorandum of Law, together with the accompanying Declaration of Michael F. Westfal ("Westfal Decl."), in support of his motion to preserve the testimony of six material witnesses who reside outside the United States.  For the reasons set forth below, Mr. Mashinsky's motion should be granted.

## PRELIMINARY STATEMENT

Cross-examination is the "greatest legal engine ever invented for the discovery of the truth." *California v. Green*, 399 U.S. 149, 158 (1990) (quoting 5 J. Wigmore, Evidence § 1367, p. 32 (J. Chadbourn rev. 1974)).  The difference between a trial based on witness testimony and a trial based on "paper testimony" is "the difference between a trial that fully accords with the basic forms of our truth-seeking process, with cross-examined witnesses --- and one that does so only to a lesser extent." *United States v. Coburn*, 19-120 (MEF), 2024 WL 3648083, at *3 (D.N.J. Aug. 2, 2024).

Mr. Mashinsky is the former CEO of Celsius, a cryptocurrency-based finance platform. He is charged with three counts of fraud and four counts of market manipulation.  The fraud counts allege that Mr. Mashinsky lied to customers in weekly videos to induce them to provide their cryptocurrency to Celsius.  The manipulation counts allege that he concocted a years' long scheme to artificially inflate the price of Celsius's proprietary token, CEL, through large undisclosed purchases in the open market.

Although the defense continues to review the millions of pages of discovery produced by the government, it expects that Mr. Mashinsky's defense will be straightforward.  As to the fraud counts, the evidence will show that Mr. Mashinsky did not intend to defraud or harm anyone and that he had a good faith basis for his video statements.  As the CEO of Celsius, Mr. Mashinsky

relied on information provided to him by the experienced team of Celsius professionals around him.  He also trusted that those professionals were following his instructions.  He did not know, for example, that even prior to joining Celsius as an executive, then-outside counsel Roni Cohen-Pavon was discussing removing Mr. Mashinsky from the company—"*we will find a reason*"— and executing a "*hostile takeover*" with Celsius's co-founder, Daniel Leon.

As to the manipulation counts, the evidence will show that Mr. Mashinsky never intended to manipulate the price of CEL token and that his conduct was consistent with written procedures that were reviewed and approved by Celsius's legal, risk, and finance professionals.  It appears that members of Mr. Mashinsky's team—including five of the six witnesses that are the subjects of this motion—ignored or disregarded Mr. Mashinsky's explicit instructions to generate revenue by consistently <u>selling</u> CEL tokens into the market and instead <u>purchased</u> excess CEL tokens on the FTX exchange throughout 2021.  They did not disclose the purchases to Mr. Mashinsky, and in fact, appear to have misrepresented to him what they were doing.

In short, it appears that Mr. Mashinsky has been charged for acts and events as to which he had no knowledge, formed no criminal intent, and at times, even instructed the opposite.  Mr. Mashinsky should be granted the opportunity to question the individuals whose conduct has been laid at his feet.

The stakes are high.  The government has informed the defense that its "current position" is that the Sentencing Guidelines call for Mr. Mashinsky to receive a sentence of 115 years in prison.  As a judge in the Eastern District of New York put it when faced with a similar request: "The defendants are facing potential life sentences. They should be offered the opportunity to present any and all exculpatory, admissible evidence that they are able to obtain." *United States v. Mohamed*, 18-cr-603 (ARR), 2020 WL 1545522, at *7 (E.D.N.Y. Apr. 1, 2020).

Prior to filing this motion, defense counsel sought the government's support and provided detailed justifications for the materiality of each of the proposed witnesses. The government declined. As set forth below, the materiality of the proposed witnesses is readily apparent. Mr. Mashinsky respectfully submits that his request to preserve the testimony of the six material witnesses is vital, and, therefore, his motion should be granted.

## FACTUAL BACKGROUND

Alex Mashinsky founded Celsius Network ("Celsius") in 2017 with co-founder Daniel Leon. Celsius was a cryptocurrency-based finance platform that allowed customers to deposit their cryptocurrency and earn yield in the form of weekly rewards that Celsius paid out every Monday for years. This was Celsius's "Earn" program. Customers also could use their crypto assets as collateral to receive loans from Celsius through the company's "Borrow" program. Celsius was very much an international company, with the majority of its employees located outside the United States, including in London, Canada, Israel, Serbia, Germany, Cyprus, and Australia.

In March 2018, Celsius conducted an initial coin offering ("ICO") for its proprietary cryptocurrency, CEL token ("CEL). The ICO allowed only accredited purchasers to buy CEL tokens directly from the company pursuant to Regulation D of the Securities Act. CEL token holders who participated in the Earn program and who chose to earn their rewards in CEL token received two benefits: 1) higher reward rates on their crypto assets in Earn, and 2) lower interest rates for loans through the Borrow program.

Two aspects of Celsius's services feature prominently in the indictment ("Indict."). First, the indictment alleges that, "*[o]ne of the core features of CEL was that Celsius would purchase in the market a portion of the CEL it owed customers in weekly [Earn] rewards, rather than*

3

*simply distributing the CEL that Celsius had in its treasury to users as rewards.*"  Indict. ¶ 51. The precise amount of CEL that the company purchased in the market varied week to week, and depended on the amount of cryptocurrency that customers held in the Earn program, the number of customers who elected to earn their rewards in CEL token, and the particular reward rates that the company had published on its website for that week.  Although the amount varied, Celsius's weekly purchases required a group of employees to calculate the amount of CEL tokens to be purchased in the market, execute those purchases on cryptocurrency exchanges on behalf of the company, and distribute every Monday the correct amount of CEL tokens to customers for their weekly rewards.  In addition to purchasing CEL tokens on exchanges on a weekly basis, the company also bought and sold CEL tokens in direct transactions with customers through its over-the-counter (or "OTC") desk.  As to OTC sales, Celsius's OTC desk received inbound email requests from customers who were interested in buying CEL tokens, and such sales were typically executed at a discounted price below the market price on exchanges.

The second aspect of Celsius's services that features prominently in the indictment is that Mr. Mashinsky held weekly "Ask Mashinsky Anything" or "AMA" video sessions in which he spoke directly to his customers in a live setting.  Every week, Mr. Mashinsky spent an hour to ninety minutes updating Celsius customers on the company's performance from the prior week, providing news and other announcements, discussing the state of cryptocurrency and traditional financial markets, and answering questions from customers, who were known as Celsius's "community."  The indictment notes that Celsius's control personnel implemented a structured process to review and, where they perceived necessary, edit the live AMAs to ensure accuracy and compliance before the recordings were posted to Celsius's website and social media channels.  Indict. ¶ 3.  The indictment refers to two instances in which Celsius executives

allegedly "*scrubbed*" or "*edited out*" certain statements from the recorded versions of the AMAs. *Id.* ¶¶ 30, 41.

**I.     Summary Of Market Manipulation Charges (Counts Four Through Seven)**

The indictment alleges that from "*in or about 2018 through at least in or about June 2022*," Mr. Mashinsky, along with Celsius's former outside and in-house counsel Roni Cohen-Pavon, "*and certain other Celsius employees and executives, orchestrated a scheme to manipulate the price of CEL by causing Celsius to conduct massive purchases of CEL, without disclosing its identity as the purchaser, in the open market to artificially support and artificially inflate the price of the CEL.*"  Indict. ¶¶ 49, 89.  The "*certain other . . . employees and executives*" have not been identified by the government.

**A.     Premise of Alleged Manipulation Scheme**

According to the indictment, in or around November 2019, Mr. Mashinsky "*and others*" began discussing "*how to execute Celsius's market purchases of CEL to maximize the price impact of CEL.*"  *Id.* ¶ 52.  The indictment alleges that Mr. Mashinsky "*publicly committed*" in June 2020 that Celsius would start buying "*almost everything, almost 100 percent*" of customers' weekly CEL rewards from the market.  *Id.* ¶ 53.  As a result of this supposed commitment, when Celsius began purchasing "*well in excess of the amount of CEL it needed to pay customers their weekly rewards,*" the indictment charges that the company was "*thereby misleading the public and market participants as to how active Celsius was in the market for CEL.*"  *Id.*

**B.     Alleged Manipulation from Late July 2020 through December 2020**

The indictment alleges that from late July 2020 through the end of December 2020, Celsius purchased three times the amount of CEL needed for customers' weekly rewards and that these "*excess purchases*" supposedly caused the price of CEL to rise from $0.40 to $5.50.  Indict.

¶ 55.  Mr. Mashinsky allegedly furthered this manipulation scheme by: (i) "*falsely representing that Celsius was purchasing CEL in the market primarily to fulfill its weekly CEL rewards obligations, and not revealing that Celsius was actually buying CEL well in excess of the amounts needed for weekly rewards to artificially support the price*"; and (ii) personally directing or executing CEL token purchases.  *Id.* ¶¶ 54-59.

   As to the public statements, the indictment alleges that Mr. Mashinsky lied to customers when he announced that "*CEL token is just rocketing and it's all organic demand*" and "*do the math how much $CEL we will need to buy next week all time record users, deposits and Celsians earning in CEL.*"  *Id.* ¶ 56.  As to CEL token purchases during this period, the indictment alleges, for example, that Mr. Mashinsky purchased CEL tokens during "*large selloffs of CEL*" in order to manipulate the price.  *Id.* ¶¶ 58-59.

### C.    Alleged Manipulation in 2021

   According to the indictment, Mr. Mashinsky allegedly continued the scheme to "*artificially inflate*[]" the price of CEL token in early 2021 by directing Celsius not to purchase CEL until the price <u>dropped</u> by at least 30 percent.  Indict. ¶ 60.  The indictment alleges that beginning around mid-April 2021 and continuing through the end of the year, Celsius resumed buying "*huge quantities of CEL*" to artificially support and inflate the price, supposedly buying $416 million worth of CEL despite paying out only $144 million in customer rewards.  *Id.* ¶ 64.

   The indictment alleges that beginning in September 2021, Mr. Mashinsky placed Mr. Cohen-Pavon in charge of Celsius's weekly CEL token purchases, and that Mr. Cohen-Pavon "*frequently communicated with Mashinsky about Celsius's efforts to artificially manipulate the price of CEL.*"  Indict. ¶ 66.  As proof of these frequent communications, the indictment cites

WhatsApp communications between Mr. Mashinsky and Mr. Cohen-Pavon on four days.  *Id.* ¶¶ 66(a)-(d).

### D.    Alleged Manipulation in 2022

The indictment acknowledges that Celsius's CEL token purchases were "*substantially lower*" in 2022, and that the price of CEL token dropped during this period, consistent with an overall drop in crypto prices.  Indict. ¶ 67.  However, according to the indictment, in May 2022, Mr. Mashinsky allegedly directed that a Celsius trader purchase up to $5 million worth of CEL to support the price, and during that week Celsius allegedly bought three times more CEL than it required for weekly customer rewards.  *Id.*  Finally, the indictment charges that while Mr. Mashinsky was causing Celsius to artificially inflate the price of CEL, he allegedly sold large volumes of his own holdings and made false and misleading statements to the public regarding his trading activity.  *Id.* ¶¶ 69-71.

## II.    Summary of Fraud Charges (Counts One Through Three)

As to Counts One through Three, the indictment charges that Mr. Mashinsky orchestrated a fraud scheme based on material misrepresentations about core aspects of Celsius's business.[1] According to the indictment, those alleged misrepresentations were intended to induce potential customers either to deposit their cryptocurrency with Celsius, purchase CEL token, or receive their weekly reward payments in CEL.  Indict. ¶¶ 73, 75, 77.

### A.    Alleged Misrepresentations Regarding ICO Success

The indictment alleges that Mr. Mashinsky falsely claimed that Celsius raised $50 million in its 2018 ICO, when in fact Celsius had only raised $32 million.  Indict. ¶ 18.  According to the

---

[1] This motion addresses only the allegations as to which the six proposed witnesses will offer material testimony for Mr. Mashinsky's defense, based on the defense's review of the Rule 16 discovery to date.

indictment, Mr. Mashinsky then "*engaged in an elaborate effort to make [his] false claims appear true*" by arranging for an entity he controlled to purchase 117 million CEL tokens in the ICO pursuant to a token sale agreement.  Indict. ¶ 19.  The indictment alleges that after Celsius and Mr. Mashinsky converted the token sale agreement into a loan agreement that required Mr. Mashinsky to post his shares in Celsius as collateral, the company decided to return the 117 million CEL tokens to its treasury in April 2020.  Indict. at ¶¶ 20-21.  The indictment describes this as the company "*effectively nullifying the prior loan agreement and doubling down on Celsius's violation of the terms of its own whitepaper*."  *Id.* ¶ 21.

**B.**    **Alleged Misrepresentations Regarding Profitability and Revenue-Sharing**

The indictment further charges that Mr. Mashinsky misrepresented to customers "*that Celsius was profitable and that the high reward rates that Celsius paid to its customers on a weekly basis reflected its earnings.*"  Indict. at ¶ 24.  For example, the indictment alleges that Mr. Mashinsky intentionally defrauded customers when he "*claimed that Celsius returned 80 percent of its revenues back to Celsius customers in the form of weekly rewards*."  *Id.* at ¶ 26.  According to the indictment, this was fraudulent, in part, because Celsius executives "scrubbed" Mr. Mashinsky's March 4, 2022 AMA statement that "*Celsius is trying to do something very simple. Okay?  How about we charge borrowers 9 percent and pay users 7 percent?  Right?  So most of the yield goes to the community or the coin owners.*"  *Id.* ¶ 30.

**C.**    **Alleged Misrepresentations Regarding Celsius' Purportedly Market-Neutral Strategy**

Mr. Mashinsky allegedly misrepresented that Celsius employed a "market-neutral strategy" and did not make "directional bets," which the indictment describes as "*gambling on the future value of cryptocurrencies by taking long or short positions in various crypto assets*[.]"  Indict. at ¶ 31.  As proof that these were knowing lies by Mr. Mashinsky, the indictment alleges

that in 2021, "*Celsius specifically created subaccounts called 'Directional1' and 'Directional2,'*

*which were for the purpose of taking directional risk*." Indict. at ¶ 32. These were Celsius

subaccounts on the FTX cryptocurrency exchange. The indictment also cites a July 2021

conversation in which Mr. Mashinsky allegedly instructed a Celsius trader to execute certain

transactions and the trader responded, "*[n]o matter how you structure those momentum trades*

*we would take a directional bet*." *Id.* Finally, the indictment alleges that "*in or about January*

*2022, MASHINSKY knew that Celsius's trading desk had taken directional bets that exceeded its*

*own risk limits*." *Id.* ¶ 33. The indictment charges that "*that month, MASHINSKY took control of*

*Celsius's trading at one point and directed that Celsius's traders take a large directional bet in*

*Bitcoin, overruling concerns raised by others at Celsius, including Celsius's risk department*."

*Id.*

### D.     Alleged Misrepresentations Regarding Uncollateralized Loans

The indictment next alleges that Mr. Mashinsky "*repeatedly and falsely claimed that all*

*of the loans extended by Celsius were either fully or partially collateralized and that Celsius did*

*not offer uncollateralized loans to counterparties*[.]" Indict. ¶ 35. According to the indictment,

Mr. Mashinsky "*had been warned by other Celsius employees not to make false statements*

*regarding the fact that Celsius did not offer uncollateralized loans*[,]" citing email

correspondence about the upcoming publication of a November 2021 magazine interview. *Id.* ¶

37. The indictment also cites an April 2022 CNBC interview in which Mr. Mashinsky allegedly

stated that Celsius's institutional business had "*under collateralized [loans], but we don't offer*

*any non-collateralized loans*." *Id.*

### E.    Alleged Misrepresentations Regarding Counterparty Defaults

The indictment also charges Mr. Mashinsky with "repeatedly and falsely" claiming that "*Celsius had never had an institutional borrower default on a loan.*"  Indict. at ¶ 38.  According to the indictment, Mr. Mashinsky learned by early 2021 that two institutional counterparties had defaulted on their loans, yet he stated on multiple occasions, including a July 9, 2021 AMA, that Celsius never had any such defaults.  *Id.* at ¶ 39.

### F.    Alleged Misrepresentations Regarding Regulatory Clarity

The indictment alleges that Mr. Mashinsky deliberately defrauded customers by falsely assuring them that Celsius had "*clarity and guidance from government regulators*[.]"  Indict. at ¶ 40.  As proof of these allegedly fraudulent misrepresentations, the indictment cites a December 2021 interview in which Mr. Mashinsky was quoted as saying, "*[t]he regulators looked into us and said these guys know what they're doing*."  The indictment also cites an April 2022 AMA in which Mr. Mashinsky allegedly said, "*there's not—no legal issues at least with the services that Celsius provides or so*," and notes that the statement was subsequently edited out of the recorded version of the AMA that was posted online.  *Id.* at ¶ 41.

### G.    Alleged Misrepresentations Leading Up to the June 12, 2022 "Pause"

The final charged misrepresentations addressed in this motion are alleged statements by Mr. Mashinsky in the weeks leading up to the June 12, 2022 pause on customer withdrawals.  The indictment alleges that days after Mr. Mashinsky discussed a June 2, 2022 slide deck which stated that "*Celsius has been consistently losing money and is facing an erosion in the capital position as well as liquidity constraints*[,]" Celsius issued a June 7, 2022 blog post titled "Damn the Torpedoes, Full Speed Ahead" which supposedly falsely claimed that "*Celsius has the*

*reserves (and more than enough ETH) to meet obligations, as directed by our comprehensive liquidity risk management framework.*"  *Id.* at ¶ 47.

## III.    OVERVIEW OF PROPOSED WITNESSES

Mr. Mashinsky seeks permission from the Court to take the depositions of five relevant witnesses who are outside the subpoena power of the Court, and to subpoena one U.S. citizen who currently resides in Israel.  As discussed below, the materiality of each of these witnesses is established by the Rule 16 discovery produced to date.[2]  Each of the witnesses was either a member of Celsius's executive management team, a critical participant in the conduct charged in the indictment and attributed to Mr. Mashinsky, or both.

### A.    Roni Cohen-Pavon

Mr. Cohen-Pavon was Celsius's former outside counsel, in-house counsel, Chief Revenue Officer, interim CFO, and President.  He is an Israeli citizen who resides in Israel.  The indictment alleges that Mr. Cohen-Pavon and Mr. Mashinsky were co-conspirators in the alleged market manipulation scheme (Counts 4-7), but not the alleged fraud scheme (Counts 1-3).[3]  Mr. Cohen-Pavon is a material witness on the manipulation charges because he provided legal advice to Celsius regarding the manner in which it purchased and sold CEL tokens in the open market from 2019 through 2022.  However, the Rule 16 evidence suggests that by 2021, Mr. Cohen-Pavon and several other Celsius employees decided to disregard explicit instructions from Mr. Mashinsky to <u>sell</u> CEL tokens in order to earn revenue for the company, and instead chose to <u>buy</u>

---

[2]  The government has produced more than 5 million pages of Rule 16 discovery, including nearly 700,000 pages produced as recently as May 16, 2024, and more than 1,400 video files.  Westfal Decl. ¶ 7.  Although the defense's review of the discovery remains ongoing, the defense could not wait for its review to be completed before filing this motion.  The government has also provided the defense with bullet-point excerpts of pre- and post-indictment interviews that it conducted with certain witnesses, which are cited herein.  *See* Westfal Dec. at Ex. 1 (exhibits filed under seal pursuant to the Protective Order entered in this case, ECF No. 22).

[3]  To date, the government has not identified any other alleged co-conspirators to the defense.

CEL tokens in a secret account to move its market price to levels they desired, without disclosing the purchases to Mr. Mashinsky, Celsius's Board of Directors, or its executive committee ("EXCO").

As to the fraud charges, the Rule 16 discovery suggests a clear pattern of Mr. Mashinsky asking Mr. Cohen-Pavon for permission to make certain announcements on Twitter or his weekly AMAs, and Mr. Cohen-Pavon responding with his advice. And yet, as to several of the misrepresentations charged in the indictment, it appears that Mr. Cohen-Pavon made the deliberate decision <u>not</u> to correct or advise Mr. Mashinsky about the alleged inaccuracy of his public statements, despite the fact that Mr. Cohen-Pavon was communicating with the SEC about those very statements at the same time.

The exhibits cited in this motion that are most relevant to Mr. Cohen-Pavon include Exhibits 1, 3, 4, 7, 9, 10, 12, 14, 17-36, 38-45, 47-49, 50, 52, 53, 55, 56.

**B.    Daniel Leon**

Mr. Leon was Celsius's co-founder, and former President, Chief Operating Officer, and Chief Strategy Officer. He is an American and Israeli citizen who resides in Israel. Mr. Leon is a material witness on the manipulation charges because he was present for executive-level discussions about the manner in which Celsius would buy CEL tokens in 2019, 2020, and 2021. Like Mr. Cohen-Pavon, it appears that Mr. Leon was part of a small group of employees who disregarded Mr. Mashinsky's instructions to sell CEL token throughout 2021. On the fraud charges, Mr. Leon was one of two board members who voted to return the 117 million CEL tokens to Celsius's treasury in April 2020 (the other was not Mr. Mashinsky, who recused himself from the vote). Mr. Leon had contemporaneous knowledge of unauthorized directional trading and substantial losses in those positions, which were not disclosed to Mr. Mashinsky. He also drafted the "Damn the Torpedoes" blog post that the government attributes to Mr.

Mashinsky.  Further, Mr. Leon's WhatsApp conversations with Mr. Cohen-Pavon appear to corroborate Rule 16 discovery suggesting that, on multiple occasions, Mr. Cohen-Pavon deliberately decided not to correct what he considered to be inaccuracies in Mr. Mashinsky's public statements.

The exhibits cited in this motion that are most relevant to Mr. Leon include Exhibits 3, 4, 6-10, 12, 14, 23, 27, 29-35, 39, 43-45, 54-56.

### C.    Johannes Treutler

Mr. Treutler was Celsius's former Senior Token Analyst and head of the company's Yield Desk.  He is a German citizen who resides in Germany.  Mr. Treutler is a material witness on the manipulation charges because he was responsible for Celsius's weekly CEL token purchases from 2019 through 2021.  It appears that Mr. Treutler has already spoken extensively with the government about his purchases of CEL during 2019 and 2020, and confirmed that they were consistent with the company's policies.  In 2021, however, it appears that Mr. Treutler's conduct took a drastic turn.  Mr. Treutler engaged in explicit conversations with Mr. Cohen-Pavon, Mr. Leon, and Ron Sabo about purchasing CEL token for the purpose of inflating its price.  From approximately May 2021 through January 2022, the Rule 16 discovery suggests that Mr. Treutler purchased hundreds of millions of dollars' worth of CEL token in a secret Celsius subaccount on the FTX cryptocurrency exchange, which was done at the instruction of, or with the knowledge of, Mr. Cohen-Pavon, Mr. Leon, Mr. Sabo, and Yaron Shalem.  To conceal that conduct from Mr. Mashinsky and the rest of the company, Mr. Treutler provided inaccurate reporting on his CEL token purchases to Mr. Mashinsky and the Celsius EXCO throughout this period.  Mr. Cohen-Pavon has confirmed this for the government.

On the fraud charges, Mr. Treutler is quoted in the indictment's allegations about so-called directional trading.  Indict. ¶ 32.  He also appears to have conducted months of directional

trading in 2021 either at the direction of, or with the knowledge of, Mr. Cohen-Pavon, Mr. Leon, Mr. Sabo, and Mr. Shalem.  That directional trading was not disclosed to Mr. Mashinsky until January 2022, after it had already resulted in substantial losses for Celsius.

The exhibits cited in this motion that are most relevant to Mr. Treutler include Exhibits 1-14, 21, 26, 35, 40-42.

### D.    Ron Sabo

Ron Sabo was Celsius's former Head of Research and was appointed to manage the company's CEL token purchases starting in March 2021.  He is an Israeli citizen whose last known residence is in the Netherlands.  The Rule 16 discovery shows that Mr. Sabo can provide material testimony that Mr. Treutler's CEL token purchases on FTX throughout 2021 were contrary to Mr. Mashinsky's explicit instructions and were not reported to Mr. Mashinsky.  Email correspondence shows that beginning in March 2021, Mr. Sabo became responsible for setting the company's weekly strategy for CEL purchases and sales, which was then reviewed and approved by Mr. Cohen-Pavon, Mr. Leon, and Yaron Shalem.  Mr. Sabo can also provide material testimony regarding CEL token purchases that he executed on behalf of Celsius at the instruction of Mr. Cohen-Pavon, but did not report to Mr. Mashinsky.  Mr. Sabo was also aware of directional trading conducted by Mr. Treutler and others in the second half of 2021, but rather than report that trading to Mr. Mashinsky or the company's internal audit team, it appears that he changed the name of Celsius's "Team Directional" trading account in an apparent effort to conceal it.

The exhibits cited in this motion that are most relevant to Mr. Sabo include Exhibits 25, 26, 35, 39, 40, 41, 42.

### E.    Yaron Shalem

Mr. Shalem was Celsius's former Chief Financial Officer, and along with Mr. Cohen-Pavon, Mr. Leon, and Mr. Sabo, was responsible for setting and executing the company's strategy for weekly purchases and sales of CEL token for most of 2021.  He is an Israeli citizen who lives in Israel.  Mr. Shalem was also responsible for providing weekly financial reporting to Mr. Mashinsky and Celsius's EXCO.  It appears that throughout 2021, Mr. Shalem's financial reporting understated Celsius's CEL token purchases by hundreds of millions of dollars and deliberately omitted references to increased purchases on FTX.  It also appears that Mr. Shalem deleted references to Celsius's "Team Directional" and "Long 1" trading accounts in his weekly reporting to Mr. Mashinsky.  Those were the same trading accounts in which Mr. Treutler conducted unauthorized directional trading which caused substantial losses that were eventually reported to Mr. Mashinsky in January 2022.

The exhibits cited in this motion that are most relevant to Mr. Shalem include Exhibits 12, 14, 19, 26, 35, 38, 39-45, 56.

### F.    Yarden Noy

Mr. Noy was Celsius's former outside counsel (at the same law firm as Mr. Cohen-Pavon), and then in-house counsel and Head of Regulation.  He is an Israeli citizen who lives in Israel.  Mr. Noy was primarily responsible for communicating any necessary changes to the weekly AMAs during the pre-AMA prep process and post-AMA editing process. It appears that Celsius's former General Counsel has already informed the government that Mr. Noy was responsible for reviewing all aspects of the company's marketing in 2021 and 2022, including Mr. Mashinsky's weekly AMAs.  The Rule 16 discovery corroborates that Mr. Noy was involved in the pre-AMA prep process, which included Mr. Mashinsky, and the post-AMA editing process that the company put in place in early 2021, which largely excluded Mr. Mashinsky.  Mr. Noy

can provide material testimony on advice that he communicated to Mr. Mashinsky about several

of the supposedly fraudulent misrepresentations charged in the indictment.  It also appears that as

to several other misrepresentations charged in the indictment, Mr. Noy and Mr. Cohen-Pavon

chose not to advise Mr. Mashinsky about perceived inaccuracies, nor did they ask him to correct

any of his prior statements.  That decision was made at the same time that the company was

pursuing both a public listing and the settlement of an SEC investigation.  In connection with

that investigation, it appears that Mr. Noy and Mr. Cohen-Pavon were submitting to the SEC

examples of what they perceived to be inaccurate public statements by Mr. Mashinsky, including

statements that are quoted in the indictment.

The exhibits cited in this motion that are most relevant to Mr. Noy include Exhibits 3, 16,

17, 18, 28, 29, 46-54.

## ARGUMENT

### I.    TESTIMONY FROM THE PROPOSED WITNESSES IS WARRANTED BY EXCEPTIONAL CIRCUMSTANCES AND IS IN THE INTEREST OF JUSTICE

**Legal Standard**

Rule 15(a)(1) of the Federal Rules of Criminal Procedure provides, in relevant part, that

"[a] party may move that a prospective witness be deposed in order to preserve testimony for

trial.  The court may grant the motion because of exceptional circumstances and in the interest of

justice."  Fed. R. Cr. P. 15(a)(1).  The decision whether to grant a Rule 15 motion is within the

discretion of the trial court.  *United States v. Johnpoll*, 739 F.2d 702, 708 (2d Cir. 1984), *cert.

denied* 469 U.S. 1075 (1984) (superseded on unrelated grounds).

The standard for "exceptional circumstances" is satisfied where: (1) it appears that a

prospective witness may be unable to attend or is prevented from attending a trial or hearing; (2)

the testimony of such witness is material; and (3) it is necessary to take the witness's deposition

in order to prevent a failure of justice. *United States v. Singleton*, 460 F.2d 1148, 1154 (2d Cir. 1972); *see also United States v. Dunseath*, Case No. 98-cr-493 (JGK), 1999 WL 165703, at *1 (S.D.N.Y. March 25, 1999) (citing *Johnpoll*, 739 F.2d at 708).

**A.      Each of the Witnesses is Unavailable to the Defense**

A witness's unavailability "is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." *United States v. Grossman*, 03 Cr. 1156 (SHS), 2005 WL 486735, at *2 (S.D.N.Y. Mar. 2, 2005) (quoting *Johnpoll*, 739 F.2d at 709). "It is well established that movants need not present proposed witnesses' affidavits or prior statements to establish unavailability." *United States v. Fargesen*, 21 Cr. 602 (LAP), 2022 WL 4110303, at *3 (S.D.N.Y. Sept. 8, 2022). Instead, "[c]ourts may accept the assertions of counsel on the facts relating to unavailability, as long as those assertions are neither conclusory nor speculative." *Id.* (citing *Grossman*, 2005 WL 486735, at *3).

In *United States v. Little*, Judge Carter granted Rule 15 motions by both parties after finding the proposed witnesses unavailable due to the fact that they were non-U.S. citizens who resided abroad and were unwilling to travel to the United States to testify at trial. No. 12 Cr. 647 (ALC), 2014 WL 1744824, at *2 (S.D.N.Y. Apr. 23, 2014). Similarly, in *United States v. Menendez*, Judge Stein found that the defendant satisfied the unavailability prong of Rule 15 based on representations that the proposed deponents "will not voluntarily testify at the trial" and the court's finding that "the three men all reside in the United Kingdom, which is beyond this Court's subpoena power." 23 Cr. 490 (SHS), 2024 WL 2214906, at *1 (S.D.N.Y. May 16, 2024) (internal citation omitted) (motion denied on other grounds).

As set forth in the accompanying attorney declaration, the government has never disputed the unavailability of any of the proposed witnesses.  Westfal Decl. ¶ 19.  Other than Daniel Leon, each witness is a non-U.S. citizen who resides outside the United States, is therefore outside the subpoena power of the Court, and either has informed the defense (through counsel) that he is unwilling to come to the United States to testify at trial or has refused to respond to multiple requests by defense counsel.[4]  Westfal Decl. ¶¶ 9-14.  That is all that is required to establish unavailability in this district.  *Little*, 2014 WL 1744824, at *2; *Menendez*, 2024 WL 2214906, at *1.

The only possible exception is Mr. Cohen-Pavon.  Although the government has represented to defense counsel that it "expects" Mr. Cohen-Pavon to be available to testify at trial, there is no assurance that he will appear as a witness.  Westfal Decl. at ¶¶ 17, 19.  In the event that Mr. Cohen-Pavon testifies in the government's case-in-chief, his counsel has represented that he is also willing to testify in the defense case.  *Id.* at ¶ 9(c).  The defense considers this representation sufficient at this stage, but only if Mr. Cohen-Pavon is in fact called to testify.

In the event the government chooses <u>not</u> to call Mr. Cohen-Pavon, this motion is necessary to protect Mr. Mashinsky's right to preserve his testimony for trial.  If Mr. Cohen-Pavon is not called by the government, his counsel has represented that he is not willing to travel to the United States to testify in the defense case.  *Id*.  If that were to happen, Mr. Cohen-Pavon would be unavailable to Mr. Mashinsky under Rule 15.  *Little*, 2014 WL 1744824, at *2.  Thus,

---

[4]  Because Daniel Leon is an American citizen, Mr. Mashinsky moves for an order granting him permission to serve a subpoena requiring Mr. Leon's appearance at trial, rather than proceeding under Rule 15.  Under 28 U.S.C. § 1783(a), there is no unavailability or materiality requirement, only that the testimony sought by the movant is "necessary in the interest of justice."  The defense has identified no case law suggesting that Section 1783(a)'s standard is more stringent than Rule 15.  Accordingly, the defense submits that a showing of "exceptional circumstances" under Rule 15 is sufficient to satisfy the interest of justice standard under 28 U.S.C. § 1783(a).

short of an assurance from the government that it will be calling Mr. Cohen-Pavon, Mr.

Mashinsky should be permitted to obtain his deposition testimony to preserve it for trial.

### B.    Each of the Witnesses is Material to Mr. Mashinsky's Defense[5]

Following a meet-and-confer session in which the defense laid out nearly all of the facts

described in this motion, the government informed the defense that "*we just don't think these*

*individuals meet the high standard necessary for having trial testimony by deposition*."  Westfal

Decl. ¶¶ 18-21.  The government provided no further explanation.

The government's position runs counter to the bulk of authority on this issue.  Under Rule

15, a witness's testimony is material if it "would challenge central aspects of the government's

allegations."  *Grossman*, 2005 WL 486735, at *4.  However, "it is not necessary that [the]

defendant show the testimony will surely acquit him."  *Id.* at *3 (quoting *United States v.*

*Bronston*, 321 F. Supp. 1269, 1272 (S.D.N.Y. 1971)); *see also Little*, 2014 WL 1744824, at *1.

Instead, a defendant need only show that the testimony "would tend to disprove the

Government's assertion[s]."  *United States v. Alexandre*, 22 Cr. 326 (JPC), 2022 WL 9843495, at

*3 (S.D.N.Y. Oct. 17, 2022).  As Judge Cronan explained in *Alexandre*, "materiality is primarily

a question of *relevance*, not necessity."  *Id.* at *4 (citations omitted).

As is the case with unavailability, a movant's representations are sufficient to demonstrate

materiality.  *United States v. Vilar*, 568 F. Supp. 2d 429, 440 (S.D.N.Y. 2008) (Sullivan, J.).  The

moving party is not required to present affidavits from the proposed deponents, or any other

materials concerning their prior statements, and "courts reviewing Rule 15 applications have

---

[5]  This section should not be interpreted as an exhaustive recitation of all material evidence identified to date.
Rather, given the complexity of this case and the volume of discovery produced by the government, this section
summarizes the most relevant evidence identified to date based on the defense's understanding of the grand jury's
indictment.

overwhelmingly rejected such requirements." *Id.* In addition, the admissibility of the proposed

testimony need not be considered when determining its materiality. *Id.* at 440 n.10 (citation

omitted); *see also United States v. Salim*, 855 F.2d 944, 950-51 (2d Cir. 1988).

Courts in this district have granted Rule 15 motions by defendants under analogous

circumstances. *See Alexandre*, 2022 WL 9843495, at *3-5 (finding proposed testimony from

corporate representatives of crypto platforms material because it "would be highly relevant to a

primary defense against [fraud] charges, would assist the jury in understanding the evidence, and

could help the defendant present the 'most thorough defense' possible") (citation omitted); *see

also Little*, 2014 WL 1744824, at *2 (ordering deposition of witness whose testimony would

"establish that Little only attended the first part of the August 8, 2001 meeting at the Four

Seasons hotel during which the secret inheritances were not discussed"); *United States v. Wey*, 15

Cr. 611 (AJN), 2017 WL 237651, at *25 (S.D.N.Y. Jan. 18, 2017) (ordering Rule 15 deposition

of fugitive co-defendant in securities fraud and market manipulation case, and finding "there can

be no doubt" expected testimony was material based on FBI interview memo showing deponent

would testify that he "never did business with or received trading instructions or payments from"

defendant); *Fargesen*, 2022 WL 4110303, at *4 (ordering Rule 15 depositions of three witnesses

whose expected testimony would contradict fraud and conspiracy allegations, including witness

referenced in the indictment as "Individual-1"); *United States v. Banki*, 10 Cr. 08 (JFK), 2010

WL 1459442, at *1 (S.D.N.Y. April 6, 2010) (ordering Rule 15 deposition of seven witnesses

expected to provide "an alternate explanation for the money transfers that are the subject of the

indictment"). The same is true of courts outside this district. *See, e.g., United States v. Fleet

Mgmt. Ltd.*, 07 Cr. 279, 2007 WL 2463364, at *2 (E.D. Pa. Aug. 28, 2007) ("[G]iven that one of

the central factual issues in this case will be whether the Ship's occupants illegally discharged oil

into the ocean, we can think of no witnesses that are more material than the very individuals who are alleged to have discharged the oil.").

### 1.    Summary of Defenses

Mr. Mashinsky should have the same opportunity as the government to present witnesses in support of his theory of the case.  Justice requires it.

### a.    Market Manipulation Charges

With regard to the manipulation charges, Mr. Mashinsky's defense is that he lacked criminal intent and acted in good faith, relying on the information that was reported to him (and not reported to him) by others.  Out of hundreds of thousands of CEL token purchases executed by Celsius during the indictment period, Mr. Mashinsky appears to have been personally involved in no more than a handful.  When the defense sought clarity from the government as to which transactions formed the basis of the manipulation charges, the government responded, in sum and substance, that all of Celsius's CEL token transactions are within the scope of the charges.  Westfal Decl. ¶¶ 5-6.  Quite simply, if Mr. Mashinsky is being charged based on CEL token purchases that were executed by other people, then those other people are plainly material witnesses.  *Fleet Mgmt.*, 2007 WL 2463364, at *2 ("we can think of no witnesses that are more material than the very individuals who are alleged to have discharged the oil").  This applies to Roni-Cohen Pavon, Daniel Leon, Johannes Treutler, Ron Sabo, and Yaron Shalem.

During the manipulation alleged between July 2020 through April 2021, Mr. Mashinsky plans to show that he never intended to artificially inflate the price of CEL token.  To the contrary, the evidence will show that Mr. Mashinsky understood that Celsius was purchasing CEL token in line with written procedures that were reviewed and approved by the company's legal, risk, and finance professionals, and outside counsel, including a U.S. law firm.  Westfal

Decl. Ex. 2 (Mashinsky Nov. 23, 2019 WhatsApp message to Johannes Treutler: "*Asaf will send you BTC and ETH to start buying CEL.  The lawyers asked to set a written program so it's clear how you are doing it for Celsius and the community.*").[6]  Those written procedures included instructions reviewed and approved by counsel acknowledging that: (i) Celsius intended to "*buy CEL for the lowest possible average price*" to save the company millions of dollars a year, Westfal Decl. Ex. 5; (ii) "*especially in weeks with selling pressure the weekly CEL accumulation is key for price stability*," Westfal Decl. Exs. 6-7; and (iii) Celsius had active buy and sell orders for CEL token "*at the near market (+ - 25% [price] move)*" and would re-purchase on exchanges between 25-50% of the CEL tokens sold to customers via the OTC desk in order to "*support $CEL.*"  Westfal Decl. Ex. 8 (at pages 375014 and 375026).[7]  The government alleges that buying CEL token when the price was low, buying when there was selling pressure, and buying back a percentage of OTC sales amounts to criminal market manipulation.  Mr. Mashinsky intends to show that all of that conduct was reviewed and approved by Celsius's legal, risk, and finance professionals, negating any suggestion of criminal intent.

In addition, both the historic trading data for Celsius's market activity, and the weekly updates that were provided to Mr. Mashinsky in real time, show that from July 2020 through

---

[6]  The Rule 16 productions from the government include extensive email correspondence with company counsel relating to Celsius's purchases of CEL token.  Many of those emails were produced with redactions as apparently Celsius has deemed the communications privileged.  *See, e.g.*, Westfal Decl. Exs. 3-4.  The government has informed the defense that it entered into a stipulation with Celsius whereby the company agreed to waive the attorney-client privilege for a limited category of communications.  However, that category does not include this critical correspondence relating to the company's procedures around its weekly CEL token purchases.

[7]  Note that this proposal for Celsius to re-purchase or "hedge" 25-50% of CEL tokens sold by its OTC desk necessarily meant that the company would engage in what the indictment deems "excess purchasing," since the 25-50% would be on top of purchases for weekly customers rewards.  However, the indictment does not appear to account for the fact that there would also necessarily be more sales of CEL token than purchases since Celsius was only buying back a percentage of its OTC sales.  Nor does the indictment explain how a company can artificially inflate the price of its token by selling more than it bought, which is what appears to have happened throughout the period of alleged manipulation charged in this case.

April 2021, Celsius <u>sold</u> approximately $60 million more CEL tokens than it bought.[8]  That is, while the government alleges that Celsius's excess buying drove up the price of CEL token, Mr. Mashinsky expects the trading data to show that Celsius engaged in excess selling during this period.  The updates that were provided to Mr. Mashinsky at the time included an EXCO report from Johannes Treutler showing that Celsius's sales of CEL token exceeded its purchases by $22 million from October 1, 2020 through January 3, 2021, the period highlighted in the indictment as when the price of CEL increased to $5.50.  Westfal Decl. Ex. 9 (at page 2608588); Indict. ¶ 55.  Those updates also included "weekly CEL reports" showing that Celsius had not made any "CEL surplus" purchases in the 35 weeks prior to November 3, 2020.  Westfal Decl. Ex. 10 (at page 88946).  In other words, the evidence will show that Mr. Mashinsky was consistently presented with data showing that Celsius's market activity during this period was consistent with the company's written procedures and, if anything, would have driven the price <u>down</u> considering that the company's $60 million in excess sales were executed via its OTC desk at prices <u>below</u> CEL token's market price.  *See, e.g.*, Westfal Decl. Ex. 11 ("*up to 10% discount on the purchase price*").

From mid-April 2021 forward, when the indictment charges that Celsius "resumed" its massive purchases of CEL token, Indict. ¶ 64, the evidence will show that a small group of Celsius employees—specifically, five of the six witnesses proposed in this motion—secretly began purchasing CEL token in a manner that was contrary to Mr. Mashinsky's instructions. Rather than purchasing CEL token in the company's dedicated "CEL" subaccount on the FTX

---

[8] The government has produced voluminous trading data that supposedly reflect Celsius's CEL token transactions on the Liquid and FTX cryptocurrency exchanges during the indictment period.  Given the volume of that data, which total hundreds of thousands of transactions, the defense's review and evaluation is ongoing.  However, a purported expert analysis submitted on behalf of the Unsecured Creditors' Committee in Celsius's Chapter 11 bankruptcy found that from July 2020 through April 2021, Celsius sold nearly $58 million more CEL token than it bought.  Case No. 22-mg-10964, ECF No. 3580 (Declaration of Maxwell Galka), at 63 (S.D.N.Y. Sept. 27, 2023).

cryptocurrency exchange, the purchases were carried out in a separate subaccount called "CNC."
That account was where Celsius was supposed to be executing an approved "cash and carry"
trading strategy that had nothing to do with CEL token purchases.  The purchases were also in
disregard of Mr. Mashinsky's repeated instructions that Celsius should be net sellers of CEL
token, and that the company's OTC desk should, for example, net $1 million in sales per day, or
$100 million in sales by August 2021.  Westfal Decl. Exs. 12-13.  The Rule 16 discovery
suggests that these CNC purchases were also deliberately concealed from Mr. Mashinsky and the
company's EXCO, precisely because they caused Celsius to buy approximately $190 million
more CEL token than it sold from May 2021 through January 2022.[9]

Testimony concerning this conduct is vital for Mr. Mashinsky to establish lack of intent
and lack of knowledge; that is, to confirm that he instructed his team to do the opposite of what
they did—Mr. Mashinsky consistently instructed them to <u>sell</u> CEL token on a net basis, not buy
it.  Westfal Decl. Ex. 12.  Testimony from the proposed witnesses is also essential to confirm
documentary and other evidence showing that the company's CEL purchases in the CNC account
during this period were not included in the weekly reporting provided to Mr. Mashinsky and
Celsius's EXCO.  Westfal Decl. Ex. 14 (at pages 376969 and 376983); Ex. 1, at 7 (excerpts of
Cohen-Pavon interview).

### b.    Fraud Charges

As to the fraud charges, the evidence will show that Mr. Mashinsky never knowingly
misrepresented any facts to his customers, and he never intended to defraud anyone.  In addition
to demonstrating a lack of falsity, Mr. Mashinsky will show that he believed in good faith that his

---

[9] According to report submitted on behalf of the Unsecured Creditors' Committee in the Celsius Chapter 11
bankruptcy.  *See* n.8, *supra*.

employees would follow the instructions he provided, and he relied in good faith on the information those employees provided to him. As discussed below, that information included advice from the company's in-house counsel regarding certain of the public statements charged in the indictment.

As to other charged statements, however, the evidence will show that Celsius's legal and risk personnel made edits to Mr. Mashinsky's AMAs, but for some reason, chose not to share those edits with him. Mr. Mashinsky understood that the company had implemented a structured process to: (i) review the talking points for his AMAs each week; (ii) hold an internal prep meeting ahead of each AMA that included legal, risk, finance and regulation personnel; and (iii) have the company's legal, risk, and regulation teams review the transcript of each AMA and make any edits they found necessary before posting the AMA video to the company's website and social media channels. Westfal Decl. Ex. 15 (starting at page 148328).

As a result of this review process, Mr. Mashinsky fully expected and understood that any accidental or unintentional inaccuracies in his public statements would be brought to his attention. And when they were, the evidence shows that Mr. Mashinsky accepted them, which is evidence of good faith, not fraud. *See, e.g.*, Westfal Decl. Ex. 16. Yet other than a handful of times, AMA corrective edits were almost always made behind Mr. Mashinsky's back and without his knowledge. For example, the indictment specifically notes two statements being edited out of the recorded version of the AMAs, but it appears that neither corrective edit was ever disclosed to Mr. Mashinsky. Indict. ¶¶ 30, 41. Witness testimony is therefore needed to establish that AMA edits should have been communicated to Mr. Mashinsky, and were not. This undermines the government's apparent theory of Mr. Mashinsky's knowledge of falsity.

The evidence also shows that Mr. Cohen-Pavon and the company's Chief Risk Officer were fully aware that edits were not being communicated to Mr. Mashinsky. Westfal Decl. Ex. 17 (at page 149371). This is material to Mr. Mashinsky's defense because at least as to Mr. Cohen-Pavon, Mr. Mashinsky had a years' long practice of seeking and receiving advice regarding his public statements. *See* Westfal Decl. Ex. 24 (excerpts of Mashinsky and Cohen-Pavon WhatsApp messages). However, it appears that at some point in 2021 or 2022, Mr. Cohen-Pavon decided to stop advising Mr. Mashinsky about his public statements, which Mr. Mashinsky understood was part of Mr. Cohen-Pavon's job responsibilities as in-house counsel. Instead, Mr. Cohen-Pavon started collecting examples of what he and others at Celsius perceived to be inaccuracies in Mr. Mashinsky's public statements, and transmitting them to the SEC (without informing Mr. Mashinsky). Westfal Decl. Ex. 18 (at page 2502764). The SEC commenced an investigation into Celsius in mid-2021, and by April 2022, it appears that the company was expecting to resolve that investigation through an out-of-court settlement. Westfal Decl. Ex. 29 (at page 03001720). Given Mr. Mashinsky's years of interactions with Mr. Cohen-Pavon, and expectation that he would advise him as to any potential issues with his public statements, Mr. Cohen-Pavon's unilateral decision to stop providing that advice is highly relevant to Mr. Mashinsky's good faith belief in the accuracy of his statements. *See United States v. Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 2014), Trial. Tr. (Dkt. 63), at 83-85 (permitting defendant to elicit testimony that attorneys were involved in the charged transactions, that their involvement affected his state of mind, and that attorneys reviewed the charged transactions and the defendant "took comfort in the attorney silence").

As to each of these defenses, Mr. Mashinsky should not be forced to rely solely on argument and inferences based on documentary evidence, or what Judge Farbiarz of the District

of New Jersey recently termed "paper testimony." *Coburn*, 2024 WL 3648083, at *3. Testimony

from the Celsius employees who were there at the time, who were part of the very conversations

charged in the indictment, is essential to Mr. Mashinsky's defense, especially given the

complexity of the indictment. *Fargesen*, 2022 WL 4110303, at *4 (ordering Rule 15 deposition

of witness referenced in the indictment as "Individual-1"); *Alexandre*, 2022 WL 9843495, at *3-5

(testimony material because it "would assist the jury in understanding the evidence").

### 2.    Materiality of Witnesses

Aside from the substance of the Rule 16 discovery discussed below, there are also

objective ways for the Court to assess the materiality of these witnesses. To date, the

government has produced more than 170,000 documents from the custodial files of the six

proposed witnesses. Westfal Decl. ¶ 7. The defense does not know if the government has ever

communicated with Mr. Leon, Mr. Shalem, or Mr. Noy. The government has already spoken

with Mr. Cohen-Pavon or his counsel at least three times, and Mr. Treutler or his counsel at least

five times, including once when the FBI questioned him in an interrogation room at Newark

International Airport. Westfal Decl. Ex. 1, at 6-8; 12-14. The defense also understands that the

government has communicated through counsel that Mr. Sabo is (or was) a subject of their

investigation. Westfal Decl. ¶ 12(a). All of this is to say, the government's own activity is proof

that these witnesses are material.

### a.    Roni Cohen-Pavon

On the manipulation charges, Mr. Cohen-Pavon's testimony is essential for confirming

the written CEL purchase procedures that he reviewed and approved in 2019 and 2020 as

Celsius's outside counsel. *See, e.g.*, Westfal Decl. Ex. 6-7. His testimony is also needed to

confirm that at least as early as April 2021, he began instructing Johannes Treutler to execute

CEL token purchases in a manner directly contrary to Mr. Mashinsky's instructions.  For example, Mr. Cohen-Pavon is expected to confirm that Mr. Mashinsky instructed his employees in March 2021 that Celsius should only be buying 50% of customers' weekly rewards on exchanges, and that Celsius should be net <u>selling</u> $1 million worth of CEL token per day.  Westfal Decl. Exs. 19, 12.  Unless the government concedes that these instructions in fact reflected Mr. Mashinsky's good faith intent to engage in excess <u>selling</u> during this period, and not excess <u>buying</u>, Mr. Cohen-Pavon's testimony is essential to confirm the legitimacy of Mr. Mashinsky's instructions.  *Wey*, 2017 WL 237651, at *25; *Banki*, 2010 WL 1459442, at *1.

Despite Mr. Mashinsky's clear instructions to sell CEL token, the Rule 16 discovery shows the following:

- On April 30, 2021, Mr. Cohen-Pavon sent a direct message to Mr. Treutler via WhatsApp stating: "*get me to 8*."  Mr. Cohen-Pavon followed that instruction with a wink emoji and an explanation: "*We really need this strategically*."[10] Westfal Decl. Ex. 21 (at pages 3411138-39).  At the time, the price of CEL token was less than $6.[11]  That is, it appears Mr. Cohen-Pavon was instructing Mr. Treutler to buy CEL token to boost the price in contravention of Mr. Mashinsky's express instructions.

- In August 2021, Mr. Cohen-Pavon wrote to Mr. Treutler, "*I'll not risk this [financing] round because of this*," and "*I don't care if you stop trading because the fact you are trading and not reporting properly puts this company in a bigger risk*."  Mr. Cohen-Pavon then told Mr. Treutler that "*we don't have an investment, but rather a convertible note, because the investors think your reports are inaccurate . . . if they will find out it's true, this [financing] round is dead*."  *Id.* (at page 03411169).  These messages suggest that Mr. Cohen-Pavon knew by August 2021 at the latest that Mr. Treutler's trading reports, which Mr. Mashinsky relied on, were not accurate.

---

[10] The day before this instruction, Celsius had begun discussions with a private equity firm named Westcap about a potential investment in the company.  Westfal Decl. Ex. 20.  In other words, Mr. Cohen-Pavon's instructions appear to have been motivated by a desire to boost Celsius's numbers to make it look more attractive to Westcap.  Ultimately, Westcap and a Canadian pension fund manager named CDPQ closed their equity investment in Celsius in November 2021 after six months of due diligence.

[11]  Historical CEL token prices available at: https://coinmarketcap.com/historical/20210430/.

- On September 1, 2021, Mr. Cohen-Pavon instructed Mr. Treutler to start buying 100% of rewards on FTX.  When Mr. Treutler told Mr. Cohen-Pavon that doing so would "*definitely contribute to a stabilization between $5.50-6*," Mr. Cohen-Pavon responded, "*6??? You lose . . . loser . . . Bring us to 7*." And when Mr. Treutler responded, "*I am not a magician*," Mr. Cohen-Pavon told him, "*Yes you are* :)." *Id.* (at page 3411172).

- Two days later, Mr. Cohen-Pavon instructed Mr. Treutler, "*let's take it to $9.99*." Mr. Treutler responded, "*I mean . . that's no problem.  I just need $25M+ . . it'll definitely look good on our balance sheet*." *Id.* (at page 3411173).

- On November 24, 2021, the same day that Westcap and CDPQ announced investments in Celsius, Mr. Cohen-Pavon himself purchased 200,000 CEL tokens for Celsius on FTX after asking Mr. Treutler, "*How much do you need in order to push it towards 4.55?*"  When Mr. Treutler learned about the purchase and commented that he did not know Mr. Cohen-Pavon had access to FTX, Mr. Cohen-Pavon responded, "*I have everything* ;)." *Id.* (at pages 3411200-3411201).

The defense has not found evidence that any of these instructions from Mr. Cohen-Pavon were reported to Mr. Mashinsky.  Quite the opposite.  On October 1, 2021, the very day that Mr. Cohen-Pavon told this Court that he started directing a pattern of excess CEL token purchases, he wrote to Mr. Mashinsky: "*Talked with Johannes.  We are not pushing the price in any way*." Westfal Decl. Ex. 24 (at pages 2471-72).

Within days of Mr. Cohen-Pavon's April 30 instruction to "*get me to 8*," it appears that Mr. Treutler began executing massive CEL token purchases in a Celsius subaccount on the FTX exchange called "CNC."  This was a subaccount where Mr. Treutler was supposed to be executing the company's approved "cash-and-carry" trading strategy, which did not require him to purchase any CEL token.  And yet, between May 2021 and January 2022, Mr. Treutler appears to have used the CNC and other Celsius subaccounts on FTX to secretly purchase hundreds of millions of dollars' worth of CEL tokens, in a manner directly contrary to Mr. Mashinsky's

instructions.[12]  In other words, even though Mr. Mashinsky directed his team to <u>sell</u> $100 million worth of CEL in 2021, they chose to <u>buy</u> multiples of that amount instead.

As discussed further below, despite these purchases, Mr. Treutler's reporting to Mr. Mashinsky and the EXCO showed that he was complying with Mr. Mashinsky's instructions. Mr. Cohen-Pavon has already told the government that he identified Mr. Treutler's reporting inaccuracies in October 2021 (even though he seems to have known about them as early as August according to his own communications with Mr. Treutler).  *Compare* Westfal Decl. Ex. 1, at 7 *and* Ex. 21 (at page 3411169).  Although Mr. Cohen-Pavon also claims that he made Celsius's EXCO aware of those inaccuracies, the defense has not found any documentary evidence to corroborate that claim.  In short, Mr. Cohen-Pavon's testimony is vital to confirm that he orchestrated a covert scheme to purchase massive amounts of CEL token between May 2021 and January 2022, and that he and others then hid those purchases from Mr. Mashinsky. *See, e.g., Fleet Mgmt. Ltd.*, 07 Cr. 279, 2007 WL 2463364 at *2 ("we can think of no witnesses that are more material than the very individuals who are alleged to have discharged the oil").

Mr. Cohen-Pavon's testimony is also needed to provide critical context to the handful of WhatsApp conversations that the indictment seems to consider full and complete disclosures of Mr. Treutler's activity to Mr. Mashinsky.  Indict. ¶¶ 66(a)-(d).  For example, his testimony is crucial for confirming that he never informed Mr. Mashinsky about any of his private instructions to Mr. Treutler ("*get me to 8*," etc.).  *Wey*, 2017 WL 237651, at *25 (testimony that alleged co-conspirator "never did business with or received trading instructions or payments from" defendant is material).  And clearly it would be material for Mr. Cohen-Pavon to confirm

---

[12]  The defense has not yet confirmed the precise U.S. dollar value or amount of CEL tokens purchased by Mr. Treutler during this period.

that after he sent the messages quoted in the indictment, Mr. Mashinsky's response was not to

join in his alleged scheme or encourage it, but rather to direct Mr. Cohen-Pavon to ramp up

Celsius's marketing of CEL token. *Fargesen*, 2022 WL 4110303, at *4 (testimony that disputes

conspiracy allegations is material); *Banki*, 10 Cr. 08 (JFK), 2010 WL 1459442, at *1 (testimony

that provides alternate explanation for charged transactions is material).

In short, Mr. Mashinsky's response to Mr. Cohen-Pavon was that he should stop buying

CEL from existing users on FTX and start marketing CEL to attract new buyers and customers

earning in CEL instead. For example, after Mr. Cohen-Pavon's October 30, 2021 message

quoted in the indictment, Indict. ¶ 66(a), Mr. Mashinsky responded:

> *Instead of focusing on the market maker focus on a plan with [Celsius's head of marketing] and launch marketing spend on CEL next week. Also new listings will help a lot . . . Just met with Arben. He will help launch CEL in Korea and list on Upbit . . . Buying from existing CEL holders on FTX does not solve any of our problems . . . What we need is NEW retail users buying on Uniswap. To get that you need a marketing push where they live. Telegram, Reddit, Asian forums and so on . . . None of these retail guys know anything about Celsius or that we even have a token. All we do is keep telling everyone in the company NOT to talk about CEL. Work with [Celsius's head of marketing] to create a swat team that only does CEL.*

Westfal Decl. Ex. 22 (at pages 2600142-45).

Mr. Cohen-Pavon's testimony is also material on several categories of alleged

misrepresentations charged in the fraud counts. Specifically, Mr. Cohen-Pavon's testimony will

corroborate Mr. Mashinsky's good faith reliance on the information provided—and not

provided—by his team. For instance, the indictment charges that the return of the 117 million

tokens to Celsius's treasury in April 2020 was the culmination of "*an elaborate effort to make*

*MASHINSKY's false claims appear true[,]*" and a violation of the company's whitepaper

published in advance of the ICO. Indict. ¶¶ 19, 21. Mr. Cohen-Pavon, who drafted the loan

documentation that is described in the indictment, *see* Westfal Dec. Ex. 55, has already

confirmed to the government that Celsius received legal advice from Latham & Watkins that

returning the tokens to the treasury would <u>not</u> be a violation of the whitepaper because the whitepaper did not create binding legal obligations for Celsius.  Westfal Decl. Ex. 1, at 8; *see also* Westfal Decl. Ex. 23 (April 7, 2020 Board minutes at pages 25043-44).[13]  His testimony will therefore support Mr. Mashinsky's defense that the transactions described in the indictment were neither "*an elaborate effort*" to cover up fraud nor a violation of Celsius's whitepaper.[14]  *See United States v. Bankman-Fried*, S6 22-cr-0673 (LAK), 2023 WL 6392718, at *1 (S.D.N.Y. Oct. 1, 2023) ("Thus, the evidence concerning the presence, involvement and even advice of lawyers in relevant events is viewed best as evidence probative of the defendant's intent to defraud or lack thereof.") (citing *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017)).

As to Celsius's market-neutral strategy, the indictment alleges that Mr. Mashinsky knowingly lied to customers because he knew about directional trading in or about January 2022.  Indict. ¶ 33.  However, just like Mr. Treutler's secret CEL token purchases in the CNC subaccount, it appears that Mr. Cohen-Pavon was fully aware of directional trading that Mr. Treutler was conducting in contravention of Mr. Mashinsky's instructions.  For example, on November 21, 2021, Mr. Cohen-Pavon informed Ron Sabo that he was cancelling a weekly call with Westcap and CDPQ because, "*I don't want to show them that Johannes also lost at the casino*."  Westfal Decl. Ex. 25 (at page 3377278).  The Rule 16 discovery also confirms that in September 2021, Mr. Cohen-Pavon asked Mr. Sabo, Mr. Shalem, Mr. Treutler, and others to

---

[13]  What Mr. Cohen-Pavon appears not to have confirmed to the government is that he is the one that coordinated that advice from Latham & Watkins on behalf of Celsius.  On March 18, 2020, he reported to Mr. Mashinsky: "*probably resolved the AMV issue without burning it.  Sent my legal arguments to UK counsel, now had a call with them during which they said they can support it.  They're making a memo out of it and send it to us so that the board can make a final decision*."  Westfal Decl. Ex. 24 (at page 200-202).

[14] According to the government, Mr. Mashinsky returned 117 million CEL tokens to Celsius's treasury in April 2020, at the same time that he was supposedly conspiring to artificially inflate the price of CEL.  Indict. ¶ 52.  The indictment alleges that Mr. Mashinsky agreed to purchase those tokens from Celsius for $18 million.  *Id.* ¶ 19.  At its peak of approximately $8 per token, the CEL tokens that Mr. Mashinsky agreed to return to the company were worth more than $900 million.

change the name of Celsius's "team directional" trading account "*before it becomes to be some of the company's terminology*."  Westfal Decl. Ex 26.  The discovery suggests that, at least in part because of this concealment by Mr. Cohen-Pavon, Mr. Mashinsky did not learn about months of directional trading until substantial losses were incurred and disclosed to him in January 2022.

Mr. Cohen-Pavon's testimony is also material for Mr. Mashinsky's alleged misrepresentations regarding Celsius's institutional loan collateralization.  The indictment highlights an April 2022 CNBC interview in which Mr. Mashinsky allegedly stated that Celsius did not offer uncollateralized loans.  Indict. ¶ 37.  The evidence shows that immediately after that interview was aired, Celsius's head of marketing sent a text message to the EXCO, including Mr. Mashinsky, Mr. Cohen-Pavon, and Mr. Leon, congratulating Mr. Mashinsky on the interview: "*Alex's interview with CNBC went well.  The focus was on how our business model works, how we generate yield, and our POV on regulation*."  Westfal Decl. Ex. 27 (at page 54835).  Later that day, Celsius's Chief Risk Officer, Rodney Sunada-Wong, circulated a link to the interview, but neither Mr. Cohen-Pavon nor anyone else on the chain ever suggested to Mr. Mashinsky that his comments about loan collateralization were inaccurate, much less fraudulent.

However, three days later, Mr. Cohen-Pavon and Celsius's Head of Regulation Yarden Noy discussed among themselves statements by Mr. Mashinsky during that very interview that they considered inaccurate, including "*don't do uncollateralized*."  Westfal Decl. Ex. 28.  The defense understands that this email conversation between Mr. Cohen-Pavon and Mr. Noy took place as Celsius was trying to finalize a settlement with the SEC.  Westfal Decl. Ex. 29 (April 5, 2022 draft blog post: "*Celsius Network Reaches Benchmark Agreement with SEC*").  The defense also understands that for the prior several months, Mr. Cohen-Pavon and Mr. Noy had been working with an outside vendor to collect for the SEC examples of allegedly inaccurate

statements by Mr. Mashinsky, instead of advising Mr. Mashinsky to correct them.  Westfal Decl.

Ex. 18**.**  It thus appears that Mr. Cohen-Pavon once again failed to follow a formal procedure that

had been set up at Celsius, in this case to review Mr. Mashinsky's public statements.  In doing so,

he also abandoned a years-long practice of advising Mr. Mashinsky regarding his statements.

*See* Westfal Ex. 24.  Mr. Cohen-Pavon's testimony is therefore material in showing that after his

April 2022 CNBC interview, Mr. Mashinsky saw a congratulatory text from Celsius's head of

marketing to the EXCO (including Mr. Cohen-Pavon), and nothing else.

This was not the only time that Mr. Cohen-Pavon was aware that guidance was not being

shared with Mr. Mashinsky.  Less than a week before, on April 8, 2022, Mr. Cohen-Pavon asked

Mr. Sunada-Wong about a series of proposed edits to that week's AMA: "*Don't you think we*

*should have Alex on this thread? Maybe it will make him more aware of the do's and don'ts.*"

Mr. Sunada-Wong responded, "*[w]e could, but haven't added him because the email has 30*

*people in it*."[15]  Westfal Decl. Ex. 17.  Mr. Cohen-Pavon's testimony is therefore material to Mr.

Mashinsky's defense that as to several allegedly fraudulent misstatements charged in the

indictment, Mr. Cohen-Pavon and others made a deliberate choice not to alert him to perceived

inaccuracies, even though Mr. Mashinsky understood that Celsius had put in place a formal

structure for the Legal, Risk, and Regulation departments to do exactly that.[16]  *Bankman-Fried*,

2023 WL 6392718, at *1.

---

[15]  Mr. Sunada-Wong then wrote to a member of his Risk team that "*it may make sense each week to create for Alex a summary . . . that says the following items have been removed from the youtube recordings . . . with a brief explanation for why each was removed.*"  Westfal Decl. Ex. 17.  Celsius's AMA review and editing process had already been in place for nearly a year by this point, and it does not appear that this suggestion was ever implemented.

[16]  To be clear, Mr. Mashinsky does not concede that any of the charged misstatements were inaccurate or misleading.

The indictment also charges Mr. Mashinsky with fraud based on his alleged statement in a December 2021 interview that, *"[t]he regulators looked into us and said these guys know what they're doing*." Indict. ¶ 41. Mr. Cohen-Pavon is a material witness as to essentially any statement that Mr. Mashinsky made about Celsius's interactions with regulators, because such interactions were Mr. Cohen-Pavon's responsibility. The information that he reported to Mr. Mashinsky is therefore essential for evaluating Mr. Mashinsky's good faith basis for his statements. For example, only a few weeks before this December 2021 interview, Mr. Cohen-Pavon wrote to Mr. Mashinsky on WhatsApp that the "*SEC has confirmed to the states that we are a good actor and cooperating. That's why we got the extension in NJ and now got another one on Alabama. Hopefully that will ease some of the pressure*." Westfal Decl. Ex. 24 (at pages 2787-88).

It also appears that Mr. Noy flagged for Mr. Cohen-Pavon Mr. Mashinsky's April 2022 statement that "*there's not—no legal issues at least with the services that Celsius provides or so*" shortly after it was made on an AMA. Westfal Decl. Ex. 28. Yet once again, Mr. Cohen-Pavon did not share the potential inaccuracy with Mr. Mashinsky. The jury simply cannot evaluate the full context and basis for Mr. Mashinsky's statements about regulatory clarity and interactions without hearing from Mr. Cohen-Pavon.

Finally, as to the "Damn the Torpedoes" blog post that the indictment suggests was a fraudulent misrepresentation by Mr. Mashinsky, Mr. Cohen-Pavon is a material witness because he will confirm that the blog post was "*pushed for*," drafted, and approved by Mr. Leon. Westfal Decl. Ex. 1, at 8-9. It also appears he will confirm that the blog post was accurate, as he told the government that the statement about Celsius having "more than enough ETH" was approved by the company's Treasury group. *Id.*

### b.    Daniel Leon

Mr. Leon is similarly a material witness on both the manipulation and fraud charges.  As to the manipulation charges, like Mr. Cohen-Pavon, Mr. Leon was present for, and party to, critical communications regarding the review and approval of Celsius's written CEL token procedures.  *See, e.g.*, Westfal Decl. Exs. 6-7.  He can confirm the content of those communications, including that Celsius's procedures were reviewed and approved by in-house counsel, outside counsel, and Celsius's Chief Risk Officer and Chief Financial Officer.  Such testimony can  support Mr. Mashinsky's good faith basis for Celsius's market conduct between July 2020 and April 2021.  *Bankman-Fried*, 2023 WL 6392718, at *1.

It also appears that Mr. Leon will confirm that he provided direct instructions to Mr. Treutler to purchase CEL tokens in order to raise the price of CEL.  In January 2021, Mr. Cohen-Pavon told Mr. Leon that "*the currency is crashing . . . 3.97.*" Mr. Leon responded, "*I saw.*"  Mr. Cohen-Pavon asked, "*why should Johannes not raise it a bit?*" to which Mr. Leon responded, "*I will talk to him.  The question is how much cash we have . . . we will know in a few hours.*"  Westfal Decl. Ex. 30 (at pages 3426052-53).  Given that the government is seeking to hold Mr. Mashinsky criminally responsible for all of Celsius's market conduct between 2018 and June 2022, Mr. Leon is necessary to provide testimony to the effect that he spoke with Mr. Treutler at the direction of Mr. Cohen-Pavon, not Mr. Mashinsky, and that such directions were the opposite of what Mr. Mashinsky was instructing the company to do at that time.  *Wey*, 2017 WL 237651, at *25; *Banki*, 2010 WL 1459442, at *1.

Mr. Leon can also confirm the financial motivation that appears to have caused this group of employees to disregard Mr. Mashinsky's instructions.  Such motivation is material corroboration that their conduct from April 2021 through January 2022 was not accidental, and

that it was deliberately hidden from Mr. Mashinsky. In July 2021, after several months of Mr.

Treutler's concealed purchases of CEL token in the CNC subaccount, Mr. Cohen-Pavon

informed Mr. Leon that his CEL tokens were worth $300 million. Mr. Cohen-Pavon then

commented, "*I am looking to make 50, not more. And then do whatever I want*." Mr. Leon

responded, "*What is mine is yours . . . Shame. That you do not believe me. And do not know me.*

*Half yours . . . Mine. Yours. You are my partner. Period*." Westfal Decl. Ex. 31 (at pages

3427042-44). At the end of October 2021, Mr. Cohen-Pavon told Mr. Leon that a call he was

having with Westcap's due diligence advisors at Deloitte "*will determine if you are a billionaire,*

*my friend*." Mr. Leon responded, "*[b]illion or prison*." Westfal Decl. Ex. 32 (at page 3426143).

As to the fraud charges, Mr. Leon is a material witness on the ICO, since he approved the

company's decision, following advice from Latham & Watkins, to return the 117 million CEL

tokens to the treasury. Westfal Decl. Ex. 23 (at page 25043-44). Mr. Leon made that decision

along with another member of Celsius's three-person Board of Directors. Mr. Mashinsky, on the

other hand, recused himself from the decision. *Id.* As a result, if the government continues to

insist that decision was incriminating, Mr. Leon is of course a material witness. *Fleet Mgmt.*

*Ltd.*, 2007 WL 2463364, at *2.

With respect to Mr. Cohen-Pavon's apparent decision not to share comments and edits

regarding Mr. Mashinsky's public statements with Mr. Mashinsky, it appears that Mr. Leon has

material testimony to offer. For example, in June 2020, in a private WhatsApp conversation

before Mr. Cohen-Pavon had even joined Celsius as a full-time employee, but while he was then

outside counsel to the company, Mr. Cohen-Pavon wrote to Mr. Leon: "*Listen, I love this*

*company so much. In certain moment, I am really thinking of expelling Alex (we will find a*

*reason indeed) and execute a hostile takeover*[.]" Westfal Decl. Ex. 33 (at page 3425020). Mr.

Leon can confirm whether he ever informed Mr. Mashinsky that he was discussing a hostile takeover with Celsius's then-outside counsel, and soon-to-be in-house counsel.

It also appears that Mr. Leon can confirm that Mr. Cohen-Pavon's decision not to share certain edits with Mr. Mashinsky was a deliberate one. On April 9, 2022, only a few days before Mr. Mashinsky's CNBC interview and his allegedly fraudulent AMA statement about Celsius having received regulatory clarity, Mr. Leon and Mr. Cohen-Pavon engaged in another private WhatsApp chat about Mr. Mashinsky. In the chat, Mr. Cohen-Pavon commented, "*I've never met such a stupid person in my life . . . He's a stupid asshole, I've never seen anything like it*." Mr. Leon responded, "*Agree. Agree. I said it a long time ago*." Mr. Leon then directed Mr. Cohen-Pavon to return to a document they appear to have been jointly editing at that time. While discussing the document, Mr. Leon wrote to Mr. Cohen-Pavon, "*Let us get on a call with him? It will speed up his lack of understanding and help promote this. What say?*" Westfal Decl. Ex. 34 (at 3201559-60). The defense has not yet identified why Mr. Leon and Mr. Cohen-Pavon would have wanted to "*speed up*" and "*promote*" Mr. Mashinsky's "*lack of understanding*" about anything, especially at a time when Celsius believed it was on the verge of reaching a settlement with the SEC. Westfal Decl. Ex. 29.

It also appears that Mr. Leon is a material witness on Mr. Mashinsky's statements regarding Celsius's market-neutral strategy. Despite those statements, Mr. Leon participated in a September 2021 WhatsApp chat with Mr. Cohen-Pavon, Mr. Sabo, Mr. Shalem, and one other employee. In the chat, the participants appear to be openly discussing that Mr. Treutler was engaging in directional trading in contravention of Mr. Mashinsky's instructions, and that the trading was causing Celsius to suffer significant losses. Westfal Decl. Ex. 35. Despite those significant losses, the indictment suggests that Mr. Mashinsky did not learn about this directional

trading until several months later in January 2022. Indict. ¶ 33. Mr. Leon's confirmation of this chronology is therefore material to establishing the good faith basis for Mr. Mashinsky's statements and the fact that, once again, these witnesses engaged in conduct behind his back and in contravention of his instructions.

Mr. Leon is also a material witness regarding the "Damn the Torpedoes" blog post since, according to Mr. Cohen-Pavon, he is the one who pushed for, drafted, and approved it.

### c.    Johannes Treutler

The materiality of Mr. Treutler's testimony cannot be overstated. Mr. Mashinsky's defense on the manipulation charges with respect to the period of July 2020 through April 2021 is that he understood Celsius's CEL token purchases were consistent with the written procedures approved by the company's legal, risk, and finance departments. Mr. Treutler is the one who carried out those purchases, and it appears that he followed Celsius's procedures in doing so until Mr. Cohen-Pavon instructed him to "*get me to 8*" in April 2021. *Fleet Mgmt. Ltd.*, 2007 WL 2463364, at *2. As noted, the government has already spoken with him on five separate occasions. During those interviews, it appears that Mr. Treutler confirmed that at times he wanted Celsius to buy more CEL token than what Mr. Mashinsky was prepared to authorize. Westfal Decl. Ex 1, at 12. He also confirmed that Mr. Mashinsky wanted Celsius to hedge its OTC sales less than Mr. Treutler and Celsius's then-CFO did, meaning that Mr. Mashinsky wanted Celsius to buy fewer CEL tokens. *Id.* at 14. Hedging was the approved process by which Celsius would buy back a certain percentage of its OTC sales as a form of "*treasury management*." Westfal Decl. Ex. 8 (at page 375026). Mr. Treutler also confirmed that Mr. Mashinsky was "*interested in OTC proceeds and wanted to monetize Celsius's CEL token treasury*"; that is, Mr. Mashinsky wanted Celsius to be <u>selling</u> its CEL token. Westfal Decl. Ex 1,

at 14; *see Wey*, 2017 WL 237651, at *25 (establishing materiality based on FBI interview memo).

As to the alleged manipulation between July 2020 and April 2021, Mr. Treutler's testimony is also necessary to confirm the documentary evidence from this period which shows that he reported to Mr. Mashinsky, on a weekly basis, that Celsius was executing its CEL token purchases in line with the company's written policies. *See, e.g.*, Westfal Decl. Ex. 10 (at page 88946) (zero "CEL Surplus" purchases in previous 35 weeks); *see Alexandre*, 2022 WL 9843495, at *3-5. That is highly material to a defense of good faith.

Turning to April 2021 forward, Mr. Treutler's testimony is material to confirm Mr. Mashinsky's defense that when Mr. Cohen-Pavon, Mr. Leon, Mr. Sabo and Mr. Shalem took over responsibility for Celsius's OTC desk in March 2021, the company's market conduct dramatically changed. In particular, Mr. Treutler can confirm that his decision to execute massive CEL token purchases in the CNC account on FTX was contrary to Mr. Mashinsky's express instructions, and that he chose to listen to Mr. Cohen-Pavon instead. *Wey*, 2017 WL 237651, at *25 (testimony that alleged co-conspirator did not receive trading instructions from defendant material); *Banki*, 2010 WL 1459442, at *1 (testimony that provides an alternate explanation for charged instructions material). Mr. Treutler's testimony is also needed to confirm that even though he prepared a weekly slide for Mr. Mashinsky and the Celsius EXCO titled, "*$CEL KPIs—What you need to know about last week*," he never disclosed on those slides that for months he was secretly purchasing hundreds of millions of dollars of CEL token in the CNC account. *See, e.g.,* Westfal Decl. Ex. 14 (at page 376969). This is vital to Mr. Mashinsky's defense.

Mr. Treutler's testimony should also confirm that, as a result of his secret purchases, what he did report to Mr. Mashinsky was wildly inaccurate. For example, at the end of June 2021, Mr. Treutler reported to Mr. Mashinsky and the EXCO that Celsius had earned nearly $70 million in proceeds from net sales of CEL token via the OTC desk that year. *Id.* That reporting showed that Celsius was executing its CEL token purchases and sales consistent with Mr. Mashinsky's instructions, and that the company was in line to meet Mr. Mashinsky's instruction to sell approximately $100 million worth of CEL by August 2021. Westfal Decl. Ex. 13. Mr. Treutler's June 29, 2021 EXCO presentation also reported that the previous week was Celsius's "*first negative week since March*" for CEL token. Westfal Decl. Ex. 14 (at page 376969).

All of this appears to have been false. What Mr. Treutler did not report to Mr. Mashinsky is that during the months of May and June alone—apparently at the direction of Mr. Cohen-Pavon—he purchased more than $100 million worth of CEL token in the CNC subaccount, singlehandedly erasing Celsius's OTC net sales for the year by more than $30 million. So, while Mr. Mashinsky saw approximately $70 million in net <u>proceeds</u> from CEL sales reported to him at the end of June 2021, he should have seen more than $30 million in net <u>costs</u> from CEL purchases.[17] The inaccuracies in Mr. Treutler's reporting will support Mr. Mashinsky's defense that he relied on the information reported to him in good faith and did not know about Mr. Treutler's unauthorized purchases of CEL token throughout 2021.

Mr. Treutler is also a material witness on the fraud charges. The indictment charges that Mr. Mashinsky is guilty of fraud because a trader notified him in July 2021 that "*[n]o matter how we structure those momentum trades we would take a directional bet*." Indict. ¶ 32. That

---

[17] The defense understands that Mr. Cohen-Pavon has already informed the government that Mr. Treutler's weekly reporting to Mr. Mashinsky and the EXCO was inaccurate. Westfal Decl. Ex. 1, at 7.

trader was Johannes Treutler.  *See Fargesen*, 2022 WL 4110303, at *4 (ordering Rule 15

deposition of witness referenced in the indictment as "Individual-1").  The quotation suggests

that the government believes if Mr. Treutler considered Mr. Mashinsky's proposed course of

action to be directional trading, then Mr. Mashinsky must have as well.  Mr. Mashinsky's defense

is that what Mr. Treutler and others at Celsius may have thought was directional trading, was in

fact a good faith effort by Mr. Mashinsky to limit Celsius's potential losses—and thereby limit

customers' potential losses—in existing, non-directional positions.  This was not "*gambling on

the future value of cryptocurrencies*" as the indictment alleges, but rather an earnest, good faith

effort by Mr. Mashinsky to limit losses and preserve company and customer assets.  That is not

fraud, and Mr. Treutler's testimony is essential for providing this critical context to explain to the

jury what was actually happening in the market at the time.  It is the difference between paper

testimony and live witness testimony.  *Coburn*, 2024 WL 3648083, at *3.

Mr. Treutler's testimony is also key to Mr. Mashinsky's defense that this portion of the

indictment is yet another example of Celsius employees deliberately disregarding his instructions

and then hiding it from him.  The indictment alleges that Mr. Mashinsky knew in January 2022

that Celsius had taken directional bets that exceeded its own risks limits.  Indict. ¶ 33.  But the

reason he did not know before then is because Mr. Treutler and others disregarded his

instructions.  The discovery shows that Mr. Treutler engaged in directional trading throughout

the second half of 2021, with the full knowledge of Mr. Cohen-Pavon, Mr. Leon, Mr. Sabo, and

Mr. Shalem.  Westfal Decl. Ex. 35.

Mr. Mashinsky intends to show that when he learned about such trading for the first time

in January 2022, he wrote to his team, "*[w]e lost more than $26m on directional positions in the

past week, we should not have had any of these positions at all.  I don't understand why there*

*were approved or stayed on, and why Risk did not request for them to be closed or brought them up during ALCO or Risk committee meetings*." Westfal Decl. Ex. 36. Mr. Mashinsky will also show that after learning about these directional positions, and tens of millions of dollars of losses, he immediately instructed Celsius's Head of Audit to investigate and "*[u]nderstand the root cause of the CeFi [Centralized Finance] trading activity which resulted in significant losses during the month of January 2022*." Westfal Decl. Ex. 37. Mr. Treutler's testimony is essential for confirming this crucial chronology, and placing into context what the indictment alleges to be Mr. Mashinsky "*tak[ing] control of Celsius's trading and direct[ing] that Celsius's traders take a large directional bet in bitcoin[.]*" Indict. ¶ 33. Mr. Mashinsky's defense is that such alleged transactions were yet another example of his attempts to de-risk Celsius's portfolio and to limit losses from existing positions, in this case losses from directional positions that were opened against his instructions and concealed from him for months.

### d.    Ron Sabo

Mr. Sabo's testimony is likewise material on the manipulation charges and directional trading allegations. As to the manipulation charges, the discovery confirms that on March 20, 2021, Mr. Mashinsky emailed the company's new CFO, Yaron Shalem, and directed that he take over responsibility for the company's OTC desk. His instructions to Mr. Shalem were clear:

> *Seems the OTC desk is doing whatever they want – cutting sweet deals for "friends" of Celsius . . . Instead of our team defending the dump they sell out at low prices and let the buyers manipulate the system . . . 90% of the [OTC] transactions are buys so we should have no problem to get the $100m we need on our balance sheet, lets just tighten the spreads and have clear instructions, also anyone can amend this spreadsheet so we need better security and change tracking.*

Westfal Decl. Ex. 38. In other words, Mr. Mashinsky instructed Mr. Shalem to tighten the procedures around Celsius's OTC desk and execute the company's cash goal of $100 million in net <u>sales</u> throughout 2021.

Within a week of this instruction, email correspondence shows that Mr. Sabo, Mr. Shalem, Mr. Cohen-Pavon, and Mr. Leon held a "CEL OTC meeting" at the company's Tel Aviv office. Following that meeting—which Mr. Mashinsky did not attend—it was agreed that Celsius's "*OTC strategy to be set by Ron [Sabo] and approved weekly on Thursdays by COO [Daniel Leon]+CRO [Roni Cohen-Pavon]+CFO [Yaron Shalem]*." Westfal Decl. Ex. 39. Mr. Sabo's testimony can therefore establish confirmation that he was responsible for setting the company's OTC strategy, which included the amount of CEL tokens that the company would purchase and sell each week, beginning in March 2021. *Id.* If Celsius's CEL token purchases are now being attributed to alleged criminality by Mr. Mashinsky, then of course the person who directed those purchases is a material witness. *Fleet Mgmt. Ltd.*, 2007 WL 2463364, at *2.

Given Mr. Sabo's insight into Celsius's strategy at that time, it appears he will be able to confirm that in March and April 2021, Mr. Mashinsky instructed the company buy <u>less than</u> 100% of weekly rewards in the market at the time, and to generate revenues from OTC <u>sales</u> of CEL token. Westfal Decl. Ex. 39. Mr. Sabo's testimony is also needed to confirm that Mr. Cohen-Pavon, Mr. Treutler, and at times, Mr. Sabo himself, were purchasing CEL tokens on FTX in a manner directly contrary to Mr. Mashinsky's instructions. It appears that Mr. Sabo had contemporaneous knowledge of unauthorized transactions in the company's CNC subaccount, but never reported them to Mr. Mashinsky. For example:

- On October 10, 2021, Mr. Cohen-Pavon emailed Mr. Sabo that, "*we must gain more control on Johannes' activity re CEL*." Westfal Decl. Ex. 40. Later that day, Mr. Cohen-Pavon asked for a call "*to understand what the hell Johannes is doing at FTX*." Westfal Decl. Ex. 25 (at page 3377239). To be clear, Mr. Cohen-Pavon was describing conduct by Mr. Treutler that he has now pled guilty to ordering. ECF No. 32, at 38:17-25 (Sept. 13, 2023 Hearing Transcript).

- A few weeks later, on October 24, 2021, Mr. Cohen-Pavon wrote to Mr. Sabo that "*Johannes has no interest in volume because it prevents him manipulating*." When Mr. Sabo asked, "*what manipulations do you think he is doing?*" Mr.

Cohen-Pavon responded, "*raises the price. He invested his entire life in the token [a]nd in the company's equity. He has nothing but that. And he has millions of CEL . . . we let the cat watch the cream*." Westfal Decl. Ex. 25 (at page 3377248). Neither reported Mr. Treutler's apparent manipulation to Mr. Mashinsky.

- On November 5, 2021, Mr. Cohen-Pavon wrote to Mr. Sabo that, "*something really strange is happening in the exchange.*" Mr. Sabo responded, "*someone is buying like crazy*" and then asked, "*Johannes?*" Ten minutes later, Mr. Cohen-Pavon responded, "*Johannes.*" *Id.* (at page 3377265).

- On December 7, 2021, Mr. Sabo reported to Mr. Cohen-Pavon, "*I received from [a Celsius employee] the details of Johannes' withdrawals and compared them to the actions he made in the company's account. I want to show it to you sometime.*" Mr. Cohen-Pavon asked, "*Should he be fired?*" Mr. Sabo responded, "*It looks bad.*" *Id.* (at page 3377292).

- As late as January 19, 2022, Mr. Sabo and Mr. Cohen-Pavon discussed an unauthorized purchase of 300,000 CEL tokens in the CNC subaccount by Mr. Treutler, and then a sale of 50,000 CEL tokens ten days later, which Mr. Sabo described as "*likely a wash against [another Celsius trader].*" *Id.* (at page 3377325).

Despite these explicit conversations about Mr. Treutler's CEL token purchases, Mr. Sabo never reported any of it to Mr. Mashinsky. And in November 2021, Mr. Cohen-Pavon and Mr. Sabo themselves discussed bringing the price of CEL to five dollars within the next week. Mr. Cohen-Pavon asked Mr. Sabo how much it would cost and commented that "*the gates of hell will open if we go down from four.*" Mr. Sabo responded that $600,000 would bring the price to five dollars. Thirty minutes later, Mr. Cohen-Pavon wrote, "*it's under 4. Sorry to drive you crazy. We need to push fast*." Mr. Sabo responded, "*it cost a million and a half dollars. I am stopping for the time being*." Westfal Decl. Ex. 25 (at pages 3377261-62). Mr. Sabo's testimony is therefore essential to support Mr. Mashinsky's defense that he had no knowledge of months of unauthorized CEL token purchases on FTX because such purchases were deliberately concealed from him. *Wey*, 2017 WL 237651, at *25.

It appears Mr. Sabo also has knowledge of the unauthorized directional trading that Mr. Treutler conducted in the second half of 2021.  Mr. Sabo can offer testimony that just like the undisclosed CEL token purchases, this trading was deliberately hidden from Mr. Mashinsky.  For example, Mr. Sabo can corroborate that on September 27, 2021, Mr. Cohen-Pavon instructed that a group of employees to "*[p]lease find another name to 'team directional', before it becomes to be some of the company's terminology*."  In response to that instruction, Mr. Sabo responded, "*[l]et's call it 'futures MM'.  I'll send a separate email to make sure the change takes effect in all relevant places*."  Westfal Dec. Ex 41.  It appears that the decision to hide the name of the company's directional trading account led to $26 million in losses that Mr. Mashinsky did not learn about until January 2022.  Westfal Decl. Ex. 36.

### e.    Yaron Shalem

None of the concealment described in this motion would have been possible without Celsius's former Chief Financial Officer, Yaron Shalem.  As described above, in March 2021, Mr. Mashinsky placed his trust in Mr. Shalem to supervise the company's OTC desk to ensure that Celsius was buying and selling CEL token consistent with his instructions.  Westfal Decl. Ex. 38.  That is not what happened.

Mr. Shalem covered up both unauthorized CEL token purchases on FTX and unauthorized directional trading positions.  This was conduct that Mr. Shalem openly discussed in a WhatsApp chat with Mr. Cohen-Pavon, Mr. Leon, and Mr. Sabo in September 2021.  Westfal Decl. Ex. 35.  Mr. Shalem also received reporting on the company's P&L on a weekly basis, and then transmitted that P&L reporting to Mr. Mashinsky and the EXCO.  The discovery shows that the reporting within Mr. Shalem's finance department openly discussed that the company's negative P&L was being driven by excess CEL token purchases on FTX.  For example, a

September 26, 2021 email from a Celsius employee to Mr. Shalem, Mr. Cohen-Pavon, Mr. Treutler, Mr. Sabo and others (but not Mr. Mashinsky) specifically noted that the company's negative $11.4 million P&L for that week "*was driven by an increase in CEL purchases on FTX.*" Westfal Decl. Ex. 42 (at page 1454895). However, the reporting that Mr. Shalem submitted for that week's EXCO meeting made no mention of an increase in CEL purchases on FTX. Instead, Mr. Shalem's EXCO slide simply attributed the negative $11.4 million to "*Cel OTC net inflow (outflow).*" Westfal Decl. Ex. 43 (at page 377993). His testimony is plainly material.

In addition, Mr. Shalem's regular EXCO reports showing positive net OTC sales for the months of May, June, July and August 2021 appear to have been off by at least tens of millions of dollars each month, in light of Mr. Treutler's CEL token purchases in the CNC subaccount on FTX. *See* Westfal Decl. Exs. 44-45 (at pages 3766681 and 378043). It appears that Mr. Shalem fully understood that the "*CEL OTC net inflow (outflow)*" line item was materially inaccurate because he removed it from his weekly EXCO reporting on November 2, 2021. However, he provided no explanation for why that decision was made, and certainly did not disclose Mr. Treutler's months of massive CEL token purchases in the CNC subaccount. Westfal Decl. Ex. 56 (at page 377492). As to directional trading, Mr. Shalem's internal finance department emails delineated Celsius's trading activities according to its "*Futures Funding,*" "*Team Directional,*" and "*LONG 1*" trading accounts. But when that same trading was reported to Mr. Mashinsky, there was no mention of such account names. Instead, Mr. Shalem reported weekly P&L for "*CeFi – Trading,*" with no mention of directional or long positions. *Compare* Westfal Decl. Ex. 42 (at page 1454894) *and* Ex. 43 (at page 377993).

In sum, Mr. Mashinsky trusted Mr. Shalem and relied in good faith on the accuracy of his reporting.  His testimony is needed to confirm the material *in*accuracies of the reporting that he provided to Mr. Mashinsky on a weekly basis.

**f.    Yarden Noy**

Yarden Noy is a material witness and can provide essential testimony on several aspects of the government's fraud charges.  First, Celsius's former General Counsel has already reported to the government that as Celsius's Head of Regulation, it was Mr. Noy's responsibility to review all of Celsius's marketing materials, that he and his team "*were heavily involved in reviewing all aspects of marketing*," and that the weekly AMAs "*were a focus*."  Westfal Decl. Ex. 1, at 10.  Given the centrality of the AMAs to the fraud charges, there is no doubt that Mr. Noy's testimony regarding his participation in the pre-AMA prep process and post-AMA editing process on a weekly basis is material to Mr. Mashinsky's defense.  *Alexandre*, 2022 WL 9843495, at *3-5 (testimony material because it "would assist the jury in understanding the evidence").  That defense will include that Mr. Mashinsky's state of mind was informed by the participation of Celsius's in-house counsel and risk personnel in the weekly AMA process, and that he expected potential inaccuracies or issues to be brought to his attention.  *Tagliaferri*, No. 13 Cr. 115 (RA) (S.D.N.Y. 20014), Trial. Tr. (Dkt. 63), at 83-85; *Bankman-Fried*, 2023 WL 6392718, at *1.  Indeed, that was the very reason the AMA review process was put into place.  Westfal Decl. Ex. 15.

In several respects, however, Mr. Noy will be able to confirm that post-AMA edits and other discussions concerning the accuracy of charged public statements were not shared with Mr. Mashinsky.  For example, the indictment alleges that Mr. Mashinsky intended to defraud his customers because Celsius executives "scrubbed" Mr. Mashinsky's March 4, 2022 AMA

statement that "*Celsius is trying to do something very simple. Okay? How about we charge borrowers 9 percent and pay users 7 percent? Right? So most of the yield goes to the community or the coin owners*." Indict. ¶ 30. The defense has not yet confirmed who allegedly "scrubbed" this statement from the AMA, or why, but while Mr. Noy identified it to Mr. Cohen-Pavon in an April 16, 2022 email titled, "*Alex's statements*," it appears he did not communicate it to Mr. Mashinsky at that time. Westfal Decl. Ex. 28. It also appears that Mr. Noy will be able to confirm that Mr. Cohen-Pavon prioritized collecting and transmitting to the SEC examples of Mr. Mashinsky's public statements that he perceived to be inaccurate, rather than advising Mr. Mashinsky about those statements. Westfal Decl. Ex. 18 (at page 2502764).

Mr. Noy's April 16, 2022 email to Mr. Cohen-Pavon also identified supposed issues with Mr. Mashinsky's CNBC interview from only a few days prior that is quoted in the indictment with respect to uncollateralized loans. Indict. ¶ 37. But it does not appear that anyone at the company raised any potential inaccuracies in that interview with Mr. Mashinsky either. Mr. Noy's testimony is material to Mr. Mashinsky's defense on that point. The indictment also quotes email correspondence about a November 2021 interview in which Mr. Mashinsky allegedly stated that "*[o]ne way the company protects funds is by always requiring its borrowers to put up more than 100 percent of the value of their loan in collateral in another asset*." *Id.* According to the indictment, a Celsius executive then emailed Mr. Mashinsky that, "*this is not true, and we can not say that*." Westfal Decl. Ex. 46. Mr. Noy was that executive. *Fargesen*, 2022 WL 4110303, at *4 (ordering Rule 15 deposition of witness referenced in the indictment as "Individual-1"). His testimony is material to support Mr. Mashinsky's defense that he is the one who requested that the draft article be reviewed by Mr. Noy, and that the quoted language was referring to retail loans, not institutional loans, and was therefore accurate. Mr. Noy's testimony

is also needed to confirm that after he sent across edits to the draft article, his edits were accepted and incorporated into the final version that was published. Westfal Decl. Ex. 16. In other words, his testimony will corroborate good faith, not fraud.

Mr. Mashinsky is also charged with criminality based on alleged statements that Celsius never had any institutional counterparty defaults, including on a July 9, 2021 AMA. Indict. ¶¶ 38-39. There is no more material witness on this issue than Yarden Noy. The Rule 16 discovery shows that beginning on May 14, 2021 and continuing every week through mid-November 2021, a bullet point on the first page of AMA talking points that were circulated throughout the company stated that Celsius had "*[n]o bad debt no defaults from Institutions*." *See, e.g.*, Westfal Decl. Exs. 47-49. And yet, despite the indictment's allegation that two counterparties had defaulted in early 2021, not one of Celsius's legal or risk personnel edited this talking point for more than six months.

In addition, approximately two weeks before Mr. Mashinsky's allegedly fraudulent statement on the July 9 AMA that is quoted in the indictment, Indict. ¶ 39, he sent around proposed language for a press release to Mr. Noy, Mr. Cohen-Pavon, and Celsius's then-General Counsel. Mr. Mashinsky's proposed language stated: "*At the end of May Celsius announced that it had zero liquidations of its institutional client loans and loans Celsius had taken*[.]" Not one of the recipients suggested that such language was in any way inaccurate. Westfal Decl. Ex. 50.

On October 16, 2021, Celsius's Chief Risk Officer Rodney Sunada-Wong deleted a statement by Mr. Mashinsky about no defaults from the recorded version of the October 15 AMA. Westfal Decl. Ex. 51. Mr. Noy received that edit, but neither he, Mr. Sunada-Wong, nor anyone else shared it with Mr. Mashinsky. On November 25, 2021, however, Mr. Noy wrote to Mr. Mashinsky directly and instructed him to no longer say that Celsius had "*no bad debt*."

Westfal Decl. Ex. 52.  The result?  The bullet point was removed from the weekly AMA talking points, and as far as the defense has found, Mr. Mashinsky never made that allegedly fraudulent misstatement again.  Westfal Decl. Ex. 53.  Testimony regarding Mr. Noy's interactions with Mr. Mashinsky on this subject in November 2021 is plainly material, specifically, his confirmation that after he advised Mr. Mashinsky to stop saying "*no bad debts*" on his AMAs, Mr. Mashinsky complied with his request and the bullet point that had been on the first page of the AMA talking points for six months was removed.  That is not fraud; it is the epitome of good faith.  *Bankman-Fried*, 2023 WL 6392718, at *1.

Finally, the indictment suggests that Mr. Mashinsky lied to customers about Celsius's stance vis-à-vis regulators.  According to the indictment, Mr. Mashinsky "*knew that Celsius faced substantial regulatory issues*" because the SEC had commenced an investigation of Celsius and by late 2021 Mr. Mashinsky was allegedly discussing a potential settlement.  Indict. ¶ 41.  And yet, despite that ongoing investigation, in May 2022, Yarden Noy circulated "*summary guidelines for things to say and not to say on the AMA (and generally)*" to members of the marketing team and Celsius's executive management (including Mr. Mashinsky).  Notably, those guidelines made no mention of allegedly fraudulent statements about Celsius's ICO, profitability, uncollateralized loans, institutional defaults, or directional trading—all topics that Mr. Mashinsky is now alleged to have lied about.  While Mr. Noy did instruct the recipients to "*[p]lease avoid representing that the Company is a regulated entity[,]*" he clarified that it was acceptable to say that Celsius was "*compliant*."  Westfal Decl. Ex. 54.  Mr. Noy's testimony is therefore material to confirm Mr. Mashinsky's understanding that an ongoing SEC investigation did not mean that Celsius "*faced substantial regulatory issues,*" as the indictment charges, or that it was not a compliant company.  Mr. Mashinsky believed in good faith that Celsius was

compliant, and Mr. Noy's summary guidelines confirmed that belief.  His testimony is material.
*Bankman-Fried*, 2023 WL 6392718, at *1.

C.    **The Government Has Offered No Basis to Overcome the Failure of Justice Presumption**

An inability to obtain the testimony of these witnesses would result in a failure of justice.
The principal consideration in determining whether the absence of a witness's testimony would
produce injustice is the materiality of that testimony to the case.  *United States v. Drogoul*, 1 F.3d
1546, 1552 (11th Cir. 1993).  As the Eleventh Circuit held in *Drogoul*, "[w]hen a prospective
witness is unlikely to appear at trial and his or her testimony is critical to the case, simple
fairness requires permitting the moving party to preserve that testimony—by deposing the
witness—absent significant countervailing factors which would render the taking of the
deposition unjust."  *Id.*

Once a movant establishes unavailability and materiality, the failure of justice factor "is
likely satisfied" and courts in this district "presume[] that the testimony is necessary to prevent a
failure of justice 'so long as there are no substantial countervailing factors militating against the
taking of the depositions.'"  *Alexandre*, 2022 WL 9843495, at *3, *5 (quoting *Fargesen*, 2022
WL 4110303, at *2, *5).  The government bears the burden of demonstrating any such
countervailing factors.  *Id.* at *3.  With Mr. Mashinsky's liberty at stake, and the glaring
materiality of each of the proposed witnesses, Mr. Mashinsky submits that the final Rule 15
factor is easily satisfied here.  However, it is the government's burden to overcome the law's
presumption and establish countervailing factors that militate against the relief sought in this
motion.  To date, the government has made no attempt to argue that any such countervailing
factors exist.  Unless it does so, the law's presumption favors Mr. Mashinsky.

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Mashinsky respectfully requests that the Court grant his motion to obtain the testimony of the six named witnesses. It simply would not be justice for Mr. Mashinsky to be relegated to relying on documents and inferences when the very individuals whose words are quoted in the indictment, and whose conduct is being attributed to Mr. Mashinsky, are the witnesses whose testimony he seeks to preserve for trial through this motion.

Should the Court grant this motion, Mr. Mashinsky respectfully requests that the Court enter the following order:

1) As to Daniel Leon, pursuant to 28 U.S.C. § 1783, Mr. Mashinsky is authorized to serve a subpoena requiring Mr. Leon's appearance as a live witness at trial. The subpoena shall designate the time and place for Mr. Leon's appearance and the defense shall tender to Mr. Leon his estimated necessary travel and attendance expenses, in an amount to be determined by the Court.

2) Pursuant to Rule 15(e)(3) of the Federal Rules of Criminal Procedure, the government shall produce to the defense within seven days of this Order any statement of the deponents in the government's possession to which the defendant would be entitled at trial.

3) Within seven days of this Order the government shall inform the defense whether it is willing to facilitate the Rule 15 depositions by utilizing the procedures set forth in the respective Mutual Legal Assistance Treaties ("MLATs") between the United States and Israel, Germany, and the Netherlands.

4) If the government is not willing to facilitate the depositions by utilizing the procedures set forth in the respective MLATs, the defense shall submit proposed letters rogatory for the deponents within fourteen days of this Order.

Dated: New York, New York
      September 14, 2024

MUKASEY YOUNG LLP

  /s/ Michael F. Westfal
Marc L. Mukasey
Torrey K. Young
Michael F. Westfal

570 Lexington Avenue, Suite 3500
New York, NY 10022
Tel: (212) 466-6400
Email: michael.westfal@mukaseylaw.com

*Counsel for Alexander Mashinsky*