UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------x
                        :

UNITED STATES OF AMERICA     :

                        :

        - v. -           :         23 Cr. 347 (JGK)

                        :

ALEXANDER MASHINSKY,     :

                        :

          Defendant.    :

                        :

-----------------------------------------------------x

**MEMORANDUM OF LAW OF THE UNITED STATES OF AMERICA IN
OPPOSITION TO MASHINSKY'S MOTION FOR RULE 15 DEPOSITIONS**

                                   DAMIAN WILLIAMS
                                   United States Attorney
                                   Southern District of New York

Adam S. Hobson
Allison Nichols
Peter J. Davis
Assistant United States Attorneys

- Of Counsel –

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.   Overview of the Fraudulent Schemes ............................................................. 2

    B.   The Indictment .............................................................................................. 7

    C.   The Motion .................................................................................................... 8

    D.   Testimony in Israel, Germany, and the Netherlands ...................................... 8

ARGUMENT ..................................................................................................................... 10

I.    THE DEFENDANT HAS NOT ESTABLISHED EXCEPTIONAL CIRCUMSTANCES
JUSTIFYING FIVE FOREIGN PRETRIAL DEPOSITIONS ................................................. 10

A.   APPLICABLE LAW ................................................................................................. 10

B.   DISCUSSION ......................................................................................................... 13

    1.   The Defendant Has Not Established the Willingness of the Witnesses to Sit for
Depositions .......................................................................................................... 13

    2.   The Defendant Has Not Established Cohen-Pavon's Unavailability ............................ 15

    3.   The Defendant Has Failed to Establish That Any of the Witnesses Will Testify to Facts
That Tend to Exculpate the Defendant. ..................................................................... 17

    4.   Foreign Depositions Would Not Be In the Interests of Justice ..................................... 22

II.    THE DEFENDANT HAS NOT ESTABLISHED THE NECESSITY OF A § 1783
SUBPOENA TO LEON ................................................................................................. 25

CONCLUSION .................................................................................................................. 26

i

## PRELIMINARY STATEMENT

With four months remaining until trial, Alexander Mashinsky, the defendant, has moved the Court to order five foreign depositions and issue a trial subpoena to an American citizen residing abroad. The Rule 15 standard for ordering a deposition in a criminal proceeding is a high one and is satisfied only by a showing of "exceptional circumstances." This exacting standard reflects the fact that, unlike civil discovery, criminal discovery does not provide for strategic advantage through previews of the Government's case or a fishing expedition into any topics that the defendant might hope will be relevant. It also reflects the strong preference for live testimony at trial, where the jury can evaluate the witness's credibility, where the Court can police the witness's testimony, and where the witness is sworn and subject to United States perjury laws.

Mashinsky has failed to meet the Rule 15 standard. One of the witnesses—Roni Cohen-Pavon—is not even unavailable for trial. Cohen-Pavon is a cooperating witness whose testimony will be provided live on the stand; there is no exceptional circumstance to justify the unheard of situation of a defendant deposing a cooperating witness before trial. As for the other witnesses, they have all told Mashinsky that they are unwilling to answer questions at a deposition, which is not surprising given that Mashinsky's defense theory is that these witnesses, not he, committed the crimes charged in the Indictment. If the Court were to order depositions—requiring the parties and foreign authorities to expend valuable time and resources when they would otherwise be preparing for trial, and likely requiring an adjournment of the trial date—it appears most likely that those depositions would yield nothing more than the witnesses refusing to answer questions. And even if one of the witnesses were to provide substantive testimony, everything in the record indicates that the testimony would be more likely to inculpate the defendant than to exculpate him. The high standard for Rule 15 depositions has not been satisfied, and the motion should be denied.

## BACKGROUND

### A. Overview of the Fraudulent Schemes

In 2018, Alexander Mashinsky founded Celsius Network LLC and its related entities (collectively, "Celsius"), which he marketed as a modern-day bank for crypto assets. (Ind. ¶ 1). He portrayed Celsius as a safe place for customers to deposit crypto assets and earn interest, and Celsius grew to be one of the largest crypto platforms in the world, at one point purportedly holding $25 billion in assets. (Ind. ¶¶ 1, 4). But from the start, Mashinsky operated Celsius through fraud. He lied to investors about Celsius's profitability and business practices, taking in customer money under false and misleading pretenses and turning customers into unwitting investors in a business far riskier and less profitable than what Mashinsky had represented. (Ind. ¶ 1). And he used hundreds of millions of dollars of Celsius's money to orchestrate a yearslong scheme to manipulate Celsius's proprietary token, CEL, so that he could sell his personal CEL holdings at artificially inflated prices. (Ind. ¶ 6). At least in part as a result of Mashinsky's fraud, by May 2022, Celsius was in a dire financial situation, and on June 12, 2022, Celsius halted all customer withdrawals from its platform—but not before Mashinsky had first withdrawn almost all his own non-CEL crypto assets. (Ind. ¶ 9). A month later, Celsius filed for bankruptcy. *Id.*

Mashinsky's frauds at Celsius involved two interrelated criminal schemes, one involving false and misleading statements to Celsius's customers to induce them to invest their crypto assets with Celsius, and one involving manipulative trading in CEL token that was achieved by selling other assets, including Bitcoin, for CEL. (Ind. ¶ 1, 29).

In the misrepresentation scheme, Mashinsky induced crypto investors to invest their crypto assets with Celsius, which purportedly would use those assets to generate yield through safe, low-risk investment strategies, and then distribute a portion of that yield back to the investors in the

form of weekly "rewards" payments.  (Ind. ¶ 2).  Celsius referred to this rewards system as the "Earn Program."  (Ind. ¶ 12).  Throughout his tenure as Chief Executive Officer of Celsius, Mashinsky repeatedly made public misrepresentations regarding core aspects of Celsius's business and financial condition—including the safety of Celsius's yield-generating activities, Celsius's profitability, the long-term sustainability of Celsius's high reward rates, and the risks associated with depositing crypto assets with Celsius—in order to induce retail customers to provide their crypto assets to Celsius and continue to use Celsius's services.  (Ind. ¶ 2).

In the manipulation scheme, Mashinsky and others at Celsius worked for years to artificially inflate the price of CEL token.  CEL token was Celsius's own native crypto token, which it launched in 2018 to raise money to fund Celsius's operations.  (Ind. ¶ 5).  Mashinsky was a large holder of CEL token and stood to benefit from its price increasing.  (Ind. ¶ 50).  Celsius and Mashinsky encouraged investors in its Earn Program to receive their weekly rewards in CEL token and touted CEL as an investment.  (Ind. ¶ 14).  But the price of CEL nonetheless remained low, and by the end of October 2019, CEL was trading at approximately $0.05 per token.  (Ind. ¶ 51).

To inflate the price of CEL and make the token appear more valuable than it was, Mashinsky and others at Celsius proceeded to spend hundreds of millions of dollars purchasing excess CEL in the market, including through sales of commodities such as Bitcoin, without disclosing this fact to investors.  (Ind. ¶¶ 6, 29).  At times, Mashinsky even caused Celsius to carry out these purchases using customer assets, which resulted in further strain on Celsius's already weak financial situation.  (Ind. ¶¶ 7, 49).  Between late July 2020 and the end of 2020, Celsius purchased more CEL than was needed to pay weekly CEL rewards every single week—in other words, Celsius purchased CEL at levels far in excess of what was publicly represented by Celsius

and Mashinsky.  (Ind. ¶ 55).  During this period, Celsius was a net purchaser in the market of approximately 22 million CEL tokens in excess of the amount of CEL necessary to pay rewards, which represented approximately three times more CEL than Celsius needed to pay rewards.  *Id.* These excess purchases—which bore no relation to Celsius's distribution of weekly rewards of CEL—were designed by Mashinsky to artificially support and inflate the price of CEL.  *Id.*  As a result, the price of CEL rose dramatically from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020.  *Id.*

By early 2021, the price of CEL had increased to approximately $6.50 as a result of Celsius's market purchases.  (Ind. ¶ 60).  After a temporary pause in excess purchases, in about mid-April 2021 Celsius resumed buying huge quantities of CEL token, far in excess of what was required to fulfill weekly rewards.  (Ind. ¶ 64).  It continued these excess purchases through the end of 2021.  *Id.*  In total for 2021, Celsius was a net purchaser of approximately 82 million CEL tokens, which was over three times the volume of CEL needed to fulfill weekly rewards.  *Id.* Celsius spent approximately $416 million in 2021 alone purchasing CEL in the market, whereas Celsius's CEL rewards obligations were only approximately $144 million worth of CEL.  *Id.*

Some of Celsius's excess CEL purchases were conducted to support CEL's price in advance of anticipated negative news about Celsius.  (Ind. ¶ 54).  For example, in July 2020, Mashinsky directed others to be prepared to conduct large market purchases of CEL to support CEL's price in light of an anticipated news article that was expected to be critical of Celsius.  *Id.* On the date Mashinsky expected the article to come out, he directed another Celsius executive with trading authority to purchase CEL in excess of what was necessary to fulfill the weekly rewards if the CEL price "drops a lot."  *Id.*  On the date that the article was ultimately published, Celsius did in fact conduct large purchase of CEL, and the price of CEL remained relatively stable

as a result.  *Id.*  At other times, Mashinsky coordinated with a trader working at Celsius to use Mashinsky's personal funds to make purchases timed to prop up the price of CEL in the face of large market selloffs, asking that trader, for example, "what size swap orders for ETH will have the most impact."  (Ind. ¶ 58).

To further the scheme to manipulate CEL, Mashinsky repeatedly made false and misleading public statements concerning the nature of Celsius's market activity and the extent to which Celsius itself was responsible for artificially supporting and inflating the price of CEL, thus making it appear that there was a broader market interest in CEL than actually existed.  (Ind. ¶ 7).  While Mashinsky at various points publicly stated that Celsius was purchasing CEL in the market to pay customers their weekly CEL rewards, in reality, Mashinsky directed Celsius to purchase volumes of CEL well in excess of the amount required to pay weekly CEL rewards.  *Id.*  In certain circumstances, Mashinsky and other Celsius executives also personally purchased CEL for the purpose of artificially supporting CEL's price.  *Id.*  For example, on September 11, 2020, Mashinsky put out a video statement touting the fact that CEL's price was increasing and stating: "CEL token is just rocketing and it's all organic demand.  There's no market making or manipulation or wash trading or anything." (Ind. ¶ 56(a)).  As Mashinsky knew, the price increase in CEL was not due to "organic" demand, but was due to Celsius's own massive market purchases. *Id.*  In March 19, 2021, Mashinsky put out a statement about the CEL price, saying, "We obviously want CEL token to go higher in price, but we don't control it.  It's not like we are the invisible hand that controls the pricing here or anything like that. . . . I think 56.5% of [Celsius users] are earning in CEL.  Those are the drivers.  That's what's driving adoption and demand—creates demand for CEL token.  Those are the biggest drivers compared to buyers and sellers."  (Ind. ¶ 62).

While Mashinsky was externally messaging that Celsius's purchasing in the market was simply a function of how much CEL it needed to distribute to its users, behind the scenes Mashinsky was frequently discussing the need to purchase CEL to artificially support CEL's price. (Ind. ¶ 66).  On October 30, 2021, as the price of CEL was dropping, Mashinsky and co-defendant Roni Cohen-Pavon discussed in a WhatsApp communication their efforts to support the price of CEL.  (Ind. ¶ 66(a)).  Mashinsky told Cohen-Pavon that "[t]he price will not take care of itself if everyone will just get scared and sell."  *Id.*  Cohen-Pavon responded, "We're not just sitting and watching the price.  We're on it all week and even now [another Celsius executive] and I are live with the market maker.  The issue is that people are selling and no one is buying except for us. The main problem was that the value was fake and was based on us spending millions (~8M a week and even more until February 2020) just to keep it where it is.  This week we spent 'only' $4M (on top of the rewards) and the price is still going down."  *Id.*  Later in the same WhatsApp conversation, Mashinsky wrote, "Does doge coin value real?  How about the $5B for Solana. Everyone knows what these tokens are and want to buy them because they think price is going up."  *Id.*

In early 2022, Celsius reduced how much excess CEL it purchased, and the price of CEL began to drop as a result.  (Ind. ¶ 67).  But as the price dropped lower and lower, Mashinsky directed Cohen-Pavon, "let's defend CEL here so we don't loose [sic] all our users."  That same day, Mashinsky gave a directive to a Celsius trader that Celsius could purchase up to $5 million worth of CEL to support the price of CEL.  *Id.*  Celsius did in fact purchase approximately three times more CEL than was needed for its weekly rewards that week.  *Id.*  Moreover, Mashinsky was directing Celsius to spend its money propping up the price of CEL at a time when it was in such dire financial condition that it was just a few weeks from pausing all customer withdrawals,

and two months from declaring bankruptcy.

Artificially inflating the price of CEL allowed Mashinsky to sell his own CEL holdings for a substantial profit. (Ind. ¶ 8). Mashinsky personally reaped approximately $42 million in proceeds from his sales of CEL. *Id.* At times, Mashinsky falsely claimed to the public that he was not selling CEL, when in reality he was taking advantage of the upward price manipulation he had orchestrated by contemporaneously selling huge quantities of his CEL on the market. *Id.* These sales violated Celsius's insider trading policy, which Mashinsky had signed, and which forbade him from selling CEL in excess of $20,000 per day or $50,000 per week. (Ind. ¶ 71).

## B. The Indictment

On July 11, 2023, Mashinsky and Cohen-Pavon were charged in a seven-count Indictment. The Indictment charged Mashinsky with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count One"); commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1 ("Count Two"); and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Three"). Counts One through Three related to the misrepresentation scheme and named only Mashinsky. In addition, the Indictment charged Mashinsky and Cohen-Pavon each with conspiracy to commit securities fraud, market manipulation, and wire fraud through the manipulating of the price of CEL, in violation of Title 18, United States Code, Section 371s and 1343; Title 15, United States Code, Sections 78i(a)(2), 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Four"); engaging in a fraudulent scheme to manipulate the price of CEL token, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Five"); market manipulation of CEL token, in violation

7

of Title 15, United States Code, Sections 78i(a)(2) and 78ff ("Count Six"); and wire fraud in connection with the manipulation of CEL token, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Seven").

On September 13, 2023, Cohen-Pavon pled guilty to Counts Four through Seven of the Indictment, which related to his participation in Mashinsky's scheme to manipulate the price of CEL. Cohen-Pavon's plea was pursuant to a cooperation agreement.

### C. The Motion

On September 13, 2024, Mashinsky filed the instant motion to order depositions of five foreign witnesses pursuant to Rule 15 of the Federal Rules of Civil Procedure, in anticipation of introducing that deposition testimony at trial in lieu of live testimony. Those five witnesses are Roni Cohen-Pavon, Yaron Shalem, Yarden Noy, Johannes Treutler, and Ron Sabo. In addition, Mashinsky has moved the Court to issue a trial subpoena to Daniel Leon, who is a United States citizen living in Israel. According to Mashinsky's papers, Cohen-Pavon, Shalem, Noy, and Leon live in Israel; Treutler lives in Germany; and Sabo's current location is unconfirmed, but Mashinsky suspects him to be in the Netherlands. As a cooperating witness, Cohen-Pavon already expects to testify at the January trial. As noted in the declaration attached to the defendant's motion, the other proposed witnesses have told Mashinsky that they are unwilling to testify at trial. All of the proposed witnesses have told Mashinsky that they are also unwilling to sit for a deposition.

### D. Testimony in Israel, Germany, and the Netherlands

Counsel for the Government has consulted with the Office of International Affairs of the United States Department of Justice ("OIA") about the procedures to obtain testimony from witnesses located in Israel, Germany, and the Netherlands. OIA has advised Government counsel that coordination of depositions for use in criminal prosecutions involves issues relating to the

sovereignty of the respective countries and cannot be informally arranged. Accordingly, the taking

of a deposition from a resident of Israel, Germany, or the Netherlands would require the consent

and assistance of the respective governments.

With respect to depositions, Rule 15(d) of the Federal Rules of Criminal Procedure directs

that depositions are to be taken in the manner provided in civil actions, and Rule 28(b)(3) of the

Federal Rules of Civil Procedure authorizes the taking of depositions in foreign countries pursuant

to a letter rogatory. Accordingly, to depose the proposed witnesses in their countries of residence,

the defendant would have to prepare a letters rogatory package for this Court to transmit to the

U.S. State Department, which would send the request to the foreign authority, and all parties would

have to await an answer. *See* 22 C.F.R. 92.54 (defining "letters rogatory"); 22 C.F.R. 92.66

(describing taking of foreign depositions). According to the State Department, execution of letters

rogatory could take over a year. (*See* https://travel.state.gov/content/travel/en/legal/travel-legal-

considerations/internl-judicial-asst/obtaining-evidence/Preparation-Letters-Rogatory.html).

OIA has informed Government counsel that even if the letters rogatory are granted, there

is no guarantee that Government or defense counsel would be able to question the witnesses

directly. In particular, OIA advises that there has been only one recent Rule 15 deposition in

Germany, and in that deposition the questioning was conducted by the judge herself, with the

parties allowed to ask only follow-up questions at the end, and subject to time restrictions. The

judge also did not allow a U.S. court report to take a verbatim transcript; the German court instead

produced a "protocol" which reflected the questions asked and the answers given, but not verbatim.

OIA also advises that in the one recent Rule 15 deposition in the Netherlands, the judge also

insisted on conducting the questioning rather than the attorneys. OIA does not have recent

experience conducting depositions in Israel, but advises that it is possible that the judge would

insist on conducting the questioning, as is common in the Israeli legal system, and as happened in Germany and the Netherlands.

OIA has advised Government counsel that the Mutual Legal Assistance Treaty, or "MLAT," process cannot be used to request Rule 15 defense depositions in either Germany or the Netherlands, and that the letters rogatory process must be followed.  With respect to Israel, the Government could make the request pursuant to the MLAT process.  Although potentially faster than the letters rogatory process, OIA advises that the MLAT process in Israel still takes two months at minimum and often a year or longer, in part depending on how busy the Israeli government is at the time.

According to OIA, neither Israel, Germany, nor the Netherlands would compel a witness to testify at a deposition if the witness did not want to testify.

## ARGUMENT

### I. THE DEFENDANT HAS NOT ESTABLISHED EXCEPTIONAL CIRCUMSTANCES JUSTIFYING FIVE FOREIGN PRETRIAL DEPOSITIONS

#### A.  APPLICABLE LAW

Rule 15 permits a court to grant a party's motion for a pretrial deposition in a criminal case only "because of exceptional circumstances and in the interest of justice."  Fed. R. Crim. P. 15(a)(1).  The Rule requires that such a "deposition must be taken and filed in the same manner as a deposition in a civil action" and that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial."  *Id*. 15(e).  As a result, "more than one court has observed that 'foreign depositions are suspect and, consequently, not favored.'"  *United States v. Oudovenko*, No. 00 Cr. 1014 (JG), 2001 WL 253027, at *3 (E.D.N.Y. Mar. 7, 2001) (quoting *United States v. Drogoul*, 1 F.3d 1546, 1551 (11th Cir. 1993)); *see also United States v. Johnson*, No. 21 Cr. 428 (ER), 2023 WL 5632473, at *15 (S.D.N.Y. Aug. 31,

2023) (denying Rule 15 motion and noting that "foreign depositions are generally disfavored"). "This is due, in part, to the use of different procedures related to, inter alia, the oath, the translation process, and the opportunity for cross-examination." *Id*.; *see also United States v. Salim*, 855 F.2d 944, 950 (2d Cir. 1988) (expressing "considerable concern about the possible abuses of foreign methods of examining witnesses").

The party seeking a Rule 15 deposition bears the burden of demonstrating that "exceptional circumstances" exist. *United States v. Vilar*, 568 F. Supp. 2d 429, 437 (S.D.N.Y. 2008). Specifically, the movant "'must show that (1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice.'" *Id*. (quoting *United States v. Cohen*, 260 F.3d 68, 78 (2d Cir. 2001)). Even with a finding of exceptional circumstances, however, the Court retains discretion to grant or deny the motion. *See United States v. Menendez*, No. 23 Cr. 490 (SHS), 2024 WL 2214906, at *1 (S.D.N.Y. May 16, 2024) ("As the word 'may' signifies, the district court 'retains broad discretion' in deciding whether to grant a Rule 15(a)(1) motion." (citing *United States v. Dillman*, 15 F.3d 384, 389 (5th Cir. 1994))).

With respect to witness availability, the movant must establish that he made a "good-faith effort to produce the person to testify at trial." *United States v. Johnpoll*, 739 F.2d 702, 709 (2d Cir. 1984). "[S]pecific reasons" must be provided to establish unavailability; "'[c]onclusory statements of unavailability . . . are insufficient." *United States v. Pham*, No. 12 Cr. 423 (AJN), 2015 WL 7871348, at *1 (S.D.N.Y. Dec. 4, 2014) (quoting *United States v. Chusid*, No. 00 Cr. 263 (LAK), 2000 WL 1449873, at *1 (S.D.N.Y. Sept. 27, 2000)). In addition to demonstrating the unavailability of the witness to testify at trial, the movant also "has the burden of demonstrating the availability of the proposed witnesses [for the deposition] and their willingness to appear [at

the deposition]." *United States v. Whiting*, 308 F.2d 537, 541 (2d Cir. 1962); *see also United States v. Ramirez*, No. 20 Cr. 22 (JMF), 2024 WL 4007794, at *1 (S.D.N.Y. Aug. 30, 2024) (denying Rule 15 motion where movant failed to establish that witness would be willing to appear for deposition).

Evidence is "material" for purposes of Rule 15 "if it is 'highly relevant to a central issue in the case' . . . ." *United States v. Grossman*, No. 03 Cr. 1156 (SHS), 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005) (quoting *Drogoul*, 1 F.3d at 1556); *see also United States v. Abu Ghayth*, No. 98 Cr. 1023 (LAK), 2014 WL 144653, at *2 (S.D.N.Y. Jan. 15, 2014) (reasoning that proposed Rule 15 testimony "should be more than merely relevant"). This requires "some showing, beyond unsubstantiated speculation, that the evidence exculpates the defendant." *United States v. Kelley*, 36 F.3d 1118, 1125 (2d Cir. 1994) (quotation marks omitted); *see also United States v. Merritt*, No. 90 Cr. 767 (JSM), 1991 WL 79235, at *5 (S.D.N.Y. May 7, 1991) (denying Rule 15 deposition request where "the defendants have made no showing that the deponents' testimony would be exculpatory"). And even if the sought-after evidence is material, "a court may properly deny the motion if the proposed testimony would be cumulative or consists of hearsay." *Id.* (citing *United States v. Dunseath*, No. 98 Cr. 493 (JGK), 1999 WL 165703, at *1 (S.D.N.Y. Mar. 25, 1999) and *United States v. Campbell*, No. 91 Cr. 1219 (RJD), 1998 WL 564376, at *1 (E.D.N.Y. June 30, 1998)); *see also Abu Ghayth*, 2014 WL 144653, at *2 ("[T]he proposed testimony must be admissible and non-cumulative of other evidence.").

Finally, "[t]he 'failure of justice' element is met if the other two elements are met and there are no other countervailing factors." *United States v. Epskamp*, No. 12 Cr. 120 (RJS), 2013 WL 12175097, at *2 (S.D.N.Y. Oct. 3, 2013); *accord Vilar*, 568 F. Supp. 2d at 442 (reasoning that courts must also consider "'substantial countervailing factors militating against the taking of the

deposition'" (citation omitted)). "Such countervailing factors would include," among other things, (i) "undue expense to the non-moving party and significant delays in trying the matter," *United States v. Al Kassar*, No. 07 Cr. 354 (JSR), 2008 WL 4735269, at *2 (S.D.N.Y. Oct. 27, 2008); (ii) "whether the safety of United States officials would be compromised by going to the foreign location," *United States v. Olafson*, 213 F.3d 435, 442 (9th Cir. 2000); and (iii) "the likelihood that the procured testimony will be admissible at trial," *United States v. Jefferson*, 594 F. Supp. 2d 655, 655 (E.D. Va. 2009).

## B. DISCUSSION

### 1. The Defendant Has Not Established the Willingness of the Witnesses to Sit for Depositions

The defendant's motion fails at the outset because he has not established that the witnesses are willing to appear for a deposition even if the Court were to grant the defendant's motion. To the contrary, the attorney declaration submitted in support of the motion states that Cohen-Pavon, Leon, Treutler, and Sabo have each confirmed to the defense that they are unwilling to sit for a deposition, and Shalem and Noy have declined to even respond. *See* Westfal Decl. ¶¶ 9(c) (Cohen-Pavon), 10(c) (Leon), 11(b) (Treutler), 12(d) (Sabo), 13(c)-(d) (Shalem), & 14(d)-(e) (Noy). The witnesses' refusal to sit for a deposition is not surprising, given that the defendant's purported basis for seeking their testimony is to have the witnesses admit that they, and not the defendant, are the ones who committed the charged crimes. *See, e.g.*, Br. at 2 ("It appears that members of Mr. Mashinsky's team—including five of the six witnesses that are the subjects of this motion— ignored or disregarded Mr. Mashinsky's explicit instructions to generate revenue by consistently underline selling CEL tokens into the market and instead underline purchased excess CEL tokens on the FTX exchange throughout 2021."). OIA has advised that none of the countries implicated by the defendant's motion would compel the witnesses to testify if the witness declined.

13

Because the witnesses intend to refuse to sit for deposition, the defendant's motion will result only in a waste of time and resources, with no prospect of relevant testimony. To avoid just this situation, the Second Circuit requires that before a Rule 15 motion can be granted, the movant must demonstrate "the availability of the proposed witnesses and their willingness to appear." *Whiting*, 308 F.2d at 541. Courts in this District have denied Rule 15 motions where movants have failed to make this threshold showing. *See, e.g.*, *Ramirez*, 2024 WL 4007794, at *1 (denying motion where movant failed to establish that witness "would be willing to appear for a deposition" and where witness's willingness to be deposed was further unlikely because "his answers might well incriminate him"); *Chusid*, 2000 WL 1449873, at *2 (denying motion where "there is no reason to suppose that [the witnesses] would voluntarily appear at the United States Embassy in Bulgaria to submit to depositions.").[1] The requirement of establishing that a witness is even willing to sit for deposition is an important threshold consideration, because the interests of justice will not be served by expending the time, effort, and expense of not only the parties and the Court, but also foreign governments and foreign courts, to arrange a deposition for a witness who is not even willing to testify, and cannot be made to testify. The defendant's motion should be denied for this reason alone.

---

[1] As Judge Furman recognized in *Ramirez*, "at least one Judge in this District (since elevated to the Court of Appeals) has held that 'whether or not a witness would be willing to testify at the deposition is irrelevant in decided a Rule 15 motion.'" 2024 WL 4007794, at *1 n.1 (citing *United States v. Eskamp*, No. 12 Cr. 120 (RJS), 2013 WL 12175097, at *1 (S.D.N.Y. Oct. 3, 2013)). But Judge Furman also correctly noted that Judge Sullivan's decision in *Eskamp* was contrary to the Second Circuit's decision in *Whiting*, which "appears to remain good law for that point and, thus, constitutes 'binding case law.'" *Id.* In addition, the fact that the depositions would entail a massive expenditure of resources to arrange, while the result is expected to be a refusal to testify, would be appropriately considered under the "interests of justice" prong.

14

### 2. The Defendant Has Not Established Cohen-Pavon's Unavailability

The Government does not dispute, for purposes of this motion and crediting the representations in defense counsel's declaration, that five of the proposed witnesses (Leon, Treutler, Sabo, Shalem, and Noy) reside beyond the subpoena power of this Court and have either declined to testify at trial, or failed to respond to requests that they testify at trial. And, as discussed above in Part II.A, the fact that the defendant's motion is premised on these witnesses themselves having criminal exposure, and the witnesses' consequent refusal to testify even in a foreign deposition, is further evidence of their unavailability at trial. *See United States v. Pham*, No. 12 Cr. 423 (AJN), 2015 WL 7871348, at *3 (S.D.N.Y. Dec. 4, 2015). At this time, the Government therefore does not dispute that these five witnesses are unavailable for purposes of the Rule 15 analysis. *See Johnpoll*, 739 F.2d at 709.

With respect to Cohen-Pavon, however, the defendant has failed to meet his burden of establishing that the witness is unavailable to testify at trial. Cohen-Pavon pled guilty pursuant to a cooperation agreement that requires him to testify at the request of the Government, and the Government intends to call Cohen-Pavon as a witness at trial. In addition, according to defense counsel's declaration, Cohen-Pavon's counsel has represented to defense counsel that after Cohen-Pavon testifies in the Government's case, he is also willing to testify as part of the defense case. Decl. ¶ 9(c). The defendant concedes these points, and even "considers this representation [of Cohen-Pavon's counsel] sufficient at this stage," but nonetheless contends that Cohen-Pavon is unavailable for purposes of Rule 15 because "there is no assurance that he will appear as a witness." Br. at 18. But, as noted above, the Cohen-Pavon's cooperation agreement with the Government requires him to testify at the Government's request, and the Government intends to call Cohen-Pavon as a witness. We are aware of no case in which a Court has found a witness

unavailable where the Government intends to call that witness at trial, and where the Government has received contractual assurances that the witness will in fact testify at trial. The defendant's request to take Cohen-Pavon's deposition appears to be nothing more than an attempt to circumvent the rules of criminal discovery and to question the cooperating witness before trial without the safeguards of testimony in an American courtroom.

Indeed, as a general matter, the restrictions on criminal discovery that exist under the Federal Rules are designed to preserve the truth-seeking functions of the criminal process by restraining the ability of criminal defendants to tailor testimony, suborn perjury, manufacture evidence or intimidate witnesses. *See United States v. Percevault*, 490 F.2d 126, 129 (2d Cir. 1974) (noting that the Jencks Act, 18 U.S.C. § 3500, "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial"); *United States v. McCarthy*, 292 F. Supp. 937, 942 (2d Cir. 1968) ("The claimed need to see such statements in advance in order to prepare to rebut them is little more than open notice of an intention to tailor testimony to fit the statement."). For this reason, courts in this district have repeatedly endorsed limitations on civil discovery in civil cases concerning matters also at issue in a pending criminal case in recognition of the fact that a civil litigant should not be allowed to use civil discovery to avoid the restrictions that would otherwise apply in criminal discovery to a criminal defendant. *See, e.g.*, *S.E.C. v. Beacon Hill Asset Management LLC*, No. 02 Civ. 8855 (LAK), 2003 WL 554618, at *1 (S.D.N.Y. Feb. 27, 2003) ("The principal concern with respect to prejudicing the government's criminal investigation is that its targets might abuse civil discovery to circumvent limitations on discovery in criminal cases."); *Phillip Morris Inc. v. Heinrich*, No. 95 Civ. 328 (LMM), 1996 WL 363156, at *19 (S.D.N.Y. June 28, 1996) (granting stay motion because if "civil discovery is not stayed, the criminal investigation

will be prejudiced, as the Defendants may have an opportunity to gain evidence to which they are not entitled under criminal discovery rules"); *Bd. of Governors of the Federal Reserve System v. Pharaon*, 140 F.R.D. 634, 639 (S.D.N.Y. 1991) ("'A litigant should not be allowed to make use of the liberal discovery procedures applicable to a civil suit as a dodge to avoid the restrictions on criminal discovery and thereby obtain documents he would not otherwise be entitled to for use in his criminal trial.'" (quoting *Campbell v. Eastland*, 307 F.2d 478, 487 (5th Cir. 1952))).  This same logic applies here—the defendant should not be permitted to circumvent the well-established and important limitations on pre-trial discovery through the use of a Rule 15 deposition simply because of the immaterial happenstance that this particular witness—who will appear at trial—happens to be temporarily located abroad.

The defendant's motion for an order requiring Cohen-Pavon's deposition should be denied on this ground alone.

### 3.  The Defendant Has Failed to Establish That Any of the Witnesses Will Testify to Facts That Tend to Exculpate the Defendant.

The Court should also deny the Motion because the defendant has not made the necessary "showing that the proposed testimony exculpates . . . the defendant." *Abu Ghayth*, 17 F. Supp. 3d at 300.[2]  Indeed, defense counsel has had no discussions with the proposed witnesses about what the witnesses might say about the relevant facts, and the only representation the defense has made about the testimony is that each witness is expected to refuse to answer any questions.  The defendant can therefore only guess what these witnesses might say.  In the typical case, the substance of a proposed deponent's testimony is set forth in either a witness affidavit or a representation by counsel, *see Vilar*, 568 F. Supp. 2d at 440, and while witness affidavits are not

---

[2] The testimony "need not be definitive proof of guilt or innocence, but the testimony should be more than merely relevant." *Abu Ghayth*, 17 F. Supp. 3d at 300.

required to establish materiality if the movant can represent to the Court what a deponent will say, "the movant must show beyond 'unsubstantiated speculation' that the testimony tends to exculpate the defendant." *United States v. Norman*, No. 07 Cr. 961 (KBF), 2012 WL 5278548, at *1 (S.D.N.Y. Oct. 24, 2012) (quoting *United States v. Kelley*, 36 F.3d 1118, 1125 (D.C. Cir. 1994)). In short, the defendant is not seeking to preserve known testimony favorable to his defense. Instead, he is asking for a fishing expedition in hopes of manufacturing a defense theory.

The defendant first suggests that Cohen-Pavon, Leon, Treutler, Sabo, and Shalem would provide material testimony on the manipulation charges because, he speculates, these individuals will testify that they conducted market manipulation on their own and without Mashinsky's knowledge. But there is no basis to believe that this is how these witnesses would testify. If anything, the record suggests they will inculpate Mashinsky.

As an initial matter, the Indictment alleges a market manipulation conspiracy, so any testimony that these Celsius employees conducted market manipulation is inculpatory. As counsel admits, "Mr. Treutler engaged in explicit conversations with Mr. Cohen-Pavon, Mr. Leon, and Ron Sabo about purchasing CEL token for the purpose of inflating its price." Br. 13. Those "explicit conversations" are proof of the conspiracy. Cohen-Pavon in fact pleaded guilty to participating in a conspiracy with the defendant to manipulate the market. As this Court confirmed during Cohen-Pavon's plea allocution, Cohen-Pavon discussed the "plan to artificially manipulate the price of CEL" with Mashinsky. Plea Tr. 40. The documentary record further confirms this, including an exchange, attached to the defendant's motion, in which Mashinsky texted Cohen-Pavon: "The price will not take care of it self [sic] if everyone will just scared and sell." Def. Ex. 22 at 02600140. In response, Cohen-Pavon explained to Mashinsky, "[w]e're not just sitting and watching the price. We're on it all week and even now Ron Sabo and I are live with the market

maker.  The issue is that people are selling and *no one is buying except for us.  The main problem was that the value was fake and was based on us spending millions (~$8M a week and even more until February 2020) just to keep it where it is.*"  *Id.* (emphasis added).  Cohen-Pavon continued, "The only buyers in the market in the past week were us."  *Id.* at 02600143.   Cohen-Pavon and Mashinsky even discussed the manipulative trades that had been executed by Leon and Treutler: "Daniel [Leon], Johannes [Treutler], and I also bought from our personal money to support the price."  *Id.* at 02600145.

It is against this background that the defendant speculates that Leon, Treutler, Sabo, and Shalem will testify that they committed this crime exclusively by themselves, hid it from Mashinsky, and disregarded Mashinky's directions.  But there is no reason to think that these witnesses will say what the defendant wants them to say, rather than testifying that they were acting with Mashinsky's knowledge and at Mashisnky's direction.  In fact, the Government has interviewed both Cohen-Pavon and Treutler, and can confirm that each witness has stated, in substance and in part, that they were instructed by Mashinsky to purchase excess CEL token to support the price of CEL.  The defendant's speculation about the potential value of the witnesses' testimony is therefore contradicted by all available evidence, including the prior statements of the witnesses themselves.

*Second*, the defendant contends that these witnesses are material because they will testify that Mashinsky gave instructions to *sell* Celsius during certain periods of time.  *See* Br. at 36 ("Mr. Leon is necessary to provide testimony to the effect that he spoke with Mr. Treutler at the direction of Mr. Cohen-Pavon, not Mr. Mashinsky, and that such directions were the opposite of what Mr. Mashinsky was instructing the company to do at that time.").  But the Indictment itself alleges that by early 2021, the price of CEL "had increase dramatically," and "[t]his caused MASHINSKY to

instruct another Celsius executive and a Celsius trader to temporarily cease purchasing CEL," and that "Celsius temporarily stopped buying CEL in the market altogether between in or about late March 2021 through mid-April 2021." (Indictment 29-30.)  Testimony about periods when Celsius was selling CEL are not exculpatory—they are alleged in the Indictment and are part of the set of facts the Government expects to prove at trial.  For this reason, even if this testimony were exculpatory, it would also be cumulative, and for this reason too, the defendant cannot carry his burden of demonstrating the exceptional circumstances necessary for an order directing Rule 15 depositions.

*Third*, the defendant argues that these witnesses are material to the fraud charges because "Mr. Mashinsky fully expected and understood that any accidental or unintentional inaccuracies in his public statements would be brought to his attention." Br. at 30.  Again, the defendant offers nothing more than speculation that the witnesses will testify that they did not bring Mashinsky's misstatements to his attention.  To the contrary, Cohen-Pavon has proffered to the Government that he brought Mashinsky's misstatements to his attention on multiple occasions, but that Mashinsky ignored him.  And even if individuals at Celsius had not told Mashinsky that his statements were false after Mashinsky made them, such evidence is not a defense to fraud.  The defendant expects that these witnesses will, at a minimum, testify that Mashinsky's statements were false, and that evidence alone is evidence of his guilt.

*Fourth*, the defendant attempts to justify the need for these depositions so he can ask the witnesses to "*confirm*" the content of documentary evidence.  (*See, e.g.*, Br. 36-38 (contending, as to Leon, that "[h]e can *confirm* the content of those communications"); 40 (contending, as to Treutler, that his "testimony is also necessary to *confirm* the documentary evidence from this period"); 44 (contending as to Sabo, he "can therefore establish *confirmation* that he was

responsible for setting the company's OTC strategy. . . ."); 46 (as to Shalem, "[h]is testimony is needed to *confirm* the material *in*accuracies of the reporting that he provided to Mr. Mashinsky on a weekly basis"); 49 (as to Noy," his testimony is needed to *confirm* that after he sent across edits to the draft article, his edits were accepted and incorporated into the final version that was published.").) But testimony that simply confirms documentary evidence or other witness testimony is cumulative and not material. *See, e.g.*, *United States v. Buck*, 271 F. Supp. 3d 619, 623 (S.D.N.Y. 2017) ("As to testimony regarding legal advice Buck received, Buck could introduce this same evidence by testifying himself. In fact, while the Court need not reach the potential admissibility of any witnesses' testimony, as Buck himself likely could provide this same evidence, any testimony about what advice Buck was given by other witnesses may be cumulative.").

Further still, even if "confirming the content of . . . . communications," were a proper basis for a Rule 15 deposition—and it is not—the defendant's exhibits and arguments demonstrate that other witnesses could do so. By way of example, Mashinsky, Cohen-Pavon, and Jeremie Beaudry are parties to Def. Ex. 7, Cohen-Pavon is a party to Def. Exs. 30, 31, 33, 34; and there are six participants on Def. Ex. 35 (including Cohen Pavon). Indeed, the defendant concedes that the proposed deponents were one of many people who could testify to this subject matter. As to the return of the ICO tokens, for instance, the defendant admits that "Mr. Leon made that decision along with another member of the Celsius's three-person Board of Directors." Br. at 37. And the defendant concedes that Cohen-Pavon can testify regarding reporting to the EXCO. *See* Br. at 41. The Government intends to call Cohen-Pavon, and defendant does attempt to explain why he or the other individuals involved in these communications are not equipped to "confirm" their contents.

### 4. Foreign Depositions Would Not Be In the Interests of Justice

Even if the defendant was able to show that the witnesses were willing to sit for depositions, or would offer material or exculpatory evidence at trial, or (with respect to Cohen-Pavon) was not available to testify at trial—which he cannot—his motion should still be denied because granting the motion would not further the interests of justice.

*First*, the defendant is seeking to use the much broader tools of civil discovery to circumvent the limitations of criminal discovery. As discussed above, "federal criminal discovery is far more limited than federal civil discovery," and "unlike their civil counterparts, criminal proceedings have no extensive discovery procedures requiring both sides to lay their evidentiary cards on the table before trial." *United States v. Sampson*, 898 F.3d 270, 280 (2d Cir. 2018) (citations and alterations omitted). Courts routinely stay parallel civil actions until the completion of the criminal action, in part to avoid "extend[ing] criminal discovery beyond the limits set forth in Federal Rule of Criminal Procedure 16(b)," *Razak v. Leissner*, No. 20 MC 387 (JGK), 2021 WL 2581560, at *1 (S.D.N.Y. June 22, 2021), and because "the broad disclosure of the essentials of the prosecution's case may lead to perjury and manufactured evidence." *Id.* at *2. With respect to Cohen-Pavon in particular, as noted above, the motion appears to be designed to get an early preview of Cohen-Pavon's anticipated trial testimony and an opportunity to cross-examine a cooperating witness in advance of the trial. But the Second Circuit has emphasized that the Jencks Act "is the exclusive vehicle for disclosure of statements made by government witnesses," and "represents a legislative determination that access to a witness' statements could be useful in impeaching a witness but was not intended to be utilized in preparation for trial." *Percevault*, 490 F.2d at 128-29 (holding that court lacked authority to order early disclosure of Government witness statements); *see also United States v. Coppa*, 267 F.3d 132, (2d Cir. 2001) ("We have previously

held that Jencks Act prohibits a District Court from ordering the pretrial disclosure of witness statements.").  Indeed, the defendant makes this motive clear when he requests that along with ordering the depositions, the Court also order the Government to "produce to the defense within seven days of this Order any statement of the deponents in the government's possession to which the defendant would be entitled at trial."  Br. at 53.  Thus, even if the witnesses refuse to sit for the depositions, the defendant will still get the benefit of early § 3500 materials in contravention of the Jencks Act, which appears to be the true objective.  The defendant should not be afforded an opportunity to circumvent the well-wrought rules of criminal discovery just because a witness lives abroad.

*Second*, at this point, Rule 15 depositions would almost certainly require a delay of the January 2025 trial date.  "Motions to conduct depositions in criminal cases must be made promptly and certainly are denied properly where the depositions sought would delay the trial."  *United States v. Chusid*, No. 00 Cr 263 (LAK), 2000 WL 1449873, at *3 (S.D.N.Y. Sept. 27, 2000).  *See also United States v. Ramirez*, No. 20 Cr. 22 (JMF), 2024 WL 4007794, at *1 (S.D.N.Y. Aug. 30, 2024) (denying Rule 15 motion which "at this point would almost certainly delay the trial and, at a minimum, 'would deprive the government' of much of its valuable remaining time for 'trial preparation' as it would need to attend the deposition in the Dominican Republic." (citing *Chusid*, 2000 WL 1449873, at *1)); *Menendez*, 2024 WL 2214906, at *3 ("[T]here is a recognized interest of justice factor present here that militates against granting the motion:  potential delay in trying the matter."); *Johnson*, 2023 WL 5632473, at *16 (denying Rule 15 motion in part because of "the significant delays that would be caused by the Defendants' requests here.  The defendant was indicted in July 2023 and was aware that Cohen-Pavon was a cooperating witness exactly a year to the day before he filed this motion seeking depositions.  By waiting until just four months before

trial to seek these depositions, the defendant has created a situation where even under the fastest schedule, the depositions almost certainly cannot be taken before the current trial date. Moreover, if somehow the depositions were able to be scheduled prior to the current trial date, it would require the Government to expend its "valuable remaining time for 'trial preparation'" traveling to three countries for six depositions. *Ramirez*, 2024 WL 4007794, at *1.

*Third*, the format of the foreign depositions, including the likelihood that the questioning would be conducted by the foreign judge with limited if any availability for cross-examination, and the inability of this Court to hold the witnesses in contempt for false testimony or otherwise refusing to comply with trial procedures (such as refusing to answer questions on cross-examination), raises concerns about the reliability of the testimony. OIA has advised that in the only Rule 15 depositions to have been conducted in Germany or the Netherlands in recent years, the foreign judges insisted on conducting the primary questioning. This judge-led questioning prevents the parties from confronting witnesses when they make misstatements or effectively challenging witnesses with documents. Under these circumstances, it does not appear that the depositions would meet the requirements of Rule 15(e)(2), which requires that the "scope and manner of the deposition examination and cross-examination must be the same as would be allowed during trial." And while the possibility of foreign perjury consequences might theoretically exist based on the foreign oath, in reality, the witnesses would know that, as a practical matter, the foreign authority that has no knowledge of the underlying facts with which to prove the falsity of the testimony is unlikely to bring such charges. *See United States v. Banki*, No. 10 Cr. 08 (JFK), 2010 WL 1063453, at *2 (S.D.N.Y. Mar. 23, 2010) ("Without the teeth of the penalty of perjury, the oath becomes nothing more than an empty recital."); *Buck*, 271 F. Supp.

3d at 624 ("[T]hese [Swiss] witnesses' testimony may essentially be free of any penalty of perjury, calling into doubt the reliability of any of the potential testimony.").[3]

For each of these reasons, the interests of justice counsel against granting the defendant's motion for depositions under Rule 15.

## II.  THE DEFENDANT HAS NOT ESTABLISHED THE NECESSITY OF A § 1783 SUBPOENA TO LEON

With respect to Daniel Leon, the defendant is not seeking a pretrial deposition, but instead is asking the Court to issue a subpoena pursuant to 28 U.S.C. § 1783 for Leon to appear at trial. Section 1783 provides that a court "may" issue a subpoena to a United States national who is in a foreign country if the Court finds that the particular testimony is "necessary in the interest of justice." The provision is designed to be used to subpoena witnesses who are "crucial" to the proceeding, *Estate of Ungar v. Palestinian Authority*, 412 F. Supp. 2d 328, 333 (S.D.N.Y. 2006), and courts consider "a multitude of factors, including 'the nature of the proceedings, the nature of the testimony or evidence sought, the convenience of the witness or the producer of the evidence, the convenience of the parties, and other facts bearing upon the reasonableness of requiring a person abroad to appear as a witness.'" *Id.* at 333-34 (quoting S. REP. No. 88-1580 at 10 (1964)); *see also United States v. Thompson*, 319 F.2d 665, 669 (2d Cir. 1963) (noting that §1783 was "designed to enable the Government to bring back from Europe two material witnesses to testify in the trial of actions arising out of the Teapot Dome scandals"). The defendant argues that the

---

[3] The very real risk of perjury in a foreign deposition was demonstrated in *United States v. Fargesen*, 21 Cr. 602 (LAP), which the defendant cites throughout his brief. In that case, Judge Preska granted the defendant's Rule 15 motion and ordered depositions to take place in Dubai. After the deposition, the Government discovered that one of the witnesses had not only perjured himself, but had introduced fabricated documents that he created just a day before the deposition. To date, we are not aware of the witness facing any consequences from the United Arab Emirates authorities. *See* 21 Cr. 602, Dkt. 167.

25

"necessary in the interest of justice" standard for issuing a subpoena under § 1783 is the same as the "exceptional circumstances" standard under Rule 15, *see* Br. at 18 n.4, and for purposes of responding to this Motion, the Government applies that standard.

For the reasons set forth above in Part I.B, the defendant has failed to meet the high standard for issuing a subpoena under § 1783.  The defendant has proffered nothing about Leon's expected testimony, other than the fact that Leon is unwilling to testify, suggesting that he will likely assert his Fifth Amendment right not to incriminate himself.  And even were he not to decline to testify, there is no reason to believe that his testimony would be favorable to the defense.  The defendant is thus asking the Court to engage the international machinery of effecting foreign service and requiring a witness to travel here from overseas even though there is no indication that the witness's testimony would be material to the defense and every reason to believe that the witness does not testify at all.  Under these circumstances, the defendant has not shown that the subpoena is necessary in the interest of justice.

## **CONCLUSION**

Accordingly, the Government respectfully requests that the Court deny the defendant's motion in its entirety.

Dated: New York, New York
     September 27, 2024

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s_____
    Adam S. Hobson
    Allison Nichols
    Peter J. Davis
    Assistant United States Attorneys
