UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

v.

ALEXANDER MASHINSKY and RONI
COHEN-PAVON,

               Defendants.

Case No. 23 Cr. 347 (JGK)

**ORAL ARGUMENT REQUESTED**

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANT
ALEXANDER MASHINSKY'S MOTION TO PRESERVE THE TESTIMONY OF
<u>MATERIAL WITNESSES RESIDING OUTSIDE THE UNITED STATES</u>**

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for Alexander Mashinsky*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .............................................................................................................2

I.      THE GOVERNMENT HAS FAILED TO REFUTE THAT THE TESTIMONY SOUGHT IS WARRANTED BY EXCEPTIONAL CIRCUMSTANCES AND IS IN THE INTEREST OF JUSTICE ..........................................................................................2

      A.      Rule 15 Relief Is Within The Discretion Of The District Court And There Is No Requirement That A Proposed Deponent Consent To A Deposition ......................4

      B.      The Court Should Reject The Government's Circumscribed View Of Materiality ..................................................................................6

      C.      The Government's Arguments On The Interests Of Justice Factors Contradict Established Law ..................................................................13

CONCLUSION AND RELIEF REQUESTED ...........................................................19

# TABLE OF AUTHORITIES

## CASES

*Holmes v. South Carolina*,
  547 U.S. 319 (2006) ............................................................................................................ 7

*Leatherman v. Tarrant County*,
  507 U.S. 163 (1993) ............................................................................................................ 5

*Overseas Programming Cos., Ltd. v. Cinematographische Commerz-Anstalt*,
  684 F.2d 232 (2d Cir. 1982) .............................................................................................. 5

*Pennsylvania v. Ritchie*,
  480 U.S. 39 (1987) .............................................................................................................. 1

*Seales v. Panamanian Aviation Co. Ltd.*,
  No. 07-CV-2901 (CPS)(CLP), 2009 WL 395821 (E.D.N.Y. Feb. 18, 2009) .......................... 5

*Taylor v. Illinois*,
  484 U.S. 400 (1988) ............................................................................................................ 1

*United States v. Al Fawwaz*,
  98 Cr. 1023 (LAK), 2014 WL 627083 (S.D.N.Y. Feb. 18, 2014) ...................................... 5

*United States v. Alexandre*,
  23 Cr. 326 (JPC), 2022 WL 9843495 (S.D.N.Y. Oct. 17, 2022) .................................... *passim*

*United States v. Banki*,
  10 Cr. 08 (JFK), 2010 WL 1063453 (S.D.N.Y. Mar. 23, 2010) ............................................ 18

*United States v. Banki*,
  10 Cr. 08 (JFK), 2010 WL 1459442 (S.D.N.Y. Apr. 6, 2010) ................................................ 18

*United States v. Bankman-Fried*,
  22 Cr. 0673 (LAK), 2023 WL 6392718 (S.D.N.Y. Oct. 1, 2023) ........................................ 11

*United States v. Buck*,
  271 F. Supp. 3d 619 (S.D.N.Y. 2017) ................................................................................ 12

*United States v. Coburn*,
  19 Cr. 120 (MEF), 2024 WL 3648083 (D.N.J. Aug. 2, 2024) ............................................... 17

*United States v. Epskamp*,
  12 Cr. 120 (RJS), 2013 WL 12175097 (S.D.N.Y. Oct. 3, 2013) ........................................... 14

*United States v. Fargesen*,
  21 Cr. 602 (LAP), 2022 WL 4110303 (S.D.N.Y. Sept. 8, 2022) ..................................... 13, 15

*United States v. Grossman*,
  03 Cr. 1156 (SHS), 2005 WL 486735 (S.D.N.Y. Mar. 2, 2005) .................................... *passim*

*United States v. Htut*,
  22 Cr. 671 (NSR), 2023 WL 3222484 (S.D.N.Y. May 3, 2023) ........................................... 7

*United States v. Johnpoll*,
  739 F.2d 702 (2nd Cir. 1984) ............................................................................................. 6

*United States v. Rhodes*,
    229 F.3d 659 (7th Cir. 2000) ................................................................. 10

*United States v. Salim*,
    855 F.2d 944 (2d Cir. 1988) ................................................................. 17

*United States v. Scully*,
    877 F.3d 464 (2d Cir. 2017) ................................................................. 11

*United States v. Singleton*,
    460 F.2d 1148 (2d Cir. 1972) ................................................................. 2

*United States v. Tagliaferri*,
    13 Cr. 115 (RA) (S.D.N.Y. Aug. 5, 2014), Trial Tr. (ECF No. 63) ....................... 11

*United States v. Vilar*,
    568 F.Supp.2d 429 (S.D.N.Y. 2008) ....................................................... 4

*United States v. Wey*,
    15 Cr. 611 (AJN), 2017 WL 237651 (S.D.N.Y. Jan. 18, 2017)............................ 4, 7

## STATUTES

15 U.S.C. § 78i(a)(2) ...................................................................... 7

## RULES

Fed. R. Civ. P. 28(b) ...................................................................... 5

Defendant Alexander Mashinsky respectfully submits this Reply Memorandum of Law, together with the accompanying Reply Declaration of Michael F. Westfal ("Westfal Reply Decl.") and supporting exhibits, in support of his motion to preserve the testimony of six material witnesses who reside outside the United States.[1]

## PRELIMINARY STATEMENT

Alex Mashinsky has a constitutional right to present a defense. As the Supreme Court has observed on more than one occasion, "'at a minimum, . . . criminal defendants have the right . . . to put before a jury evidence that might influence the determination of guilt.'" *Taylor v. Illinois*, 484 U.S. 400, 408 (1988) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). Mr. Mashinsky's Rule 15 motion is supported by specific documentary evidence demonstrating that six proposed witnesses are essential to his ability to mount a defense and safeguard the integrity of the proceedings and the truth-seeking process. In response, the government offers an abrupt, "nothing-to-see-here" dismissal of their importance, and a distortion of Rule 15 law. This effort to curtail Mr. Mashinsky's ability to present a defense must fail.

*First*, the government claims that the testimony of the six witnesses is immaterial to Mr. Mashinsky's defense. Of course, the government will almost undoubtedly move to admit the electronic communications of those very same witnesses in their case-in-chief as statements by Mr. Mashinsky's supposed co-conspirators and agents. *Second*, the government seeks to deny Mr. Mashinsky the opportunity to examine the witnesses regarding documents that show that they engaged in the very conduct erroneously ascribed to Mr. Mashinsky—and they did so

---

[1] Mr. Mashinsky's opening brief, ECF No. 70, is cited herein as "Br." The government's opposition brief, ECF No. 72, is cited as "Opp." Exhibit 57 to the Westfal Reply Declaration has been filed under seal pursuant to the Protective Order entered in this case, ECF No. 22.

behind his back.  Without the presence of the witnesses, the government will no doubt object to

the admission of that exculpatory documentary evidence as hearsay.  In short, the government

wants to introduce communications from persons they deem to be co-conspirators and agents of

the defendant, but when the defendant—whose liberty is at stake—wishes to examine those same

witnesses concerning their communications, the government cries foul.  They can't have it both

ways.

## **ARGUMENT**

### I. **THE GOVERNMENT HAS FAILED TO REFUTE THAT THE TESTIMONY SOUGHT IS WARRANTED BY EXCEPTIONAL CIRCUMSTANCES AND IS IN THE INTEREST OF JUSTICE**

As Mr. Mashinsky showed in his opening brief, the "exceptional circumstances" standard

under Rule 15 is satisfied where a movant shows that: (1) the prospective witness is unavailable;

(2) the testimony of such witness is material; and (3) it is necessary to take the witness's

deposition in order to prevent a failure of justice.  Br. at 16-17 (citing *United States v. Singleton*,

460 F.2d 1148, 1154 (2d Cir. 1972)).  The government concedes that each of the proposed

witnesses is unavailable other than Roni Cohen-Pavon.[2]  Opp. at 15.

As to the materiality standard of Rule 15, the government has it wrong.  The law does not

require a defendant to show that the Rule 15 testimony will surely acquit him, only that it "would

challenge central aspects of the government's allegations."  Br. at 19 (quoting *United States v.

Grossman*, 03 Cr. 1156 (SHS), 2005 WL 486735, at *3-4 (S.D.N.Y. Mar. 2, 2005)).  Mr.

Mashinsky easily satisfied that standard by submitting 56 exemplary exhibits that established the

materiality of each of the proposed witnesses.  Five of the six witnesses were involved in a clear

---

[2]  The government's opposition brief is the first time it has definitively represented that Mr. Cohen-Pavon will be a witness at trial.  Mr. Mashinsky accepts the government's representation and no longer seeks a pre-trial deposition of Mr. Cohen-Pavon.  Should the government choose not to call Mr. Cohen-Pavon at trial, Mr. Mashinsky reserves the right to seek a Rule 15 deposition during the trial.

and concerted effort to disregard Mr. Mashinsky's repeated instructions to buy *less than* 100% of customers' weekly CEL token rewards on exchanges, and to sell CEL tokens into the market in order to generate revenue for Celsius. *See* Westfal Decl. Exs. 12, 13, 19.  Instead, those individuals worked together to purchase hundreds of millions of dollars' worth of CEL token in a secret Celsius subaccount on the FTX exchange, and then conceal those purchases from Mr. Mashinsky and the rest of the company for more than a year.  Br. at 24, 27-30, 36-37, 39-41, 43-45, 46-47.  Such proof would "challenge"—if not wholly undermine—"central aspects of the government's allegations" of conspiracy and market manipulation.  *Grossman*, 2005 WL 486735, at *3-4.

The government fails to address any of these 56 exhibits, save for an October 30, 2021 WhatsApp exchange between Mr. Mashinsky and Roni Cohen-Pavon.  Opp. at 18-19.  But even there, the government continues to ignore Mr. Mashinsky's responses which were, in effect, that Celsius should *not* buy CEL token on the FTX exchange and instead should ramp up its marketing efforts to attract new buyers and customers earning in CEL.  Br. at 31.  The government cannot rebut this evidence or show that anyone ever reported Mr. Treutler's secret purchases of hundreds of millions of dollars of CEL token in the CNC subaccount throughout the months of May, June, July, August, September, and October 2021.  Br. at 29-30.  Nor does the government challenge that Mr. Treutler and Mr. Shalem's weekly reporting to Mr. Mashinsky was wildly inaccurate throughout that period.  Br. at 40-41, 46-47.  These facts go directly to Mr. Mashinsky's knowledge and intent and thus are material to his defense.

As to the fraud charges, the same five witnesses concealed unauthorized directional trading from Mr. Mashinsky until the point where the trading resulted in tens of millions of dollars in losses for Celsius in a single week.  Br. at 32-33, 38-39, 42-43, 46, 47.  There is no

witness more material on the rest of the fraud charges than Yarden Noy. As in-house counsel, Mr. Noy was responsible for the review of Celsius marketing materials, including coordinating the process implemented to ensure that the information provided on Mr. Mashinsky's weekly AMA videos was accurate. Br. at 48-49. The government alleges that Mr. Noy and others chose to edit certain statements Mr. Mashinsky made on his AMAs, *see* Indict. at ¶¶ 30, 41, but objects to the defense's attempt to show *why* those edits were made, the fact that Mr. Mashinsky was not made aware of them, Opp. at 20, or that when he was, he accepted the edits. Br. at 49-51. The evidence cannot be material for the government's purposes but immaterial when the defense seizes on it. This testimony goes to the heart of Mr. Mashinsky's good faith defense and demonstrates lack of fraudulent intent.

### A.   Rule 15 Relief Is Within The Discretion Of The District Court And There Is No Requirement That A Proposed Deponent Consent To A Deposition

The government's opposition brief invents a mandatory requirement for a Rule 15 deposition: that every proposed deponent must agree to sit for deposition voluntarily. Opp. at 13-14. The Court should reject the government's position for four reasons.

*First,* there is no such requirement in the language of the rule. To the contrary, Judge Nathan and Judge Sullivan (both since elevated to the Circuit) have noted that Rule 15 only requires a deponent to consent when he or she is a defendant in the underlying case. *See United States v. Wey*, 15 Cr. 611 (AJN), 2017 WL 237651, at *25 (S.D.N.Y. Jan. 18, 2017) (granting deposition of fugitive co-defendant and noting that "Rule 15(e)(1) requires that [the co-defendant] consent to his deposition before it may proceed"); *see also United States v. Vilar*, 568 F.Supp.2d 429, 439 (S.D.N.Y. 2008) (rejecting voluntary appearance requirement and contrasting Rule 15(e)'s provision that "[a] *defendant* may not be deposed without that defendant's consent") (emphasis in original). Clearly, the drafters of Rule 15 understood how to require consent from a

deponent, and they chose to require it only for defendants.  That deliberate drafting decision undercuts the government's novel interpretation of Rule 15.  *See Leatherman v. Tarrant County*, 507 U.S. 163, 168 (1993) ("*Expressio unius est exclusion alterius*.") (emphasis in original).

*Second*, Judge Kaplan has rejected the notion of a voluntary appearance requirement and found that the very purpose of letters rogatory is to reach witnesses who would not appear at a deposition voluntarily.  *United States v. Al Fawwaz*, 98 Cr. 1023 (LAK), 2014 WL 627083, at *2 (S.D.N.Y. Feb. 18, 2014) (internal citation omitted).  That position is supported by the weight of authority in this district that makes no mention of such a requirement.  *See, e.g., United States v. Alexandre*, 23 Cr. 326 (JPC), 2022 WL 9843495, at *3 (S.D.N.Y. Oct. 17, 2022) (granting defendant's Rule 15 motion to depose corporate representative of Cyprus-based cryptocurrency broker that had not responded to repeated requests to make witnesses available for trial); *Grossman*, 2005 WL 486735, at *3-4 (finding deponent who became unresponsive after maintaining contact with defense counsel for seven months unavailable under Rule 15).

*Third*, the Federal Rules of Civil Procedure incorporated into Rule 15(e) do not require a proposed deponent to voluntarily consent to a deposition either.  *See Seales v. Panamanian Aviation Co. Ltd.*, No. 07-CV-2901 (CPS)(CLP), 2009 WL 395821, at *12 (E.D.N.Y. Feb. 18, 2009) (noting that defendant "does not appear to have considered that the testimony of these witnesses [residing in Jamaica] could be compelled by other means, such as a letter of request") (citing Fed. R. Civ. Proc. 28(b) and *Overseas Programming Cos., Ltd. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982)).

*Fourth,* the government's proposal would turn the Second Circuit's well-established *un*availability factor under Rule 15 on its head and mandate the availability of any proposed deponent instead.  Especially in cases such as this one where the government is seeking to hold a

defendant criminally responsible for the conduct of others, requiring those other individuals to consent to a deposition provides all the wrong incentives. The government's proposal would only embolden potential witnesses to flee the jurisdiction and, apparently, the reach of the United States judicial system entirely. Such unintended consequences caused the Second Circuit in *Johnpoll* to reject a defendant's attempt to require the government to give in to ever-increasing demands for cost reimbursements from proposed Rule 15 deponents. *United States v. Johnpoll*, 739 F.2d 702, 709 (2ⁿᵈ Cir. 1984) ("It is readily apparent that in the absence of extraordinary circumstances (not present here), even assuming the government had funds to meet the witnesses' demands, its submission to these conditions would establish a precedent that could have extensive harmful repercussions.").

In sum, the Court should reject the dreamt-up requirement that Rule 15 depositions can only proceed with the consent of the deponent.

**B.    The Court Should Reject The Government's Circumscribed View Of Materiality**

The assertion that Mr. Mashinsky's motion is a fishing expedition is demonstrably false. Opp. at 18. The motion is supported by 56 exhibits that detail exactly what the defendant intends to show at trial. The government fails to address all but one. Regardless, the government's challenge to the materiality of the proposed witnesses fails at every step.

*First*, the government seeks to prevent Mr. Mashinsky from obtaining essential testimony because it considers the exhibits submitted with his motion and "any testimony that these Celsius employees conducted market manipulation [to be] inculpatory." Opp. at 18 ("Those 'explicit conversations' are proof of the conspiracy."). That is specious. The government asks this Court

to assume that if there was a conspiracy, Mr. Mashinsky must have been part of it.[3]

Unsurprisingly, the government cites no caselaw holding that a bare assertion that there was a

conspiracy is sufficient to prevent a defendant from proving that he was not a participant.  *Cf.*

*United States v. Htut*, 22 Cr. 671 (NSR), 2023 WL 3222484, at *2 (S.D.N.Y. May 3, 2023)

("Although this testimony 'does not necessarily vitiate the possibility of a conspiracy' between

Defendant and Individual-1, it is highly relevant to the question of whether [Defendant]

knowing[ly] and willfully joined a conspiracy' with Individual-1.") (citations omitted); *see also*

*Wey*, 2017 WL 237651, at *25 (testimony from alleged co-conspirator that he "never did

business with or received trading instructions or payments from [defendant]" is material).

The government likewise argues that Mr. Mashinsky should not be able to obtain

testimony from five witnesses relating to the alleged market manipulation because "the

Government has interviewed both Cohen-Pavon and Treutler, and can confirm that each witness

has stated, in substance and in part, that they were instructed by Mashinsky to purchase excess

CEL token to support the price of CEL."  Opp. at 19.  This is backwards—a unanimous Supreme

Court has already rejected the idea that the government can prevent a defendant from showing

that others were responsible for the charged conduct simply by asserting that it has evidence to

support its case.  *See Holmes v. South Carolina*, 547 U.S. 319, 330 (2006) ("Just because the

prosecution's evidence, *if credited*, would provide strong support for a guilty verdict, it does not

follow that evidence of third-party guilt has only a weak logical connection to the central issues

in the case.") (emphasis in original).

---

[3] The government's opposition focuses on the lone conspiracy count but ignores that it has also charged Mr.
Mashinsky with substantive market manipulation, including under Section 9(a)(2) of the Exchange Act.  That statute
requires the government to prove that a defendant "effect[ed], alone or with 1 or more other persons, a series of
transactions in any security."  15 U.S.C. § 78i(a)(2).  The government's opposition offers no theory as to how Mr.
Mashinsky could have "effected" securities transactions that he did not know about, or a basis for precluding a
defendant from obtaining testimony to demonstrate that the charged securities transactions were deliberately
concealed from him.

The defense will address Mr. Cohen-Pavon's purported testimony—and his own criminal activity—during cross-examination at trial. But the government's representations of Mr. Treutler's interviews merit scrutiny. As Mr. Mashinsky noted in his opening brief, the government has spoken with Mr. Treutler or his counsel at least five times. Br. at 27. Yet the Court currently does not have a scintilla of evidence before it to support the government's assertion about how Mr. Treutler *might* testify. Opp. at 19. On the other hand, the Court has ample documentary evidence and bullet point excerpts from Mr. Treutler's prior interviews with the government[4] to conclude that he would provide testimony material to Mr. Mashinsky's defenses of lack of knowledge and intent, including the following:

- Treutler (who had worked in traditional finance for nearly a decade before joining Celsius) "*did not understand*" the language used by Mr. Mashinsky and others at Celsius "*as manipulation talk at the time*." Westfal Decl. Ex. 1 at 12.

- At times Treutler wanted [another Celsius employee] to buy more CEL token as a hedge for OTC desk activity. Sometimes it was more than Mashinsky and other executives were prepared to authorize or have the company fund. *Id.*

- Treutler and [his supervisor] believed that hedging [*i.e.*, buying CEL tokens to offset OTC sales] was a very important aspect of the OTC desk and [his supervisor] expressed concern about depleting Celsius's treasury supply of CEL tokens too fast. Leon and Mashinsky wanted to hedge [*i.e.*, buy] less. *Id.* at 13.

- Mashinsky and Leon were interested in OTC proceeds and wanted to monetize Celsius's CEL token treasury. *Id.* at 14.

And there is more. In direct contradiction to the government's assertion that Mr. Treutler has stated that Mr. Mashinsky instructed him to purchase excess CEL token to support the price of CEL, the defense has submitted with this reply memorandum video excerpts from Mr. Treutler's December 14, 2022 FBI interview at Newark Airport. Westfal Reply Decl. Ex. 57. Those excerpts include the following:

---

[4] The government's letter disclosing Mr. Treutler's interview excerpts cited *Brady v. Maryland*, but did not "conced[e] that this information constitutes material exculpatory information[.]" Westfal Decl. Ex. 1 at 1.

- **FBI:** At the time you understood it to be that he, Alex wanted the CEL token to be like a higher volume, or what? You said more accessible, I think, right? . . . So he wanted to increase liquidity? **TREUTLER:** Yeah, that's what I think they wanted to do . . . **FBI:** So what were the ways in which you were supposed to increase liquidity? How do you go about doing that? **TREUTLER:** They implemented an OTC desk so, like, you can write an email saying I want to buy or I want to sell . . . And they [Celsius] would normally hedge it, that was how I understood OTC, and later on learned that Alex was more focused on being a seller always, so he didn't care for hedging . . . (Westfal Reply Decl. Ex. 57-A).

- **FBI:** Did you talk with [Celsius employee] or other people about what they should do to support the price to make a strong market to like say, for example, eliminate sellers, basically buy up some sellers on the order book? **TREUTLER:** I mean, this was like what Alex would say, [laughing]. Kill the sellers, or what was he saying even on social media, like, destroy the sellers [inaudible]? **FBI:** Did he ever instruct you to do that? **TREUTLER:** No. (Westfal Reply Decl. Ex. 57-B).

- **FBI:** Isn't the objective though to make it appear to the market that the price, the token is stronger than it is because you are eliminating the, these low sellers? **TREUTLER:** No, I don't think so. **FBI:** No? That's not what clean up the order book means? **TREUTLER:** It just means take the cheap thing and [inaudible] because like, I explained we have this budget, and you can only buy, you need to buy this token the exact number, and make sure you don't, you spend the least money as possible. (Westfal Reply Decl. Ex. 57-C).

- **FBI:** I mean I'm not sure that prices are really that important, but it seems, like I was getting at before, that this is an effort to, as you said, have a, look like it's a strong market and have a high and stable price. It seems to not be about buying cheaply but to make the market look strong, is that fair? **TREUTLER:** I don't know. So, I don't understand, I could only understand that if there is selling pressure to just take advantage of it and then buy cheap. **FBI:** It seems like you have a reluctance to say that it was to make the market look strong. Is there something wrong with making the market look strong? **TREUTLER:** It would be a bit shady to me. **FBI:** It would be what? **TREUTLER:** It looks shady if you change the way the market looks like . . . I mean, it's hard in an asset where you are always the buyer, right? . . . as I said, every small order will make the market strong . . . **FBI:** Except if the purpose of these orders were to just make the market look strong, do you think there would be something wrong with that? . . . Like market manipulation, are you familiar with that phrase? **TREUTLER:** Yeah sure, in traditional markets you also don't make markets stronger as well by manipulating it. **FBI:** Manipulating it. Um, and do you think that that's what was going on here? **TREUTLER:** Not from my side. (Westfal Reply Decl. Ex. 57-D).

- **FBI:** Did Alex ever ask you or direct you to make the market look stronger by doing purchases in the market? **TREUTLER:** I mean he didn't ask me to do any purchases. But on company calls for sure he asked to find new volume and to make more buying pressure into CEL. He wanted to sell [inaudible] cards or so . . . or

something he mentioned in a company call, or stuff like this or, oh yeah, he wanted to have people borrow money backed by CEL . . . **FBI:** So Alex wanted to be able to use the CEL token as collateral? **TREUTLER:** Yes, that was [shared out] publicly and thousands of calls [inaudible]. **FBI:** So how did he want to accomplish that? Was it by making the market for CEL token to be stronger? **TREUTLER:** No, basically he wanted to have it be used in a lot of use cases . . . he just painted pictures of adding more, um, yeah, basically use cases for using CEL and buying and selling and making the token be more use of more people and more traded, because people need to trade it.  Yeah, so that's, yeah, like I said [inaudible] was a big issue for us . . . (Westfal Reply Decl. Ex. 57-E).

- **FBI:** But you didn't have knowledge that the buying was just consistently more than the amount of rewards that was being paid out?  **TREUTLER:**  No, definitely not. (Westfal Reply Decl. Ex. 57-F).

Therefore, the only evidence before the Court demonstrates that Mr. Treutler's testimony, at a minimum, "would challenge central aspects of the government's allegations."  *Grossman*, 2005 WL 486735, at *3-4.

*Second*, the government takes the position that in the face of an allegation that Mr. Mashinsky "worked for years to artificially inflate the price of CEL token," Opp. at 3, evidence that Mr. Mashinsky was instructing his team to *sell* CEL tokens into the market is not exculpatory, or somehow would be cumulative.  Opp. at 19-20.  The government justifies its position by citing indictment paragraphs that allege that at certain times, Celsius stopped purchasing CEL in the market—but those indictment references make no mention of Mr. Mashinsky's repeated instructions to sell CEL token.  *Id.*  The idea that a defendant charged with artificially inflating the price of a security through excess *purchases* cannot elicit testimony that he repeatedly instructed his team that he wanted them to make excess *sales* is difficult to comprehend.  *See United States v. Rhodes*, 229 F.3d 659, 661 (7th Cir. 2000) ("Evidence relevant to undercut a charge is no less relevant to bolster it; the standard under Rule 401 is symmetric.").

*Third*, as to the fraud charges, the government argues that "the defendant offers nothing more than speculation that the witnesses will testify that they did not bring Mashinsky's

misstatements to his attention." Opp. at 20. That's just wrong. Mr. Mashinsky supported his

motion on this point with several documents showing that corrections to supposedly inaccurate

statements he made were never brought to his attention. *See, e.g.*, Westfal Decl. Exs. 27 and 28

(as to CNBC interview described in Indict. ¶ 37) and Ex. 51 (as to alleged misstatements about

institutional counterparty defaults described in Indict. ¶¶ 38-39). In addition, the government's

bald assertion that a defendant's good faith reliance on his lawyers' involvement, review, and

silence with respect to conduct charged in the indictment "is not a defense to fraud[,]" Opp. at

20, is inconsistent with the law in this district. *United States v. Bankman-Fried*, 22 Cr. 0673

(LAK), 2023 WL 6392718, at *1 (S.D.N.Y. Oct. 1, 2023) ("Thus, the evidence concerning the

presence, involvement and even advice of lawyers in relevant events is viewed best as evidence

probative of the defendant's intent to defraud or lack thereof.") (citing *United States v. Scully*,

877 F.3d 464, 476 (2d Cir. 2017)); *United States v. Tagliaferri*, 13 Cr. 115 (RA) (S.D.N.Y. Aug.

5, 2014), Trial Tr. (ECF No. 63), at 83-85 (permitting defendant to elicit testimony that attorneys

were involved in the charged transactions, that their involvement affected his state of mind, that

attorneys reviewed the charged transactions and the defendant "took comfort in the attorney

silence").

     *Fourth*, the government argues that Rule 15 testimony that would serve to confirm

documentary evidence is cumulative and not material. Opp. at 21. The irony of that position is

lost on the government. Of course, the government will seek to admit the statements of these five

proposed deponents as co-conspirator or agency statements and then prohibit the defendant from

seeking testimony as to their exculpatory value. This "heads we win, tails you lose" position is

fundamentally unjust. And the defense does not seek merely to "confirm" documentary

evidence, but rather to highlight the statements, events and actions reflected in those documents,

and what the proposed witnesses saw, heard, planned, discussed, reported, concealed, or

otherwise witnessed.  The government also omits that it will likely object to the admission of that

same documentary evidence on hearsay grounds, and if such documents do not come into

evidence, then the proposed witness testimony could not possibly be cumulative, but rather

would be essential to Mr. Mashinsky's ability to present a defense.

The government next argues that the defense could call other witnesses to testify about a

handful of the cited exhibits, including Roni Cohen-Pavon.  Opp. at 21.[5]  Of course, the

government cites no authority for the proposition that since the defense may (or may not) be able

to obtain testimony from the government's lone cooperating witness, other witnesses are

cumulative.  And while Mr. Mashinsky may be able to call certain witnesses to testify about the

CEL token policies and procedures that Celsius established in consultation with counsel, *see*

Westfal Decl. Ex. 7, only the proposed deponents would be able to offer any testimony about

CEL token purchases in violation of those policies, and the concealment of those purchases from

Mr. Mashinsky.  *See Grossman*, 2005 WL 486735, at *4 (finding that even if the defendant

testified at trial, the proposed deponent "can testify directly" about several material subjects "in a

way that [the defendant] cannot").  The government also notes that Exhibit 35 has six

participants, Opp. at 21, but omits that five of the six are the very witnesses whose testimony is

sought in this motion, and the sixth is an individual who resides in Israel and is outside the

subpoena power of this Court.  As to Mr. Leon's decision to return the 117 million ICO tokens to

Celsius's treasury in April 2020, *see id.*, that decision was likewise made with the third member

---

[5] The government cites *United States v. Buck* for the proposition that witness testimony regarding legal advice that a defendant received is cumulative because the defendant could introduce the same evidence by testifying himself. Opp. at 21 (citing *United States v. Buck*, 271 F. Supp. 3d 619, 623 (S.D.N.Y. 2017)).  The defense is not aware of any other case suggesting that a defendant should be deprived of material evidence to support his defense because he can always waive his Fifth Amendment right not to testify.  The Court should reject that proposition.

of Celsius's Board of Directors who resides in the United Kingdom and is not nearly as relevant to the facts of this case as Mr. Leon.

The availability of other witnesses to testify about a single electronic communication or document is beside the point; it says nothing about the essential involvement of the witnesses described in Mr. Mashinsky's motion.  It was precisely this type of argument from the government that led Judge Cronan to comment in *Alexandre* that "materiality is primarily a question of *relevance*, not necessity[,]" and "the fact '[t]hat other documents and testimony may also be relevant to the defense does not mean that the witnesses' testimony will be so cumulative as to be immaterial.'"  2022 WL 9843495, at *4 (quoting *United States v. Fargesen*, 21 Cr. 602 (LAP), 2022 WL 4110303, at *4 (S.D.N.Y. Sept. 8, 2022)).

### C.    The Government's Arguments On The Interests Of Justice Factors Contradict Established Law

Courts in this district presume a "failure of justice" in the absence of "substantial countervailing factors militating against the taking of the depositions."  Br. at 52 (citing *Alexandre,* 2022 WL 9843495, at *3, *5).  The government has not met its burden of establishing *any* countervailing factors, let alone substantial ones, and the arguments set forth in its opposition run afoul of clearly established law.

*First*, the government argues that "the defendant is seeking to use the much broader tools of civil discovery to circumvent the limitations of criminal discovery."  Opp. at 22.  That is false.  Mr. Mashinsky filed this motion pursuant to Rule 15 of the Federal Rules of Criminal Procedure, and a statute that is applicable to criminal and civil cases, 28 U.S.C. § 1783.  The government takes issue with Mr. Mashinsky's request that the government produce statements from the proposed deponents for the defense's use at the depositions.  Opp. at 23.  But that evidence is material and necessary to rebut the government's ability to prove the elements of the charged

13

crimes, and the proposed relief is taken directly from the language of Rule 15(e)(3), as indicated in Mr. Mashinsky's motion.  Br. at 53.

*Second*, the government asserts that Rule 15 depositions would almost certainly require a delay of the January 2025 trial date.  Opp. at 23.  Ironic, given that the government sought and obtained a four-month delay to accommodate the personal schedule of one of the prosecutors, without objection from the defense.  In any event, Mr. Mashinsky does not seek any delay of his trial date at this time.  He seeks an opportunity to obtain material testimony from witnesses who are essential to his defense.  The possibility of an adjournment, or the possibility that the depositions cannot be completed in advance of the trial date, is pure speculation.  And the government's failure to assert that it would be prejudiced in any way by an adjournment undermines its complaints.  *See United States v. Epskamp*, 12 Cr. 120 (RJS), 2013 WL 12175097, at *2 (S.D.N.Y. Oct. 3, 2013) ("The government has not claimed it would be prejudiced by any delay.  But the prejudice to Defendant of denying the motion could be substantial.  If [the deponent] does testify, his testimony could be critical to Defendant's defense.  In this case—as in many others, unfortunately—for the wheels of justice to grind fine, they must grind slow.").

The government also complains that "[b]y waiting until just four months before trial to seek these depositions, the defendant has created a situation where even under the fastest schedule, the depositions almost certainly cannot be taken before the current trial date."  Opp. at 23-24.  Judge Cronan rightfully rejected similarly speculative complaints from the government about what "*almost certainly*" can or cannot occur.  *See Alexandre*, 2022 WL 9843495, at *5 ("But these concerns are speculative; there is no reason that Defendant should not be permitted to *try* to obtain the testimony before the scheduled trial date. This is especially so given that the

14

Government may have tools at its disposal that could help speed up the process.") (emphasis in original).

The notion that the defense somehow sat on its hands before bringing this motion is flat-out wrong. The government produced more than five million pages of discovery in this case, including approximately 700,000 pages only a few months ago. ECF No. 69, at ¶ 7.[6] Critical parts of the discovery are in Hebrew. Sorting through the discovery requires an immense amount of time. It has been an enormous undertaking to piece together and make sense of myriad strings of electronic communications and documents that comprise the exhibits submitted with this motion. And heightened attention must be paid to the discovery because it does not include even a single *Brady* disclosure. So, for example, the government never alerted the defense to the WhatsApp communication where Mr. Cohen-Pavon told Mr. Treutler to "*get me to 8*" (Westfal Decl. Ex. 21), or the Hebrew messages where Mr. Cohen-Pavon and Mr. Leon discussed a "*hostile takeover*" of Celsius from Mr. Mashinsky (Westfal Decl. Ex. 33), or the Hebrew messages in which Messrs. Cohen-Pavon, Leon, Sabo, and Shalem discussed—behind Mr. Mashinsky's back—excess CEL token purchases and unauthorized directional trading by Mr. Treutler (Westfal Decl. Ex. 35).

The government's complaint that it should not have to spend its time traveling to depositions also rings hollow. Opp. at 24. There is no reason why the parties cannot limit the time and cost of depositions by agreeing to remote, video-recorded depositions rather than in-person testimony, where possible. *Fargesen*, 2022 WL 4110303, at *5 (granting defense motion

---

[6] The government's May 2024 production came well after the discovery timeline represented by the government at the July 25, 2023 Status Conference, ECF No. 26, Tr. at 6:3-8 (THE COURT: Okay. What's the government's estimate with respect to how long it will take to produce the discovery? [GOVERNMENT]: It's our intention to push this out on a rolling basis, your Honor. I think the bulk of it, we expect in terms of processing and downloading time, could take between three and five weeks.)

to take remote video depositions of three witnesses based in Dubai).  Moreover, the government

is under no obligation to attend a deposition, especially if it truly considers the testimony

immaterial, as it argues throughout its opposition.

The Court should also discount the government's complaints about the possibility of

delay when, as Judge Cronan pointed out in *Alexandre*, the government has at its disposal several

tools to expedite the deposition process.  2022 WL 9843495, at *5.  As the government's

opposition acknowledges, it could expedite the depositions of Yaron Shalem, Yarden Noy, and

potentially Ron Sabo in as little as two months under the Mutual Legal Assistance Treaty with

Israel.  Opp. at 10.  Although Mr. Sabo's last known residence is in the Netherlands, he is an

Israeli citizen and that MLAT appears to provide a mechanism for the United States to request

the Israeli government's assistance with locating one of its citizens.  *See* Westfal Reply Decl. Ex.

58 at 9, Art. 13 (Location or Identification of Persons or Items).  The MLAT with the

Netherlands provides a similar mechanism for locating persons believed to be in the Requested

State.  Westfal Reply Decl. Ex. 59 at 5, Art. 2 (Locating Persons).

The government broadly asserts that the MLAT process cannot be used in Germany or the

Netherlands to request "defense depositions," Opp. at 10, but there is no language in either

MLAT indicating that a proceeding in which both parties ask questions must be deemed a

"defense deposition."  To the contrary, Article 10 of the MLAT with Germany provides that the

"Requested State shall permit the presence, during execution of a request, of persons concerned

in the investigation or proceeding and specified in the request and shall allow such persons to

propose questions to be asked of the person giving the testimony."  Westfal Reply Decl. Ex. 60 at

10, Art. 10 (3) (Taking Testimony and Producing Evidence).  And the MLAT with the

Netherlands provides as to requests for testimony that the Requested State "shall permit the

16

presence of an accused, counsel for the accused, and any other interested person specified in the request." Westfal Reply Decl. Ex. 59 at 7, Art. 5 (3) (Taking Testimony and Producing Documents in the Requested State). The MLAT also states that the "executing authority shall provide any person permitted to be present the opportunity to pose questions for the person whose testimony is sought." *Id.* at Art. 5 (4). If the government chooses not to use these tools at its disposal, that is on the government, not Mr. Mashinsky.[7]

*Third,* the government takes issue with the format of the depositions, suggesting that depositions in Germany or the Netherlands might be conducted by a foreign judge under procedures that do not mirror the precise requirements of the Federal Rules of Civil Procedure. Opp. at 24. The Second Circuit has already rejected such an argument, making clear that a deposition under such procedures is better than the alternative, which is no evidence at all. *See United States v. Salim*, 855 F.2d 944, 949-50 (2d Cir. 1988) ("We must apply the rule to effectuate this [testimonial preservation] purpose . . . A sovereign nation is entitled to refuse to acquiesce in the use within its borders of American methods of gathering, preserving and presenting evidence; such refusal, however, should not automatically and invariably cause the prosecution to abandon its efforts to obtain evidence abroad.").[8] The government's assertion that Rule 15 "reflects the strong preference for live testimony at trial," Opp. at 1, is therefore misplaced, as the choice here is between deposition procedures permitted by local law in the host

---

[7] It appears that the government recently made a similar representation in *United States v. Coburn* regarding its inability to use the MLAT with India to secure depositions sought by the defendants. *See* 19 Cr. 120 (MEF), 2024 WL 3648083, at *1 (D.N.J. Aug. 2, 2024). After the defendants proceeded (unsuccessfully) with letters rogatory issued to India, the government apparently changed its position "and in early 2024 the United States made an MLAT request to India to secure the depositions the Defendants have sought." *Id.*

[8] The government cited *Salim* as an example of the Second Circuit "expressing 'considerable concern about the possible abuses of foreign methods of examining witnesses[.]'" Opp. at 11. The full quote from *Salim* is as follows: "Despite our considerable concern about the possible abuses of foreign methods of examining witnesses, we are not persuaded by the challenges presented in this case." 855 F.2d at 950.

countries, or no testimony at all. The law in this district is equally clear that the hypothetical

possibility of witness perjury, Opp. at 24-25, and premature arguments about the admissibility of

deposition testimony, Opp. at 13, are not obstacles to relief under Rule 15.[9]  *See Alexandre*, 2022

WL 9843495, at *5-6 (collecting cases that rejected both arguments).

Finally, the government suggests throughout its opposition that the witnesses might assert

their rights under the Fifth Amendment at any scheduled depositions. Opp. at 1, 13, 14 n.1, 26.

It provides no evidentiary support for this assertion. And it misconstrues Mr. Mashinsky's

defense theory to be that the proposed witnesses are guilty of criminal conduct, *see* Opp. at 15,

when nowhere in the Rule 15 motion did Mr. Mashinsky ever make such an accusation. It is not

defense counsel's job to accuse others of criminal conduct, or to prosecute that conduct. It is the

defense's job to establish Mr. Mashinsky's lack of criminal intent and lack of knowledge of the

conduct of others. The defense must be able to introduce documentary and testimonial evidence

to carry out that duty. The idea that the government can defeat a Rule 15 motion by speculating

that proposed deponents *might* take the Fifth, without any evidence whatsoever, finds no support

in the caselaw. None of the witnesses or their counsel has said they would take the Fifth, and the

government has provided the Court with no basis to conclude that they will. In fact, in four

separate interviews with the government, it appears that Mr. Treutler has never refused to answer

any questions from the government. Westfal Decl. Ex. 1, at 12-14. In the absence of any

evidence that the proposed witnesses would refuse to answer defense counsel's questions at a

deposition, the Court should reject the government's speculation.

---

[9] As to the hypothetical possibility of perjury, the government cited Judge Keenan's opinion in *United States v. Banki*, 10 Cr. 08 (JFK), 2010 WL 1063453, at *2 (S.D.N.Y. Mar. 23, 2010).  *See* Opp. at 24.  In that opinion, Judge Keenan was not reviewing a Rule 15 motion but rather a defendant's motion to present live testimony from witnesses in Iran via videoconference. *Id.*  However, in the follow-up opinion cited by Mr. Mashinsky, Judge Keenan granted the defendant's Rule 15 motion for depositions of the same witnesses. Br. at 20 (citing *United States v. Banki*, 10 Cr. 08 (JFK), 2010 WL 1459442, at *1 (S.D.N.Y. Apr. 6, 2010)).

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Mr. Mashinsky respectfully requests that the Court grant his motion to obtain and preserve for trial the testimony of Daniel Leon, Johannes Treutler, Ron Sabo, Yaron Shalem, and Yarden Noy, and enter the following order:

1) As to Daniel Leon, pursuant to 28 U.S.C. § 1783, Mr. Mashinsky is authorized to serve a subpoena requiring Mr. Leon's appearance as a live witness at trial. The subpoena shall designate the time and place for Mr. Leon's appearance and the defense shall tender to Mr. Leon his estimated necessary travel and attendance expenses, in an amount to be determined by the Court.

2) Pursuant to Rule 15(e)(3) of the Federal Rules of Criminal Procedure, the government shall produce to the defense within seven days of this Order any statement of the deponents in the government's possession to which the defendant would be entitled at trial.

3) Within seven days of this Order the government shall inform the defense whether it is willing to facilitate the Rule 15 depositions by utilizing the procedures set forth in the respective Mutual Legal Assistance Treaties ("MLATs") between the United States and Israel, Germany, and the Netherlands.

4) If the government is not willing to facilitate the depositions by utilizing the procedures set forth in the respective MLATs, the defense shall submit proposed letters rogatory for the deponents within fourteen days of this Order.

Dated:  New York, New York  
       October 4, 2024

MUKASEY YOUNG LLP

 /s/ Michael F. Westfal       
Marc L. Mukasey  
Torrey K. Young  
Michael F. Westfal

570 Lexington Avenue, Suite 3500  
New York, NY 10022  
Tel: (212) 466-6400  
Email: michael.westfal@mukaseylaw.com

*Counsel for Alexander Mashinsky*