**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**UNITED STATES OF AMERICA,**

       **- against -**                **23-cr-347 (JGK)**

**ALEXANDER MASHINSKY,**           **MEMORANDUM OPINION AND**
                                  **ORDER**
                        **Defendant.**
————————————————————————

**JOHN G. KOELTL, District Judge:**

The defendant, Alexander Mashinsky, was charged in a seven-count indictment on July 11, 2023 (the "Indictment"). ECF No. 1. The Indictment charges the defendant with securities fraud, commodities fraud, wire fraud, market manipulation, and conspiracy to commit securities fraud, wire fraud, and market manipulation. The defendant has moved, pursuant to Rule 15 of the Federal Rules of Criminal Procedure and 28 U.S.C. § 1783(a), to preserve the testimony of six witnesses who reside outside the United States. For the following reasons, the motion is **granted in part** and **denied in part**.

**I.**

The Indictment alleges that, from 2018 through June 2022, the defendant engaged in two interrelated criminal schemes in connection with his operation of Celsius Network LLC and its related entities (collectively, "Celsius"). The first alleged scheme involved false and misleading statements that the

1

defendant purportedly made to customers to induce them to invest
their assets with Celsius, and the second alleged scheme
involved manipulative trading in CEL, Celsius's native crypto
token.

According to the Indictment, in 2018, the defendant founded
Celsius and served as its CEO. Indictment ¶¶ 1, 10. The
defendant marketed Celsius as a safe place for customers to
deposit their crypto assets and earn interest. Id. ¶ 1. By the
fall of 2021, Celsius had become one of the largest
cryptocurrency platforms in the world. Id. ¶ 4.

The first alleged scheme involved Celsius's "Earn Program,"
through which customers could invest their crypto assets with
Celsius and earn returns—weekly "rewards" payments. Id. ¶ 12.
The Indictment alleges that the defendant repeatedly made public
misrepresentations about core aspects of Celsius's business and
financial condition to induce retail investors to invest their
assets in the Earn Program. Id. ¶ 2. The defendant allegedly
misrepresented, among other things, Celsius's profitability and
the risks associated with depositing crypto assets with Celsius.
Id. ¶¶ 2, 15-47. For example, the Indictment alleges that the
defendant assured Celsius's customers that Celsius was not
making "directional bets"—that is, gambling on the future value
of cryptocurrencies by taking long or short positions in various

crypto assets—but instead was earning yield on Celsius's customers' investments through a market-neutral strategy. Id. ¶ 31. However, the defendant allegedly knew that, contrary to his representations, Celsius was not market-neutral and instead regularly used customer assets to take risky bets on the future value of crypto assets. Id.

The second alleged scheme involved CEL, Celsius's native crypto token, which was launched sometime in 2018. Id. ¶¶ 5, 14. The defendant and Celsius touted CEL as a worthy investment and encouraged Earn Program investors to receive their weekly rewards in CEL. See id. ¶ 14.

The Indictment charges that the defendant, who was a large holder of CEL and stood to benefit from an increase in its price, worked with others at Celsius to manipulate the price of CEL. Id. ¶¶ 6, 49-50. Initially, despite Celsius's efforts to promote CEL, the price of CEL remained low; by the end of October 2019, CEL was trading at approximately $0.05 per token. See id. ¶ 51. The defendant publicly represented that Celsius would purchase in the market only the amount of CEL necessary to pay investors their weekly CEL rewards. Id. ¶ 53. However, to inflate the price of CEL artificially, in July 2020, Celsius (allegedly at the defendant's direction) began to purchase excess CEL in the market—approximately three times more CEL than

Celsius needed to pay rewards. Id. ¶¶ 54-55. The defendant and other Celsius executives also personally purchased CEL to prop up CEL's price. Id. ¶¶ 7, 57-59. As a result, the price of CEL rose from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020. Id. ¶ 55. Celsius continued these practices through much of 2021 and in early 2022. See id. ¶¶ 64, 67.

The Indictment also alleges that the defendant repeatedly made false and misleading statements about Celsius's CEL market activity. Id. ¶¶ 56, 60-63, 65-66. In these statements, the defendant falsely claimed that the price increase in CEL was due to "organic" demand, when in reality the price increase was due to Celsius's own excess market purchases. See id. ¶ 56. The defendant also allegedly made false and misleading statements regarding his own CEL trading activity. Id. ¶¶ 69-71.

By artificially inflating the price of CEL, the defendant allegedly reaped approximately $42 million from his personal sales of CEL. Id. ¶ 8.

On July 11, 2023, the defendant and Roni Cohen-Pavon, Celsius's Chief Revenue Officer, were charged in the Indictment. See ECF No. 1.

4

On September 13, 2023, Cohen-Pavon pleaded guilty, pursuant to a cooperation agreement, to four counts of the Indictment. See ECF No. 32.

On January 12, 2024, the defendant filed a motion to dismiss Counts Two and Six of the Indictment and to strike surplusage from the Indictment (the "motion to dismiss").[1]

On February 20, 2024, the Court set the trial date in the defendant's case as January 28, 2025. See ECF No. 54.

## II.

On September 14, 2024, the defendant filed a motion to preserve the testimony of six witnesses residing outside the United States. See ECF No. 68. The defendant seeks permission to take the depositions of five witnesses who are outside the subpoena power of the Court, and to subpoena for trial one United States citizen who currently resides in Israel. The six witnesses are: Cohen-Pavon, Daniel Leon, Johannes Treutler, Ron Sabo, Yaron Shalem, and Yarden Noy. The Government opposes the motion. See ECF No. 72.

## A.

Cohen-Pavon is an Israeli citizen who resides in Israel. The Indictment alleges that Cohen-Pavon and the defendant were

---

[1] The Court addresses the motion to dismiss in a separate order dated today.

co-conspirators in the alleged market manipulation scheme involving CEL. The defendant argues that Cohen-Pavon is a material witness on both the market manipulation and fraud charges. As to the market manipulation charges, the defendant claims that Cohen-Pavon provided legal advice to Celsius regarding its CEL market activity from 2019 and 2022, and that, in 2021, Cohen-Pavon and several other Celsius employees disregarded explicit instructions from the defendant to sell CEL and instead chose to buy CEL. As to the fraud charges, the defendant asserts that the defendant sought advice from Cohen-Pavon regarding his public statements about Celsius, and that in some cases Cohen-Pavon deliberately decided not to correct or advise the defendant about the alleged inaccuracy of the defendant's statements. Cohen-Pavon is a cooperating witness and is expected to testify at the trial in January.

**B.**

Leon was Celsius's co-founder and former President, Chief Operating Officer, and Chief Strategy Officer. Leon is a United States and Israeli citizen who resides in Israel. The defendant claims that Leon, like Cohen-Pavon, was part of the group of Celsius employees who disregarded the defendant's instructions to sell—rather than buy—CEL throughout 2021. The defendant also asserts that Leon had contemporaneous knowledge of unauthorized

directional trading and substantial losses in these positions,
which were not disclosed to the defendant, and that Leon drafted
a blog post, issued by Celsius in June 2022, that stated that
"Celsius has the reserves . . . to meet obligations, as dictated
by our comprehensive liquidity risk management framework," even
though in reality Celsius's business was in trouble. Indictment
¶ 47. The defendant also points to Leon's WhatsApp conversations
with Cohen-Pavon, which the defendant claims suggest that Cohen-
Pavon deliberately decided not to correct perceived inaccuracies
in the defendant's public statements regarding Celsius.

On August 1, 2024, defense counsel emailed counsel for
Leon, seeking an interview in preparation for trial. Westfal
Decl. ¶ 10a, ECF No. 69. On August 12, 2024, Leon's counsel
responded that Leon was not available for an interview, that
Leon was unwilling to return to the United States to testify at
the trial, and that Leon was unwilling to sit for a pre-trial
deposition in Israel. Id. ¶ 10c.

### c.

Treutler, a German citizen who resides in Germany, was
Celsius's former Senior Token Analyst and head of Celsius's
Yield Desk. With respect to the market manipulation charges, the
defendant alleges that Treutler was responsible for Celsius's
weekly CEL purchases from 2019 through 2021, and that, from May

2021 through January 2022, Treutler bought hundreds of millions of dollars' worth of CEL on the FTX cryptocurrency exchange through a secret Celsius subaccount at the instruction of, or with the knowledge of, Cohen-Pavon, Leon, Sabo, and Shalem. However, Treutler allegedly provided inaccurate reporting on his CEL purchases in order to conceal these purchases from the defendant and the rest of the company. With respect to the fraud charges, Treutler is quoted in the Indictment's allegations regarding the directional trading positions that Celsius purportedly took at the direction of the defendant. See Indictment ¶ 32. The defendant also alleges that Treutler himself conducted directional trading in 2021 at the direction of, or with the knowledge of, Cohen-Pavon, Leon, Sabo, and Shalem, and that this trading activity was not disclosed to the defendant until 2022.

On June 10, 2024, defense counsel emailed counsel for Treutler to request an interview in preparation for trial, but Treutler's counsel declined. Westfal Decl. ¶ 11a. On August 5, 2024, defense counsel asked Treutler's counsel if Treutler would be willing to come to the United States to testify at trial and if Treutler would sit for a deposition in Germany before the trial. Id. ¶ 11b. Treutler's counsel confirmed that Treutler would not consent to either proposal. Id.

D.

Sabo was Celsius's former Head of Research and was appointed to manage Celsius's CEL purchases beginning in March 2021. Sabo is an Israeli citizen whose last known residence is in the Netherlands. According to the defendant, Sabo can testify that Treutler's CEL purchases on FTX in 2021 were contrary to the defendant's explicit instructions and were not reported to the defendant. The defendant contends that Sabo can also testify regarding CEL purchases that Sabo made on behalf of Celsius, at Cohen-Pavon's direction, that were not reported to the defendant. Beginning in March 2021, Sabo allegedly became responsible for setting Celsius's weekly strategy for CEL purchases and sales. The defendant further claims that Sabo was aware of the directional trading that Treutler and others conducted in 2021, but—instead of reporting that trading to the defendant—Sabo participated in an apparent effort to conceal that activity.

Defense counsel has been in contact with counsel for Sabo since around June 20, 2024. See id. ¶ 12a. On June 25, 2024, defense counsel learned that the Government had informed Sabo's counsel that Sabo had at one point been a subject of the Government's investigation. Id. On July 30, 2024, Sabo's counsel informed defense counsel that Sabo was unwilling to participate

in a trial prep interview or to come to the United States to
testify at trial. Id. ¶ 12c. On August 1, 2024, Sabo's counsel
confirmed that Sabo would not come to the United States to
testify at trial or sit for a video deposition in his country of
residence. Id. ¶ 12d.

**E.**

Shalem was Celsius's former Chief Financial Officer and is
an Israeli citizen who resides in Israel. Shalem was responsible
for providing weekly financial reporting to the defendant. The
defendant claims that, throughout 2021, Shalem's financial
reporting understated Celsius's CEL purchases by hundreds of
millions of dollars, and that Shalem appears to have deleted
from his weekly reporting to the defendant references to
Celsius's trading accounts in which Treutler conducted
unauthorized directional trading.

On February 28, 2024, defense counsel emailed Shalem to
request an interview as part of trial preparation. Id. ¶ 13a. On
August 1, 2024, defense counsel asked Shalem by email if he was
willing to come to the United States to testify at trial, and if
he was willing to sit for a video deposition in Israel before
trial. Id. ¶ 13b. Defense counsel received no response from
Shalem. See id. ¶ 13d. On August 27, 2024, defense counsel
emailed Shalem again, reiterating the same requests. See id.

¶ 13c. Defense counsel again received no response. See id.
¶ 13d.

**F.**

Noy, an Israeli citizen who resides in Israel, was
Celsius's former outside counsel and then in-house counsel and
Head of Regulation. According to the defendant, Noy bore primary
responsibility for reviewing all aspects of the company's
marketing in 2021 and 2022, including the defendant's weekly
"Ask Mashinsky Anything" sessions, or "AMAs," in which the
defendant spoke in a live broadcast to the Celsius community and
took questions from Celsius's existing and prospective
customers. The defendant alleges that Noy can testify about
advice that Noy conveyed to the defendant about several of the
purportedly fraudulent misrepresentations charged in the
Indictment. The defendant also claims that Noy, along with
Cohen-Pavon, chose not to advise the defendant about certain
perceived inaccuracies in other statements that the defendant
had made.

Defense counsel first contacted Noy to ask for an interview
on April 17, 2024, but did not receive a response. See id.
¶ 14a. On August 1, 2024, defense counsel followed up with Noy
by email; Noy responded and asked for more time. Id. ¶ 14b. On
August 19, 2024, defense counsel asked Noy if Noy was willing to

come to the United States to testify at trial, and if he was willing to sit for a video deposition in Israel before trial. Id. ¶ 14c. Noy responded on August 27, 2024, stating that he was still looking for legal representation. Id. ¶ 14d. Later that day, defense counsel again asked Noy to confirm whether he was willing to come to the United States to testify at trial or to sit for a deposition in Israel. Id. Defense counsel has received no response from Noy. Id. ¶ 14e.

## III.

Pursuant to Federal Rule of Criminal Procedure 15, a court may order the deposition of a witness to preserve testimony for trial where there are "exceptional circumstances and in the interest of justice." Fed. R. Crim. P. 15(a)(1). To establish exceptional circumstances under Rule 15, the movant must show that "(1) the prospective witness is unavailable for trial, (2) the witness' testimony is material, and (3) the testimony is necessary to prevent a failure of justice." United States v. Cohen, 260 F.3d 68, 78 (2d Cir. 2001).[2] In general, "the discretion afforded district courts to decide Rule 15 motions is considerable." United States v. Fargesen, No. 21-cr-602, 2022 WL 4110303, at *2 (S.D.N.Y. Sept. 8, 2022).

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

"Unavailability is to be determined according to the practical standard of whether under the circumstances the [movant] has made a good-faith effort to produce the person to testify at trial." United States v. Johnpoll, 739 F.2d 702, 709 (2d Cir. 1984). Movants need not present proposed witnesses' affidavits or prior statements to establish unavailability. Fargesen, 2022 WL 4110303, at *3; see also United States v. Vilar, 568 F. Supp. 2d 429, 438 (S.D.N.Y. 2008). Rather, "[c]ourts may accept the assertions of counsel on the facts relating to unavailability, as long as those assertions are neither conclusory nor speculative." Fargesen, 2022 WL 4110303, at *3; see also United States v. Grossman, No. 03-cr-1156, 2005 WL 486735, at *3 (S.D.N.Y. Mar. 2, 2005).

Testimony is material if it is "highly relevant to a central issue in the case." Vilar, 568 F. Supp. 2d at 440. "There is no requirement that the testimony being sought must surely acquit the defendant." United States v. Alexandre, No. 22-cr-326, 2022 WL 9843495, at *2 (S.D.N.Y. Oct. 17, 2022). Rather, it is enough that the testimony sought would "challenge central aspects of the [G]overnment's allegations." Id. As with unavailability, the Court may rely solely on the movant's representations to find the materiality requirement satisfied. Vilar, 568 F. Supp. 2d at 440. However, even if the proposed testimony would be material, "a court may properly deny a motion

to depose if the proposed testimony would be cumulative."
Fargesen, 2022 WL 4110303, at *2.

When the first two requirements of the Rule 15 "exceptional circumstances" test are met, the third requirement, "necessity to prevent a failure of justice, is likely satisfied if there are no substantial countervailing factors militating against the taking of the deposition." United States v. Wey, No. 15-cr-611, 2017 WL 237651, at *24 (S.D.N.Y. Jan. 18, 2017).

28 U.S.C. § 1783, meanwhile, provides that a court may issue a subpoena to a United States national who is in a foreign country requiring the appearance of that person as a witness before the court "if the court finds that particular testimony . . . is necessary in the interest of justice."

## IV.

With respect to Cohen-Pavon, the Government has represented that it intends to call him as a witness at trial. See Gov't Opp. at 15, ECF. No. 72. Cohen-Pavon's counsel has also represented to defense counsel that, after Cohen-Pavon testifies in the Government's case, Cohen-Pavon is willing to testify as part of the defense case. See Westfal Decl. ¶ 9(c). The defendant accordingly no longer seeks a pre-trial deposition of Cohen-Pavon. See Def. Reply at 2 n.2, ECF No. 74. Therefore, the defendant's motion to depose Cohen-Pavon is **denied as moot.**

**V.**

With respect to the four remaining non-United States citizen witnesses, the defendant has established that the three requirements of Rule 15's "exceptional circumstances" test have been met.

**A.**

The Government does not dispute that Treutler, Sabo, Shalem, and Noy live abroad, are outside the subpoena power of the Court, and—despite the defendant's efforts to produce these four witnesses for trial—are unwilling to come to the United States to testify at trial (or, at a minimum, did not respond to defense counsel's requests). In short, these witnesses are unavailable to testify at trial.

Rather, the Government argues that the defendant must establish not only the witnesses' unavailability for trial but also the witnesses' willingness to sit for a deposition. In support, the Government relies on a line from the Second Circuit Court of Appeals' decision in United States v. Whiting, 308 F.2d 537 (2d Cir. 1962). In Whiting, the Court of Appeals stated that "the moving party has the burden of demonstrating the availability of the proposed witnesses and their willingness to appear." Id. at 541.

15

However, this statement in Whiting appears to be dicta and has generally not been relied upon. In Whiting, the Court of Appeals held that it was not an abuse of discretion for the trial court to deny the defendant's successive motions under Federal Rule of Civil Procedure 15 to take the depositions of five persons located in Brazil. The Court of Appeals held that such a motion is addressed to the discretion of the trial court, and the District Court "properly characterized [the first motion] as 'vague and indefinite.'" Id. at 541. The successive motion was denied when it was made at twenty minutes after three on the opening day of trial. Id. at 541–42. The Court of Appeals held: "We think that the District Court was well within its allowable discretion in denying a motion made only after a considerable delay . . . and on the eve of trial." Id. at 542. The Court of Appeals did not rely on any failure to show that the witnesses had not agreed to testify. More recently, in examining the requirements for authorizing the deposition of a witness prior to trial pursuant to Rule 15, the Court of Appeals noted the requirement that the witness be "unavailable for trial" without including a requirement that the witness be available for the deposition. Cohen, 260 F.3d at 78.

More recent decisions in this District have rejected the Government's argument that the movant must show that a proposed witness would voluntarily sit for a deposition in response to

16

compulsion abroad. See, e.g., Vilar, 568 F. Supp. 2d at 439
("Neither the text of Rule 15 nor binding case law concerning
the Rule provide any basis to conclude that, in resolving a Rule
15 motion, courts must consider the witness's willingness to
voluntarily appear at a deposition in a foreign country. Rather,
. . . in order to resolve a motion under Rule 15, courts need
only look to the witness' unavailability 'for trial' and not to
whether they have actually consented to make themselves
available for the deposition."); United States v. Epskamp, No.
12-cr-120, 2013 WL 12175097, at *1 (S.D.N.Y. Oct. 3, 2013)
("[W]hether or not a witness would be willing to testify at the
deposition is irrelevant in deciding a Rule 15 motion.").[3]

The reasoning in cases like Vilar is persuasive. As the
court in Vilar explained, Rule 15(e) expressly provides that
"[a] defendant may not be deposed without that defendant's
consent," Fed R. Crim. P. 15(e) (emphasis added), but Rule 15
makes no such provision as to other deponents. See Vilar, 568 F.
Supp. 2d at 439; cf. Wey, 2017 WL 237651, at *24 (explaining
that, even if the Rule 15 "exceptional circumstances"
requirements are satisfied, "because [the deponent] is a

---

[3] But see United States v. Ramirez, No. 20-cr-22, 2024 WL 4007794, at *1 n.1
(S.D.N.Y. Aug. 30, 2024) (finding that "Whiting appears to remain good law"
and thus constitutes "binding case law"). However, Ramirez's motion was also
untimely because it was made within three weeks of the trial in a case that
had been pending for almost five years. See id. at *1.

defendant in this matter his deposition may only proceed with
his consent"). In addition, courts in this District that have
granted Rule 15 motions make no mention of such a requirement.
See, e.g., Alexandre, 2022 WL 9843495, at *3; Fargesen, 2022 WL
4110303, at *2-3; Grossman, 2005 WL 486735, at *3.

For these reasons, the defendant need not show that
Treutler, Sabo, Shalem, and Noy would appear voluntarily for
depositions to establish unavailability under Rule 15. All that
Rule 15 unavailability requires is that the defendant establish
that the witnesses are unavailable to testify at trial. In this
case, the defendant has made that showing.

**B.**

The defendant has established that the anticipated
testimony of Treutler, Sabo, Shalem, and Noy would be material.

With respect to the alleged market manipulation, the
Indictment charges the defendant with directing Celsius to
conduct excess purchases of CEL in order to inflate the price of
CEL artificially and with making false and misleading statements
about Celsius's CEL market activity. The defendant contends,
however, that—contrary to what the Indictment alleges—the
defendant explicitly instructed his team consistently to sell
CEL, but certain individuals, including Cohen-Pavon, Leon,
Treutler, Sabo, and Shalem, disregarded these instructions and

18

instead purchased excess CEL throughout 2021. Moreover, the defendant claims that these individuals failed to disclose these purchases to the defendant and, on some occasions, misrepresented this CEL activity to the defendant. The defendant has submitted extensive documentation that appears to provide some support for the defendant's assertions. Because the anticipated testimony would tend to reflect that people other than the defendant purportedly made the excess purchases of CEL without the defendant's knowledge, such testimony would "challenge central aspects of the [G]overnment's allegations" and is therefore material.

The Government responds that the Indictment alleges that there were periods in 2021 when Celsius was selling CEL, and that testimony about how the defendant instructed executives to sell CEL in 2021 would not be exculpatory. But the issues of exactly when and how long those periods were, and whether the defendant in general was urging the purchase of CEL to inflate the price of the token, will be important issues at the trial, and the proposed witnesses' testimony would be material on these points.

With respect to the alleged fraud, the Indictment charges the defendant with making public misrepresentations about core aspects of Celsius's business and financial condition to induce

retail investors to invest their assets with Celsius. But the
defendant contends that Cohen-Pavon, Leon, Treutler, Sabo, and
Shalem directed, engaged in, or were aware of the directional
trading positions that Celsius took, but failed to disclose this
activity to the defendant until January 2022, after these
positions had already resulted in significant losses for
Celsius. The defendant also claims that Cohen-Pavon, Leon, and
Noy deliberately chose not to correct or advise the defendant
about perceived inaccuracies in some of the defendant's public
statements. As with the manipulation charges, the defendant
supports his assertions with documentary evidence. The testimony
of these witnesses would be material because the testimony would
"tend to disprove" the Government's assertion that the defendant
made these public statements with the requisite fraudulent
intent. Alexandre, 2022 WL 9843495, at *4.

Additionally, the Government argues that deposition
testimony from the proposed witnesses would be cumulative, in
view of Cohen-Pavon's anticipated testimony at trial and
documentary evidence that the defendant could introduce at
trial. Although some of the witnesses' anticipated testimony
could indeed be cumulative, especially of Cohen-Pavon's
testimony and testimony by the defendant's other proposed
witnesses, "the fact that other documents and testimony may also
be relevant to the defense does not mean that the witnesses'

testimony will be so cumulative as to be immaterial." Id.; see also Fargesen, 2022 WL 4110303, at *4. The proposed testimony would be material to several central issues in this case and could help the defendant present "the most thorough defense possible." Alexandre, 2022 WL 9843495, at *5; see also United States v. Mohamed, No. 18-cr-603, 2020 WL 1545522, at *6 (E.D.N.Y. Apr. 1, 2020) ("[A]s a practical matter, if the parties establish a method of conducting these depositions, I see no reason why the defendants should not depose all of their witnesses to present the most thorough defense.").

Accordingly, the testimony sought from Treutler, Sabo, Shalem, and Noy would be material for purposes of Rule 15.

### c.

Because the defendant has established the unavailability and materiality requirements, the third requirement, necessity to prevent a failure of justice, is likely satisfied "so long as there are no substantial countervailing factors militating against the taking of depositions." Fargesen, 2022 WL 4110303, at *5. Countervailing factors may include, for example, "any undue expense to the non-moving party and significant delays in trying the matter." Alexandre, 2022 WL 9843495, at *3. At this point, no countervailing factors weigh sufficiently against the taking of the depositions in this case.

The Government contends that the defendant waited too long to seek these depositions and that permitting these depositions now would require a delay of the January 2025 trial date. The Government represents that execution of letters rogatory to depose the witnesses in Germany or the Netherlands could take over a year. See Gov't Opp. at 9. Furthermore, even if the letters rogatory are granted, there is no guarantee that the witnesses would be questioned directly by the Government or defense counsel, or that an unwilling witness could be compelled to sit for a deposition at all. See id. at 9-10. Meanwhile, the Government could use the Mutual Legal Assistance Treaty ("MLAT") to request Rule 15 depositions in Israel, but the Government represents that the MLAT process in Israel still takes two months at a minimum and often a year or longer. See id. at 10.

However, these concerns are speculative. See Alexandre, 2022 WL 9843495, at *5 ("[T]here is no reason that Defendant should not be permitted to try to obtain the testimony before the scheduled trial date. This is especially so given that the Government may have tools at its disposal that could help speed up the process."). The Government's speculations may prove to be correct, but that is not a reason not to try now. The defense represents that at this time it is not seeking a delay of the January 2025 trial date, which was set in February 2024. This is not a situation where the Court could find at this point that

22

the request is simply made too late. See United States v.
Menendez, No. 23-cr-490, 2024 WL 2214906, at *3 (finding "the
potential delay in trying the matter" to militate against
granting the motion where the trial had already begun three days
before the motion was made); Ramirez, 2024 WL 4007794, at *1
(finding the defendant's motion untimely where the defendant
"ha[d] been on notice for years" of what the Government intended
to prove, yet waited until three weeks before trial to make the
motion). In this case, the parties have over ten weeks before
the trial is scheduled to begin to attempt to obtain the
deposition testimony of the proposed witnesses.

However, the defendant's delay in making this motion cannot
be overlooked. There was nothing to prevent the defendant from
making this motion months ago. The defendant was indicted in
July 2023, and the Indictment's allegations clearly state the
charges against the defendant. The defendant learned that Cohen-
Pavon was a cooperating witness in September 2023. Although the
defendant claims that the defense needed all this time to sort
through the discovery produced by the Government and points to
the fact that the Government made a document production as
recently as May 2024, the Government had previously made
substantial document productions in August and September 2023—
well over a year ago. See Oct. 3, 2023 Status Conf. Tr. at 2:3-
6, ECF No. 36. Moreover, that Treutler, Sabo, Shalem, and Noy

might provide testimony relevant to the defendant's asserted
defenses should have been clear to the defendant, at least based
on the proposed witnesses' roles and responsibilities at Celsius
and the allegations contained in the Indictment. The proposed
witnesses' identities and job responsibilities at Celsius were
all known to the defendant.

In any event, the defendant states that he does not seek
any delay of the trial at this time. See Def. Reply at 14. The
defendant is authorized to attempt to seek the depositions of
Treutler, Sabo, Shalem, and Noy before the trial is scheduled to
begin. If, because of the defendant's delay in making this
motion, the depositions cannot be arranged without an
adjournment, then the fault lies with the defendant. Based on
all of the submissions of the parties, the testimony sought is
not so material that the defendant would be denied a fair trial
without it—particularly with the testimony of Cohen-Pavon, as
well as the possibility of the subpoenaed testimony of Leon,
which the Court addresses in more detail below.

Finally, the Government expresses concern regarding the
format and reliability of any foreign depositions that might
take place. Specifically, the Government points out that the
questioning would likely be conducted by a foreign judge with
limited availability for cross-examination, and that the

inability of this Court to hold witnesses in contempt for false testimony might render any testimony obtained unreliable or otherwise unusable in court. However, if the defendant is able to arrange for the testimony of the witnesses and questions of reliability or admissibility arise, these issues can be addressed in motions in limine closer to trial. See, e.g., Alexandre, 2022 WL 9843495, at *6; Fargesen, 2022 WL 4110303, at *6; Vilar, 568 F. Supp. 2d at 440 n.10.

Accordingly, the Rule 15 necessity to prevent a failure of justice requirement is satisfied. The motion to depose Treutler, Sabo, Shalem, and Noy is **granted.**

## VI.

With respect to Leon, the defendant seeks a subpoena pursuant to 28 U.S.C. § 1783 requiring Leon to appear as a live witness at trial. It is undisputed that Leon is a United States citizen, and the parties appear to agree that a showing of "exceptional circumstances" under Rule 15 is sufficient to satisfy the "necessary in the interest of justice" standard of § 1783.

As with the non-United States citizen witnesses, the defendant has made this "exceptional circumstances" showing as to Leon. Leon is unwilling to testify at trial and is therefore unavailable. Leon's anticipated testimony would also be

25

material: the defendant asserts that Leon will testify that he instructed Treutler to purchase CEL in order to raise the price of CEL at Cohen-Pavon's—and not the defendant's—instructions, and that Leon's testimony will shed light on the financial motivation that allegedly led a group of employees, including the proposed witnesses, to disregard the defendant's instructions. And the defendant's request for a § 1783 subpoena, although delayed, was not made so late as to warrant denial of the motion outright.

For these reasons, the defendant's request pursuant to § 1783 for a subpoena requiring the appearance of Leon at trial is **granted.**

CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to preserve the testimony of material witnesses residing outside the United States is **denied as moot** as to Cohen-Pavon, and **granted** as to Treutler, Sabo, Shalem, and Noy. Further, the defendant's request, pursuant to 28 U.S.C. § 1783, to serve a subpoena requiring Leon to appear at trial is **granted.**

The Court orders that the depositions be recorded by video to allow for presentation to the jury in a manner that would replicate in-trial testimony. The parties are directed to confer and work in good faith to identify appropriate next steps, including to arrange for the depositions to occur as soon as possible. See Fargesen, 2022 WL 4110303, at *5. While not directing it to take any specific actions, the Court also asks the Government to consider using MLATs or other processes for seeking international assistance that might expedite the necessary coordination with Dutch, German, and Israeli officials. See United States v. McLellan, 959 F.3d 442, 476 (1st Cir. 2020). The Clerk is respectfully directed to close ECF No. 68.

**SO ORDERED.**

**Dated:**    **New York, New York**
            **November 8, 2024**

                                    John G. Koeltl
                            United States District Judge