**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA,**

      - against -                    **23-cr-347 (JGK)**

**ALEXANDER MASHINSKY,**          **MEMORANDUM OPINION AND ORDER**

          Defendant.

---

**JOHN G. KOELTL, District Judge:**

    The defendant, Alexander Mashinsky, was charged in a seven-count indictment on July 11, 2023 (the "Indictment"). ECF No. 1. The Indictment charges the defendant with the following crimes: (1) securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (Count One); (2) commodities fraud in violation of 7 U.S.C. §§ 9(1) and 13(a)(5), 17 C.F.R. § 180.1, and 18 U.S.C. § 2 (Count Two); (3) wire fraud in violation of 18 U.S.C. §§ 1343 and 2 (Count Three);(4) conspiracy to commit securities fraud, market manipulation, and wire fraud through manipulating the price of CEL token in violation of 18 U.S.C. §§ 371 and 1343, 15 U.S.C. §§ 78i(a)(2), 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (Count Four); (5) engaging in a fraudulent scheme to manipulate the price of CEL token in violation of 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5 (Count Five); (6) market manipulation of Celsius's proprietary token—CEL—in violation of 15 U.S.C.

1

§§ 78i(a)(2) and 78ff (Count Six); and (7) wire fraud in connection with the manipulation of CEL in violation of 18 U.S.C. §§ 1343 and 2 (Count Seven).

The Indictment alleges that, from 2018 through June 2022, Mashinsky engaged in two interrelated criminal schemes in connection with his operation of Celsius Network LLC and its related entities (collectively, "Celsius"). The first alleged scheme involved false and misleading statements that Mashinsky purportedly made to customers to induce them to invest their assets with Celsius, and the second alleged scheme involved manipulative trading in CEL.

Mashinsky now moves to dismiss Counts Two and Six of the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B), and to strike surplusage pursuant to Federal Rule of Criminal Procedure 7(d). See ECF No. 41. For the reasons that follow, the motions are **denied**.

I.

The following facts are taken from the Indictment and are accepted as true for the purposes of this motion to dismiss. See United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir. 1999).

In 2018, Mashinsky founded Celsius and served as its CEO. Indictment ¶¶ 1, 10. Mashinsky marketed Celsius as a modern-day bank-a safe place for customers to deposit their crypto assets and earn interest. Id. By the fall of 2021, Celsius had become one of the largest cryptocurrency platforms in the world, at one point purportedly holding $25 billion in assets. Id. ¶ 4.

Celsius's main offering was its "Earn Program." Through the Earn Program, customers could invest their crypto assets with Celsius and earn returns-weekly "rewards" payments-through Celsius's investment of those assets. Id. ¶ 12. Celsius's core marketing pitch to customers was that Celsius would use their crypto assets to generate yield through safe, low-risk investment strategies, but-unlike traditional banks, which kept most of the profits from investing customer deposits for themselves-Celsius would return the majority of profits back to customers. Id.

The Indictment alleges that Mashinsky repeatedly made public misrepresentations about core aspects of Celsius's business and financial condition to induce retail investors to provide their assets to Celsius and participate in the Earn Program. Id. ¶ 2. Mashinsky allegedly misrepresented, among other things, the safety of Celsius's yield-generating activities, Celsius's profitability, and the risks associated

3

with depositing crypto assets with Celsius. Id.; see also id. ¶¶ 15-47.

Sometime in 2018, Celsius launched CEL, Celsius's native crypto token, to raise money for Celsius's operations. Id. ¶¶ 5, 14. Mashinsky and Celsius promoted CEL as a worthy investment and encouraged Earn Program investors to receive their weekly rewards in CEL. See id. ¶ 14. Mashinsky frequently discussed CEL in public and equated the price of CEL with the strength of Celsius's overall business. Id. ¶ 48.

The Indictment charges that Mashinsky, who was a large holder of CEL and stood to benefit from an increase in its price, worked with others at Celsius to manipulate the price of CEL. Id. ¶¶ 6, 49-50. Initially, despite Celsius's efforts to promote CEL, the price of CEL remained low; by the end of October 2019, CEL was trading at approximately $0.05 per token. See id. ¶ 51. Mashinsky publicly represented that Celsius would purchase in the market only the amount of CEL necessary to pay investors their weekly CEL rewards. Id. ¶ 55. However, to inflate the price of CEL artificially, in July 2020, Celsius (at Mashinsky's direction) began to purchase excess CEL in the market–approximately three times more CEL than Celsius needed to pay rewards. Id. On occasion, Mashinsky and other Celsius executives also personally purchased CEL to prop up CEL's price.

Id. ¶¶ 7, 57-59. This scheme worked: the price of CEL rose from approximately $0.40 in late July 2020 to approximately $5.50 by the end of 2020. Id. ¶ 55. Celsius continued these practices through much of 2021 and in early 2022. See id. ¶¶ 60, 64, 67.

Some of these excess CEL purchases were aimed at supporting CEL's price in anticipation of negative news about Celsius. See id. ¶¶ 54, 58. For example, in July 2020, Mashinsky instructed others at Celsius to be prepared to purchase large quantities of CEL to support CEL's price if a news article that was expected to be critical of Celsius came out. See id. ¶ 54. The article was ultimately published, and Celsius did in fact conduct this large purchase of CEL, which enabled the price of CEL to stay relatively stable as a result. Id.

The Indictment further alleges that Mashinsky repeatedly made false and misleading statements about the nature and extent of Celsius's CEL market activity. Id. ¶¶ 56, 60-63, 65-66. In these statements, Mashinsky falsely claimed that the price increase in CEL was due to "organic" demand, when in reality the price increase was due to Celsius's own excess market purchases. See id. ¶ 56. Mashinsky also allegedly made false and misleading statements regarding his own CEL trading activity–specifically, by representing on certain occasions that he had not been selling CEL when, in fact, he had. Id. ¶¶ 69-71.

According to the Indictment, by artificially inflating the price of CEL, Mashinsky was able to sell his personal CEL holdings for a substantial profit. Id. ¶ 8. Mashinsky reaped approximately $42 million from his personal sales of CEL. Id.

By mid-2022, Celsius was in dire financial straits. Id. ¶ 9. In May 2022, when the prices of crypto assets, including CEL, dropped, Mashinsky continued to tout publicly the safety of the Celsius platform and to encourage investors to continue to deposit their crypto assets with Celsius, even while he withdrew almost all of his non-CEL personal deposits from the platform. Id. On June 12, 2022, Celsius announced that it was halting all customer withdrawals from its platform, leaving hundreds of thousands of Celsius customers unable to access $4.7 billion worth of crypto assets. Id. In July 2022, Celsius filed for Chapter 11 bankruptcy. Id.

## II.

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."[1] An indictment is sufficient if it contains the elements of the offense charged and fairly informs a defendant

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

6

of the charges against him. See United States v. Alfonso, 143 F.3d 772, 776 (2d Cir. 1998). Accordingly, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992).

An indictment may be defective if it charges logically inconsistent counts. See, e.g., United States v. Conde, 309 F. Supp. 2d 510, 511 (S.D.N.Y. 2003) (describing allegations that the defendant's acceptance of payment was both part of a conspiracy to transfer false identification and theft as "mutually exclusive," rendering the indictment "inconsistent" and therefore "defective"); United States v. Rajarantnam, No. 13-cr-211, 2014 WL 1554078, at *6 (S.D.N.Y. Apr. 17, 2014) (finding two counts inconsistent where the counts attributed the purchase of the same shares to two different defendants).

Moreover, due process requires that a criminal statute "provide a person of ordinary intelligence fair notice of what is prohibited." United States v. Williams, 553 U.S. 285, 304 (2008). "Due process is not, however, violated simply because the issue is a matter of first impression." Ponnapula v. Spitzer, 297 F.3d 172, 183 (2d Cir. 2002). "[I]t is immaterial that there is no litigated fact pattern precisely in point," so

7

long as the language of the statute provides notice. United States v. Kinzler, 55 F.3d 70, 74 (2d Cir. 1995).

**A.**

**1.**

Mashinsky moves to dismiss Count Two, contending that the allegations charged in Count Two are "repugnant" to and "inconsistent" with those charged in Count One. ECF No. 42 at 2-3. Count One charges that Mashinsky, in violation of the Securities Exchange Act of 1934 (the "Exchange Act"), fraudulently "induce[d] investors to purchase an interest in Celsius's Earn Program and to acquire CEL token." See Indictment ¶¶ 72-73. Count Two alleges that Mashinsky violated the Commodity Exchange Act (the "CEA") by fraudulently "induc[ing] investors to sell their Bitcoin[s] to Celsius in exchange for an interest in Celsius's Earn Program." See id. ¶¶ 74-75. Mashinsky does not dispute that Count One, as alleged, sufficiently charges that the Earn Program was a security. Nor does he contend, at this stage, that Bitcoin is not a commodity for purposes of Count Two. See, e.g., United States v. Reed, No. 20-cr-500, 2022 WL 597180, at *4 (S.D.N.Y. Feb. 28, 2022) ("[U]nder the plain language of the CEA, cryptocurrencies fall within the definition of commodities.").

Rather, Mashinsky argues that the allegations contained in the counts are inconsistent because Count One charges the defendant with securities fraud, while Count Two charges the defendant with commodities fraud, based on substantially the same conduct. According to Mashinsky, because the Indictment charges the "whole" of the Earn Program as an "investment contract" and thus a "security" under the Securities Act of 1933, see 15 U.S.C. § 77b, in Count One, the Indictment cannot charge the "parts" of the Earn Program–the Bitcoins that investors deposited with Celsius–as commodities under the CEA in Count Two. ECF No. 42 at 6.

This argument is without merit. Mashinsky cites no case for the proposition that counts that charge conduct touching on the same investment vehicle as both securities fraud and commodities fraud are inconsistent. Finding that the Earn Program was a security, as Count One requires, would not be at odds with finding that the Bitcoins that investors deposited with Celsius through the Earn Program are commodities, as Count Two requires. Cf. Reed, 2022 WL 597180, at *4 ("[T]he fact that cryptocurrencies may be regulated . . . as an 'investment contract' under the Securities Act of 1933 . . . does not mean that a cryptocurrency is not a 'commodity' within the meaning of the CEA, an entirely distinct statute that was enacted in 1922."). A conviction on Count One would not compel an acquittal

9

on Count Two. Therefore, there is nothing inconsistent about the allegations supporting Counts One and Two.

The cases on which Mashinsky relies do not support his position. For example, the court in Rajarantnam concluded that two counts were "internally inconsistent" because each count charged a different defendant with the purchase of the same shares. 2014 WL 1554078, at *6-7. Two individuals simply could not have purchased the same shares; only one of them could have done so. And in Conde, the court concluded that an indictment that described the defendant's acceptance of payment from a confidential informant as part of a conspiracy to transfer false identification in one count and as theft in another was "logically inconsistent." 309 F. Supp. 2d at 511. As the court in Conde pointed out, if the defendant accepted payment to provide the confidential informant with false identification, the defendant plainly could not have converted the informant's payment, and vice versa. Id. The two counts contained in that indictment thus were "mutually exclusive": "[T]he allegations contained in one count, if proven, would negate the allegations in the other count." Id. The circumstances in Rajarantnam and Conde were different from those in this case.

The cryptocurrency-related cases that Mashinsky cites do not provide otherwise. In those cases, courts considered whether

investment schemes involving crypto assets not at issue here constituted "investment contract[s]," and therefore securities, under the test set forth in SEC v. W.J. Howey Company, 328 U.S. 293 (1946). See SEC v. Terraform Labs Pte. Ltd., 708 F. Supp. 3d 450, 472-73 (S.D.N.Y. 2023) (concluding that, although UST, a crypto asset, on its own was not a security, "UST in combination with the Anchor Protocol," which allowed UST holders to earn interest payments by depositing their UST in a shared pool from which others could borrow, was a security); SEC v. Ripple Labs, Inc., 682 F. Supp. 3d 308, 324, 328 (S.D.N.Y. 2023) (determining that Ripple's institutional sales of XRP constituted investment contracts under Howey, even though "XRP, as a digital token, is not in and of itself" an investment contract); SEC v. Telegram Grp., 448 F. Supp. 3d 352, 367-68, 379 (S.D.N.Y. 2020) (finding that the scheme at issue, consisting of the "full set of contracts, expectations, and understandings centered on the sales and distribution of the Gram," Telegram's native token, was a "security"). Terraform, Ripple Labs, and Telegram rejected the defendants' attempts to avoid liability under the federal securities laws by focusing only on discrete parts of an alleged scheme, rather than on the scheme as a whole. See, e.g., Telegram, 448 F. Supp. 3d at 379 (explaining that "Howey requires an examination of the entirety of the parties' understandings and expectations," "not simply the Gram, which is

11

little more than [an] alphanumeric sequence"). Those cases said nothing about whether an item that is part of alleged conduct giving rise to liability under the securities laws may <u>also</u> serve as a basis for liability under the CEA.

Moreover, insofar as Mashinsky's argument can be characterized as an assertion that Counts One and Two are multiplicitous, any such contention is unavailing. An indictment is multiplicitous if a single offense is charged in more than one count. <u>United States v. Hatfield</u>, No. 06-cr-550, 2009 WL 2182593, at *2 (E.D.N.Y. July 22, 2009). "The vice in multiplicity of charges is that it may lead to multiple sentences for the same offense and may improperly prejudice a jury by suggesting that a defendant has committed not one but several crimes." <u>United States v. Reed</u>, 639 F.2d 896, 904 (2d Cir. 1981). But it is well-established that "a single act can violate two statutes." <u>Hatfield</u>, 2009 WL 2182593, at *2 (citing <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932)). Specifically, in determining whether the same act or transaction can properly be charged as two separate statutory offenses, courts consider "whether each provision requires proof of a fact which the other does not." <u>Blockburger</u>, 284 U.S. at 304. In this case, Count One requires proof of a fact that Count Two does not: For example, Count One requires proof of a security, while Count Two requires proof of a commodity.

12

Accordingly, Counts One and Two do not contain repugnant allegations, nor are they multiplicitous. Therefore, the motion to dismiss Count Two on those grounds is denied.

2.

Mashinsky also argues that Count Two, standing alone, is legally insufficient because the Indictment does not allege adequately that Celsius investors' deposits of Bitcoins into the Earn Program constitute "contract[s] of sale of any commodity." See ECF No. 42 at 10. According to Mashinsky, the factual allegations contained in the Indictment-that Celsius's investors "provide[d]" or "deposited" their Bitcoins to Celsius to invest, see Indictment ¶¶ 12, 24-do not support the Government's theory, charged in Count Two, that these activities were "contract[s] of sale of any commodity" under the CEA. 7 U.S.C. § 9(1) (emphasis added).

However, this is not a reason to find Count Two insufficient. "At the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense. That is something [courts] do after trial." United States v. Wedd, 993 F.3d 104, 121 (2d Cir. 2021); see also United States v. Dawkins, 999 F.3d 767, 779-80 (2d Cir. 2021) (rejecting the defendants' argument that the district court, in evaluating whether the indictment properly alleged a criminal

13

offense, should have "weighed whether certain factual allegations . . . were consistent with the charged violations"). The question whether the customers' investment of Bitcoins with Celsius were "in connection with . . . a contract of sale of any commodity," 7 U.S.C. § 9(1), is a factual one that cannot be resolved at this stage.

It is well-established that "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." Stavroulakis, 952 F.2d at 693. Count Two "easily meets these basic requirements." Wedd, 993 F.3d at 120.

**B.**

Mashinsky moves to dismiss Count Six as constitutionally infirm on the ground that he lacked "fair warning" that the charged conduct was criminal. United States v. Lanier, 520 U.S. 259, 266–67 (1997). In particular, Mashinsky argues that he had no warning that the open-market transactions alleged, even if conducted with the purpose of manipulating the price of CEL, were illegal under Section 9(a)(2) of the Exchange Act ("Section 9(a)(2)"). See 15 U.S.C. § 78i(a)(2). This argument is meritless.

To establish a violation of Section 9(a)(2), the Government must prove that the defendant, through a series of transactions:

14

first, either created actual or apparent active trading in a stock, or raised or depressed the price of a stock, see United States v. Stein, 456 F.2d 844, 850 (2d Cir. 1972); second, "acted for the purpose of inducing the purchase or sale of such security by others," United States v. Mulheren, 938 F.2d 364, 368 (2d Cir. 1991); and third, acted willfully and with a manipulative purpose, see Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 794 (2d Cir. 1969).

Mashinsky's contention that he lacked notice that open-market transactions, if conducted with manipulative intent, could expose him to liability is without merit. As the Second Circuit Court of Appeals has observed, "[o]pen-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent." Set Cap. LLC v. Credit Suisse Grp. AG, 996 F.3d 64, 77 (2d Cir. 2021). Indeed, "in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 102 (2d Cir. 2007).

Further, in courts within this district, the Government has pursued criminal prosecutions for market manipulation involving open-market transactions. See, e.g., United States v. Hwang, No. 22-cr-240 (AKH) (S.D.N.Y. Mar. 23, 2023) (ECF No. 66 at 3)

15

(denying the defendant's motion to dismiss market-manipulation claims under Sections 10(b) and 9(a)(2) based on open-market transactions); cf., e.g., United States v. Phillips, 690 F. Supp. 3d 268, 289 (S.D.N.Y. 2023) (denying the defendant's motion to dismiss market-manipulation claims under the CEA based on open-market transactions). In Hwang, the court denied the defendant's motion to dismiss the market manipulation charges, which were based on the same theory as that alleged by the Government in this case. See Hwang, No. 22-cr-240, ECF No. 66 at 3. That the court's order in Hwang was entered after the alleged criminal conduct in this case occurred does not help Mashinsky. See Reed, 2022 WL 597180, at *4 ("[I]n light of the clear language of the relevant statutes, additional clarity from interpretive decisions is not required.").

In any event, Mashinsky's constitutional challenge to Count Six is "premature and not properly made on a motion to dismiss." Phillips, 690 F. Supp. 3d at 292. In assessing fair-warning challenges, "the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." Lanier, 520 U.S. at 267 (emphasis added). "Thus, the Court requires full factual development at trial before it can determine whether the [relevant] statutes failed to provide [Mashinsky] fair warning that his conduct was prohibited by law,

as required by the Due Process Clause." Phillips, 690 F. Supp. 3d at 293.

Mashinsky's motion to dismiss Count Six is therefore denied.

### III.

Finally, Mashinsky moves to strike references to Celsius's bankruptcy from the Indictment pursuant to Federal Rule of Criminal Procedure 7(d). Mashinsky asserts that, among other things, Celsius filed for bankruptcy after the end of the Indictment period, and the stigma associated with bankruptcy would be unfairly prejudicial. The government, for its part, responds that the fact that Celsius filed for bankruptcy is relevant to and probative of Mashinsky's state of mind at the time that he allegedly made misrepresentations regarding Celsius's financial health.

Motions to strike surplusage from an indictment are generally disfavored and will be granted "only where the challenged allegations are not relevant to the crime charged and are inflammatory and prejudicial." United States v. Hernandez, 85 F.3d 1023, 1030 (2d Cir. 1996). "If evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the language is, it may not be stricken." United States v. Scarpa, 913 F.2d 993, 1013 (2d Cir.

17

1990). The standard under Rule 7(d) is "exacting": The defendant must "demonstrate clearly that the allegations are irrelevant to the crimes charged." United States v. Maxwell, 534 F. Supp. 3d 299, 322 (S.D.N.Y. 2021).

At this point, the Court cannot determine whether any evidence of the bankruptcy is irrelevant to the charges. Any such determination should await motions in limine or trial. See, e.g., id. (reserving the issue for trial); United States v. Mostafa, 965 F. Supp. 2d 451, 467 (S.D.N.Y. 2013) ("Courts in this district routinely await presentation of the Government's evidence at trial before ruling on a motion to strike."). Accordingly, Mashinsky's motion to strike surplusage from the Indictment is denied without prejudice to the ability to raise the argument after motions in limine or at trial.

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the defendant's motion to dismiss Counts Two and Six of the Indictment is **denied,** and the defendant's motion to strike surplusage is **denied without prejudice**. The Clerk is respectfully directed to close ECF No. 41.

**SO ORDERED.**

Dated:    New York, New York
         November 8, 2024

_____
John G. Koeltl
United States District Judge