

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*Jacob K. Javits Federal Building*
*26 Federal Plaza*
*New York, New York 10278*

April 3, 2025

**BY ECF**

The Honorable John G. Koeltl
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl Street
New York, NY 10007-1312

    Re:    *United States v. Alexander Mashinsky*, 23 Cr. 347 (JGK)

Dear Judge Koeltl:

    We write to respectfully request that in advance of the May 8, 2025 sentencing of defendant Alexander Mashinsky the Court (1) resolve the outstanding factual disputes concerning the offense conduct described in the Presentence Investigation Report ("PSR") and the factual bases for the Sentencing Guidelines enhancements, or, in the alternative, (2) schedule a multiday hearing so the Government may call witnesses to establish the relevant facts.

    The number and extent of outstanding disagreements relating to the nature and scope of the defendant's offense conduct pose a practical obstacle to sentencing. As things stand now, the parties dispute nearly every fact of consequence to understanding Mashinsky's role in the fraud at Celsius. Indeed, the defendant has objected to the entirety of the offense conduct described in the PSR, as well as to the factual underpinnings of many of the Guidelines enhancements. Defense counsel has informed the Government that although Mashinsky is not withdrawing any of these objections, he is also not seeking a *Fatico* hearing to resolve the factual disputes. However, the factual disputes require resolution. Much of what either party may argue at sentencing—and, indeed, what conduct constitutes the crimes for which Mashinsky will be sentenced—will depend on how the Court resolves the outstanding objections. By settling these disputes in advance of the sentencing proceeding, the Court will enable the parties to provide useful advocacy to the Court on the appropriate sentence.

    To be clear: the Court already has ample record upon which to reject the defendant's objections and need not hold a hearing to do so. The defendant and the Government have each provided lengthy submissions about the disputed issues to the Probation Office. Based on the parties' submissions, the Probation Office resolved the disputed issues in the Government's favor. But we are also mindful of the critical importance of the contested issues and stand ready to present witnesses at a *Fatico* hearing if the Court believes that is necessary prior to adopting the facts in the PSR or fashioning an appropriate sentence.

The Court should not, however, accept the defendant's proposal to forego a hearing and also decline to adopt the facts as set forth in the PSR.

The defendant is now taking the position that the entirety of his wrongful conduct is limited only to making the two misstatements to which he specifically allocuted during his plea proceeding. He has denied making the many other misleading statements identified as part of the scheme to entice investors to invest their crypto with Celsius, and he has denied participating in a scheme to manipulate the price of CEL token by directing employees to secretly purchase more CEL than was required to pay rewards. These positions are impossible to reconcile with the detailed factual recitations in the PSR, many of which quote Mashinsky himself and otherwise draw from extensive documentary evidence, the authenticity of which is undisputed. Nor does the defense position cohere with the plea agreement itself, in which the defendant stipulated, among other things, that he was the organizer or leader of crimes that were "extensive," that used sophisticated means, and that resulted in a loss of more than $550 million, to more than 10 victims. Mashinsky also agreed that the conduct underlying Count Five resulted in a personal benefit to him in an amount over $48 million.[1]

By now distancing himself from the stipulations in the plea agreement while claiming to stand by the Guidelines calculation itself, and by objecting wholesale to the offense conduct while asking that the Court not hold a hearing to resolve the disputes, the defendant is trying to create ambiguity over exactly what conduct the Court should consider when imposing sentence.

Because of the seriousness of these disputes, the Government asks that the Court either (1) rule in advance that the Court intends to adopt the facts as currently described in the PSR, or (2) schedule a *Fatico* hearing in advance of sentencing, which the Government expects could last approximately two weeks.

I.  **Relevant Background**

On July 11, 2023, Mashinsky and Roni Cohen-Pavon were charged in a seven-count Indictment. The Indictment charged Mashinsky with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count One"); commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1 ("Count Two"); and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Three"). Counts One through Three related to Mashinsky's scheme involving false and misleading statements to Celsius's customers to induce them to invest their crypto assets with Celsius.

---

[1] The defendant's attempt to limit his conduct to his narrowly worded plea allocution combined with his objections to the entirety of the offense conduct description raises serious questions about the defendant's acceptance of responsibility. *See* U.S.S.G. § 3E1.1, Application Note 1 ("A defendant who falsely denies, or frivolously contests, relevant conduct that the court determines to be true has acted in a manner inconsistent with acceptance of responsibility."); *United States v. Kumar*, 617 F.3d 612, 636 (2d Cir. 2010) (defendant's "carefully worded plea allocution" and meritless objections to presentence report justified denial of acceptance points).

In addition, the Indictment charged Mashinsky and Cohen-Pavon each with conspiracy to commit securities fraud, market manipulation, and wire fraud through the manipulating of the price of CEL, in violation of Title 18, United States Code, Section 371s and 1343; Title 15, United States Code, Sections 78i(a)(2), 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Four"); engaging in a fraudulent scheme to manipulate the price of CEL token, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Five"); market manipulation of CEL token, in violation of Title 15, United States Code, Sections 78i(a)(2) and 78ff ("Count Six"); and wire fraud in connection with the manipulation of CEL token, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Seven").

The Indictment also included a lengthy recitation of facts describing how, from Celsius's inception and over the course of several years, Mashinsky repeatedly made false and misleading statements about the success and profitability of Celsius and the nature of the investments Celsius made with customer funds. Mashinsky portrayed Celsius as a modern-day bank, where customers could safely deposit crypto assets and earn interest, when in fact Mashinsky operated Celsius as a risky investment fund, taking in customer money under false and misleading pretenses and turning customers into unwitting investors in a business far riskier and less profitable than what he had represented. The Indictment also described the market manipulation scheme, in which Mashinsky, Cohen-Pavon, and others illicitly manipulated the price of CEL, thereby causing the public to purchase CEL at inflated prices, which personally benefited Mashinsky because he was secretly selling his own CEL at prices that they knew were artificially inflated. The Indictment described how, for years, Celsius employees, at Mashinsky's direction, secretly bought more CEL than what they were disclosing to the market in an intentional effort to support the price of CEL, often using customer money to make these purchases. Mashinsky ultimately profited over $48 million by selling his CEL at these inflated prices, while other CEL investors were left with an almost worthless crypto token when the truth came out.

On September 13, 2023, Cohen-Pavon pled guilty pursuant to a cooperation agreement to Counts Four through Seven of the Indictment, which related to his participation in Mashinsky's scheme to manipulate the price of CEL.

### A.     Mashinsky's Guilty Plea

On December 3, 2024, Mashinsky pled guilty to Counts Two and Five of the Indictment pursuant to a written plea agreement dated December 2, 2024 (the "Plea Agreement," Ex. A hereto). The Plea Agreement provided that in consideration of the defendant's guilty plea on Counts Two and Five, he would not be further prosecuted for (i) the scheme to defraud investors and customers of Celsius from 2018 to June 2022, as charged in Counts One through Three of the Indictment and (ii) conspiring to execute and executing a fraudulent scheme to manipulate the market for CEL token, as charged in Counts Four through Seven of the Indictment. (Plea Agmt. 1-2). Mashinsky also admitted to the forfeiture allegation with respect to Count Five of the Indictment, agreed that a sum of money equal to $48,393,446 represented proceeds traceable to the commission of Count Five, and consented to the entry of a preliminary forfeiture order. (Plea Agmt. 2; *see also* Dkt. 112 ("CPOF")).

The Plea Agreement set forth the parties' agreement as to the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") (Plea Agmt. 3-5).  As relevant here, the parties agreed that the loss exceeded $550,000,000 (the top Guidelines loss range); that the offense involved ten or more victims; that the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; and the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive.  (Plea Agmt. 4).  The parties further agreed that neither would seek a departure or adjustment pursuant to the Guidelines not set forth in the agreement, nor would either party in any way suggest that the Probation Office or the Court consider any other departure or adjustment under the Guidelines.  (Plea Agmt. 5).  The Plea Agreement further provided that the sentencing range would be life imprisonment, but because the statutorily authorized sentences are less than the minimum of the applicable Guideline range, the Stipulated Guidelines Sentence is 30 years' imprisonment, or the statutory maximum.

Mashinsky acknowledged that he "has accepted this Agreement and decided to plead guilty because [he] is in fact guilty."  (Plea Agmt. 6).

At the outset of the plea hearing, the Court placed Mashinsky under oath and confirmed that he understood that any false or untrue answers could be later used against him in a prosecution for perjury or making a false statement. (Plea Tr. 3).  The Court confirmed that Mashinsky wished to plead guilty to Counts Two and Five of the Indictment, that he had had a full opportunity to discuss the case and the consequences of entering a guilty plea with his attorneys, and that he was satisfied with his lawyers' representation.  (Plea Tr. 5).  The Court confirmed that Mashinsky understood the rights he would give up by entering a plea.  (Plea Tr. 6-9).  The Court described the allegations and elements of Counts Two and Five, and Mashinsky confirmed he understood.  (Plea Tr. 10-16).  When asked to explain his conduct with respect to Counts Two and Five, Mashinsky stated:

> Your Honor, as to Count Two, in December 2021, in connection with the Celsius Earn Program, part of which included electronic sales of the commodity Bitcoin in exchange for the CEL tokens that were used to pay customer rewards, I gave an interview in which I suggested that Celsius had received approval from regulators even though I knew that was not true.
>
> I understand at the time that customers would likely find false comfort in that misrepresentation, and that it would be material to their decision to invest in the Earn Program.
>
> As to Count Five, in September of 2019, I intentionally failed to disclose that I was selling my CEL token holdings even though I represented to the public, using electronic communications and wires, that I was not selling. I understand at the time that customers would likely find false comfort in that misrepresentation, and that it would be material to their decision to purchase or sell CEL token as an investment contract.

> I was working in the Southern District of New York as a CEO of Celsius at these times. I know what I did was wrong, and I want to try to do whatever I can to make it right. I accept full responsibility for my actions.

(Plea Tr. 25). When pressed by the Court, Mashinsky acknowledged that he knew at the time that his actions were wrong and illegal. (Plea Tr. 26-27). Mashinsky acknowledged that he was pleading guilty because he was in fact guilty and that he was pleading guilty voluntarily and of his own free will. (Plea Tr. 28). The Court accepted Mashinsky's plea. (Plea Tr. 29).

### B. The Parties' Submissions to the Probation Office

On December 17, 2024, in connection with the standing order pertaining to the preparation of Presentence Investigation Reports, the Government submitted a factual summary of the offense conduct, along with other materials, to the Probation Office. The factual summary included information directly related to Counts Two and Five, as well as information constituting relevant conduct as defined in U.S.S.G. § 1B1.3 for the Court's consideration at sentencing.

The Government understands that Mashinsky was interviewed by the U.S. Probation Officer in the presence of his counsel on December 20, 2024. (PSR ¶ 164). Through counsel, Mashinsky submitted an alternative written factual summary of the offense conduct, currently set forth in the PSR as "Defense Version of Events" at paragraphs 122 through 141.

On January 27, 2025, the Probation Office provided its initial PSR to the parties.

On February 18, 2025, Mashinsky submitted a 92-page letter (the "Defense Letter") with 112 exhibits, objecting to the factual recitations in the initial PSR.[2] Referring to Mashinsky's plea allocution, the defense noted that Mashinsky "pleaded guilty to misrepresentations concerning two items" (Def. Ltr. 7) and objected "to Probation adopting any aspect of the government's [offense conduct] submission beyond the conduct for which Alex pleaded guilty on December 3, 2024." (Def. Ltr. 2).

Mashinsky also objected to the factual bases set forth in the PSR supporting many of the Guidelines calculations. As to the loss calculation, Mashinsky objected to each of the five methodologies the Government had proffered that support the Guidelines loss amount of greater than $550,000,000 (*see* PSR ¶ 112) but proffered no alternative methodology. (Def. Ltr. 79-88). As to number of victims, Mashinsky appeared to take the position that the Government must establish that 10 or more victims had relied on the two specific misrepresentations that formed the basis of his guilty plea allocution. (Def. Ltr. 89, 92).

---

[2] The Government understands that the Probation Office has provided this letter and the other correspondence referred to in this subsection to the Court directly; the Government is happy to furnish additional copies upon request.

Also on February 18, 2025, the Government sent the Probation Office its objections to the "Defense Version of Events," noting that the Government did not object to including that version within the "Acceptance of Responsibility" section of the PSR but that the factual assertions therein did not accurately reflect the offense conduct, as they were in some instances false and in others misleadingly minimized Mashinsky's actions.

On February 27, 2025, the Government sent the Probation Office a letter (the "Government Letter") responding to the objections set forth in the Defense Letter. The Government Letter addressed the defense's objections to the initial PSR by responding in broad categories, rather than undertaking to refute each and every one of the defense objections. (Gov. Ltr. 1). In a chart, the Government addressed the defense exhibits, "[s]ome of [which] present merely extraneous material, but others [of which] are in fact directly contradictory to the argument made by defense counsel or are otherwise not as described." (Gov. Ltr. 10; 10-35).

C.  The Probation Office's Resolution of the Defense Objections

On March 5, 2025, the Probation Office issued the final PSR. The Probation Office's resolution of the specific defense objections is set forth at pages 78 to 84 of the PSR. The Probation Office accepted the concessions and revisions that the Government had made in the Government Letter to Paragraphs 53, 60, 97, 105, 105(f), and 108(a), (PSR p. 79), and removed certain adjectives in other paragraphs, (PSR pp. 78-79). Otherwise, the Probation Office determined that the scope of the offense conduct was "accurate and appropriate" and need not be limited to the two misstatements in the defendant's plea allocution. (PSR p. 78).

The Probation Office rejected the defendant's objections to the loss amount calculations, the number of victims, the sophisticated means enhancement, and the organizer/leader enhancement. (PSR pp. 79-82).

II.  Applicable Law

A.  Scope of the Presentence Investigation Report

The commentary to the Guidelines provides that "[a] thorough presentence investigation ordinarily is essential in determining the facts relevant to sentencing." U.S.S.G. § 6A1.1, Commentary. The Guidelines also include a broad definition of Relevant Conduct, which includes "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," and, in the case of jointly undertaken activity, acts and omissions of others that were "within the scope of the jointly undertaken criminal activity," that were "in furtherance of that criminal activity," and that were "reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3. The Guidelines specify that relevant conduct, whether committed by the defendant or within the scope of jointly undertaken criminal activity, consists of "all acts and omissions . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2).

A common scheme or plan refers to offenses that are "substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose,

or similar modus operandi." U.S.S.G. § 1B1.3 cmt. 5(B)(i). A common scheme or plan "requires a connection among participants and occasions." *United States v. Shonubi,* 998 F.2d 84, 89 (2d Cir.1993); *United States v. Dixon,* 175 F. App'x 384, 385 (2d Cir. 2006). Offenses are part of the same course of conduct "if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." U.S.S.G. § 1B1.3 cmt. 5(B)(ii). Factors to be considered include "the degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses. When one of the above factors is absent, a stronger presence of at least one of the other factors is required." *Id.*

### B. The Court's Resolution of Factual Disputes Relevant to Sentencing

A district court may find facts relevant to sentencing by a preponderance of the evidence. *See United States v. Vaughn,* 430 F.3d 518, 527 (2d Cir. 2005); *United States v. Garcia,* 413 F. 3d 201, 220 n.15 (2d Cir. 2005); *United States v. Crosby,* 397 F.3d 103, 112 (2d Cir. 2005). As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues, including the discretion to decide whether a hearing is necessary and how such a hearing should be conducted." *United States v. Ambrosio,* 129 F.3d 114 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez,* 924 F.2d 427, 430 (2d Cir. 1991)). Indeed, the sentencing court "is entitled to rely on any type of information known to it," in resolving sentencing disputes. *United States v. Tracy,* 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona,* 873 F.2d 569, 574 (2d Cir. 1989)).

At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico,* 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez,* 413 F.3d 239, 242 (2d Cir. 2005) (Sotomayor, J.) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). "It is not a denial of due process for the trial judge, when determining sentence, to rely on evidence given by witnesses whom the defendant could neither confront nor cross-examine." *Carmona,* 873 F.2d at 574 (citing *Williams v. New York,* 337 U.S. 241, 250-51 (1949)). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Id.*

### III. Outstanding Disputes

### A. Calculation of the Applicable Sentencing Guidelines Requires Resolution of the Pending Factual Disputes Concerning the Guidelines Enhancements

While the defendant stipulated to the proper calculation of the Sentencing Guidelines in his plea agreement, he now disputes the factual bases for the Guidelines enhancements therein. At the same time, while claiming not to challenge the enhancements themselves or that there exists some factual basis for each of them, Mashinsky has not identified alternative specific factual bases that could form the necessary factual predicate for the agreed-upon enhancements. The tension in

these positions requires resolution, as the Court must both find facts relevant to sentencing and accurately calculate the applicable Sentencing Guidelines. "A district court must make 'specific factual findings,' by a preponderance of the evidence, to support any sentencing enhancement under the Guidelines." *United States v. Ahders*, 622 F.3d 115, 119 (2d Cir. 2010). To make those specific factual findings here, resolution of the following Guidelines disputes is required:

**Loss:** The defendant continues to object to each of the factual bases for the loss calculation set forth in the PSR at paragraph 112, but believes there is a basis to stipulate to a loss amount of $590 million based on his declaration in the Celsius bankruptcy.[3]

According to information provided by counsel: "That loss amount reflects the shortfall in Celsius's total available assets on the day of the bankruptcy compared to the $4.72 billion in User Liabilities, after applying the company's $180 million in Custody Assets to its $180 million in Custody Liabilities." This declaration is the basis of the PSR's loss calculation at paragraph 112(c), which notes that the declaration specified a deficit of $1.190 billion. (Ex. B hereto at 7). Defense counsel has also told the Government that *no* loss should be attributed to the scheme to manipulate the price of CEL, even though Mashinsky stipulated elsewhere in the plea agreement that he would forfeit "a sum of money equal to $48,393,446 in United States currency, representing proceeds traceable to the commission of Count Five," Plea Agmt. 2, and even though he agreed in the Consent Preliminary Forfeiture Order that $48,393,446 "represent[s] the amount of proceeds traceable to the offense charged in Count Five of the Indictment that the Defendant personally obtained." (CPOF at ¶ 1).

The Government does not understand how defense counsel has concluded that the chart at page 7 of Exhibit B, representing Celsius's consolidated assets and liabilities as of July 13, 2022, reflects a loss of $590 million rather than $1.190 billion; nonetheless, the Government is satisfied that the defendant has now at least provided *some* factual theory for the loss amount to which he stipulated. The Government submits that the other methods of calculating loss set forth in the PSR are also reasonable, and are in fact more accurate estimates, for the reasons set forth in the Government Letter. (Gov. Ltr. 6-10). This includes the fact that the Government's loss calculation actually includes a loss amount attributable to the market manipulation scheme, whereas the defendant's does not.

The more significant issue regarding loss amount is not the specific number attached to the loss, but how to reconcile a loss amount of more than $550 million with the defendant's position that the full extent of his crime was making only two misstatements, one about regulatory clarity and one about his own purchases of CEL token. If Mashinsky's fraudulent schemes to induce investors to invest their crypto with Celsius and manipulate the price of CEL token consisted of just these two misstatements, it is difficult to see how a loss of more than $550 million would have been foreseeable. In contrast, it is the sort of years-long, far-reaching scheme described in the PSR—including repeated misrepresentations about Celsius's profitability, sustainability, low-risk investment strategies, and general safety as an investment—that would have foreseeably induced

---

[3] The Government's summary of the defense positions with respect to the Guidelines is based on its conversations with defense counsel, including an email summary from counsel dated March 19, 2025.

investors to deposit more than $550 million on the Celsius platform. And it is the sort of extended market manipulation scheme described in the offense conduct, with the regular expenditure of millions of dollars to secretly purchase more CEL than Celsius told the market, that could inflate the price of CEL to a level that Mashinsky was able to personally profit more than $48 million.

Mashinsky insists he is standing by the stipulated loss amount in the plea agreement, but he has offered no way to reconcile the loss amount with his version of the offense conduct.

**Number of Victims:** The defendant has also objected to the statement in the PSR that the offense involved at least 600,000 victims, but has not provided an alternative victim number, other than agreeing that he stipulated to ten or more victims and does not believe that anything further is needed. At the time of the bankruptcy, over 600,000 Earn users and 23,000 investors in the Borrow program had lost assets that they placed on the Celsius platform, making "at least 600,000 victims" an appropriate estimate. The defendant will concede only that the victim number was somewhere above 10, without providing any estimate.

As with loss amount, Mashinsky's view of the victim number is inconsistent with his own purported version of the facts and with his other stipulations. If, as Mashinsky suggests, the loss amount is best represented by the shortfall in assets at the time of the bankruptcy, then the victims are the individuals whose money that represents—i.e., the more than 600,000 individuals whose money remained on the platform. More fundamentally, as with loss amount, Mashinsky's factual stipulations in the plea agreement about the scale of the crime—that it involved more than 10 victims whose total losses exceeded $550 million—is inconsistent with his much narrower description of the offense conduct.

**Sophisticated Means:** The defendant proffered to the Probation Office that Mashinsky's "dissemination of a false statement via an online magazine and Twitter, combined with his sales of CEL token via a cryptocurrency exchange, could be used to support this enhancement." (PSR p. 82). The Probation Office rejected this reasoning as "vague" and noted that "making only two false statements does not support a sophisticated scheme." (PSR p. 82). The PSR gave the following basis for the sophisticated means enhancement:

> The offense involved sophisticated means as MASHINSKY timed trades of CEL tokens which specifically required analysis of the markets to maximize price impact but also increase concealability. The use of the blockchain for cryptocurrency is also complex. Finally, the offense involved Celsius, and MASHINSKY, making representations about what they were doing with the CEL tokens that differed from what was happening. The structure of the company made it difficult for customers and in turn regulators to capture and understand the difference between what was being said and what occurred.

(PSR ¶ 113). The Government submits that the Probation Office's description of the factual basis for the sophisticated means enhancement is most appropriate in light of Mashinsky's actual conduct. His two schemes were much more sophisticated than simply making a false statement in

an online magazine and on Twitter, and involved elaborate efforts to use technology to inflate the price of CEL and deceive investors in Celsius.

**Organizer/leader:** The defendant objected to the PSR's finding that the organizer/leader enhancement was justified because "Mashinsky directed others, including Cohen-Pavon, on specific actions regarding Celsius, its financial transactions, and the sale and purchase of CEL tokens." PSR ¶ 114. The Government understands that the defense agrees there is an adequate factual basis for this enhancement because Mashinsky "was the CEO of Celsius and was responsible for organizing and directing its operations. Celsius was a major cryptocurrency company and its operations were extensive in both scale and geographic scope." But the enhancement does not apply where a defendant simply organizes and directs a *company* that is extensive—it applies to an "organizer or leader of a *criminal activity* that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a) (emphasis added). The defendant's version of his offense conduct, which is limited to only two misstatements which he made on his own, is not a criminal activity that "involved five or more persons or was otherwise extensive." In contrast, the two schemes as described in the PSR, which involved multiple misstatements over the course of years and involved multiple Celsius employees acting at Mashinsky's direction to take steps to manipulate the price of CEL, would constitute criminal activity that involved five or more participants or was otherwise extensive. Yet again, it is impossible to reconcile Mashinsky's stipulations in the plea agreement with his version of events.

### B.   Resolution of the Factual Disputes Regarding the Offense Conduct is Necessary

For purposes of sentencing, it will also be necessary for the Court to resolve material factual disputes concerning the offense conduct. Those disputes regarding the offense conduct set forth in the PSR are, quite simply, extensive. As set forth in the Government Letter, some of the defendant's objections are not true factual objections but are rather argument or provide extraneous material and, as such, may not require resolution. (Gov. Ltr. 4-5). However, based on conversations with defense counsel in addition to its review of the pending objections, the Government has attempted to group the factual objections, and understands the following to represent the questions as to which the parties have core factual disputes that require resolution prior to sentencing:

1. Were the material misrepresentations Mashinsky made limited to the two that he cited in his guilty plea allocution?

2. If not, did Mashinsky make knowingly false misrepresentations concerning each of the categories of misrepresentations cited in the PSR?

3. Was Celsius unlawfully manipulating the price of CEL by purchasing CEL in excess of what Celsius was disclosing to the public?

    4.      Was Mashinsky aware of these excessive purchases done for the purpose of unlawfully manipulating the price of CEL at the time and condoning and/or directing it?

The disputes can be distilled even further into the following: Is this a case about extensive schemes to mislead investors and manipulate the price of CEL, or is it a case about two stray remarks made by Mashinsky?

The facts as resolved by the Probation Office in the final PSR more than adequately answer that question. The PSR details Mashinsky's extensive, multi-year involvement in two discrete schemes to defraud Celsius's investors and manipulate the price of CEL token. The offense conduct includes voluminous detail, quotes specific documents and misstatements, describes witness statements with particularity, and identifies specific instances of manipulative activity.

Mashinsky's shifting positions about the crimes he committed, on the other hand, seems designed to obfuscate the full scope of his crimes while still receiving the benefits of his plea agreement.[4] The Government therefore requests that the parties receive clarity, in advance of sentencing, about how the Court wishes to address the disputed facts. The Government believes that the record before the Court is sufficient to resolve them, especially in light of the stipulations in the plea agreement and the defendant's stated preference not to hold an evidentiary hearing. But the Government also recognizes that the Court might prefer a more fulsome record, and we stand ready to present evidence at a hearing.

---

[4] Consistent with Mashinsky's wholesale rejection of the PSR, he has even attempted to minimize facts related to one of the two misstatements he does not disclaim. (Def. Ltr. 41-42 "There is also substantial evidence to support optimism about Celsius's interactions with the SEC, even if Alex knew at the time of his December 2021 *Barron's* interview that the company had not yet received regulatory approval.").

If the Court believes a hearing is appropriate, the Government submits that a multi-day hearing will be required to resolve the outstanding factual disputes, which go to the heart of the case, the defendant's yearslong offense conduct, and thus, necessarily, to the appropriate sentence. The Government's present estimate is that it would call as many as eight or nine witnesses to establish the full scope of the conduct discussed in the PSR and respectfully requests the Court set aside two weeks for the presentation of this evidence.

        Respectfully submitted,

        MATTHEW PODOLSKY
        Acting United States Attorney

by: /s/
        Allison Nichols
        Adam S. Hobson
        Peter J. Davis
        Assistant United States Attorneys
        (212) 637-2366 / 2484 / 2468

cc: Defense Counsel (by ECF)