UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ALEXANDER MASHINSKY,

                    Defendant.

Case No. 23 Cr. 347 (JGK)

**SENTENCING MEMORANDUM OF ALEX MASHINSKY**

Marc L. Mukasey
Torrey K. Young
Michael F. Westfal
Tom Thornhill

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Attorneys for Alex Mashinsky*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ............................................................................. 2

ALEX MASHINSKY'S PERSONAL HISTORY AND CHARACTERISTICS
18 U.S.C. § 3553(a)(1)..........................................................................................4

    A.    Alex's Childhood ........................................................................4

    B.    Military Service ...........................................................................6

    C.    Alex's Business History................................................................8

ALL RELEVANT FACTORS COUNSEL LENIENCY ......................................13

    A.    Title 18, Section 3553, Subsection (a)(1) ................................14
        1.    Nature And Circumstances Of The Offense ............................14
            a.    The Celsius Network Community ..................................14
            b.    A Team of Skilled and Dedicated Employees ...............18
            c.    The Pursuit of Transparency .........................................20
            d.    Regulatory Compliance in the Face of Uncertainty.......23
            e.    Investment in Risk Management ...................................26
            f.    Sudden and Rapid Expansion in 2021 ...........................27
            g.    The Crypto Winter(s)......................................................28
        2.    The Broader Context Of Alex's Two Misstatements Mitigates The
            Seriousness Of His Offenses........................................................31
        3.    A Bankruptcy Filing By A Crypto Start-Up Is Not Proof Of Rampant
            Fraud And Criminality .................................................................33
        4.    Celsius's Bankruptcy Has Shown That It Was A Real Company Helping
            Real People ...................................................................................35

    B.    Title 18, Section 3553, Subsection (a)(2)(A)...........................39
        1.    The Loss Is Not The Reality Of The Offense ............................39
        2.    Alex's Low-Level Of Culpability................................................44
        3.    Alex Is Already Being Punished.................................................46
        4.    Collateral Consequences .............................................................47

    C.    Title 18, Section 3553, Subsection (a)(2)(B)...........................51
        1.    General Deterrence .....................................................................51
        2.    Specific Deterrence......................................................................52

    D.    Title 18, Section 3553, Subsection (a)(2)(C)...........................53

    E.    Title 18, Section 3553, Subsection (a)(6) ................................53
        1.    U.S. v. Bankman-Fried ..............................................................55
        2.    U.S. v. Ng Chong Hwa (a/k/a "Roger Ng").............................57
        3.    U.S. v. Milton.............................................................................58

     F.     Title 18, Section 3553, Subsection (a)(7) ................................................................53

ALEX MASHINSKY TODAY ........................................................................................................60

CONCLUSION....................................................................................................................................63

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*,
    552 U.S. 38 (2007) ............................................................................................ 13, 14

*Kaley v. United States*,
    571 U.S. 320 (2014) ................................................................................................ 52

*Kimbrough v. United States*,
    552 U.S. 85 (2007) .................................................................................................. 13

*Pepper v. United States*,
    562 U.S. 476 (2011) .......................................................................................... 14, 36

*Peugh v. United States*,
    569 U.S. 530 (2013) ................................................................................................ 39

*United States v. Adelson*,
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) ........................................................... 4, 41, 43

*United States v. Algahaim*,
    842 F.3d 796 (2d Cir. 2016) .................................................................................... 41

*United States v. Anderson*,
    267 F. App'x 847 (11th Cir. 2008) ......................................................................... 48

*United States v. Anderson*,
    533 F.3d 623 (8th Cir. 2008) .................................................................................. 47

*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................................ 53

*United States v. Bryson*,
    229 F.3d 425 (2d Cir. 2000) .................................................................................... 14

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008) (*en banc*) ............................................................ 13, 44

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) .................................................................................... 42

*United States v. Emmenegger*,
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) .................................................................... 41

*United States v. Faibish*,
    No. 12-cr-265 (ENV), 2015 WL 4637013 (E.D.N.Y. Aug. 3, 2015) ..................... 44

*United States v. Johnson,*
  16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 26, 2018).................. 40, 42, 43, 52

*United States v. Johnson*,
  964 F.2d 124 (2d Cir. 1992)...................................................................... 13

*United States v. Malik*,
  424 F. App'x 122, 127 (3d Cir. 2011) ...................................................... 48

*United States v. Milikowsky*,
  65 F.3d 4 (2d Cir. 1995)............................................................................ 13

*United States v. Musgrave*,
  647 F. App'x 529 (6th Cir. 2016) ....................................................... 43, 52

*United States v. Olis*,
  Criminal No. H-03-217-01, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2006) ......................... 48

*United States v. Parris*,
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) ...................................................... 41

*United States v. Redemann*,
  295 F.Supp.2d 887 (E.D. Wis. 2003).......................................................... 48

*United States v. Samaras*,
  390 F.Supp.2d 805 (E.D. Wis. 2005).......................................................... 48

*United States v. Sponaugle*,
  Crim. No. 19-103-LPS, 2022 WL 4079197 (D. Del. Sept. 6, 2022) ...................... 47

*United States v. Vigil*,
  476 F.Supp.2d 1231 (D.N.M. 2007) .......................................................... 48

*Wasman v. United States*,
  468 U.S. 559 (1984)........................................................................... 14, 36

## STATUTES

18 U.S.C. § 3553(a) ................................................................................ passim

18 U.S.C. 3663A(c)(3)............................................................................ 60

This Sentencing Memorandum is respectfully submitted on behalf of defendant Alex Mashinsky, who is scheduled to be sentenced on May 8, 2025. For the reasons set forth below, the Court should impose a sentence of no more than 366 days.

On July 11, 2023, a grand jury in the Southern District of New York returned a seven-count indictment against Alex Mashinsky. ECF No. 1. Counts One through Three related to allegations that Alex misled Celsius Network customers by making fraudulent misrepresentations regarding "core aspects of Celsius's business." ECF No. 1 at ¶¶ 1, 15. Counts Four through Seven related to allegations that Alex, Roni Cohen-Pavon, and other unidentified Celsius employees "orchestrated a scheme to inflate the price of Celsius's proprietary token, *CEL*." *Id.* at ¶ 1.

Alex pleaded guilty to Counts Two and Five of the indictment, each a substantive count, pursuant to a plea agreement. During the Rule 11 proceeding, Alex admitted that he misled Celsius's customers when he falsely suggested in a December 2021 media interview that Celsius had received approval from regulators even though it had not (Count Two), and when he intentionally failed to disclose in September 2019 that he was selling his CEL token holdings even though he represented to the public, on Twitter, that he was not selling his CEL (Count Five). Hearing Tr. 25:4-27:6, Dec. 3, 2024, ECF No. 112. Alex told the Court that he knew what he did was unlawful, that he wanted to try to do whatever he could to make it right, and that he accepted full responsibility for his actions. Hearing Tr. 25:23-25, Dec. 3, 2024, ECF No. 112.

Alex stands 100% by the plea agreement. There is no dispute here about the statutory maximum sentence, the application of the Sentencing Guidelines, or the Stipulated Guidelines

sentence of 30 years.  For the ease of the Court, the specific portions of the presentence report that are being contested are consolidated in a chart and attached as Exhibit B.[1]

## PRELIMINARY STATEMENT

Alex Mashinsky's life has been defined by humility, gratitude, intellectual curiosity, and, above all, service.  As a young boy in the Soviet Union, Alex comforted his siblings while their family was persecuted and terrorized for the crime of being Jewish.  As a decorated Israeli combat veteran, he was wounded in battle while protecting his fellow men in service to his country.  As an American businessman, he brought technology and services to people who needed them.  There have been successes and there have been failures.  But the guiding principle in Alex's life has always been that only a life lived in the service of others is a life worth living.

So this case is not about an arrogant, greedy swindler who thought he could get away with stealing people's hard-earned money to satisfy his own hedonistic pleasures.  Nor is it about a sham company that was exposed as a house of cards when it went bankrupt.  Those are *post-hoc*, shallow and dehumanizing tropes that do not apply here.

In reality, when Alex Mashinsky founded Celsius, he was a successful businessman who had never faced a single disciplinary action over a 30-year career.  He formed Celsius to help retail customers achieve financial independence. And Celsius lawfully and faithfully served its online customer community for years; it paid almost $1.5 billion in weekly rewards and extended hundreds of millions of dollars in low-interest loans to retail customers.  Celsius was a maturing

---

[1] A *Fatico* hearing is unnecessary. There is no dispute between the parties about the statutory maximum, the application of the Guidelines, or the stipulated Guidelines range in the plea agreement. Nor is "relevant conduct" under U.S.S.G. § 1B1.3. implicated here. Relevant conduct concerns "Factors that *Determine* the Guideline Range." (emphasis added).  Here, the applicable Guidelines have already been agreed to.  The objections set forth in Exh. B, many of which are made for completeness and accuracy, can be resolved under § 3553 based on the submissions and/or should not affect the sentence.  Probation resolved nearly all objections in the government's favor, and, referencing the § 3553(a) factors, recommends a sentence that is half of the applicable Guidelines sentence.  PSR at 85, 87.

company and a budding success until it had to pause and reset when a cataclysmic downturn devastated the crypto markets in May and June of 2022.

Yes, Alex Mashinsky pleaded guilty to two serious crimes.  But no, that should not operate as a wholesale condemnation of Alex or his efforts at Celsius. His actions were never predatory, exploitative or venal. He never acted with the intent to hurt anyone.  He never stole money or scurried away with anyone's assets. And he has never been driven by greed, cruelty, or avarice.  Alex's goal was always to achieve success based on service to others, not at the expense of others.

Alex learned from his parents, his military experience and his prior business dealings that part of service is accepting responsibility for your actions.  He knows that recognizing his actions and their impact on others is the first step of acceptance.  He has owned up to his role.  He is prepared to be held accountable for his behavior.

Service also means being proactive in dealing with the consequences.  Taking responsibility and finding solutions to rectify the situation.  Understanding the impact of his actions on others and expressing genuine remorse, empathy and compassion.  Alex has served in this way as well.  He fought for Celsius users before the company filed for bankruptcy, during the bankruptcy, and after the bankruptcy, and he did so without seeking recognition or compensation.  Until the day Alex resigned from the company, he

> . . . was focused entirely on preserving value for Celsius' customers. Said customers, who ultimately became the primary, if not exclusive, claimants of Celsius in the bankruptcy proceedings were his singular interest; not himself. He continued to develop a plan to get the customers' cryptocurrency back to them as quickly as possible. . . . [U]ntil the conclusion of the bankruptcy proceedings in the Southern District of New York, Alex continued to postulate proposals to protect the customers. The ultimate plan structured heavily relied on the ideas developed by Alex.

> Throughout the post-bankruptcy time frame, my observations and experience were that Alex operated with the highest moral character in attempting to right the wrongs of which he is accused.

(Exh. A-2).

## ALEX MASHINSKY'S PERSONAL HISTORY AND CHARACTERISTICS
## 18 U.S.C. § 3553(a)(1)

"[I]f ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be at the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F.Supp.2d 506, 513-14 (S.D.N.Y. 2006).

### A.    Alex's Childhood

Alex Mashinsky was born on October 5, 1965, in the small town of Chernivtsi, Ukraine, in the Soviet Union.  His early life was dark and grim.  He was born to Boris and Stella Mashinsky, a Jewish couple in communist Russia at a time of state-sponsored antisemitism. Soviet Jews like the Mashinskys were considered social outcasts, cutoff from their brethren, harassed for minor incidents, persecuted, and denied the right to practice their religion.  More than two million Jews faced government-led religious persecution and were unable to openly live as Jews. Soviet Jewish "refuseniks" like the Mashinskys were for years denied permission by the Soviet Union to leave the country. Many – like Alex's father – were fired from their jobs and threatened with imprisonment for treason and related charges when they asked to move to Israel.

When Alex was 7, the Mashinskys were finally able to flee the Soviet Union and immigrate to Israel.  Russian soldiers at the border refused to let his family leave the country until Alex surrendered his two toys.  The toys didn't belong to Alex, the armed soldiers told him sternly.  They were "Russian toys," and Alex had to leave them in Russia.  Little Alex

relinquished the toys so his family could flee the Soviet oppression and find freedom in the Jewish homeland.

According to Alex's sister Karina, his experience as a young boy in the Soviet Union inspired him later in life:

> [I]n communist Russia . . . people were told what to think and what to do. Alex's drive would have been extinguished if he had continued to live there. Fortunately for us, our father, also a freedom loving man, left Russia as soon as he could for the benefit of the democratic State of Israel, where he could give us freedom of thought and freedom of choice.
>
> . . . Many people say about Alex that he is a maverick, that he is an entrepreneur, that he dares to do what others don't, but few understand that what always drove him was the desire to make the world a better place and allow people what he didn't have as a child - freedom.

(Exh. A-26).

Alex's first three years in Israel were dangerous and difficult. The Mashinsky family lived in government housing during the sudden and violent Yom Kippur War. The war saw fighting throughout the country and the Israelis took heavy casualties. Alex's family was forced to evacuate their home in Kiryat Motzkin several times because it was near the northern border where bombings constantly occurred. His parents were newly arrived immigrants who could not find regular work and Alex's father was quickly conscripted into the army. There were food shortages, so food had to be rationed. They had no telephone and frequently lacked electricity. When they did have electricity, they often needed to keep the lights out at night to avoid enemy detection. Young men from their village left their families to go to war and funerals were held every day of the week. It was a terrifying time for young Alex.

Eventually Alex and his family moved to the city of Rehovot, Israel, which was a larger immigrant community, where many Jews from Eastern Europe had settled. Alex's father, an anesthesiologist by training, managed to secure employment in the hospital in Rehovot, and his

mother worked as a teacher.  Much like his parents, Alex developed an insatiable thirst for knowledge and had an innate desire to learn.  His sister Karina recounts:

> I remember one evening when I asked him: "Alex, Tell me, how do you get all these new ideas?" He was silent for a moment and then replied – "I just ask why. Why does a ball fall back down to earth? or - why do we only produce electricity from chemical reactions? Are there other ways to produce pure water? or - why do people believe in paper money? Are there other options?"
>
> I was mesmerized. To sit and listen to Alex is to agree to open your eyes. To put our reality in a big question mark and challenge it. To agree to try to see beyond. To explore something new.

(Exh. A-26).

Propelled by this intellectual curiosity, the teenage Alex attended Katzir High School in Rehovot, Israel, while he simultaneously studied electrical engineering at Open University in Tel Aviv.  By the time Alex graduated from high school, he also had a two-year college degree.  And as he studied, he never stopped trying to understand or questioning how to make things better and more accessible, more reliable and more democratic.

The curiosity, respect, kindness and character that Alex learned from his parents would become hallmarks of his approach to business and to life.  But above all else, the value that Boris and Stella Mashinsky instilled most deeply in Alex – and that he carried throughout his own life – was that of service.  Service to community, service to humanity, service to make things better. That a life of service to others is a life that is well-lived.

## B.    Military Service

Between ages 18 and 21, Alex served in the Israeli Defense Forces ("IDF").  He started his service as a pilot cadet training to fly F-15 and F-16 fighter jets.  He then joined the Golani Brigade, one of the IDF's most highly decorated infantry units and completed the advanced training program.  Many of the soldiers in the Golani Brigade were farmers or new immigrants

like Alex, and their strong connection to the land was symbolized by their brown berets.  The Golani have earned a reputation throughout Israel's history as elite fighters and Alex was a worthy addition to their ranks.  Alex saw war zone deployment and combat, including at the border with Lebanon and in the West Bank where he was wounded.  But he served on.  He was honorably discharged in 1987.

During his time in combat, Alex, like many of the bravest soldiers, saw horror and experienced extreme trauma.  He was involved in several firefights.  Members of his unit were killed in action.  Others were severely wounded.  One committed suicide.  But day after day, with bravery and resolve, he fought on.  At times the losses seemed too much to bear, but Alex had come to Israel to be free and he was willing to fight to preserve freedom for all Israelis.  The fighters in his unit underwent psychological reviews and were offered therapy, but it was not natural or easy for Alex and his unit mates to cope with the fear, the carnage and the loss.

Alex's unit suffered several casualties. The funerals of fallen men were excruciatingly painful for Alex. A matter of centimeters meant one person died rather than another.

Alex, like many veterans, is quietly proud of his military service, but he does not like to discuss it.  Not with therapists, not with friends, not at all.  It is axiomatic that if you haven't been to war, it's impossible to understand war.  The long-term effects of trauma are significant and the current conflicts in Ukraine and Israel only keep his time in both places in the front of his mind.  He has not spoken to many people about his experience.  He keeps the stories inside and handles the post-traumatic stress by himself.  Alex cried during the Probation interview when he discussed his military service.  He eventually cut the discussion short rather than relive it.  He just summarized: "[A] lot of good men were lost."

Alex insists that war did not harden him.  To the contrary, he thinks it softened him.  It made him quick to recognize, understand, and share the thoughts and feelings of others.  It enabled him to experience another person's point of view.  His stepdaughter, Makenzie Moen, states:

> One of my earliest memories of Alex is him sitting me down and saying, "Put yourself in somebody else's shoes." He asked if I understood what that meant and then explained the importance of empathy, selflessness, and kindness. That lesson has stayed with me throughout my life, and I learned how to embody it by watching him. Alex leads by example, always striving to help others in meaningful ways.

(Exh. A-18).

Service to Israel and its people remains in Alex's heart.  At one of the holiest spots in Jerusalem, the Western Wall, there is a 24-hour online camera that allows people of all faiths around the world to see the historic site, share the emotions, pray, and experience the spiritual energy.  Alex Mashinsky donated it.  (Exh. A-34).

### C.    Alex's Business History

In 1988, following his military service, Alex set out for America.  He had few resources, but he possessed an intellectual curiosity and a desire to serve people in new ways.  Alex was a seeker.  Not a seeker of fame or fortune – "financial success . . . is never what drove him" – but a seeker of answers, solutions, and innovations.  "What drives Alex is to identify a problem, understand the problem and fix it."  (Exh. A-34).  When he came to New York, Alex set out on a business career by asking himself, "What am I giving or doing or making that makes a difference in someone's life or that makes their life better in some small and meaningful way?"

Alex soon found his way to the telecommunications field, which combined his love of science and technology.  According to his sister:

> In the 1990s, Alex was fascinated by the field of telecommunications. At the time, telecom companies were massive monopolies with virtually unlimited resources.

> Despite this, Alex — self-taught and driven — conceived a new technology: to make voice calls free on a new network called "The Internet". He filed patents related to electronic telecommunications, and became a pioneer in the Voice Over Internet Protocol (VoIP) industry. His work in VoIP enables the free transfer of billions of bytes every day through chats, social media, and conversations.

(Exh. A-30).

In 1995, Alex founded Arbinet (previously known as "Smartnet"), a switch maker that introduced internet technology to automate and manage the sale of global telecoms traffic. The company provided an electronic exchange through which its member customers, telecommunications companies like AT&T, Sprint and other major carriers, bought and sold voice calls and used internet capacity through its centralized marketplace. The company was profiled in *The Economist* in 1997 and *The New York Times* in 1999, the same year it won a World Communications Award.  Its initial public offering took place in December 2004.  Alex raised over $350 million for Arbinet and served as the company's CEO from 1995 to 2000.  He also served as a member of its board of directors.

After Arbinet, Alex's next big project was an on-demand ride-booking platform called GroundLink (previously known as Limores).  The company, which he co-founded around 2003, connected passengers to cars, limousines and other forms of ground transportation. Headquartered in New York, GroundLink allows customers to find and reserve ground transportation in every city in the U.S. and 172 countries around the world via GroundLink's network of 45,000 taxis, car service, limousines, shuttles and vans. The company provides these services via the web, phone and mobile applications with instant pricing and the ability to have a car waiting for you in under 30 minutes anywhere in the U.S. and within an hour anywhere in the world.  According to businessman David Barse:

> [Alex] introduced me to a limousine service he was developing by applying technology to an antiquated car-hire system. His idea was similar to what is now

> UBER but predated Uber's consumer offering by several years. Alex developed an
> app that would efficiently allow a customer to find a car/driver near the customer's
> location and correspondingly for the driver to find a passenger. He branded this
> service and offered me an opportunity to be a customer. I became one of the early
> users and found the service extremely convenient and effective.

(Exh. A-2).

Alex was a finalist for the Ernst & Young Entrepreneur of the Year Award in 2011 for

his work with GroundLink.  He reports that since its inception, Groundlink has processed and

executed more than two million ground travel transactions and was the exclusive ground

transportation partner of several leading travel companies.

In 2004, Alex and Gary Simpson started a project to bring wireless service to the New

York City subway system.  In 2007, according to Mr. Simpson, the partnership they founded,

Transit Wireless, was awarded the contract to design, build, own and operate the wireless

network in all 286 underground subway stations. William Neuman, *MTA Makes Deal For

Cellphones In Stations*, The New York Times, Sep. 20, 2007, https://www.nytimes.com/

2007/09/20/nyregion/20cellphone.html and Exh. C. The first six stations went live in 2011, and

by 2018, wireless services were available in all underground stations.  It brought network

connectivity to first responders, law enforcement and millions of subway passengers.  As Mr.

Simpson put it, the project was an enormous challenge and "Alex's experience and advice were

of significant help, especially in the early days, to make this project the success that it is." (Exh.

A-32).

From 2014 to 2015, Alex served as CEO of Novatel Wireless (Nasdaq: MIFI), a publicly

traded company in San Diego, California.  Novatel was a leader in the design and development

of M2M wireless solutions based on 3G and 4G technologies. The company delivered Internet of

Things (IoT) and Cloud SaaS services to carriers, distributors, retailers, OEMs and vertical

markets worldwide. Product lines include MiFi® Mobile Hotspots, USB modems, Expedite®

and Enabler embedded modules, Mobile Tracking Solutions, and Asset Tracking Solutions.  Exh.

D.  Novatel, which was regulated by the SEC and NASDAQ, enjoyed success and had no

infractions under Alex's leadership.

Novatel fired Alex after about 16 months (he did not want to relocate to San Diego), but

the man who terminated him still holds him in high regard:

> From the outset, I was struck by his sharp intellect, visionary thinking, and
> relentless drive to push the boundaries of innovation. His ability to anticipate
> industry shifts and develop groundbreaking solutions was truly ahead of its time.
>
> During our time working together, it became clear that while we shared a deep
> passion for transformative business models, our long-term strategic paths were
> diverging. Ultimately, I made the decision to replace him, but our mutual respect
> never wavered. I always valued his forward-thinking mindset and appreciated the
> depth of his insights. Over the years, we fortunately maintained a friendly
> relationship, as I continued to admire his ingenuity and unwavering determination.
> Without question, Alex has always been a pioneer on many fronts—whether
> revolutionizing telecommunications, or tackling the complexities of finance and
> digital assets. His enthusiasm for challenging situations head-on, coupled with an
> unshakable commitment to integrity, has earned him the trust of colleagues,
> investors, and peers alike.

(Exh. A-5).

Alex also holds dozens of patents, including for electric power systems, energy

distributions, telecommunications, and related fields.  *See* PSR ¶ 200.  He has been a guest

speaker at conferences and universities and highlighted in a Harvard Business School case study.

*See* Exhs. E and F.  In 2001, he was awarded the prestigious Albert Einstein Technology Medal

by Israeli Prime Minister Benjamin Netanyahu.  The award drew praise from Senator Daniel

Patrick Moynihan. *See* Exhs. G and H.

Alex's sister, Elionora Scheiner, worked in several of his start-up companies. This is her

perspective on his approach to business:

Throughout his active years as an entrepreneur and CEO, Alex employed thousands of people, providing them with job security, steady paychecks, and a dynamic work environment where his door was always open. He welcomed ideas, opinions, and even criticism. Alex was always willing to offer advice, share anecdotes, and even lunch with his colleagues—treating everyone with respect and as equals, regardless of their background,

The employees at Smartnet, Arbinet, and Limores—where I worked from 1992 to 2007—came from diverse backgrounds. They included people of various cultures, ages, races, genders, and experiences. Some examples include:

- RG, a single mother and immigrant from the Caribbean, who was working to get back on her feet after experiencing homelessness.
- CP, a young college graduate from Australia, eager to break into the American corporate world.
- HK, a young Asian woman who had recently married.
- MN, a war refugee from Belgrade who worked as a junior technician.

(Exh. A-30).

\* \* \* \* \*

According to the government, after his decorated military service and decades of building businesses that employed scores of people and provided services to improve people's lives, Alex went rogue. They seem to think that he decided, at age 52, for no apparent reason, to throw away his values and everything he had achieved in favor of becoming a financial fraudster of epic proportions. So, their theory goes, a man with no disciplinary history started a sham company and went on an illegal rampage until he drove the company into bankruptcy and froze his customers' access to billions of dollars in crypto assets. He did it all, they suggest, so he could become a white-collar criminal for the ages, leave his wife without a husband, his children without a father, face 30 years in prison and innumerable lawsuits and ultimately, become a pariah. It is a proposition too absurd to take seriously.

The truth is that Alex is a complex person, with a loving heart, genuinely good intentions, and a previously spotless track record, who, in this case, made misleading statements that he regrets and has owned up to. The misstatements were wrong and unlawful. But, as set forth

below, when the Court analyzes the nature and circumstances of his offenses under § 3553, it is clear that Celsius was not a sham and Alex's misstatements were not part of a massive, years-long, overarching scheme to hurt Celsius's customers.

## ALL RELEVANT FACTORS COUNSEL LENIENCY

The stipulated Guidelines sentence of 30 years, per the plea agreement and the PSR, marks only the "'starting point and initial benchmark at sentencing,'" *Kimbrough v. United States*, 552 U.S. 85, 108-9 (2007), citing *Gall v. United States*, 552 U.S. 38, 39 (2007). Ultimately, sentencing is governed by 18 U.S.C. § 3553(a), which provides, in pertinent part: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2), discussed below.

Accordingly, after the Court considers the advisory Guidelines calculation, the Court must proceed to an individualized assessment of the case-specific factors, set forth in section 3553(a), to determine whether, "in [this] particular case, a within-Guidelines sentence is 'greater than necessary' to accomplish the goals of sentencing." *Kimbrough*, 552 U.S. at 91, quoting 18 U.S.C. § 3553(a). In making this determination, the Court may consider the applicable Sentencing Guidelines range but must not presume that the sentencing range is reasonable or proper in every case. The Court must "conduct its own independent review of the [§ 3553(a)] factors, aided by the arguments of the prosecution and defense." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (*en banc*). A sentencing court must, using the factors set forth in § 3553(a), "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 49-50. Furthermore, "the Sentencing Guidelines 'do not require a judge to leave compassion and common sense at the door to the courtroom.'" *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (quoting *United States v. Johnson*, 964 F.2d 124, 125 (2d Cir. 1992)).

### A.    Title 18, Section 3553, Subsection (a)(1)

18 U.S.C. § 3553(a)(1) requires the court to consider "the nature and circumstances of the offense and the history and characteristics of the defendant[.]"  As part of this analysis, a sentencing court must consider any and all information relating to the background, character and conduct of the defendant, in order to "make an individualized assessment based on the facts presented." *Gall*, 552 U.S. at 50 (2007). "Permitting sentencing courts to consider the widest possible breadth of information about a defendant 'ensures that the punishment will suit not merely the offense but the individual defendant.'" *Pepper v. United States*, 562 U.S. 476, 488 (2011) (quoting *Wasman v. United States*, 468 U.S. 559, 564 (1984)).

In attempting to ensure that the punishment fits the individual defendant, "a court's duty is always to sentence the defendant as he stands before the court on the day of sentencing." *United States v. Bryson*, 229 F.3d 425, 426 (2d Cir. 2000). Thus, the defendant's "history and characteristics," the "likelihood that he will engage in future criminal conduct," "his present purposes and tendencies," and "the period of restraint and the kind of discipline that ought to be imposed upon him" are relevant. *Pepper*, 562 U.S. at 492–93 (citations omitted).

#### 1.    Nature And Circumstances Of The Offense

##### a.    The Celsius Network Community

Alex's conduct occurred in the context of Celsius Network, the company he started with co-founder Daniel Leon, who he worked with at GroundLink.  Alex and Leon founded Celsius in 2017 with the vision of building a cryptocurrency lending platform that could deliver lasting financial freedom to everyday people—as opposed to strictly the wealthy and well-to-do.

Any discussion of Celsius can only start in one place—with its customers, who were known as the company's "community."  Celsius's goal was to empower everyday people—the

"little guy"—to achieve real and lasting financial freedom.  *See* Celsius Network, *Your Home*

*For Crypto – Celsius Network*, YouTube, Feb. 10, 2022, https://www.youtube.com/watch?v

=9xWDLyyNDeE (last visited Apr. 17, 2025).  The "little guy" is someone who has lived

paycheck to paycheck with no end in sight; who has managed to save responsibly but never seen

meaningful growth on savings; who despite those savings is one medical diagnosis or corporate

downsizing away from financial ruin; and who has been victimized by predatory lenders, high-

interest credit cards, and whatever other scheme the financial system could cook up to crush him

or her.  For many of the "little guys" out there, the financial system has been broken for years.

Alex was once one of those "little guys" and he saw such a fundamental, deeply-entrenched,

systemic problem not as an inevitable fact of life, but an opportunity for a ground-breaking

solution.  It required vision, energy, courage and a commitment to service that many claim, but

few actually possess.  Alex has all of that in spades and poured it all into Celsius.

Alex looked at a financial system in which banks held customer deposits for near-zero

interest rates as fundamentally broken, if not morally corrupt.  According to a recent bank

survey, the average interest rate for savings accounts in the United States is currently 0.59%

annual percentage yield ("APY").[2]  Alex designed Celsius as the solution to that problem.

Celsius pursued its mission through industry-leading products and services, most

prominently its "Earn" program and its "Borrow" program.  Through Earn, Celsius accepted

cryptocurrency deposits from customers and invested them in various investment

strategies.  Alex explained each of the company's strategies to customers and Celsius provided

robust risk disclosures through its Terms of Use.  ECF No. 98 at 10-11 (quoting risk disclosures

---

[2] Matthew Goldberg, *What is the average interest rate for savings accounts?*, Bankrate, Apr. 10, 2025, https://www.bankrate.com/banking/savings/average-savings-interest-rates/ (last visited April 17, 2025).

in Celsius Terms of Use).  Alex discussed the risks of investing in Celsius on his weekly Ask

Mashinsky Anything ("AMA") videos, (*see e.g.*, Exh. B-47 from 35:46 to 37:05; Exh. B-48 from

45:48 to 49:35), and he cautioned customers that they should balance their investments and only

invest what they were willing to lose.  *See* Exhs. A-3 and A-22.  Celsius used the revenue earned

by its investment of customers' crypto deposits to pay out weekly rewards. Those rewards

resembled interest payments and were based on rewards rates posted to Celsius's website every

week.  Customers holding Celsius's proprietary CEL token could earn higher rewards rates on

their Earn deposits.  At its peak, Celsius held approximately $30 billion in assets under

management, and over the course of the company's existence, Celsius paid customers nearly

$1.5 billion in weekly rewards.

    While the PSR opines that Celsius's rewards rates were "unsustainably high," (*see* PSR

¶¶ 46, 129), over the life of the company, Celsius's Earn program paid customers between 4.5-

5% APY.  *In re: Celsius Network LLC*, Case No. 22-10964-mg, ECF No. 23 (Declaration of

Alex Mashinsky) at 16 (Bankr. S.D.N.Y. July 14, 2022).  Approximately eight times the average

interest rate for a bank savings account, but nothing close to a criminally unsustainable fraud

scheme.

    Alex believed that cryptocurrency provided an opportunity for retail users to deposit

crypto assets and earn real, substantial yield in the form of weekly rewards.  In every sense, Alex

and Celsius recruited "little guys" as their customer base—not to victimize them, but to help

them.  If Celsius was able to attract enough customers and deposits, it could pool their crypto and

lend it out to institutional investors looking for loans.  While individual retail users could not

possibly earn yield from large institutional investors on their own, a community of users acting

as one could do exactly that.  That was Celsius's Earn program, and the community was its mission.

Through Celsius's Borrow program, the company offered low-interest loans to retail customers.  Celsius advertised that customers could utilize their CEL tokens to receive even lower interest rates, and they could use the loans to pay off credit card bills and other high-interest debt.  The defense understands that Celsius paid out hundreds of millions of dollars in low-interest loans to its retail customers through the Borrow program.

It's important to recognize that Alex was not just the CEO of Celsius.  He was also a member of the Celsius community.  As he explained to customers so many times, he held his money on the platform just like they did—an alignment of interests that undermines any suggestion that Alex was working to hurt customers for years.  Alex was one of them.  If he hurt Celsius customers, he would be hurting himself.  No doubt Alex was wealthy when he started Celsius, but the fact remains that he held tens of millions of dollars on the platform, and the growth of his holdings was dependent on the same investments, the same revenue, and the same weekly rewards as all other customers.

Alex's customer-centric mission resonated. The Celsius community appreciated that Alex was working and serving them after they had been left for so long to fend for themselves against the bureaucracy of large banks and other financial institutions—a deck stacked against them in every way.  Celsius customer Araceli Sanchez said it best:

> I come from a low-income family that has had to work tirelessly to earn an honest living within a financial system that often feels stacked against us. High taxes, inflation, and the devaluation of our hard-earned money are challenges my family and I have faced for as long as I can remember.  These struggles drove me to seek out alternatives that could offer financial stability and growth . . . By 2020, I was introduced to Alex Mashinsky and his revolutionary vision for Celsius Network. His ideas about creating an alternative path to the monopolistic banking system resonated deeply with me.  For the first time, I saw a pathway toward financial

freedom—an opportunity to avoid predatory loans and high-interest debt that so many of us have been forced to endure . . .Alex Mashinsky's vision was different. He sought to provide access to financial services for people like me—people who just needed a fair chance.  His message gave me hope that we could finally break free from a system that has kept us financially captive.

Alex Mashinsky's heart and soul were dedicated to providing an escape from a financial system that disproportionately benefits the wealthy elite.  He envisioned a world where financial freedom was accessible to all, not just the top 1%.  His passion was palpable, and his commitment was unwavering.

(Exh. A-28).

Celsius's services, investments, revenue, rewards, and loans were all legitimate, and confirmed by the blockchain and audited financials that were publicly available to customers.  Within years, Celsius grew from a tech start-up to one of the industry leaders in the cryptocurrency lending space.

### b.    A Team of Skilled and Dedicated Employees

For the first few years of Celsius's existence, the company was literally a cryptocurrency tech start-up.  It was not a sophisticated financial institution with systems, operations, and policies and procedures in place.  Everything had to be developed.  That gargantuan task was tackled head-on by Celsius's incredible team of employees who were just as dedicated to the company's mission as Alex.  While Alex worked tirelessly to build Celsius from scratch, his employees worked twice as hard as he did.  In its infancy, the vast majority of Celsius employees came from all walks of life, which was the opportunity that cryptocurrency provided.  Even Alex had no background in crypto or finance before Celsius.  But wherever the employees came from in the past, at Celsius they all pulled in the same direction—for the community.

As Celsius expanded, so did its employee base to locations all around the world, including Israel, London, Serbia, and Australia.  But even as Celsius's geographic footprint grew, it remained a start-up for the first few years of its existence, and the company's employees

dedicated themselves to developing the Celsius website, the Celsius app, and various other technologies and systems that allowed the start-up to expand and eventually thrive. For example, much of Celsius's initial investment strategy focused on institutional lending, so the company built an internal database to house the data relating to its institutional loans and borrowers. The database was called "Instilend," and it is one example of the many ways in which Celsius was built from the ground up.

When COVID-19 hit in March 2020, Celsius was just beginning to take off. Like everyone else in the world, this growing start-up still in its infancy was forced to transition to remote work for the next few years, but Celsius's team came through with flying colors. As governments around the world responded to the pandemic with enormous stimulus payments to businesses and individuals alike, the crypto industry was one of the main beneficiaries. *See e.g.*, Billy Bambrough, *Millions Tempted By Stimulus Check Bitcoin Bet After Sudden Price Surge*, Forbes, Mar. 17, 2021, https://www.forbes.com/sites/billybambrough/2021/03/17/millions-tempted-by-stimulus-check-bitcoin-bet/ (last visited Apr. 17, 2025).

Throughout 2021 alone, Celsius grew from approximately $5 billion in assets under management in January to approximately $30 billion by November. Celsius's growth was astronomical, and to help manage the company's operations, Alex assembled an executive team culled from some of the top financial institutions in the world. Celsius's Chief Financial Officer previously served in the same position at Royal Bank of Canada; its Chief Risk Officer joined from Morgan Stanley; Chief Investment Officer from Nuveen/TIAA-CREF; Chief Operating Officer from Citigroup; and Head of Corporate & VIP clients from Bank of America. Celsius was also represented by top global law firms such as Davis Polk & Wardwell, Morrison & Foerster, Latham & Watkins, and Kirkland & Ellis.

### c.     The Pursuit of Transparency

As a company, Celsius was committed to providing transparency to its customers. Obviously, Alex came up short of that goal in two material respects, but the key takeaway is that there was never anything fake about Celsius.  While the crypto industry is notorious for being opaque, Celsius prioritized transparency from day one.  Through the company's "*Rewards Explorer*" app, for example, Celsius showed customers that the weekly rewards they received were real, how those rewards were calculated, and that customers could track the company's weekly rewards' distributions on the blockchain.  *See* Celsius Network, *Introducing the Rewards Explorer,* YouTube, July 5, 2021, https://www.youtube.com/watch?v=8iJ-llh-Gow (last visited Apr. 17, 2025).  Revenue from the company's Earn program was used to pay weekly rewards that were deposited into customer accounts every Monday, without fail, for years.

Through Earn, Alex told customers that he would pool their crypto assets and invest them in a variety of yield-generating strategies, all disclosed on his AMAs.  The PSR does not identify a single instance in which Celsius used customer funds for anything other than investment purposes, or the revenue it earned from those investments for anything other than paying weekly rewards and operating the company's business.  There were no customer funds diverted for fancy homes or expensive cars.  There were no corporate assets wasted on private jets or other extravagance.  Alex and Celsius treated customer funds as the crown jewels of the company, and prioritized transparency.  Celsius's audited financial statements were not hidden away in a safe somewhere; they were filed publicly with the UK Companies House and viewable 24/7 on the Companies House website.  *See Find and update company information – Celsius Network Limited*, Gov.uk, https://find-and-update.company-information.service.gov.uk/company/11198050/filing-history (last visited Apr. 17, 2025).  Alex repeatedly directed his

customers to that website if they were interested in learning more about Celsius's financial condition.  *See, e.g.*, Celsius Network, *Further Volatility and Founder of B21 – Celsius AMA May 21st 2021*, YouTube, May 21, 2021, https://www.youtube.com/watch?v=L-0WjEuJT7w&t=3960s (starting at 1:06:00) (last visited Apr. 17, 2025)..

There is no better way to see the transparency that Celsius offered its customers than Alex's AMAs.  It was not at all normal or industry-standard for a crypto company's CEO to appear on a weekly show in order to provide updates and answer questions in a live Q&A format.  Alex set the industry standard, and many others followed.  The customers who have written letters of support for Alex show that the AMAs were not a vehicle for Alex to sell customers on Celsius or to convince them to buy more CEL tokens.  That was never their purpose.  Instead, AMAs allowed customers to see and hear from Celsius's CEO, educate themselves about the company and crypto investing more broadly, and ask whatever questions they had for Alex and his many AMA guests.  On a weekly basis, Alex's AMAs were attended by Celsius employees or guests from the broader crypto industry.

Several customers have remarked on how Alex's AMAs served to educate them about investing in cryptocurrency.  Felix Zeller observes: "Alexander shaped my understanding through his videos, introducing his company and his team and teaching about the cryptocurrency world."  (Exh. A-39).  Likewise, Jason Amerson explains that *"*[b]y watching several posted videos of informative talks by Alex Mashinsky and his team, I gained a better working knowledge of how to navigate the complex world of crypto finances and how to manage my crypto assets.  I only ever witnessed Alex Mashinsky working diligently and responsibly in sharing his vision with customers . . ."  (Exh. A-1).

Michael Sarkissian commented that other crypto projects paled in comparison to the

transparency provided by Alex's AMAs:

> This level and frequency of communication far exceeded the types of reports and
> or updates from any other organization that I've invested in. It was during these
> Friday Communications, that Alex would share with us the investments into the
> Ethereum protocol, and also into bitcoin mining operation investments. It was also
> during these calls that Alex would advise the community on when he was selling
> his tokens, and encourage the community to also take profits during high price
> seasons. I was fully aware of the CEL tokens he was selling and gifting to his wife,
> as was everyone else who listened to those publicly available YouTube AMA's.

(Exh. A-29).  Mark Vozzo similarly observed that Alex's level of dedication to his customers

was second-to-none:

> Of the dozens of crypto projects that I follow and I'm involved with, I rarely see
> this level of dedication by the CEO and/or co-founder . . . I am of the opinion that
> Alex is an upright and inspirational person who had excellent track record for
> building and growing technology businesses.  He is an excellent communicator and
> I personally felt that with every Live Stream AMA I attended.  Alex really cared
> about the Celsius community and I could tell that he put a lot of time, energy and
> effort into these live streams.

(Exh. A-36).  Other Celsius customers noted how Alex and the company made sure to include

clear risk disclosures on the weekly AMAs.  According to Robert Pistey:

> Mr. Mashinsky was a well-spoken and powerful advocate for his business,
> however, cautionary words of warning to his customers were also frequently there
> for those who listened.  Words like 'only invest money you're willing to lose' . . .
> To this day I've never seen a CEO willing to spend so much of his time directly
> interacting with his customers, answering questions, and explaining his view of
> current events. In my opinion, Mr. Mashinsky is a brilliant and gifted entrepreneur
> . . . If given the opportunity I would invest in his next business venture."

(Exh. A-22).  In the end, perhaps no customer better summed up the incredible value that Alex's

AMAs provided to customers than Santos Caceres:

> I will also tell you that in various occasions, Alex personally told me to sell CEL
> token, to rebalance my portfolio and to not put all my eggs in one basket . . .
> Mashinsky's vision for Celsius Network was to bring power to the people.  I can
> honestly say that I am a more powerful person today than I was before I met Alex.
> Nothing has changed since 2018.  Today, I choose to continue to believe in his
> motto: "do good then do well."

(Exh. A-3).

### d.    Regulatory Compliance in the Face of Uncertainty

The crypto industry was founded on libertarian and anti-regulation principles.  *See*

Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (Oct. 31, 2008),

https://bitcoin.org/bitcoin.pdf.  By its very nature, crypto was created to exist outside the

regulated world of banks and traditional finance.  But that is not at all the space in which Celsius

operated.  From day one, Alex set a tone that Celsius was different, that it embraced regulation

and compliance and that it would seek cooperative relationships with the company's regulators

around the world.  Alex's early AMAs in 2019 reflect that commitment.  Exh. I, from 22:13 to

23:45.

Even though Alex has pled guilty to serious misconduct, these were not just empty

words.  Celsius's Head of Compliance, Oren Blonstein, echoed years later in January 2022:

> Everybody knows, you know, Alex and the team has said this over and over again,
> we put being in compliance as a top priority.  There's really, you know, that's the
> other thing from my experience in crypto is there's no point in doing it otherwise,
> right, you're just gonna trip over yourself if you don't do things the right way.

*See* Celsius Network, *Celsius AMA 21st January 2022*, YouTube, Jan. 21, 2022,

https://www.youtube.com/watch?v=fKq5J6DqsOw (from 12:38-12:53) (last visited Apr. 17,

2025).  And here is how the government's cooperating witness, Roni Cohen-Pavon, described his

first conversations with Alex about Celsius and the company's approach regulatory compliance:

Celsius Network, *Celsius Network AMA with Alex Mashinsky and HFN's Roni Cohen Pavon*,

YouTube, July 24, 2020, https://www.youtube.com/live/kC-89USzxaM (from 19:08 to 25:40)

(last visited Apr. 17, 2025).

Celsius operated in a legal and regulatory landscape that the government has recently described as "regulation by prosecution."[3]  It was unclear throughout Celsius's existence whether the company needed to comply with securities laws and SEC regulations, commodities laws and CFTC regulations, or money transmission laws and FinCEN regulations.  So Alex and his company took the most conservative approach and aimed to comply with all of them.  Out of an abundance of caution, it treated CEL token as a security and complied with Reg D's accreditation requirements.  ECF No. 69-1 Exh. 1 at 2[4] ("Celsius had to treat the CEL token like a security per its rule 144 filing with the SEC.")  Celsius also treated CEL and other crypto tokens as money, registered as a money services business, and complied with the Bank Secrecy Act and FinCEN's anti-money laundering requirements.  Exh. J.

Whenever Celsius received legal advice that it could not operate in a particular jurisdiction, the company's response was always the same—it complied.  For example, Celsius banned all customers from Israel without exception.  And as crypto regulations in the United States began to evolve, Celsius always chose to comply.  In March 2022, the company believed it was on the verge of a settlement with the SEC that would allow it continue offering its Earn product to both accredited and unaccredited customers.  Exh. B-67 at slide 11.  Yet by April 2022, the company announced that it needed to transfer Earn deposits for unaccredited customers to its Custody program on a go-forward basis in order to comply with SEC regulations.  Exhs. B-68 and B-69; *Custody FAQ,* Celsius Network (June 10, 2022, 10:56 AM)*,*

---

[3]  *See* United States Department of Justice, Deputy Attorney General Memorandum For All Department Employees re: Ending Regulation by Prosecution (April 7, 2025), *available at* https://www.justice.gov/dag/media/1395781/dl?inline.

[4] All exhibits at ECF No. 69-1 were previously filed under seal pursuant to the Court's signed Protective Order (ECF No. 22).

https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ (last visited Apr. 17, 2025).

The point is that Alex did not openly flout regulations.  He took the same approach inside Celsius.  When Alex received feedback about comments in an upcoming magazine interview relating to loan collateralization, that feedback was accepted.  ECF No. 69-1, Exhs. 46 and 16. After six months of AMA talking points stating that Celsius had not experienced an institutional default, when Alex received contrary feedback from his legal team, the talking point was removed.  ECF No. 69-1, Exhs. 47-49, 52, and 53.  When Celsius's legal team asked Alex to read a scripted AMA announcement about Celsius's weekly burn of CEL tokens, Alex did just that.  *See* Celsius Network, *Celsius AMA October 1st 2021*, YouTube, Oct. 1, 2021, https://www.youtube.com/live/mUokZbnfFyE?si=bE5dipiOzWi1vG9v (from 7:55 to 10:30) (last visited Apr. 17, 2025).

Letters from Celsius employees who worked closely with Alex confirm his responsiveness.  Josh Tolin recalled:

> My weekly duties included assisting Alex in preparing for the shows in his NY home by gathering updates from various teams, structuring the flow of content, coordinating guest appearances, and ensuring all video and audio equipment functioned properly. Before each show, Alex would consult privately with his legal counsel, where he received guidance on how to conduct himself during the broadcasts . . . Throughout this time, I never witnessed any incriminating or questionable materials, actions, or behaviors from Alex.

(Exh. A-35).  Alex's AMA co-host, Zach Wildes, had this to say:

> Of the 95 episodes that I co-hosted I never saw, felt, or suspected Alex of trying to deceive anyone . . . The legal and compliance teams were integral participants of the AMA prep hour . . . [and] would join to instruct Alex and I on what we could and could not say during the live show. Alex and I were instructed on topics to avoid, what language to use and not use, including things we said last show that we should not repeat going forward. I went through this process on almost every show with Alex and every time he would work with the legal and risk teams to conduct the show in an appropriate manner. I was on each and every AMA prep call since

the inception of the practice. I never witnessed Alex defying the advice legal and compliance give us.

(Exh. A-37).

### e.    Investment in Risk Management

Celsius prioritized risk management in the same way it prioritized regulatory compliance—it did everything it could to protect customers and their deposits.  The company's risk management team was made up of dedicated and highly credentialed staff who worked together to build Celsius's due diligence and credit risk review process.  That process started with the collection of financial statements and other corporate documentation from prospective institutional borrowers who sought loans from Celsius.  Celsius would then engage in a thorough diligence process, interview the borrowers' management teams to understand their investment strategies, and eventually devise a credit risk assessment.  The credit risk assessment included limits on the total amount of loans Celsius was willing to extend to a particular borrower, collateral requirements, and other pertinent information about the borrower.  Exh. L.

Celsius's Chief Risk Officer joined the company from Morgan Stanley, and led a team of approximately 20 risk management personnel, which Alex understood to be large compared to Celsius's competitors.  One of Celsius's senior credit risk managers is currently the senior credit officer and head of counterparty credit for Fannie Mae.  The point is that the government should not seriously question the credentials of Celsius's risk management team or the resources that Alex invested in that critical function.  Perhaps the best way for the Court to understand how much Celsius prioritized risk management is to hear from the company's employees themselves. In October 2021, Antony Lingard, Celsius's Head of Corporate & VIP clients who joined Celsius from Bank of America, Frank van Etten, Chief Investment Officer who joined from Nuveen/TIAA-CREF, and Chad Walls, Business Development Director who joined from Credit

Agricole, were guests on Alex's AMA.  The three senior employees described Celsius's

approach to credit risk, due diligence and the steps that Celsius took to protect customer funds.

*See* Celsius Network, *Celsius AMA October 8th 2021*, YouTube, Oct. 8, 2021,

https://www.youtube.com/watch?v=UPOEPVJdcFk (from 54:20 to 1:01:10) (last visited Apr.

17, 2025).  Lingard commented that he did not see a difference between Celsius's approach to

risk management as compared to traditional banking.  Celsius's Head of Institutional Lending,

Connor Nolan, also explained on an AMA how Celsius used collateral requirements to protect

customers, Celsius Network, *Celsius AMA October 1st 2021,* YouTube, Oct. 1, 2021,

https://www.youtube.com/live/mUokZbnfFyE (from 55:05 to 57:35) (last visited Apr. 17, 2025),

a point echoed by Institutional Business Development Officer Christina Sciotto just a few weeks

later.  Exh. B-49 from 39:00 to 39:54.  Celsius's commitment to risk management was very real.

### f.    Sudden and Rapid Expansion in 2021

As the calendar turned to 2021, it is not an understatement to say that the company

exploded.  With this rapid expansion in 2021 came many challenges managing the company's

growth and ensuring that Celsius continued to comply with legal and regulatory requirements in

the crypto industry that were constantly shifting.  Celsius also worked to improve its risk

management processes, especially around credit risk and institutional due diligence to ensure that

the lending of customer funds was done in a safe and conservative manner, which it was. As

noted, Celsius grew from approximately $5 billion in assets under management in January 2021

to approximately $30 billion by November 2021.  Exh. M at slide 22.  Alex brought in

executives from the traditional finance world to help manage the suddenly massive company.

Celsius ended the year with a team of approximately 650 full-time employees, which represented

an increase of 623% over the course of the year.  Exh. N at slide 34.  In some respects, when

Celsius exploded in 2021, the company may have become too big to manage, but that was certainly not by design. The expansion was sudden and rapid, and Alex and his executive team did their level-best to manage it. Alex knows that he could have done better, but never aimed to intentionally undermine Celsius, its employees, or its customers. Alex may not have been perfect, but he gave Celsius every ounce of his passion and energy even as the pressure mounted in the second half of 2021 and into the first half of 2022.

### g.    The Crypto Winter(s)

Then came what has been coined the "crypto winter" of 2022. To be clear, this was not the first prolonged period of decline in the crypto market that Celsius had been forced to endure. The company dealt with crashes in the crypto markets several times before and "weathered" them without any significant losses. Ultimately, however, the "crypto winter" that followed the Terra Luna collapse in May 2022 was more severe than anything Alex and Celsius had ever experienced. After the catastrophic collapse of Terra Luna in early May 2022, Alex and his team understood that the company was facing a storm in the crypto markets that continued into mid-June 2022.

Celsius's past experiences gave Alex confidence that the company could weather this storm, and Celsius did everything it could to try to ease customer concerns in the days and weeks that followed the Terra Luna collapse. As always, Celsius remained true to its principles and provided the community with the same level of transparency they had come to expect. Cohen-Pavon confirmed in his interviews that Celsius prioritized transparency to customers regarding the company's liquidity throughout the months of May and June 2022. ECF No. 69-1, Exh. 1 at 9. And Alex's AMAs confirm that he never tried to hide the wave of withdrawals that Celsius was experiencing during those months. He and his team announced them with clarity and

transparency.  *See* Celsius Network, *Celsius AMA May 13 2022*, YouTube, May 13, 2022,

https://www.youtube.com/watch?v=p1ddcMgZXEY (from 42:00 to 44:00) (last visited Apr. 17,

2025).  It was a perfect storm—not massive widespread fraud or market manipulation—that

caused Celsius to pause and file for bankruptcy, decisions that were made with *unanimous board*

*approval* and in the best interests of customers.

Celsius also had to deal with vicious and false rumors in the weeks that followed the

Terra Luna collapse.  *See e.g.,* Turner Wright, *Celsius Network execs deny rumors of significant*

*losses amid market volatility,* Cointelegraph, May 11, 2022*,*

https://cointelegraph.com/news/celsius-network-execs-deny-rumors-of-significant-losses-amid-

market-volatility (last visited Apr. 17, 2025).  The rumors eroded customer trust in the company

and only accelerated the drop in the price of CEL and the wave of customer withdrawals, which

Celsius processed for nearly a month-and-a-half without issue.  Ultimately, the perfect storm that

followed Terra Luna forced the company to pause customer withdrawals on June 12, 2022.  This

brought Celsius's greatest challenge to date, and in the words of the company's independent

director David Barse, it brought out the best in Alex:

> I was appointed to the Celsius Board in June 2022, shortly before Celsius filed for
> bankruptcy. From the time of my appointment, while Celsius was in severe
> financial distress, until Alex resigned from the Company, it was clear to me that
> Alex was focused entirely on preserving value for Celsius' customers. Said
> customers, who ultimately became the primary, if not exclusive, claimants of
> Celsius in the bankruptcy proceedings were his singular interest; not himself . . .
>
> Throughout the post-bankruptcy time frame, my observations and experience were
> that Alex operated with the highest moral character in attempting to right the
> wrongs of which he is accused. As soon as the market deteriorated and impacted
> Celsius, he also dedicated himself to engage his employees and senior management
> team to work together to achieve this goal. Lastly, he sought to motivate the
> Unsecured Creditors Committee to work together to achieve this goal and
> incorporated them into the restructuring planning process. This is atypical, because
> normally the Company, or debtor, has exclusive control over a company's

reorganization. However, it was a good example of Alex's contrition and desire to
help rectify the situation for his customers.

(Exh. A-2).

Alex did everything he could in those stressful weeks and months to preserve Celsius
assets, to minimize losses, and ultimately, to maximize customer recovery. To serve the
community. It doesn't matter if Alex's effort is ultimately viewed as a success or a failure, but it
is important that the Court knows of the effort. Celsius was Alex's heart and soul, and while
June 2022 was unlike anything he had ever seen, in the end, the defense submits that it was one
of his finest moments, despite all of the pain that followed.

If the Court continues to look for a window into Alex's state of mind and intent during
those stressful times, the clearest window may be the following: on May 25, 2022, in the middle
of the post-Terra Luna turbulence, Alex received a WhatsApp message from a Celsius employee.
The employee forwarded a message from a customer struggling with loan liquidations amidst
crashing crypto prices. Alex's response says it all: "Sen[d] all these cases to Tal [Celsius's Head
of Retail Lending] we will try to help as many as we can." Exh. B-79 at 15.

The employee who forwarded the message to Alex had this to say in his letter to the
Court:

> I had the privilege to work side by side with Alex on nearly 100 AMA episodes,
> numerous conferences, and various internal meetings and projects. Not one time
> did I ever observe him act in bad faith. He worked unimaginably hard to bring value
> to his users and always acted in their best interest. He was an incredible leader and
> everyone knew his heart was in the right place.

(Exh. A-37).

That is Alex Mashinsky, and that was Celsius.

### 2.    The Broader Context Of Alex's Two Misstatements Mitigates The Seriousness Of His Offenses

Alex's two misstatements were not part of a broad, multi-year scheme to defraud Celsius's customers, and certainly not a scheme that was designed to hurt them.  The misstatements were discrete lapses in judgment and singular occurrences of unlawful conduct.  Both misstatements were rooted in Alex's deep-seated and genuine belief in Celsius, not in malice or as part of a cover-up.

With respect to his December 2021 interview statement about Celsius receiving regulatory approval, Alex's misstatement reflected an over-eagerness to champion his company and avoid any doubts about its regulatory status in the minds of customers.  Of course, Alex admits that regulators had not yet provided approval when he made that statement in December 2021, and he knew his statement would provide false comfort to customers.  He simply got too far "over his skis," and misrepresented the status of Celsius's regulatory approval.  He believed it would come, but he knew it had not.  He did not make the statement to try to hurt his customers.

The misstatement was not part of some larger plot to keep customers in the dark about Celsius's regulatory status.  In January 2022, just a few weeks *after* Alex's magazine interview, Celsius's Head of Compliance, Oren Blonstein, appeared on an AMA and openly discussed how Celsius and the broader crypto community did not yet have regulatory clarity.  Alex agreed with him.  *See* Celsius Network, *Celsius AMA 21st January 2022*, YouTube, Jan. 21, 2022, https://www.youtube.com/watch?v=fKq5J6DqsOw (from 26:40 to 30:40) (last visited Apr. 17, 2025).  In April 2022, the company provided updates to customers across multiple platforms, including Alex's AMA, which made clear that it had to make changes to its services to conform to SEC regulations.  *See* Celsius Network, *Celsius AMA April 15 2022*, YouTube, Apr. 15, 2022, https://www.youtube.com/watch?v=Yciv1MpxhEA (starting at 3:00) (last visited Apr. 17, 2025);

Exhs. B-68 and 69; *Custody FAQ,* Celsius Network (June 10, 2022, 10:56 AM)

https://support.celsius.network/hc/en-us/articles/4838161060381-Custody-FAQ (last visited Apr.

17, 2025).

      With respect to Alex's September 2019 Twitter post, he wrongly told the public that he

was not selling his CEL tokens at a time when he was.  The post was false, but it was not

designed to cover up a larger scheme or hide a failing company.  Rather, in an era of social

media feeding frenzies (*e.g.*, GameStop), Alex thought his own sales of CEL would be

misinterpreted as a vote of no-confidence in his own company.  But nothing could have been

further from the truth—Alex always believed in Celsius.

      Alex lied in the Twitter post, but he did not do so as part of a years-long scheme.  Alex

often disclosed to customers on AMAs that he was selling his CEL tokens—he didn't hide his

sales.  *See, e.g.,* Celsius Network, *A Record breaking week for Celsius! – Celsius AMA (January

1st, 2021)*, YouTube, Jan. 1, 2021, https://www.youtube.com/watch?v=h1molt_4mCE (from

1:33:08 to 1:34:30) (last visited Apr. 17, 2025); Exh. B-47 from 48:50 to 49:40.  He also

regularly showed customers the Celsius website that tracked his personal wallets and displayed

that his CEL holdings were steadily decreasing over time.  Exh. O; *Top 500 HODLers*,

Celsius.Network, https://celsius.network/top500 (last visited Apr. 17, 2025). The public was not

only aware of Alex's crypto wallets and CEL token sales, but that they were able to track them in

real-time.  In the words of Johannes Treutler and Roni Cohen-Pavon, *"everybody knows his

Uniswap wallet*[.]"  Exh. P.  There were literally social media discussions with hundreds of

Celsius users discussing Alex's CEL sales as they happened Exh. Q.  And to be clear: Alex did

not sell the vast majority of his CEL token holdings.  Over four years, he sold approximately

one-quarter of his CEL token holdings, along with the rewards that he received from the Earn program.

### 3. A Bankruptcy Filing By A Crypto Start-Up Is Not Proof Of Rampant Fraud And Criminality

Celsius's bankruptcy has distorted the government's view of Alex's conduct and cast a retrospective pall over how everyone views the company.  To be sure, Alex understands the harm that the bankruptcy has caused and he takes responsibility for it.  But a routine corporate bankruptcy filing is not evidence that large-scale fraud precipitated it; fraud-by-hindsight is no fraud at all.  The Celsius board of directors made a unanimous decision to file bankruptcy in response to a market collapse the likes of which the crypto industry had never seen.  The true story of the bankruptcy dispels the tabloid notion that the company was a Ponzi scheme, a sham, or, in the words of the former U.S. Attorney, "one of the biggest frauds in the crypto industry."

No one at Celsius knew the company would have to file bankruptcy in the weeks and months leading up to the June 12, 2022 pause.  In the words of two individuals most familiar with Celsius's financial condition reported during witness interviews:

- Chief Financial Officer Rod Bolger: "Because the model still showed that Celsius had enough runway for BTC and ETH, as of June 9 there was not discussion of pausing withdrawals, swaps, or transfers."  ECF No. 69-1, Exh. 1 at 5.  That was three days before the June 12 pause.

- In May 2022, Bolger told customers that Celsius was going to be around for the next 150 years.  Exh. B-81.  And in a June 2022 interview posted to the Celsius website, he said that the company's "strong liquidity framework, established practices around liquidity data, and modeling were elements that I was happy to find similar to other large financial institutions . . . [and] *put us in a strong position to weather the recent market turbulence and ensure that clients who needed to access their digital assets could get them free and clear*."  Exh. B-82 (emphasis added).

- Roni Cohen-Pavon said that he "*was unaware of internal concerns about Celsius's inability to meet its liabilities*" and that "Celsius had discussions about lowering reward rates, but *the consensus was* that because it had so much undeployed Bitcoin, a run on the bank would be fine—Celsius did not have a

lot deployed, so it could be used for liquidity."  ECF No. 69-1, Exh. 1 at 9 (emphases added).

Alex's message to one of his employees the day before the pause shows that he shared the "consensus" view: "As long as people can withdraw they will not listen to him [a social media commentator]. They will come back when the storm is over and so will CEL."  Exh. B-79 at 96-97.

The evidence also shows that Alex was focused on *reducing* risk in Celsius's investment portfolio—"de-risking"—in the months leading up to the pause.  *See* Exhs. B-41, B-42, B-43, and B-44.  Ultimately, Celsius was forced to file for bankruptcy not because it wasn't "safe" or because of "risky" investments, but because the collapse of Terra Luna triggered a perfect storm for the entire crypto industry.  That collapse:

- caused the crypto industry to lose nearly $60 billion in value overnight, *see What Really Happened to LUNA Crypto*, Forbes, Sept. 21, 2022, https://www.forbes.com/sites/qai/2022/09/20/what-really-happened-to-luna-crypto/ ("When the Luna crypto network collapsed, it's estimated that $60 billion got wiped out of the digital currency space.") (last visited Apr. 17, 2025);

- caused cryptocurrency prices to crater across the entire industry, *see id.* ("It's estimated that the Luna crash ended up tanking the price of bitcoin and causing an estimated loss of $300 billion in value across the entire cryptocurrency space."); and

- forced several of Celsius's institutional customers and competitors to file for bankruptcy.  *See, e.g.*, MacKenzie Sigalos, *From $10 Billion to zero: How a crypto hedge fund collapsed and dragged many investors down with it*, CNBC, July 11, 2022, https://www.cnbc.com/2022/07/11/how-the-fall-of-three-arrows-or-3ac-dragged-down-crypto-investors.html ("The fall of Three Arrows Capital can be traced to the collapse in May of terraUSD (UST), which had been one of the most popular U.S. dollar-pegged stablecoin projects.") (last visited Apr. 17, 2025); *In re Voyager Digital Holdings, Inc.*, Case No. 22-10943, ECF No. 1 (Voluntary Petition for Non-Individuals Filing for Bankruptcy) (Bankr. S.D.N.Y. July 5, 2022).

After a unanimous vote by the company's board of directors, Celsius paused withdrawals as a prophylactic measure to protect its customers—exactly what any responsible corporate actor

would have done.  *In re: Celsius Network LLC*, Case No. 22-10964-mg, ECF No. 3332 (Revised

Chapter 11 Disclosure Statement) at 158 (Bankr. S.D.N.Y. Aug. 17, 2023) ("[T]he CNL Board

unanimously determined that the best way to protect all users would be to pause withdrawals.").

Much of what befell Celsius had to do with market conditions and the simple truth that

most start-up companies fail for reasons having nothing to do with rampant, systemic fraud.

Financial downturns, booms and busts and crises are natural occurrences.  *Ex post facto*

explanations about arrogance, greed, and fraud are in many cases wrong, as they are here.  The

same idea that was expressed about the savings and loan crisis in the 1980s holds true for Celsius

and the crypto market: "the unintended folly of the reasonably decent was far more costly than

the contrived villany of the corrupted few."  Put another way, "the losses to which an

adventurous and plausible manager, in complete good faith, will readily commit a bank, are

beyond comparison greater than any which a fraudulent manager would be able to conceal."[5]

### 4.    Celsius's Bankruptcy Has Shown That It Was A Real Company Helping Real People

Alex never intended to harm his customers and the bankruptcy does not show otherwise.

That may be the most important part of this entire case, and it shows the Guidelines' complete

disconnection from reality.

The PSR states that Alex is not entitled to any credit against loss for the $4.7 billion that

customers have received through distributions in the bankruptcy.  *See* PSR at 80-81.  Even if that

is correct as a matter of Guidelines interpretation, any loss associated with the bankruptcy does

not fairly or accurately reflect the nature and seriousness of Alex's crimes or moral culpability.

*See United States v. Milton*, Case No. 21 Cr. 478 (ER), Sentencing Tr. 90:24-91:4 (S.D.N.Y.

---

[5]  Pollock, Alex J., American Enterprise Institute, *Error vs. Fraud* (Jan 4, 2010):
https://www.aei.org/articles/error-vs-fraud-2/

Dec. 18, 2023), ECF No. 322 (THE COURT: "With respect to moral culpability, the amount of the fraud . . . frequently doesn't get at what is important for people like myself to consider in imposing sentence.").  While this Court may choose not to recognize subsequent bankruptcy distributions under a Guidelines' loss calculation, it can take account of them under § 3553(a).  *Pepper*, 562 U.S. at 488 (citing *Wasman*, 468 U.S. at 564) ("Permitting sentencing courts to consider the widest possible breadth of information about a defendant[.]").

    The defense submits that such an approach is appropriate here.  Alex used his own money to replace Celsius's prior legal counsel with Kirkland & Ellis, the firm that has successfully shepherded the company through bankruptcy.  Celsius's independent director, David Barse, who has worked with Kirkland & Ellis over the past 33 months, confirms that after the pause, Alex was single-mindedly focused on maximizing customer recovery and that it was Alex's ideas that were incorporated into Celsius's plan for customer distributions.  (Exh. A-2) ("The ultimate plan structured heavily relied on the ideas developed by Alex.").

    Those distributions are the embodiment of Alex's customer-focused intent, and his desire and motivation throughout his time as Celsius's CEO.  The Court would be more than justified in crediting Alex for those distributions under § 3553(a).  The distributions also make clear that the Court should not associate Celsius's bankruptcy with permanent customer loss.  At the time of the bankruptcy filing in July 2022, Celsius had approximately $4.13 billion in available assets that could have satisfied the vast majority of the company's approximately $4.72 billion in customer liabilities on that day.  *In re: Celsius Network LLC*, Case No. 22-10964-mg, ECF No. 23 (Declaration of Alex Mashinsky) at 7 (Bankr. S.D.N.Y. July 14, 2022) ($4.13 billion assets remaining after applying $180 million in Custody assets to Custody liabilities of the same amount).  The company apparently decided that an orderly distribution of assets was more

advantageous to customers than a fire-sale liquidation at rock-bottom prices. An orderly

distribution, however, takes time, leaving customers temporarily separated from their funds for

what has likely felt like a lifetime for many.

      Based on the company's latest updates to the bankruptcy court, Celsius has either

distributed or announced the distribution of approximately $4.713 billion in value, against

approximately $4.7 billion of customer deposits at the time of the bankruptcy filing. ECF No. 1

¶ 9. The distributions include:

- As of March 21, 2025, Celsius had successfully distributed approximately $2.83 billion in crypto and fiat currency to customers. *In re: Celsius Network LLC,* Case No. 22-10964-mg, ECF No. 8068 at 1 (Bankr. S.D.N.Y. March 31, 2025). As of that date, Celsius had also held back approximately $348 million in disputed and unliquidated claims that will eventually be distributed to customers. *Id.* at 3.

- As of March 3, 2025, Celsius announced that Ionic Digital's stock transfer agent had distributed approximately 32.65 million shares to Celsius customers. Valued at $20 per share, the total distribution comes to $653 million. *Id.*, ECF No. 8005 at 25-26; *see* Odyssey Transfer and Trust Company, *IONIC DIGITAL INC. MINING CO COMMON STOCK FAQS AS OF OCTOBER 8, 2024,* https://odysseytrust.com/wp-content/uploads/2024/10/Ionic_Digital_FAQs-1.pdf (last visited Apr. 17, 2025).

- As of March 3, 2025, Celsius has announced a total of $1.23 billion in outstanding assets to be distributed to customers. *Id.* at 41.

This calculation assumes that the $348 million held back by Celsius as of March 21, 2025, is

included in the $1.23 billion left to be distributed as of March 3, 2025. If it is in addition to it,

then Celsius has distributed or announced the distribution of more than $5 billion to date.

Celsius was able to do that despite burning (*i.e.*, destroying) every one of its CEL tokens, which

were worth billions of dollars in value at their peak and approximately $600 million when

Celsius filed for bankruptcy.[6]  Celsius was also able to do that despite paying more than $200 million in professional fees during the bankruptcy.[7]

    All of these objective signs are proof positive that Celsius was not a Ponzi scheme or a sham, and that customer funds were not stolen or used without authorization.  Celsius could not have distributed nearly 100% of customers' claim value, while holding back more than $800 million in assets, if that were the case.  Celsius's bankruptcy indicates Alex and the company's commitment to its customers, not criminality.  In addition, because the asset-recovery process remains ongoing, Celsius's distributions are not yet complete.  As of the date of this submission, Celsius is still seeking more than $5 billion in crypto collateral that was wrongfully retained by two of its lenders, Tether and EFH.  *Celsius Network Limited v. Tether Limited*, Case No. 24-04018 (MG), Dkt. No. 25 (Amended Complaint) (Bankr. S.D.N.Y. Dec. 5, 2024) (seeking return of $4.8 billion worth of Bitcoin collateral and $100 million in damages);  *Celsius Network Limited v. Equities First Holdings, LLC*, Case No. 23-01167 (MG), Dkt. No. 57 (Amended Complaint) (Bankr. S.D.N.Y. Dec. 22, 2023) (claim amount redacted).  That crypto was not fraudulently diverted or stolen by Alex—nor was any—and if collected would nearly double customer recovery to something approaching 200%.  If the Court is looking for answers as to why Celsius filed for bankruptcy, it need look no further than Tether and EFH.  The more than

---

[6]  On April 30, 2024, Celsius burned a total of 650 million CEL tokens.  That burn is viewable on the public blockchain.  Etherscan, *Transaction Details,* https://etherscan.io/tx/0xe4bdc09a717dbb9c97f7f1288b37e63c1e61a724aab5b4196db613910ead067e (last visited Apr. 17, 2025).  At CEL token's peak value of approximately $8 per token, the tokens burned by Celsius were worth more than $5 billion in value.  As of July 13, 2022, the company valued their CEL token holdings at approximately $600 million.  *In re: Celsius Network LLC*, Case No. 22-10964-mg, ECF No. 23 (Declaration of Alex Mashinsky) at 7 (Bankr. S.D.N.Y. July 14, 2022).

[7]  David Yaffe-Bellany and Yiwen Lu, New York Times, Sept. 5, 2023, *A $700 Million Bonanza for the Winners of Crypto's Collapse: Lawyers,* https://www.nytimes.com/2023/09/05/technology/crypto-collapse-lawyers-turnaround-specialists.html (describing $200 million in professional fees paid in Celsius bankruptcy as of September 2023) (last visited April 17, 2025).

$5 billion in crypto is proof that the company's bankruptcy was a collections issue, not a fraud issue.

The defense respectfully submits that the Court may properly consider these facts under § 3553(a), and they counsel strongly that an extended period of incarceration is unnecessary.

### B.    Title 18, Section 3553, Subsection (a)(2)(A)

18 U.S.C. § 3553(a)(2)(A) provides that the Court shall consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."

While the Court is required to consider the Guidelines, they are draconian as to this defendant, and accordingly we respectfully request the Court temper justice with mercy and impose a sentence not greater than necessary. *See Peugh v. United States*, 569 U.S. 530, 536 (2013) ("The district court 'may not presume that the Guidelines range is reasonable,' and it 'may in appropriate cases impose a non-Guidelines sentence based on disagreement with the [Sentencing] Commission's views[.]'") (internal citations omitted).

### 1.    The Loss Is Not The Reality of the Offense

Courts in the Second Circuit continue to recognize that the § 2B1.1 loss table is not a reliable indicator of a defendant's culpability.  Judge Kaplan recently observed in *United States v. Bankman-Fried*:

> The second thing I would say is that the loss table, which is one of the significant driving forces of the guideline computation, that I am obliged by law to do, though it is not binding on me, is a debatable proposition. Any number of my colleagues have criticized it on various grounds. As I understand its genesis, there's really no empirical basis for the brackets assigned or for the assignment of different losses to different brackets. I share many of those criticisms and concerns with my colleagues.  I have never regarded myself, once Booker was decided, as in any way bound by guideline computations that depend on the loss table in 2B1.1.  I do not regard myself as bound by it now.

22 Cr. 673 (LAK), ECF No. 426, Transcript at 6:14-25 (S.D.N.Y. March 28, 2024).  Despite

calculating a Guidelines loss of $11 billion for Bankman-Fried, Judge Kaplan sentenced him to

25 years, which was one-quarter of Probation's recommended sentence of 100 years.  *Id.*, ECF

No. 424 (Judgment).

Judge Kaplan is not alone.  District court criticisms of the crushing effect of the

Guidelines' loss calculation are aplenty.  In *United States v. Johnson*, 16 Cr. 457 (NGG)

(E.D.N.Y.), the former head of HSBC's Global Foreign Exchange cash trading business engaged

in a front-running scheme.[8]  As described by the government, "after using this confidential

information for his own benefit and that of his bank, Johnson and his colleagues offered their

client a series of lies about how they executed the transaction in question. Johnson's crime not

only caused a financial loss to his client, but also caused a disruption in the rate at which the

British Pound traded against the U.S. Dollar, thereby having a financial impact on countless

businesses and consumers and undermining the public's confidence in the integrity of the foreign

exchange [ ] markets." *Johnson*, ECF No. 217 at 3.

Judge Garaufis agreed with the Probation Department that the applicable offense level

was 29, yielding an applicable Guidelines range of 87-108 months' imprisonment.  *United States

v. Johnson*, 16-CR-457-1 (NGG), 2018 WL 1997975, at *4 (E.D.N.Y. Apr. 27, 2018). Yet, the

Court imposed a sentence of 24 months' imprisonment.  *Id.* at *6.  Judge Garaufis observed what

many other courts recognized to be a fundamental flaw in the Guidelines: "[T]he Sentencing

Commission's loss-enhancement numbers do not result from any reasoned determination of how

---

[8] Dep't of Justice, U.S. Atty's Office, E.D.N.Y., Press Release, *Former Head of HSBC's Global Foreign Exchange Cash Trading Sentenced to 24 Months' Imprisonment for Front-Running Scheme* (Apr. 26, 2018), https://www.justice.gov/usao-edny/pr/former-head-hsbc-s-global-foreign-exchange-cash-trading-sentenced-24-months (last visited Apr. 17, 2025).

the punishment can best fit the crime, nor any approximation of the moral seriousness of the crime." *Id.* at *3.  He continued, "[g]iven the feeble underpinnings of the loss enhancement, it is particularly galling that this factor is often more or less <u>solely</u> responsible for a white-collar offender's Guidelines sentence." *Id.*  "Because the defendant's Guidelines sentence of 87-108 months" was "overwhelmingly due to the loss enhancement, and because I would find such a sentence well out of proportion to his appropriate sentence[,]" the Court looked "closely at the § 3553 factors" for guidance as to a reasonable sentence. *Id.* at *4.

The defense respectfully submits that the same approach is warranted here, especially given the absence of any evidence reflecting an intent to harm.  In fraud cases, "the amount of loss . . . [has] become the principal determinant of the adjusted offense level and hence the corresponding sentencing range." *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016). "This approach, unknown to other sentencing systems, was one the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider." *Id.* Scores of district court judges have recognized that the Guidelines go too far in fraud cases: the Guidelines place "inordinate emphasis . . . on the amount of actual or intended financial loss." *United States v. Adelson*, 441 F. Supp. 2d at 509; *id.* at 512 ("the guidelines' fetish with abstract arithmetic" can result in a "travesty of justice" and in "harm . . . visit[ed] on human beings[,] if not cabined by common sense"); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004) (Lynch, J.) ("The Guidelines place undue weight on the amount of loss involved in the fraud."); *United States v. Parris*, 573 F. Supp. 2d 744, 745 (E.D.N.Y. 2008) (describing "another example where the guidelines in a securities-fraud [case] 'have so run amok that they are patently absurd on their face[]'") (cleaned up).

41

The Guidelines do not "explain[] why it is appropriate to accord such huge weight to such factors." *Adelson*, 441 F. Supp. 2d at 509. Rather, "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *see also Johnson*, 2018 WL 1997975, at *4 (describing the loss enhancement as a "grievous wrong" and noting "the rigidity of the loss amount overriding the diverse reality of complex financial crimes [and] the lack of any consideration of danger to society[]").

To further highlight the irrationality of the Guidelines, at a total offense level of 43—of which 30 points is based on loss that has been or will be recovered—the fact that Alex has zero criminal history points, Celsius provided jobs to hundreds of employees and *bona fide* services to hundreds of thousands of customers for years, and paid out $1.5 billion in rewards and hundreds of millions in low-interest loans, is all deemed irrelevant. The Guidelines "advise" that Alex should receive the same life sentence as a career criminal, terrorist, serial killer, or drug kingpin. *See e.g., United States v. Milton*, Case No. 21 Cr. 478 (ER), Sentencing Tr. 90:24-91:4 (S.D.N.Y. Dec. 18, 2023), ECF No. 322 (THE COURT: "With respect to moral culpability, the amount of the fraud . . . frequently doesn't get at what is important for people like myself to consider in imposing sentence.").

For such reasons, one District Judge summarized—accurately, we submit—as follows: "The loss guideline . . . was not developed by the Sentencing Commission using an empirical approach based on data about past sentencing practices." *United States v. Corsey*, 723 F.3d 366, 379 (2d Cir. 2013) (Underhill, J., concurring). This failure to apply an empirical, reasonable approach yields "[t]he widespread perception that the loss guideline is broken[,]" *id*. at 378, and

"fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guideline's advice to sentencing judges." *Id*. at 380. Therefore, "district judges can and should exercise their discretion when deciding whether or not to follow the sentencing advice that guideline provides." *Id*. at 379.

Based on the disproportionately severe and often inhumane sentences that result from the economic loss Guidelines, courts routinely conclude that the Guidelines do not serve as a reliable benchmark for culpability, and issue sentences well below the Guidelines range. *See, e.g.*, *United States v. Milton*, Case No. 21 Cr. 478 (ER), ECF No. 327 (Judgment) (S.D.N.Y. Jan 17, 2024) and Sentencing Tr. at 25:16-26:3 (ECF No. 322) (S.D.N.Y. Dec. 18, 2023) (48-month sentence for defendant with offense level of 41, loss calculation of more than $600 million, and Guidelines range of 324 to 405 months); *Adelson*, 441 F. Supp. 2d at 512 (imposing 42-month sentence for defendant with offense level of 46); *United States v. Musgrave*, 647 F. App'x 529, 530, 538 (6th Cir. 2016) (affirming downward variance for defendant with offense level of 25 and a $1.7 million loss to a sentence of one day of imprisonment, reasoning that "because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *Johnson*, 2018 WL 1997975, at *3-4 (criticizing loss enhancement as a "grievous wrong" and imposing 24-month sentence for defendant with Guidelines range of 87-108 months); *United States v. Scott*, Case No. 17-cr-630-ER, ECF Nos. 607 (Govt. Sentencing Memorandum) and 611 (Judgment) (S.D.N.Y. 2024) (120-month sentence for lawyer who laundered $400 million in fraud proceeds and received $50 million in payments, despite Guidelines range of 600 months).

This Court should evaluate Alex based on his acts, his intent, and his history and character. If it does, the Court will find that loss is an inappropriate measure of his conduct. A

prison sentence based on Section 2B1.1's "abstract number-crunching" would not just maximize the risk of injustice, it would guarantee its result. *Gupta*, 904 F. Supp. 2d at 351.

In assessing the seriousness of this offense and just punishment for Alex, the real-world financial impact of the conduct warrants consideration. *See United States v. Faibish*, No. 12-cr-265 (ENV), 2015 WL 4637013, at *2 (E.D.N.Y. Aug. 3, 2015) (Vitaliano, J.) (refusing to "peg [the defendant's] fate to a guidelines-computed loss amount" where, using "common sense," the court found that "a strict application of the existing guidelines derived from the existing loss table in this case would unfairly balloon [the defendant's] sentencing range beyond any reasonable proportion to his crimes").

### 2.    Alex's Low-Level Of Culpability

The Second Circuit has recognized that there is a wide variety of culpability among defendants convicted of fraud crimes. *See, e.g., United States v. Cavera*, 550 F.3d at 192. Relatedly, former U.S. District Judge John Gleeson said that "fraud cases present a wide spectrum of culpability, and that the careful application of the § 3553(a) factors to fraud defendants may properly result in the imposition of sentences well below the advisory range." *United States v. Ovid*, No. 09-CR-216 (JG), 2010 WL 3940724, at *9 (E.D.N.Y. Oct. 1, 2010).

In a report concerning reform of federal sentencing for economic crimes, the Criminal Justice Section of the American Bar Association proposed assigning a culpability level to an offense.[9] "One factor in the culpability level is the defendant's motive or the nature of the offense."[10] Among the highest level of culpability are "predatory" offenses. These offenses—

---

[9] *See* The A.B.A. Crim. Just. Sect., A Report on Behalf of The American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes, (Sep. 18, 2013), available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Plenary_Session_III_Report.pdf.

[10] *Id.* at 2.

accompanied by no legitimate purpose—are among the most culpable types of offenses

sentenced under this guideline.

Alex was *not* predatory. He did not set out to prey on the elderly, the unsophisticated or

the vulnerable.  He did not poach assets.  Those who know Alex the best are unanimous that he

was never motivated by malice or animus or greed:

> While my father is by no means a perfect man, I can say with complete certainty
> that he would never, ever maliciously seek to harm anyone. That simply is not in
> his nature.
>
> From a young age, my father always emphasized the importance of kindness and
> helping others. He often told me to be a "giver" in this world, not a "taker." I vividly
> recall him explaining that the purpose of life was to leave the earth better than we
> found it—to innovate and find ways to make a positive impact. . .
>
> . . . I genuinely believe that with each company he started, including Celsius, his
> focus was on how to "do good and then do well"—a phrase he often shared with
> me and my siblings. His goal was never to harm or deceive, but to innovate and
> provide value to others. . .
>
> He is not a man driven by greed or malice, and certainly never set out to steal from
> anyone.

(Exh. A-15).

> I also saw firsthand the devastation he felt for everyone affected by Celsius. I know,
> with absolute certainty, that he would never maliciously cause harm.. . .  I can attest
> to this since I have lived under the same roof as him for the last seventeen years.

(Exh. A-18).

> I can honestly say that I don't believe that there is a malicious bone in Alex
> Mashinsky.

(Exh. A-34).

> Every venture my dad has done was about more than creating a profit; it was about
> empowering and connecting others. Solving problems that would benefit society
> and leave the world a better place. This was always the main driver behind his work.

(Exh. A-12).

> For Alex, the financial success he had his entire life was never the goal. He never
> talked about it. It was something that was incidental to the value he wanted to bring
> to the world - freedom of thought and freedom of choice.

(Exh. A-26).

> . . . Mashinsky is also an imperfect human being who has certainly made mistakes
> as well as issuing some inaccurate statements. Assembling and trusting the wrong
> team of executives represented the most detrimental flaw and he should take
> responsibility for those decisions. These bad choices, unfortunately, have led to the
> suffering of many including myself but who hasn't made mistakes when building a
> revolutionary project?  Mashinsky's vision for Celsius Network was to bring power
> to the people. I can honestly say that I am a more powerful person today than I was
> before I met Alex. Nothing has changed since 2018. Today, I choose to continue to
> believe in his motto: "do good then do well."

(Exh. A-3).

> [Alex] has never been motivated by personal enrichment at the expense of others
> but rather by the pursuit of meaningful and transformative enterprises.

(Exh. A-24).

Alex's conduct falls far lower on the culpability scale. "Legitimate *ab initio*" offenses

arise from otherwise legitimate efforts that have crossed over into criminality as a result of

unexpected difficulties.  Even though such offenses may be intended to cause loss for the

purpose of generating personal gain to the defendant or to others involved in the criminal

undertaking, they rank lower on the culpability scale than predatory offenses.  Alex does not fall

within this category either as he never intended to cause loss for the purpose of his own personal

gain.

### 3.    Alex Is Already Being Punished

Alex's punishment will not begin when the Court imposes its sentence. The prosecution

itself has already resulted in crippling hardship for Alex and those he loves.  Alex experienced

the heartbreak of getting arrested at home in front of his young children.  News of his arrest and

conviction spread worldwide. It appeared throughout the mainstream media, including but not

limited to The Associated Press, Reuters, *The Wall Street Journal*, Bloomberg, *The New York

Times* and myriad other news outlets.  Sensationalized YouTube videos – including false reports

that Mashinsky was set to flee the United States with customer money -- fanned the flames of vitriol and hatred. *See e.g.,* Upper Echelon, *The Man Who Destroyed BILLIONS,* YouTube, July 19, 2022, https://www.youtube.com/watch?v=dv6_57Bowhs&ab_channel=UpperEchelon (last visited Apr. 17, 2025); Coffeezilla, *I Caught This Scammer Stealing $10,000,000,* YouTube, Oct. 7, 2022, https://www.youtube.com/watch?v=oaRrRhEcmpo&ab_channel=Coffeezilla (last visited Apr. 17, 2025); Simon Dixon, *Alex Mashinsky Rugged Another $8.8m From Me!*, YouTube, Feb. 28, 2023, https://www.youtube.com/watch?v=gCbTsS3n6Mk (last visited Apr. 17, 2025).

Alex and his family have also been subjected to shocking and unspeakable harassment online. A few examples:

> "I'm going to fuckin murder your children if I can't get my money out of Celsius" @tweetsbybraden

> "If I ever see your kids they are getting murdered, give me my money you scamming dog. I bet they are ashamed of you." @tweetsbybraden

> "See you soon" from "kindolf90"

> "Don't think I'm kidding" from "kindolf90"

These and similar posts will live on the internet and follow Alex forever. Exh. R.

### 4.     Collateral Consequences

Alex has already begun to suffer the everlasting and harsh "collateral consequences" of a felony conviction, under both state and federal law. Such consequences impact the need "to provide just punishment for the offense," as outlined in § 3553(a)(2). *See United States v.*

*Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate

a 'just punishment' if it does not consider the collateral effects of a particular sentence.")[11]

　　　　To begin with, Alex has lost almost everything.  What he hasn't lost yet will be

surrendered and forfeited in connection with his plea agreement.  Even before he loses his

liberty, the conviction itself imposes serious punishment.  His new status of "convicted felon"

delivers a significant blow and inflicts "a stain that you can't wash off."  Steven Slivinksi,

Economist, Center For the Study of Economic Liberty, Arizona State University,

csgjusticecenter.org.  A host of sanctions and disqualifications will accompany Alex for the rest

of his life.

　　　　The Justice Center puts it as follows:

> Collateral consequences remain obscure and are increasingly complex. Because
> collateral consequences are civil in nature—and not part of a person's criminal
> punishment—they are generally imposed without the involvement of sentencing
> courts and are not referenced alongside the state and federal laws that govern
> criminal offenses or procedure. Instead, they are scattered throughout various
> portions of state statutory and regulatory codes, making it difficult for a person to

---

[11] Courts frequently take collateral consequences into account at sentencing. *See, e.g.*, *United States v. Sponaugle*, Crim. No. 19-103-LPS, 2022 WL 4079197, at *6-7 (D. Del. Sept. 6, 2022) (identifying "significant punitive components" of non-custodial sentence, including financial punishment, collateral consequences of "greatly reduced job prospects" and impact on defendant's reputation); *United States v. Anderson*, 533 F.3d 623, 633 (8th Cir. 2008) (upholding below-Guidelines sentence in part because district court found that "defendant had suffered atypical punishment such as the loss of his reputation and his company"); *United States v. Anderson*, 267 F. App'x 847, 850 (11th Cir. 2008) (affirming a below-Guidelines sentence in part because defendant lost his job and income was diminished); *United States v. Malik*, 424 F. App'x 122, 127 (3d Cir. 2011) (affirming a below-Guidelines sentence in part because the defendant "was punished by the reputational harm he suffered as a result of the criminal action"); *United States v. Redemann*, 295 F.Supp.2d 887, 894–97 (E.D. Wis. 2003) (downward departure warranted where defendant suffered serious collateral consequences from conviction); *United States v. Samaras*, 390 F.Supp.2d 805, 809 (E.D. Wis. 2005) (imposing below-Guideline sentence in part because, "as a consequence of his conviction and sentence, defendant lost a good public-sector job, a factor not considered by the Guidelines."); *United States v. Vigil*, 476 F.Supp.2d 1231, 1315 (D.N.M. 2007) (observing that, in considering justness of sentence, "it is important to consider all other forms of punishment [defendant] has already suffered," including loss of job and damage to his personal and professional reputation); *United States v. Olis*, Criminal No. H-03-217-01, 2006 WL 2716048, at *13 (S.D. Tex. Sept. 22, 2006) (finding a substantial variance warranted in part because "the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct").

identify all of the consequences that may stem from a conviction for a particular crime in a particular jurisdiction. In a single state, employment barriers may be embedded in a state's civil service code, trade and occupations code, and any other place that regulates business practices. And because collateral consequences are not criminal, they are generally implemented by state agencies through obscure and often complex administrative policies and internal practices that may drastically alter their operation and impact.

Chidi Umez and Joshua Gaines, CSG Justice Center, *After The Sentence, More Consequences:: A National Report of Barriers to Work*, at 6 (Jan. 2021), https://csgjusticecenter.org/wp-content/uploads/2021/02/collateral-consequences-national-report.pdf (last visited Apr. 17, 2025).

Alex "really cared about the Celsius community" says Celsius customer Mark Vozzo (see Exh. A-36). Now, he has been ousted from the very community he created and served. He has no job, few friends, and little prospect for either. His reputation is in tatters. The result has been depression and stress. He now takes Ambien to sleep and Xanax to help with anxiety. PSR ¶ 186.

A criminal conviction will also likely implicate his ability to obtain employment, bank, borrow, travel, and adopt, among other things. And a plethora of legal proceedings will follow Alex forever. He is a defendant in civil enforcement actions filed by the SEC, CFTC, FTC, and the New York Attorney General's Office, as well as a securities fraud class action lawsuit in the District of New Jersey, and an adversary proceeding filed by the Celsius Litigation Administrator in the United States Bankruptcy Court for the Southern District of New York. *See* PSR ¶ 218. He will never know peace.

Most painful for Alex is that the company he built and loved—and which had so much lawful success and even more potential—is gone. Alex is heartbroken about collateral damage to the Celsius community he so loved. He "lost Celsius, the company that he built, lost all of his shares, he lost all of his invested money, and now faces losing his family and young children." (Exh. A-17).

As a final collateral consequence, Alex is 59 years old and, if incarcerated, will rank among the oldest inmates in federal prison.  *See* Fed. Bur. of Prisons, *Statistics, Inmate Age* (as of Apr. 12, 2025), https://www.bop.gov/about/statistics/statistics_inmate_age.jsp (only six percent of federal prisoners for all offenses are age 61 or older; 80% of the population is age 50 or less) (last visited Apr. 17, 2025).  According to the Prison Policy Initiative, each year in prison takes 2 years off an individual's life expectancy.  *See* Emily Widra, Prison Pol. Initiative, *Incarceration shortens life expectancy,* June 26, 2017, https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/ (last visited Apr. 17, 2025).  If incarcerated for a lengthy period of time, Alex risks not seeing his younger children grow up.  In addition, people – like his wife and ex-wife – who have an incarcerated family member have a shorter life expectancy than those with no incarcerated family members.  *See* Emily Widra, Prison Pol. Initiative, *New data: People with incarcerated loved ones have shorter life expectancies and poorer health*, July 12, 2021, https://www.prisonpolicy.org/blog/2021/07/12/family-incarceration/). (last visited Apr. 17, 2025).  These are grim realities for all involved.

Not only would imprisonment come at a potential cost to Alex's health and family, but it would also come at a cost to the public.  The cost of imprisonment for a person over 50 years old is twice to five times the cost of imprisonment of a person aged 49 or younger. *See* Pew Charitable Trusts, *Prison Health Care: Costs and Quality*, at 27 (Oct. 2017), https://www.pewtrusts.org/media/assets/2017/10/sfh_prison_health_care_costs_and_quality_final.pdf (last visited Apr. 17, 2025).

This mountain of painful and long-lasting collateral consequences counsel the imposition of a most brief term of imprisonment.

C.        **Title 18, Section 3553, Subsection (a)(2)(B)**

According to 18 U.S.C. § 3553(a)(2)(B), an appropriate sentence should "afford adequate

deterrence to criminal conduct[.]"

1.        **General Deterrence**

The government, through its investigation and highly publicized prosecution, has surely

achieved adequate general deterrence of the conduct of conviction.  When Alex pleaded guilty,

the U.S. Attorney's Office issued a thunderous press release that was carried by major media

outlets and financial publications.  In the wake of his conviction, and the mountain of media that

surrounded it, the Court can reasonably conclude that company leaders, CEOs and executives

will only engage in direct social-media or video exchanges with members of the general public

and the media with extreme caution. And company boards, lawyers, and executives are on notice

that they need to police *all* public statements of executives and directors regarding the company.

On a related note, in a publication by the National Institute of Justice ("NIJ")—the

research, development, and evaluation agency of the U.S. Department of Justice—the NIJ

summarized that "increasing the severity of punishment does little to deter crime." Nat'l Inst.

Justice, *Five Things About Deterrence*, June 5, 2016, https://nij.ojp.gov/topics/articles/five-

things-about-deterrence (last visited Apr. 17, 2025). Certainty has a greater impact on deterrence

than severity of punishment. *Severity* refers to the length of a sentence. Studies show that for

most individuals convicted of a crime, short to moderate prison sentences may be a deterrent but

longer prison terms produce only a limited deterrent effect. In addition, the crime prevention

benefit of long sentences falls far short of the social and economic costs.

Certainty refers to the likelihood of being caught and punished for the commission of a

crime. Research underscores the more significant role that certainty plays in deterrence than

severity— it is the certainty of being caught that deters a person from committing crime, not the

fear of being punished or the severity of the punishment. Effective policing that leads to swift and certain (but not necessarily severe) sanctions is a better deterrent than the threat of incarceration. In other words, the message of certainty has been made loud and clear.

A sentence well below the advisory Guidelines range can still achieve the objective of general deterrence. As Judge Garaufis commented in *United States v. Johnson*, "any amount of prison time is a serious amount of prison time[]" and therefore even a lenient sentence, "combined with the expense and emotional harm that have resulted from this prosecution, and the disgrace of having been convicted of a felony, should be sufficient . . . to effect general deterrence." *Johnson*, 2018 WL 1997975, at *5.

In sum, the public is undoubtedly aware, warned, reacting, and more than adequately deterred. *See e.g., United States v. Musgrave*, 647 F. App'x at 534 (sentence of supervised release joined with home confinement and a severe financial penalty, though not imprisonment, afforded adequate general deterrence where defendant was convicted of bank fraud and wire fraud).

### 2.    Specific Deterrence

This prosecution has also already achieved specific deterrence. Unsurprisingly, neither the PSR nor the government suggests that Alex will commit any further crimes. He is a first-time, non-violent offender. He has complied with bail conditions. He has already suffered tremendously throughout this prosecution. The case will wipe him out financially. It cost him close relationships. It cost him his company and his livelihood. He will be tied up in litigation forever. And the fact is, the older someone is, the less likely they are to be arrested following release from prison, according to a recent government study of recidivism. *See* Emily Widra,

Prison Pol. Initiative, *The Aging Prison Population: Causes, Costs, and Consequences*, Aug. 2, 2023, https://www.prisonpolicy.org/blog/2023/08/02/aging/ (last visited Apr. 17, 2025).

Finally, criminal forfeiture is a punitive measure and serves as a specific deterrent. *See Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures… at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises") (citations omitted). Following Alex's guilty plea, the Court entered a preliminary order of forfeiture under which Alex agreed to forfeit $48,393,446. ECF No. 109.

A lengthy term of incarceration is unnecessary to achieve specific deterrence.

### D.    Title 18, Section 3553, Subsection (a)(2)(C)

Title 18 U.S.C. § 3553(a)(2)(C) sets forth that an appropriate sentence shall "protect the public from further crimes of the defendant[.]" Neither the PSR nor the government suggests that the public needs protection from Alex Mashinsky. He has been gainfully employed his whole life and he has no prior criminal history. (PSR ¶ 246). And in any event, Alex will never again have the opportunity to repeat the offense of conviction.

The letters of support confirm that the public needs no protection from Alex. Alex has been a law-abiding citizen for virtually his entire life, he minds his own business, he has been a model for others, and improved the lives of family, friends, business colleagues and even strangers. He is the very opposite of a dangerous person for whom prison is necessary.

### E.    Title 18, Section 3553, Subsection (a)(6)

Title 18 U.S.C. § 3553(a)(6) requires the Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]"; *see also United States v. Booker,* 543 U.S. 220, 264 (2005)

(explaining that post-Booker sentencing contemplates consideration of Guidelines to serve goals of "avoiding unwarranted sentencing disparities" and "proportionality").

In addition to the cases referenced *supra* B(3), Judiciary Sentencing Information ("JSIN") obtained from the Sentencing Commission's database supports a variance. During the last five fiscal years (FY 2020 – 2024) there were 31 defendants whose primary guideline was § 2B1.1, with a Final Offense Level of 43 and a Criminal History Category of I, after excluding defendants who received a §5K1.1 substantial assistance departure. For the 31 defendants (100%) who received a sentence of imprisonment in whole or in part, the median length of imprisonment imposed was 138 month(s). *See* U.S. Sent. Comm., *Judiciary Sentencing Information (JSIN)*, https://jsin.ussc.gov/analytics/saw.dll?Dashboard.

In this district, federal judges have granted first time offenders who are over fifty years old non-government sponsored downward variances frequently: 61.4% in 2020; 65.4% in 2021; 66.9% in 2022; 66.9% in 2023; and 69.4% in 2024. *See* U.S. Sent. Comm., *Interactive Data Analyzer*, https://ida.ussc.gov (filtering for 2nd Circuit; Southern District of New York; age 51-60). This significant trend of substantial downward variances is even more pronounced once the data is filtered for a primary guideline of Section 2B1.1. For example, eighty percent of the sentences in the Southern District of New York for defendants 51 to 60 years old received a variance in 2024. *See* U.S. Sent. Comm., *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard. This underscores the substantial degree to which this Guideline has lost judicial confidence.

1.    *U.S. v. Bankman-Fried*

This Court should resist the temptation to compare Alex Mashinsky to Sam Bankman-Fried or to liken the scandal at FTX to the state of affairs at Celsius.  While there may be some superficial similarities, these two crypto cases and their respective defendants are nothing alike.

To begin with, Sam Bankman-Fried exercised his right to trial.  *See United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y.).  His case is currently on appeal. Alex pleaded guilty, accepted responsibility for his conduct and waived his right to appeal.

According to the government, *Bankman-Fried* was a case about misappropriation of customer assets.  The government charged in the indictment that the defendant "misappropriated" billions of dollars in FTX customer deposits. *See, e.g.*, ECF No. 202, ¶¶ 1, 4, 5, 6, 7, 9, 10, 11, 17, 20, 33.  At the *Bankman-Fried* trial, the government argued that the defendant "misappropriated" (and "stole") customer assets, resulting in the FTX corporate bankruptcy (and other corporate bankruptcies) and billions in customer losses. Thus, the government in *Bankman-Fried*:

- [Bankman-Fried] was the one taking their money. When customers deposited dollars with FTX, he stole that money. And when customers deposited crypto with FTX, he stole that too.

Trial Tr. at 29:9-11, *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y. Oct. 4, 2023), ECF No. 354 (Govt. Opening).

*    *    *    *    *

- Q: And when you say "misappropriated," what do you mean by that?
- A: Stolen, used for anything else other than what the customer instructs us to do.

Trial Tr. at 1899:8-11, *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y. Oct. 19, 2023), ECF No. 372 (Direct Exam of FTX General Counsel).

*    *    *    *    *

- [W]e've talked about … how [Bankman-Fried] stole and how he misappropriated.

Trial Tr. at 3003:15, 19, *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) (S.D.N.Y. Nov. 1, 2023), ECF No. 382 (Govt. Summation).

Then, at Bankman-Fried's sentencing, the government argued that the defendant "stole over $8 billion in [FTX] customer money," 22 Cr. 673 (LAK), ECF No. 426, Transcript 41:17-18 (S.D.N.Y. March 28, 2024), and the court found that "[The defendant] was spending large sums of FTX customer funds on risky investments, political contributions, Bahamas real estate, and other things … He knew that FTX customer funds were not to be used for those purposes" *Id*. at 53:7-12.). The court calculated a Guidelines loss of $11 billion. *Id. a*t 6:3-8.

There are no allegations – let alone any proof – that Alex misappropriated, embezzled or stole any customer assets or any Celsius money. He did not. That is the most crucial difference between the cases.[12]

The government argued that there were other aggravating factors about Bankman-Fried's conduct. They claimed "[t]he evidence also showed at trial that the defendant committed the largest election crime in United States history. He paid a massive bribe, one of the largest individual bribes in United States history." *Id.* at 45:4-7. Those factors are also not found here.

There are more essential differences. The *Bankman-Fried* court applied a two-point upward adjustment to the defendant's offense level for obtaining over $1 million in revenue from one or more financial institutions as a result of the offense, pursuant to U.S.S.G. § 2B1.1(b)(17)(A). There is no such allegation here. The judge in *Bankman-Fried* also applied a two-point upward adjustment for conviction under § 1956 of the criminal code pursuant to

---

[12] According to the government, FTX represented to customers that it would keep their funds on the exchange and not use them for any other purpose. In contrast, users specifically joined Celsius to earn interest income which was generated from lending their coins to others. Put another way, according to the government, FTX violated its user terms and conditions by investing customer funds. Celsius did not.

U.S.S.G. § 2S1.1.  And the judge made findings that the defendant in that case – whose bail was revoked before trial - attempted to tamper with witnesses and perjured himself on the witness stand, warranting an obstruction of justice enhancement pursuant to U.S.S.G. § 3C1.1.  Not a single one of those factors is present in Alex's case.

In sum, the differences between the two cases are far more striking than the similarities. Bankman-Fried's sentence should not impact this Court's decision.

### 2.    *U.S. v. Ng Chong Hwa (a/k/a "Roger Ng")*

Despite similarities in the Guidelines range and forfeiture amount, this case is also readily distinguishable from *United States v. Ng Chong Hwa (a/k/a "Roger Ng")*, Case No. 18-cr-538 (MKB) (E.D.N.Y.).  There, the defendant, a Goldman Sachs managing director, "played a critical role in a massive bribery and money laundering scheme that stole billions of dollars intended for infrastructure and economic projects to aid the Malaysian people, and used it instead to pay [$1.6 billion of] bribes to at least a dozen corrupt government officials in Malaysia and Abu Dhabi, as well as to line the pockets of the defendant and others who masterminded the scheme." *United States v. Ng Chong Hwa*, Case No. 18-cr-538 (MKB), Gov't Sent. Memo, ECF No. 230, at 4 (E.D.N.Y. Mar. 3, 2023).  Ng was also charged with conspiring to violate the FCPA by circumventing the internal accounting controls of a major New York-headquartered financial institution, while Ng was employed there as a managing director.  Ng himself pocketed over $35 million in kickbacks and "carefully covered his tracks." *Id.*

Following a nine-week trial, Ng was convicted by a federal jury on all counts, including for conspiring to launder money, loot billions from Malaysia's sovereign wealth fund, and receiving millions in kickbacks to falsely facilitate bond transactions.  Ng faced a "Guidelines term of life and an effective Guidelines term of 360 months' imprisonment." *Id.*, ECF No. 230,

at 6.  While the government agreed that "a sentence at or near this range is unwarranted in this instance," it nevertheless recommended a sentence of at least 15 years.  *Id.*, ECF No. 230 at 6.  Judge Brodie sentenced Ng to ten years' imprisonment and ordered forfeiture of $35.1 million.  *Id.*, Mem. & Order, ECF No. 249-1, at 1.  "Roger Ng was a central player in a brazen and audacious scheme that not only victimized the people of Malaysia, but also risked undermining the public's confidence in governments, markets, businesses and other institutions on a global scale," stated United States Attorney Peace.[13]

While Ng and Alex are two high-profile figures involved in financial crimes, their conduct differs greatly.  The 1MDB scandal was one of the most brazen financial crimes in history, took years to investigate globally, led to multiple international prosecutions, and the removal of government officials.  Alex's conduct and the consequences pale in comparison.

### 3.    *U.S. v. Milton*

One recent case that bears similarities to Alex's is *United States v. Milton*, Case No. 21-cr-478 (ER) (S.D.N.Y.).  In *Milton*, the defendant, the founder and former chairman of Nikola, a start-up that grew to be a publicly traded electric truck manufacturer, was charged with securities and wire fraud largely based on alleged misrepresentations he made regarding his company and its products on podcasts and social media posts.  According to the government, Milton "engaged in a scheme to induce investors – particularly individual, non-professional or 'retail' investors – to purchase Nikola stock based on false, misleading, and fraudulent statements made and disseminated by Milton directly to the investing public through social media and television, print, and podcast interviews."  *Id.*, Gov't Sent. Mem., ECF No. 315, at 4 (Dec. 12, 2023).  After

---

[13] Dep't of Justice, U.S. Atty's Office, E.D.N.Y., Press Release, *Former Goldman Sachs Managing Director Sentenced to 10 Years in Prison for His Role in Massive Bribery and Money Laundering Scheme* (March 9, 2023), https://www.justice.gov/usao-edny/pr/former-head-hsbc-s-global-foreign-exchange-cash-trading-sentenced-24-months (last visited Apr. 17, 2025)

an activist short-seller published a report alleging Milton made various fraudulent statements, the company's stock price dropped significantly and the defendant resigned his position as chairman. According to the government, the defendant had targeted retail investors through his use of social media and the losses to those retail investors attributable to the defendant's alleged misrepresentations exceeded $600 million.

Milton went to trial and was convicted on one count of securities fraud and two counts of wire fraud; he was acquitted of one count of securities fraud. The government calculated Milton's guidelines range as the "statutorily authorized maximum sentence of 60 years' imprisonment." *United States v. Milton*, Gov't Sent. Memo, ECF No. 315 at 12 (Dec. 12, 2023). Probation recommended a sentence of 132 months. *Id.*, ECF No. 315 at 4. Judge Ramos sentenced the defendant to four years, approximately one-third of Probation's recommendation.[14]

Alex will appear before this Court in a different posture than Milton. Alex did not go to trial. He is not convicted of wire fraud, which has an intent to harm element. And he accepted responsibility. Alex will appear for sentencing exhibiting remorse and a desire to do right by his family and Celsius customers. This strongly counsels for leniency and a variance similar, if not greater, than Milton.

F.      **Title 18, Section 3553, Subsection (a)(7)**

Title 18 U.S.C. § 3553(a)(7) provides that the court shall consider "the need to provide restitution to any victims of the offense."

As set forth in the plea agreement, "in consideration of the number of victims and the complex issues of fact involved in calculating victim losses, the Government will not seek

---

[14] Milton challenged his conviction on appeal. While the appeal was *sub judice*, President Trump issued Milton "A Full and Unconditional Pardon."

criminal restitution and will instead seek to facilitate victim compensation through the bankruptcy proceeding.  *See* 18 U.S.C. 3663A(c)(3).

## ALEX MASHINSKY TODAY

Today, Alex is a devoted father, to 6 kids – Rena (25), David (23) and Natalie (20) from his first marriage, plus J████ and E████ from his current marriage, and Makenzie (23) from his current wife's first marriage.  He is a "loving and supportive father" (Exh. A-33) in a beautiful, blended family.  Alex gets emotional support from his current wife, his ex-wife and all his kids and he remains "deeply committed to his loved ones.  No matter how demanding his ventures . . . his role as a husband and father was never compromised. That balance—his ability to stay present for his family while pursuing ambitious goals—is a testament to his strength of character and values and which, quite frankly, is his best quality." (Exh. A-5).

Alex tries to spend as much time as possible with his youngest son, E███ who ████



. (PSR ¶ 176). ████

(PSR ¶ 179). ████

PSR ¶ 176.  E████ needs his dad.

As he awaits sentencing, Alex has shifted his focus from thinking about new businesses to his first love, science.  Over the past three years he reports that he has written several scientific papers[15] and a remarkable 300-page book called *The Cheerios Effect*, that aims to deliver the complicated and misunderstood subject of gravity to a less scientifically-oriented reader.  The book, which Alex hopes to publish, examines gravity and related scientific concepts through the eyes of a child, a college student and a trained scientist, and raises questions and proposes

---

[15] *See* attached Exh. S.

mathematical and theoretical answers. It addresses, among other things, theories of gravity, entropy, the quantum spacetime theory and different forms of energy.

Alex also "dedicates his time to doing good. Whether at the school, with his children, with his friends, with teachings, with writing books, or finding ways to help victims get more recovery back, and hear their stories, He wants to let them know he has not run [a]way, gone anywhere, and share how he can be part of the solution." (Exh. A-17).

The writer Danielle Sered describes accountability as "not just about being or feeling sorry—it is about a set of actions that demonstrate remorse in practice. And it is not the feeling of remorse that delivers us from our shame—it is the practice of accountability in action. It is doing sorry." Danielle Sered, *Until We Reckon: Violence, Mass Incarceration, and a Road to Repair* (2019).

Alex Mashinsky is *doing* sorry. Proactively. He entered his guilty plea before the government produced 3500 material, exhibits, or expert opinions and before the Court's resolution of the parties' motions *in limine*. He agreed to withdraw all claims he asserted in the Celsius bankruptcy and is using his best efforts to require his wife and the relevant decision-makers at various corporate entities to withdraw their claims as well. All in the hopes of making things right.

Alex's wife Krissy reports that when he decided to plead guilty, he held her hands, looked her in the eye, and said, "We are judged by our deeds for others and not by our wins over others, it is time to help all these people find peace" (Exh. A-17). She continues:

> Every day I hear him talk to the people who got hurt by Celsius and ask for their forgiveness. This tragedy is like a giant rock he carries on his back every day. He feels personally responsible for every person who was hurt by his creation.

*Id.*

David Barse, an independent director of Celsius, speaks of Alex's "contrition and desire to help rectify the situation for his customers." (Exh. A-2). Barse states that "Alex's primary interest and motivating force was to make sure that Celsius customers were made whole." *Id.* Toward that end, Alex voluntarily met with the Bankruptcy Examiner and answered questions for nearly seven hours while he was under investigation by the Department of Justice and the SEC. And Barse recounts how Alex engaged Celsius employees, senior management, and the Unsecured Creditors Committee to work together to preserve value and return money to customers as quickly as possible. Even after Alex resigned from his position as CEO, Barse observed that he "continued to postulate proposals to protect the customers." (Exh. A-2).

Alex was candid with Probation about his acceptance of responsibility and his feelings of remorse. He told Probation that he did not start Celsius to hurt anyone but that he "saw an opportunity and gave it all I had." PSR ¶ 120. He stated that he also had his money in the company and in the token and felt he was there to "help everyone." *Id.* He added that "the outcome is the opposite of what I was hoping for. Nothing that happened was intended to hurt but I accept responsibility as I was the CEO. I accept my role in the fraud and am here to be a part of the solution and not the problem." He added that this is a "very bad situation and I feel horrible." *Id.*

The PSR also states that Alex has "clearly demonstrated acceptance of responsibility for the offense" and has "assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of the intention to enter a plea of guilty." PSR ¶¶ 154, 155. Members of the Celsius community agree. According to Celsius user Bobby Darby:

> For whatever mistakes Alex has made he has shown sincere remorse and has
> voluntarily agreed to forfeit all his assets and claims derived from Celsius and CEL

tokens. He proved again that he is willing to do more for the community than all the lawyers, accountants, employees or creditors who just want to find more ways to take things away from us.

(Exh. A-40).

Customer Edwin Rainbow observes that Alex "is a person who [ ] deeply regrets any part he may have played to damage others, and he feels the burden." (Exh. A-23). Martin Kalin understands that Alex "is sincerely remorseful." (Exh. A-7).

This Court can be confident that Alex not only feels the pain of those who have been hurt, but that he has tried "to help all these people find peace." (Exh. A-17). He continues to find a way to serve. That is true remorse.

## CONCLUSION

The Honorable John S. Martin, former Southern District Judge and United States Attorney, recently addressed "the overly long sentences that are being imposed every day in our federal courts on nonviolent offenders."[16] He wrote that "[w]e have lost all sense of how horrible it is to spend even one year in prison, far away from family and friends, where every moment of existence must be lived under prescribed rules enforced by people who do not respect you and whom you do not respect and under constant fear of an unprovoked attack by another inmate." *Id*.

The PSR's recommendation of 15 years' imprisonment is far greater than necessary to achieve the purposes of sentencing for this defendant in this matter. Alex Mashinsky respectfully requests that the Court impose a term of 366 days' imprisonment.

---

[16] John S. Martin, *Cruel But Not Unusual: The Sentence Recommended for Sam Bankman-Fried*, New York Law Journal, Mar. 12, 2024, https://www.law.com/newyorklawjournal/2024/03/12/cruel-but-not-unusual-the-sentence-recommended-for-sam-bankman-fried/ (last visited Apr. 17, 2025).

Dated: New York, New York
      April 17, 2025

                                    Respectfully submitted,

By:   /s/ Michael F. Westfal     
      Marc L. Mukasey
      Torrey K. Young
      Michael F. Westfal

      MUKASEY YOUNG LLP
      570 Lexington Avenue, Suite 3500
      New York, New York 10022
      (212) 466-6400

      *Attorneys for Defendant Alex Mashinsky*