**yarden.noy@celsius.network**

**From:** Ashley Harrell <ashley@celsius.network>
**Sent:** Tuesday, 28May 23:12 2019
**To:** Alex Mashinsky
**Cc:** S. Daniel Leon; Young Cho
**Subject:** Re: AM Ventures note
**Attachments:** Fully Executed Token Sale Agreement AM Venture Holdings.pdf

Are you talking about the agreement that AM Ventures had to purchase remaining CEL tokens from the token sale? It was for any remaining CEL from the TGE that were unsold/unburned at $0.20 each with 30% bonus, up to a total of $18mm USD.

So that would be 90mm CEL at $0.20 plus a bonus of 27mm CEL, totaling 117mm CEL = $18mm

Agreement attached.

On Tue, May 28, 2019 at 1:03 PM Alex Mashinsky <alex@celsius.network> wrote:
> how many CEL tokens are part of this agreement.

--



**Alex Mashinsky**
**Founder & CEO** | Celsius Network

SMS: 646-552-4499
twitter: @mashinsky

- NASDAQ interview with Celsius
- Celsius video presentation
- the original Cryptobrawl with Nouriel Roubini and the 2.0 Vegas round two debate,
- Celsius TNW interview with Tim Draper.
- Blockchain Inventor joins Celsius



--



**Ashley Harrell**
**Director of Operations** | Celsius Network

mobile: +1.925.683.7945

1

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_ SEC_0001255



**TOKEN SALE AGREEMENT**

This Token Sale Agreement (the **"Agreement"**) is entered into as of [ March 29, 2018 ], (the "**Effective Date**"), by and between Celsius Network Limited, a limited liability company incorporated under the laws of England and Wales (the "**Company**") and the entity signing this Agreement ("**Purchaser**").

**WHEREAS**, the Company is in stages of developing a membership platform (the "**Platform**") which allows members to store their cryptocurrency, all as described in the Company's website, https://celsius.network/ as may be updated by the Company from time to time (the "**Company's Website**"); and

**WHEREAS**, in the next few weeks, the Company plans to conduct a smart contract-based token generation event (the **"Token Generation"**), whereby, in return for payment to the Company, the smart contract shall generate CEL Tokens (the "**CEL Tokens**"), having the functions described in the Company's Website and in the 'white paper' published on the Company's Website ("**White Paper**"); and

**WHEREAS**, to date, the Company (i) held a private sale of CEL Tokens through pre-sale agreements, and (ii) between the dates March 15 and 22, 2018, held a public crowdsale of CEL Tokens; and

**WHEREAS**, Purchaser is interested in purchasing CEL Tokens for the right to receive CEL Tokens, pursuant to the terms and conditions more fully set forth in this Agreement and to the terms and conditions published on the Company's Website;

**NOW THEREFORE**, in consideration of the mutual agreement contained below, Company and Purchaser hereby agree as follows:

1. **Consideration**

    1.1  Within 90 days of the Effective Date, Purchaser will pay the Company an aggregate amount as set forth in the signature page of this Agreement (the "**Consideration**"). If the Consideration is paid is in U.S. Dollars ("**USD**"), the Consideration shall be transferred by wire transfer of immediately available currency to a bank account as instructed by the Company. If the Consideration is paid in Bitcoin or Ether, the Consideration shall be transferred to a virtual wallet as instructed by the Company.

    1.2  If the Consideration is paid in Bitcoin or Ether, the funds shall be deemed converted into USD at the time of actual receipt of the Consideration at the virtual wallet designated by the Company, at the conversion rate published by Gemini or other

- 2 -

exchange or custodian engaged by the Company at such time, and if the Consideration is actually converted into USD, all related conversion fees, bank fees or other costs associated with its transfer to the Company's bank account shall be deducted therefrom. The resulting amount in USD shall be the Consideration for purposes of this Agreement.

2. **Issuance of CEL Tokens**

   2.1 Following both (i) the payment of the Consideration pursuant to Section 1.1 above, and (ii) the Token Generation, the Company will issue Purchaser, in consideration for the Consideration, such number of CEL Tokens equal to (i) the Consideration *divided by* 0.2 USD (the "**Base Tokens**"), plus (ii) such number of bonus CEL Tokens equal to the Bonus Rate set forth in the signature page *multiplied by* the Base Tokens (the "**Bonus Tokens**", and together with the Base Tokens, the "**Committed Amount of CEL**"). Purchaser acknowledges and agrees that different bonus rates may apply to difference purchasers.

   2.2 As a condition precedent to the issuance of the Committed Amount of CEL to Purchaser, Purchaser must complete a registration process, which will include provision of all of the documents and information set forth in **Exhibit A** herein, and execution of the form contained therein, required in order to complete the Company's "know your client" ("**KYC**") and anti-money laundering ("**AML**") reviews and any other regulatory review, including to verify accredited investor status. Purchaser agrees that the Company may give all information provided by Purchaser pursuant to this Section to a third-party service provider appointed by the Company to perform KYC or AML reviews. The Company may update Exhibit A at any time and Purchaser hereby agrees to provide any additional documentation as soon as possible, as well as to promptly respond and fully cooperate with all requests made by the Company or any third party service provider appointed by the Company to perform KYC or AML reviews. Purchaser understands that the outcome of such reviews, including a decision not to issue CEL Tokens to Purchaser, is within the Company's sole and absolute discretion. If the outcome of such reviews is a decision not to issue CEL Tokens to Purchaser, the Consideration, if transferred to the Company, shall be refunded.

3. **Lock Up**

   The sale restrictions set forth in the White Paper will apply to the Committed Amount of CEL. For the avoidance of doubt, utilization of CEL Tokens on the Platform shall not be deemed a transfer, sale or disposal of CEL Tokens.

4. **Cancellation**

   4.1 Purchaser's purchase of CEL Tokens from the Company is final, and there are no refunds or cancellations except as may be required by applicable law or regulation, if any, or as set out in this Agreement.

   4.2 At any time, the Company may temporarily suspend the Token Generation. During any period of suspension, CEL Tokens will not be available for purchase.

   4.3 At any time, if the Company fails to see any chance to successfully complete the Token Generation event, the Company may permanently abort the Token Generation. At such time, part of the Consideration may have already been utilized by the Company for business purposes. Therefore, in such event, Purchasers will only be entitled to receive a pro rata proportion of their respective consideration amounts. Purchaser understands such risk and agrees to bear it.

5. **Intended Purpose and Use of CEL Tokens**

   5.1. The intended purpose of the CEL Tokens is to facilitate the provision and receipt of

- 3 -

       services and allow for the access and utilization of features and functionalities made available by the Company and its affiliates through the Platform (collectively, the "**Services**"). CEL Tokens will be utility tokens and will not be intended to be used as an investment.

5.2. Purchaser acknowledges that the CEL Tokens will not represent or confer any ownership right or stake, share, equity or security or equivalent rights, or any right to receive future revenue shares or voting rights in the Company or in any of its affiliates or any rights in the intellectual property of the Company or of any of its affiliates. Acquiring CEL Tokens shall not grant any right or influence over the Company's or any of its affiliates' organization and governance to Purchaser, other than rights relating to the potential future provision and receipt of Services, subject to the limitations and conditions contained in this Agreement and the White Paper.

5.3. The CEL Tokens are not intended to be and will not be a representation of money (including electronic money), security, commodity, financial instrument, bond, debt instrument or any other kind of financial instrument or investment. Protections offered by the applicable law in relation to the purchase and sale of the aforementioned financial instruments or investments do not apply to the purchase and sale of CEL Tokens. CEL Tokens should not be acquired in any case or circumstance for speculative or investment purposes with the expectation of making a profit on immediate resale or otherwise.

5.4. Purchaser acknowledges and understands that the Company, or any affiliate thereof, does not provide any guarantee that it will establish an operative Platform and therefore it cannot guarantee that the CEL Tokens can be used to access or purchase goods or Services on the Platform. Purchaser acknowledges and understands therefore that neither the Company nor any affiliate thereof assumes any liability or responsibility whatsoever arising from any loss or damage that would result from or relate to the inability to use CEL Tokens. CEL Tokens do not constitute the provision of any goods or services as of the date of this Agreement.

5.5. Purchaser acknowledges and understands that the Company may adjust the Platform, the Services, the Company's Website and the "hard cap" for total amount of contributions from time to time, and that Purchaser is encouraged to visit the Company's Website frequently to remain updated. ==Currently, the Company intends to release additional 25,000,000 CEL Tokens to the Company's token treasury and to employees if the CEL Token remains above an average price of $1.50 for ten (10) days, and additional 25,000,000 CEL Tokens if the CEL Token remains above an average price of $3.00 for thirty (30) days.== In addition, Purchaser understands and accepts that it is possible and likely that the design of the CEL Token evolves until the Token Generation event. Purchaser shall not have any claim against the Company Parties (as defined below) in connection therewith.

6. **Taxes**

The Consideration is exclusive of all applicable taxes. Purchaser is solely responsible for determining what, if any, taxes apply to Purchaser's purchase of CEL Tokens, including, but not limited to: sales, use, value added, and any other taxes that may be applicable. It is also Purchaser's sole responsibility to withhold, collect, report, pay, settle and remit the correct taxes to the appropriate tax authorities in such jurisdiction where Purchaser may be liable to pay tax. The Company is not responsible for withholding, collecting, reporting, paying, settling or remitting any sales, use, value added, or any other tax arising from Purchaser's purchase of CEL Tokens.

7. **Purchaser's Acknowledgements; CEL Token Generation Procedures and Specifications**

- 4 -

7.1 Purchaser understands and accepts the risks associated with the purchase of CEL Tokens, including those risks described in **Exhibit B** attached hereto. Additional risks factors are and may be described in the White Paper. In addition, Purchaser understands that the CEL Tokens have no guaranteed value and that the creation, allocation and distribution of the CEL Tokens involve risks including, but not limited to, the risks that (a) the technology associated with the web platform in which the CEL Tokens can be used will not function as intended; (b) the web platform will fail to attract sufficient interest from key stakeholders; (c) the Company's or its affiliates' business will not progress satisfactorily and the CEL Tokens will lose all value and utility; and (d) the Company and its affiliates may be subject to investigation and punitive actions by governmental authorities. Purchaser confirms that there may be additional risks in connection with the transactions envisioned herein that are not currently known or that are currently deemed immaterial.

7.2 Purchaser acknowledges that (a) the CEL Tokens are a digital currency which is not regulated by any central bank or other government authority; (b) the Company provides no representation as to the legal status of the CEL Tokens in any jurisdiction; (c) the Company does not provide investment advice with regard to the purchase of the CEL Tokens; (d) the issuance of the CEL Tokens will be subject to the acceptance and execution by Purchaser of the relevant legal disclosures and agreements in connection therewith and the Token Generation; and (e) it is the sole responsibility of Purchaser to seek professional advice prior to executing this Agreement. Purchaser hereby confirms that it has received independent legal advice regarding this Agreement and CEL Token before entering into the Agreement.

7.3 Important information about the procedures and material specifications of the Company's Token Generation event is provided on the Company's Website and in the White Paper, including, but not limited to, details regarding the timing of and pricing of CEL Tokens at the Token Generation event, the amount of CEL Tokens the Company will sell, and the Company's anticipated use of the proceeds received in consideration for the CEL Tokens. By purchasing CEL Tokens, Purchaser acknowledges and accepts that it has read, understood and has no objection to these procedures and material specifications.

8. **Purchaser Representations**

8.1 Purchaser has read and clearly understood the terms of this Agreement and the terms and conditions published on the Company's Website and has received independent legal advice in respect thereof.

8.2 Purchaser, if a corporate entity, is duly organized and validly existing under the applicable laws of its jurisdiction of organization, and, if an individual, is at least 18 years of age and has sufficient legal capacity to execute this Agreement.

8.3 Purchaser has full legal capacity, power and authority to execute and deliver this Agreement and to perform its obligations hereunder. This Agreement constitutes valid and legally binding obligations, enforceable in accordance with its terms.

8.4 The entry into this Agreement with the Company will not result in any violation of, be in conflict with, or constitute a material default under: (a) any provision of Purchaser's constitutional or organizational documents, if Purchaser is a corporate entity; (b) any provision of any judgment, decree or order to which Purchaser is a party, by which Purchaser is bound or to which any of Purchaser's material assets are subject; or (c) any material agreement, obligation, duty or commitment to which Purchaser is a party or by which Purchaser is bound.

- 5 -

8.5    Purchaser has experience in purchasing financial and non-financial assets, including from companies in the development stage, and acknowledges that it is able to fend for itself, can bear the economic risk of its transaction, and has such knowledge and experience in financial or business matters that it is capable of evaluating the merits and risks of the transaction contemplated by this Agreement.

8.6    Purchaser has carefully considered the risks involved in purchasing and holding digital currencies (and in particular the CEL Tokens), and Purchaser is aware that it may lose all or part of the Consideration and that the CEL Tokens may have a low or even no value. Purchaser confirms that there may be additional risks associated with the transactions envisioned herein that are not currently known or that are currently deemed immaterial.

8.7    Purchaser is not, and has not been involved in any type of activity associated with money laundering or terror financing, nor violated any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act (2010), Sections 290-297 of the Israeli Penal Law 1977 (Bribery Transactions), the Israeli Prohibition on Money Laundering Law, 2000, or any other applicable anti-corruption or anti-bribery statute, nor was ever subject to any investigation by, or has ever received a request for information from any governmental body relating to corruption or bribery under any statute. The Consideration is not derived from or related to any unlawful activities, including but not limited to money laundering or terrorist financing, and Purchaser will not use the CEL Tokens to finance, engage in, or otherwise support any unlawful activities. Purchaser hereby consents to the Company running any checks or enquiries with third parties and waives any privacy or other right in connection therewith and acknowledges that any breach of this representation by Purchaser will entitle the Company to terminate this Agreement with immediate effect and without liability of any kind including refunding the Consideration.

8.8    Purchaser is aware that CEL Token may be deemed a security and that the offers and sales of CEL Token have not been registered under any country's securities laws and, therefore, cannot be resold except in compliance with the applicable country's laws. This Agreement is made with Purchaser in reliance upon Purchaser's representation to the Company that the CEL Tokens acquired by Purchaser will be acquired for Purchaser's own account and Purchaser has no intention of immediately selling, transferring or distributing the CEL Tokens it is acquiring (or any part thereof) nor has Purchaser any intention of selling, granting any participation in, or otherwise distributing the same.

8.9    Purchaser, if a U.S. resident, is an accredited investor as defined in Rule 501(a) of Regulation D promulgated under the U.S. Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder. If Purchaser is an Israeli resident, it is a qualified investor as defined in the First Addendum to the Israeli Securities Law, 1968-5728, pursuant to Section 15A(b)(1) of such law. If Purchaser is subject to the laws of any other jurisdiction, it meets the analogous criteria prescribed under such laws applicable to Purchaser, required in order to prevent its purchase hereunder from constituting a breach of the local securities laws in Purchaser's jurisdiction. The purchase of CEL Tokens will not constitute a violation of any laws or regulations, including any securities laws or investment advice laws in Purchaser's jurisdiction.

8.10    Purchaser lives or is domiciled in a jurisdiction that allows the Company to sell the CEL Tokens and does not prohibit Purchaser from participating through a token sale without requiring any local authorization. Purchaser's purchase of CEL Tokens shall be made in full compliance with any and all applicable legal and tax obligations to which Purchaser may be subject in any relevant jurisdiction.

- 6 -

8.11 Purchaser is not a resident or domiciliary of the People's Republic of China, South Korea, Singapore, or any jurisdiction that (a) prohibits token sales or any participation therein, or (b) is subject to any sovereign country's sanctions or embargoes (any of the foregoing, a "**Restricted Jurisdiction**"); Purchaser is not purchasing CEL Tokens from a location in a Restricted Jurisdiction and is not an entity (including but not limited to any corporation or partnership) incorporated, established or registered in or under the laws of a Restricted Jurisdiction, nor is Purchaser purchasing CEL Tokens on behalf of any such person or entity.

8.12 Purchaser represents that it has carefully considered the risks involved in purchasing and holding digital currencies and, in particular, the CEL Tokens, including those risks described in Section 7 hereto. Purchaser has sufficient understanding of the functionality, usage, storage, transmission mechanisms and other material characteristics of cryptographic tokens, token storage mechanisms (such as token wallets), blockchain technology and blockchain-based software systems to understand this Agreement and to appreciate the risks and implications of purchasing the CEL Tokens.

8.13 Purchaser has reviewed the Website carefully, and has obtained sufficient information about the Company and its officers, agents and representatives, and about the CEL Tokens to make an informed decision to purchase the CEL Tokens.

8.14 Purchaser understands that the CEL Tokens confer only the potential future right to receive Services and confer no other rights of any form with respect to the Platform, the Company, or any of its affiliate including, but not limited to, any voting, distribution, redemption, liquidation, proprietary (including all forms of intellectual property) or other financial or legal rights.

8.15 Purchaser is purchasing CEL Tokens in order potentially to receive Services on the Platform at a future point in time. Purchaser is not purchasing CEL Tokens for any other uses or purposes, including, but not limited to, any investment, speculative or other financial purposes.

8.16 Purchaser acknowledges that the Company may offer CEL Tokens to other purchasers prior to the Token Generation event on terms more favorable to such purchasers or otherwise different from those offered to Purchaser herein (including at a lower price per Token), as the Company may set fit at its sole and absolute discretion, and Purchaser hereby irrevocably waives any claims and demands in that regard.

8.17 Purchaser acknowledges that the Company is not a non-profit organization.

9. **Company Representations**

9.1 The Company is duly incorporated and validly existing under the laws of England and Wales, and has the power and authority to own, lease and operate its properties and carry on its business as now conducted.

9.2 The Company will be bound by the express choice of law in this Agreement, *provided* that the choice was bona fide legal and is not invalidated by reasons of public policy.

9.3 The Company has legal capacity to submit irrevocably to the jurisdiction of the courts that the parties have chosen in this Agreement and is not entitled to claim any immunity from suit or execution of any judgment on the ground of sovereignty or otherwise.

9.4 Each representation and warranty herein is deemed to be made on the date of this Agreement and to be true and correct only as of such date. Any cause of action arising from an alleged breach of such representations or warranties shall survive and be actionable only until the end of twelve (12) months from the Effective Date, at which

DocuSign Envelope ID: 8458FD4253FC74562395650BB44E0A126  Case 1:23-cr-00347-JGK  Document 145-8  Filed 04/29/25  Page 8 of 18

- 7 -

    time any such cause of action will expire and be of no further effect unless a claim based on such cause had been properly brought forth by Purchaser.

10. **Disclaimers**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW AND EXCEPT AS OTHERWISE EXPRESSLY SPECIFIED IN WRITING BY THE COMPANY, (A) THE CEL TOKENS ARE SOLD ON AN "AS IS" AND "AS AVAILABLE" BASIS, WITHOUT ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND, AND THE COMPANY EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES AS TO THE CEL TOKENS, INCLUDING, WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE AND NON-INFRINGEMENT; (B) THE COMPANY DOES NOT REPRESENT OR WARRANT THAT THE CEL TOKENS ARE RELIABLE, CURRENT OR ERROR-FREE, THAT THEY MEET PURCHASER'S REQUIREMENTS, OR THAT DEFECTS IN THE CEL TOKENS WILL BE CORRECTED; AND (C) THE COMPANY CANNOT AND DOES NOT REPRESENT OR WARRANT THAT THE CEL TOKENS OR THE DELIVERY MECHANISM FOR CEL TOKENS ARE FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS.

11. **Purchaser Indemnity**

To the fullest extent permitted by applicable law, Purchaser will fully and effectively indemnify, defend and hold harmless the Company and its respective past, present and future founders, employees, officers, directors, contractors, consultants, equity holders, suppliers, vendors, service providers, parent companies, subsidiaries, affiliates, agents, representatives, predecessors, successors and assigns (the "**Company Parties**") from and against any and all claims, judgments, demands, actions, damages, losses, costs and expenses (including reasonable professional and legal fees) that arise from or relate to Purchaser's (a) purchase and use of CEL Tokens; (b) responsibilities or obligations under this Agreement; (c) violation of this Agreement, or (d) violation of any rights of any other person or entity. The Company reserves the right to exercise sole control over the defense and settlement of any claim subject to this indemnity at Purchaser's expense. This indemnity is in addition to, and not in lieu of, any other indemnities set forth in a written agreement between Purchaser and the Company.

12. **Company Limitation of Liability**

TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW: (A) UNDER NO CIRCUMSTANCES WILL THE COMPANY OR ANY OF THE COMPANY PARTIES, INCLUDING BUT NOT LIMITED TO ITS FOUNDERS, OFFICERS, DIRECTORS, AGENTS, JOINT VENTURES, EMPLOYEES AND SUPPLIERS, BE LIABLE FOR ANY DIRECT, INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY LOSS OF ANY KIND (INCLUDING, BUT NOT LIMITED TO, LOSS OF REPUTATION, LOSS OF REVENUE, INCOME OR PROFITS, LOSS OF USE OR DATA, OR DAMAGES FOR BUSINESS INTERRUPTION) ARISING OUT OF OR IN ANY WAY RELATED TO THE PURCHASE, SALE OR USE OF THE CEL TOKENS OR OTHERWISE RELATED TO THIS AGREEMENT, REGARDLESS OF THE CAUSE OF ACTION, WHETHER BASED IN CONTRACT, TORT (INCLUDING, BUT NOT LIMITED TO, NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), OR ANY OTHER LEGAL OR EQUITABLE BASIS (EVEN IF THE COMPANY OR ANY OF THE COMPANY PARTIES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES AND REGARDLESS OF WHETHER SUCH LOSSES WERE FORESEEABLE); AND (B) UNDER NO CIRCUMSTANCES WILL THE AGGREGATE LIABILITY OF THE COMPANY AND THE COMPANY PARTIES, INCLUDING BUT NOT LIMITED TO ITS FOUNDERS, OFFICERS, DIRECTORS, AGENTS, JOINT VENTURES, EMPLOYEES AND SUPPLIERS (JOINTLY), WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE,

- 8 -

WHETHER ACTIVE, PASSIVE OR IMPUTED), OR OTHER LEGAL OR EQUITABLE BASIS, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE USE OF OR INABILITY TO USE THE CEL TOKENS, EXCEED THE CONSIDERATION RECEIVED BY THE COMPANY. THE LIMITATIONS SET FORTH HEREIN WILL NOT LIMIT OR EXCLUDE LIABILITY FOR THE GROSS NEGLIGENCE, FRAUD OR INTENTIONAL, WILLFUL OR RECKLESS MISCONDUCT OF THE COMPANY.

13. **Miscellaneous**

   13.1 Entire Agreement. This Agreement constitutes the entire agreement between the parties and supersedes all prior or contemporaneous agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

   13.2 Amendment; Waiver. Any provision of this Agreement may be amended, waived or modified only upon the written consent of the Company and the Purchaser.

   13.3 Notices. Unless otherwise expressly stated herein, all communications under this Agreement will be in writing and may be made by letter or email. Any notice required or permitted by this Agreement will be deemed sufficient when delivered personally or by overnight courier or sent by email to the relevant address listed on the signature page, or 48 hours after being deposited in the mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address listed on the signature page, as subsequently modified by written notice.

   13.4 Assignment. The Company may in its sole and absolute discretion assign its rights and interests, as contained herein. Purchaser may not assign its rights and interests, as contained herein, without the prior written consent of the Company.

   13.5 Governing Law; Arbitration. This Agreement shall be governed in all respects, including as to validity, interpretation and effect, by the laws of England and Wales, without giving effect to its principles or rules of conflict of laws, to the extent such principles or rules are not mandatorily applicable by statute and would permit or require the application of the laws of another jurisdiction. Any disputes arising out of or related to this Agreement shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce by one arbitrator appointed in accordance with such Rules. The arbitration shall be conducted in London, England, and shall be held English.

   13.6 Severability. If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid, inoperative or unenforceable for any reason, the parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the fullest extent possible. The invalidity, inoperability or unenforceability of any term of the Agreement will not adversely affect the validity, operability or enforceability of the remaining terms.

   13.7 Counterparts. This Agreement may be executed and delivered in any number of counterparts, each of which when executed and delivered shall constitute a duplicate original, but all the counterparts together shall constitute one agreement.

   13.8 Forward Contract. For the purposes of U.S. subscribers, each of the Company and Purchaser agrees to treat this Agreement as a forward contract for U.S. federal, state and local income tax purposes, and will not take any position on any tax return, report, statement or other tax document that is inconsistent with such treatment, unless otherwise required by a change in law occurring after the date hereof, a closing agreement with an applicable tax authority or a final non-appealable judgment of a court

DocuSign Envelope ID: 8C561DC2-5CFC-4562-8955-30BB44E0A728
Case 1:23-cr-00347-JGK    Document 145-8    Filed 04/29/25    Page 10 of 18

- 9 -

13.9 <u>Further Assurances</u>. Purchaser shall, and shall cause its affiliates to, execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably requested by the Company to carry out the provisions of this Agreement and give effect to the transactions contemplated by this Agreement, including, without limitation, to enable the Company or the transactions contemplated by this Agreement to comply with applicable laws.

*[Signature Page Follows]*

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_ SEC_0001264

10

In witness whereof, the parties have executed and delivered this Agreement as of the date first written above.

**Purchaser**

Signature of Purchaser: _[signature]_ 3/25/18

Name of Purchaser: AM Venture Holdings, Inc.

Name of Authorized Signatory: Alex Mashinsky

Title of Authorized Signatory: CEO

Address: 210 E 68 st #13C NY NY 10065

Company Number: DE Tax ID 134140150

Consideration: Up to $18,000,000

Bonus Rate: 30% @ $0.20 per CEL

Public Address (if paid in ETH/BTC):

**Celsius Network Limited**

Signature of Company: _[signature]_

Name of Signatory: S. Daniel Leon

Title of Signatory: Founding President & COO

*[Signature Page to Token Sale Agreement]*

13.10

11

## EXHIBIT A
## KNOW YOUR CLIENT AND ANTI-MONEY LAUNDERING REQUIREMENTS & INFORMATION

1. **Requirements**
    1.1. **For individuals:**
        1.1.1. Copy of passport
        1.1.2. Proof of address (i.e. utility bill not older than three months)
        1.1.3. Bank account ownership (such approval can be a letter from the bank or a scanned copy of void check) or, as appropriate, signed confirmation of wallet address, including declaration that the wallet address is beneficially held by Purchaser.
    1.2. **For entities:**
        1.2.1. Certificate of incorporation or similar charter document
        1.2.2. Shareholders register, stockholders ledger, or certificate of incumbency (or any similar corporate document showing the shareholders of the entity)
        1.2.3. For each ultimate beneficial holder of the entity: copy of passport
        1.2.4. For each ultimate beneficial holder of the entity: proof of address (i.e. utility bill not older than three months)
        1.2.5. Bank account ownership (such approval can be a letter from the bank or a scanned copy of a void check) or, as appropriate, signed confirmation of wallet address, including declaration that the wallet address is beneficially held by Purchaser.

2. **Questionnaire and Acknowledgement**

    In connection with the purchase of CEL Tokens from the Company, the undersigned hereby represents, warrants and agrees as follows:

    2.1. **Name of Purchaser:** Alex Mashinsky (the "**Purchaser**")
    2.2. **Purchaser's ID/Company number:** 13414050
    2.3. **Type of Purchaser:** Please check one of the following to indicate the entity type for the Purchaser:

    Individual
    (Corporation)
    Partnership
    Trust
    Estate
    Private Foundation
    Disregarded Entity
    Governmental Organization
    Non-Governmental Organization
    International Organization
    Other, please specify: _____

    2.4. **Country of Legal Domicile:** USA
    2.5. **Additional Representations:**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001266

- 2.5.1. Purchaser hereby represents that neither it nor any person or entity directly or indirectly controlling, controlled by or under common control with it is a person identified as a terrorist or terrorist organization on any relevant lists maintained by any governmental authorities.
- 2.5.2. None of the cash or property that Purchaser has paid or will pay the Company as Consideration has been or shall be derived from, or related to, any activity that is deemed criminal under the laws of any applicable jurisdiction.
- 2.5.3. No payment by Purchaser to the Company and no transfer or distribution of CEL Tokens to Purchaser from the Company shall cause the Company or its affiliates, directors, officers or representatives to be in violation of the United States Bank Secrecy Act, the United States Money Laundering Control Act of 1986 or the United States International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, or the regulations promulgated thereunder, as such laws and regulations may be amended from time to time, or any similar laws or regulations of any other applicable jurisdiction.

2.6. Additional Information:

- 2.6.1. Purchaser agrees to provide to the Company any additional information regarding the undersigned that the Company deems necessary or convenient to ensure compliance with all applicable laws concerning money laundering, terrorism, criminal acts, and similar activities.
- 2.6.2. Purchaser understands that the Company may release confidential information about Purchaser and, if applicable, any underlying beneficial owners, if the Company, in its sole discretion, determines that it is in the best interests of the Company in light of relevant rules and regulations.

The undersigned hereby undertakes to promptly notify the Company if at any time the undersigned is unable to satisfy the agreements set forth herein or if the representations set forth herein cease to be true.

Purchaser

Signature: _____ 3/29/18

Name of Purchaser (individual or corporation): AM Ventures Holdings Inc.

Name of Authorized Signatory: Alex Mashinsky

Title of Authorized Signatory: CEO

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001267

DocuSign Envelope ID: 8C561DC2-5CFC-4362-8955-30BB44E0A726  Case 1:23-cv-00347-JGK   Document 145-8   Filed 04/29/25   Page 14 of 18

- 13 -

# EXHIBIT B
# RISK FACTORS

*Risks Associated with the Platform Launch*

**If the Platform does not launch, you will not receive Celsius Credit Tokens.**

As of the date of this Agreement, the Token Generation has not occurred, and the Platform has not launched. If the Token Generation does not occur, and the Platform does not launch, your rights and remedies are limited to those under this Agreement and subject to the terms and conditions set forth therein.

**If the Platform does launch but its functionality does not meet users' expectations, the value of the Tokens may be adversely affected.**

As of the date of this Agreement, the Token Generation has not occurred, and the Platform has not launched and has not been fully developed. Any or all expectations or assumptions regarding the form and functionality of the Platform or the CEL Tokens (the "**Tokens**") (including, without limitation, user or member behaviour), including, without limitation, any or all expectations or assumptions that you may have, may not be met upon release, for any number of reasons, including, without limitation, mistaken assumptions or analysis, a change in the design and implementation plans, and execution of the Platform or client applications. If the Platform launches, but the functionality and usefulness of the Platform does not meet users' or members' expectations, the value of the Tokens may be negatively impacted, and such impact may be material and could result in the Token having little or no value whatsoever.

**The Company's plans for the Platform or the Tokens may change prior to the Token Generation, which may adversely affect the Platform and the value of the Tokens.**

As of the date of this Agreement, the specifications for the Platform and the Tokens are still under development. The Company may, subject to the conditions set forth in the Agreement, change the characteristics of the Platform or the Tokens, which may cause them not to meet any or all expectations or assumptions regarding the form and functionality of the Platform or the Tokens, including, without limitation, any or all expectations or assumptions that you may have. If the Platform launches, but the functionality and usefulness of the Platform does not meet users' or members' expectations, the value of the Tokens may be negatively impacted, and such impact may be material and could result in the Token having little or no value whatsoever.

**The Company or the Celsius project may dissolve, which could prevent or impede the Token Generation or negatively affect the operation of the Platform.**

It is possible that, due to any number of reasons, including, without limitation, an unfavorable fluctuation in the value of Ether, development issues with the Platform, the failure of business relationships, or competing intellectual property claims, the Celsius project may no longer be viable as a business or otherwise and the Celsius project or the Company may dissolve or fail to launch. In such event, the amount you contribute in consideration for the Tokens may not be repaid to you, or the amount of such repayment may be less than what you paid.

*Risks Associated with the Tokens*

**Holders of Tokens may lose access to those Tokens if they can no longer access their Token wallets.**

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001268

- 14 -

The Tokens, when generated and issued, will be controllable only by the possessor of unique private keys relating to the addresses in which the Tokens are held. The theft, loss or destructions of a private key required to access Tokens is irreversible, and because the Company does not have access to those private keys, such private keys could not be restored by the Company, and the Company will not be responsible for Purchaser's loss of access to its token wallet.

**Your Tokens may be stolen, transferred, or used by others if your credentials are compromised.**

Any person that gains access to or learns of your credentials or private keys may be able to use or dispose of any or all of your Tokens. The Company does not have the ability to restore Tokens that have been stolen. Unlike bank accounts or accounts at some other financial institutions, the Tokens are uninsured and, in the event of any loss, there is no public insurer, such as the FDIC or SIPC in the United States, or private insurer, to offer recourse to you.

**The resale of the Tokens is restricted by the terms of the Transaction and, even following the Token Generation, may be illiquid.**

There are currently no exchanges upon which the Tokens trade and there may never be a secondary market for the Tokens. This could impact your ability to sell the Tokens and may negatively impact the value of the Tokens. The liquidity of any market for the Tokens will depend upon the number of holders of the Tokens, the performance of the Platform, the market for similar tokens, and the interest of market participants in making a market in the Tokens and other factors. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Once the Token Generation event has occurred, the Tokens may not be listed on an exchange and, even if listed on an exchange, may be thinly traded or de-listed.**

Following the Token Generation event, the Tokens may be listed on one or more exchanges. For various reasons, including, without limitation, regulatory developments and a lack of purchaser interest, the Tokens may be thinly traded or may be removed from listing on such exchanges. This could impact your ability to sell the Tokens and may negatively impact the value of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**The transfer of the Tokens is restricted, which may adversely affect their liquidity and the price at which they may be sold.**

The Tokens have not been, and will not be, registered under the U.S. Securities Act or the securities laws of any other jurisdiction and, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the U.S. Securities Act and any other applicable Laws. These restrictions may limit the ability of investors to resell the Tokens. For example, Rule 144, the primary exemption for resales of restricted securities imposes a one-year holding period for restricted securities of companies, such as the Company, that do not provide current information to the public. It is your responsibility to ensure that all offers and sales of the Tokens within the United States and other jurisdictions comply with applicable securities and other laws. We have not agreed to or otherwise undertaken to register the Tokens, and do not have any intention to do so in the future.

*Risks Associated with the Platform*

**The Platform may malfunction due to problems with the Ethereum blockchain.**

- 15 -

The Platform is a platform intended to be based on the Ethereum blockchain. As such, any malfunction, unintended function, unexpected functioning of or attack on Ethereum may cause the Platform to malfunction or function in an unexpected or unintended manner. The impact of any such malfunction or unexpected or unintended function could be negative and material and could result in the Token having little or no value whatsoever.

**If there is insufficient interest in the Platform or blockchain technologies, the Tokens may have limited or no utility or value.**

It is possible that the Platform application will not be used by a large number of businesses, individuals, and other organizations and that there will be limited public interest in the creation and development of distributed applications. Such a lack of interest could negatively impact the utility of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

While the Tokens should not be viewed as an investment, they may have value over time. That value may be limited and may be zero if the Platform lacks use and adoption. If this becomes the case, there may be few or no markets following the launch of the application, potentially having an adverse impact on the value of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Competitive technologies could negatively impact the value of the Tokens.**

If a competitive technology is launched before or after the Token Generation, users interested in a platform like the Platform may use that technology in lieu of the Platform. In that case, the lack of use could limit the utility and value of the Tokens. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Security weaknesses could negatively impact the operation of the Platform.**

Developers involved in the creation and operation of the Platform software, or other persons may intentionally or unintentionally introduce weaknesses or bugs into the core infrastructural elements of the Platform, which could interfere with the operation of the Platform or result in the loss of Tokens. In addition, advances in cryptography, or technical advances such as the development of quantum computers, could present risks to cryptographic tokens (including, without limitation, the Tokens) and the Platform, which could result in the theft or loss of Tokens.

As with other decentralized cryptographic tokens and cryptocurrencies, the blockchain that the Platform may be built on has inherent risks and is susceptible to mining attacks, including, without limitation, double-spend attacks, majority mining power attacks, "selfish-mining" attacks, and race condition attacks, and other attacks. Any successful attacks present a risk to the Platform, the Tokens, and expected proper execution and sequencing of contract computations, and the Company will have no ability to mitigate any such attacks happening on the blockchain network.

Additionally, centralized access portals on internet servers are subject to similar attacks such as denial-of-service (DoS) and distributed DoS (DDoS) attacks, which can also present issues of security to the network.

Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**Following the Token Generation event, lack of sufficient funding by lenders could negatively**

- 16 -

**impact borrowing activity on the Platform.**

In the future, it is intended that the Platform will allow borrowers to borrow cryptocurrency in order to perform "short" positions. At such time, the success of the Platform will depend in part on the provision of sufficient funding by lenders to meet borrower demand. If lenders are unwilling to provide loans on terms that are acceptable to borrowers, borrowers and lenders may cease using the Platform and the Tokens. Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**The technology underlying the Platform is new and may be subject to additional risks.**

Cryptographic tokens are a new and untested technology. In addition to the risks discussed herein, there are risks that the Company and the developers of the Platform cannot anticipate. Further risks may materialize as unanticipated combinations or variations of the discussed risks or the emergence of new risks. Any impact of such risks could be negative and material and could result in the Token having little or no value whatsoever.

**Stress on the blockchain on which the Platform is built can slow down transactions and/or increase costs associated with the transactions on the network which may negatively impact Platform's operations.**

As with any blockchain networks, a large transaction volume can put a strain on the network, slowing down the transaction time and/or increasing costs for the transactions. For example, in the case of Ethereum blockchain, the Platform is not the only decentralized application that will be built on Ethereum. Increasing saturation of applications on the Ethereum network and high volume of transactions on the Ethereum network from other participants on the network can slow down the transactions happening through the Platform.

*Legal and Regulatory Risks*

**Intellectual property claims may adversely affect the operation of the Platform.**

Third parties may assert intellectual property claims relating to the operation of the Platform or the holding or transfer of the Tokens. Regardless of the merit of any intellectual property or other legal action, any threatened action that reduces confidence in the Platform's long-term viability or the ability of end-users to hold and transfer Tokens may adversely affect the usefulness and value of the Tokens. Additionally, a meritorious intellectual property claim could prevent the Company from improving, or end users from accessing, the Platform or holding or transferring their Tokens, which could adversely impact the utility of the Platform or the value of the Tokens, and such impact could be material and could result in the Tokens having little or no value whatsoever.

**Regulatory requirements imposed on lending and related activities may negatively affect the operation of the Platform**

Lending and related activities are heavily regulated and the source of frequent litigation, and lending on the Platform may subject the network or network participants to licensing obligations, compliance obligations, supervision and examination and/or litigation. This would extend to all aspects of the lending lifecycle, including, without limitation, advertisements and solicitations, the preparation and use of credit scores, underwriting, agreements and disclosures, payment terms, and debt collection practices. The functioning of the Platform could be impacted by these regulatory and compliance obligations, by the supervision and examination of platform activities, by one or more regulatory inquiries or actions or civil litigation. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001271

DocuSign Envelope ID: 8C561DC2-5CFC-4562-9955-90BB44E0A128    Case 1:23-cv-00347-JGK    Document 145-8    Filed 04/29/25    Page 18 of 18

- 17 -

**Regulatory requirements imposed on money transmission or token exchange activities may negatively affect the operation of the Celsius Network**

Money transmission and token exchange services are heavily regulated, and providing such services on the Platform may subject the network to licensing obligations, compliance obligations, and/or supervision and examination. Such compliance obligations may include, without limitation, implementing a comprehensive Bank Secrecy Act/anti-money laundering compliance program, including, without limitation, know your customer and customer identification program procedures, automated transaction monitoring, and required reporting and recordkeeping. In addition, the Platform may be expected to have a comprehensive sanctions screening program. The functioning of the Platform could be impacted by these regulatory and compliance obligations, by the supervision and examination of platform activities, and by one or more regulatory inquiries or actions. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

**Unfavorable legal or regulatory action could have a negative impact the utility of the Platform and Tokens, as well as the value of Tokens.**

Blockchain technologies have been the subject of scrutiny by various regulatory bodies around the world. The functioning of the Platform and the Tokens could be impacted by one or more regulatory inquiries or actions, including, without limitation, the licensing of or restrictions on the use, sale, or possession of digital tokens like the Tokens, which could impede, limit or end the development of the Platform. Any such impact could be negative and material and could result in the Token having little or no value whatsoever.

*Risks Associated with the Subordination Provision.*

All of the obligations of the Company to Purchaser in respect of payments are unsecured and are expressly subordinated in right of payment to the prior payment in full of the senior debt, and Purchaser has expressly waived the right to pursue, encourage or support any claim or other action (including, without limitation, arbitration) seeking to obtain or require payment by the Company prior to the payment in full of the senior debt. The Company's ability to incur senior debt (including, without limitation, senior debt that may be secured by any or all of the Company's assets) is not limited or capped. Without limiting the generality of the foregoing, in the event that the Token Generation does not occur, all of the Company's reimbursement obligations to Purchaser will be subordinated in right of payment and priority of security to the prior and indefeasible repayment of all indebtedness of the Company owing to one or more persons (any or all of which may be affiliates of the Company or any of its founders).

*The tax treatment of the Agreement and the Token is uncertain and there may be adverse tax consequences for Purchasers upon certain future events.*

The tax characterization of the Agreement and the Tokens is uncertain, and each Purchaser must seek its own tax advice in connection with the Agreement and the Tokens. The Agreement and the purchase of Tokens pursuant thereto may result in adverse tax consequences to Purchasers, including withholding taxes, income taxes and tax reporting requirements. Each Purchaser should consult with and must rely upon the advice of its own professional tax advisors with respect to the tax treatment of the Agreement and the Tokens.