# LOAN AGREEMENT

dated as of December [ 20 ], 2019

between

**AM Ventures Holdings Inc,**
as Borrower,

and

**CELSIUS NETWORK LIMITED,**
as Lender,

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001016

SEC-CELSIUS-E-0000406

# LOAN AGREEMENT

**THIS AGREEMENT** is dated Dec 20, 2019, (the "**Effective Date**") and made between:

(1) **AM Ventures Holdings Inc**, a company duly incorporated under the laws of the state of Delware, located at 221 River St, Hoboken, NJ 07030 (the "**Borrower**");

**CELSIUS NETWORK LIMITED**, a company duly incorporated under the laws of England and Wales, registration no. 11198050, whose registered office is at 35 Great St Helen St, London England. (the "**Lender**").

(each of Borrower, Guarantor and Lender being a "**Party**" and together the "**Parties**")

**RECITALS**

**WHEREAS**, the Borrower has requested the Lender to provide to the Borrower with a fixed term loan in accordance with the terms set out in this Agreement; and

**WHEREAS**, the Lender has agreed to provide the Borrower with the Loan as defined in clause 4.1 below), under the terms set forth in this Agreement; and

**WHEREAS**, the Parties are interested in arranging all the details of the Loan between them, including arranging the date of repayment of the Loan Amount (as defined in clause 4 below) and the Collateral listed in clause 6 that will be provided to the Lender to ensure the repayment of the Loan Amount by the Borrower in accordance with the terms of this Agreement.

Therefore, it was declared, stipulated and agreed between the parties as follows:

1. **PREAMBLE AND DEFINITIONS**

1.1  The Preamble to this Agreement and its Appendices constitute an integral part of this Agreement.

1.1  The headings in this Agreement are for convenience only and may not be used for the purposes of interpretation of this Agreement.

1.1  In the event that any lien document and/or any other collateral are used, by virtue of the provisions of this Agreement, as collateral for the repayment of the liabilities and obligations included in this Agreement, it is expressly agreed that the lien document or other security is an integral part of this Agreement and all the provisions, statements or undertakings therein are an integral part of this Agreement, and shall be deemed to be contained therein.

1.1  Any notice, which the Borrower is required to give to the Lender, will be provided in writing in accordance with the addresses specified in the preamble to this agreement.

1.1  In any case whereby a party is entitled to perform any act under the provisions of this Agreement, it is not obligated to perform it.

1.2  A reference to this Agreement (or any provision of it) or any other document shall be construed as a reference to this Agreement, that provision or that document as it is in

force for the time being and as amended, varied or supplemented from time to time in accordance with its terms, or with the agreement of the relevant parties.

1.3   A reference to a person shall include a reference to an individual, firm, company, corporation, unincorporated body of persons, or any state or any agency of that person.

1.4   A reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force for the time being, taking account of any amendment or extension, or re-enactment.

1.5   A reference to writing or written includes e-mail.

1.6   Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.7   An Event of Default is "continuing" if it has not been remedied or waived.

1.8   Unless otherwise specifically set forth below, any capitalized terms used herein shall have the meanings respectively ascribed to them in the Shareholders Agreement.

1.9   In this Agreement, the following terms shall have the following meanings:

**"The Collaterals"**   means the collaterals listed in Section 6 that will be provided by the Borrower to the Lender to ensure the repayment of the Loan Amount by the Borrower in accordance with the terms of this Agreement.

**"Business Day"**   means any day, other than a Saturday, Sunday or public holiday on which the banks are open for business in the Unites States of America.

**"Finance Documents"** means:

(a)   this Agreement;

(b)   any other document designated as a Finance Document by the Lender and the Borrower.

**"Material Adverse Effect"** means a material adverse effect on:

(a)   the business, operations, property or financial condition of the Borrower;

(b)   the ability of the Borrower to perform its payment obligations under this Agreement;

(c)   the rights or remedies of the Lender under any Finance Document.

**"USD", "US$" and "$"**   mean the lawful currency of the United States of America

2.   **STATEMENTS, REPRESENTATIONS AND UNDERTAKINGS OF THE BORROWER**

   **The Borrower states and undertakes the following**:

2.1 That it was legally incorporated in Delaware, and that all of the decisions required by law and according to the Borrower's Articles of Association for entering into this Agreement have been accepted and approved by its management and relevant organs and committees (if any), and that the signatories on its behalf are entitled to sign on its behalf and bind it by their signature, and that its engagement in and the execution of this Agreement does not constitute a breach of any undertaking assumed by the Borrower.

2.2 That there is no restriction and/or prohibition and/or prevention according to the provisions of the Borrower's Article of Association and there is no impediment under any law and/or agreement as far as it is concerned to enter into this Agreement and to perform its undertakings and obligations under the provisions of this Agreement in full and on time.

2.3 That the Borrower has and/or will have at its disposal the necessary financial means in order to comply and fulfill its undertakings and obligations under this Agreement.

2.4 Until the repayment of the Loan Amount (and unless approved by the Lender by providing the Borrower with a prior written consent), not to sell, transfer, assign, convert, pledge, or to make any disposition in the shares of AM Ventures Hodings Inc.

2.5 Each of the Financing Documents constitutes a legal, real, valid, binding, and enforceable undertaking on the Borrower according to its terms and according to its appendices, and there is no legal restriction and/or any other restriction to the provision of Collateral in accordance with Section 6 below.

2.6 There is no prohibition pursuant to any law or agreement (including, expressly, any bonds, lien, negative pledge, obligation or covenant given by Borrower to any entity or person) to create the liens and to grant all other collateral in favor of the Lender pursuant to this Agreement, and the providers of the Collateral are allowed to give the Lender the said Collateral in accordance with this Agreement. All the assets which are pledged pursuant to Section 6 below are free of any debt and/or charge and/or mortgage and/or pledge and/or warning and/or note and/or foreclosure and/or any judicial, administrative or other order and/or any right in favor of any third party whatsoever, and such assets shall be preserved in this condition until the repayment of the Loan Amount and the fulfillment of the other undertakings of the Borrower under this Agreement.

2.7 The Borrower has submitted to the relevant tax authorities all the reports it must submit according to any law on time, and paid, on time, all the taxes and other payments it is obliged to pay according to the said reports or has made proper provision in respect of them in its ledgers, books and records.

2.8 No event of breach occurred, which enables the Lender to make the Loan immediately payable under the terms of Section 7 below.

2.9 There is no material information with regards to its activity, which was not brought to the attention of the Lender, and which, to the best of the Borrower's knowledge, had it been brought to the Lender's attention, it would reasonably have led the Lender to refrain from providing the Loan under this Agreement in accordance with the terms of this Agreement.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

2.10   That it shall immediately notify the Lender regarding any event of the imposition of foreclosure, an order or right of a third party on any of its assets, and shall immediately, without delay, at its own expense, take all measures to remove such restrictive right as aforementioned.

2.11   That the Borrower are not insolvent and/or liquidation proceedings, and/or a request has been filed against them for declaring them insolvent and/or initiating liquidation proceedings (including recovery proceedings, freezing of proceedings, receivership procedures and/or similar proceedings).

2.12   The undertakings in this Section 2 remain in force from the date of this Agreement for so long as any amount is outstanding under this Agreement.

2.13   The Borrower will:

    (a)   promptly upon becoming aware of the same, give the Lender notice in writing of all litigation or arbitration proceedings which are current, threatened or pending against it which, if adversely determined, would have or could reasonably be expected to have a Material Adverse Effect; and

    (b)   promptly upon becoming aware of any Event of Default or the occurrence of any event which results or may be reasonably likely to result in any of the representations and warranties contained in Section 2 above being incorrect or untrue, notify the Lender in writing.

## 3. STATEMENTS AND UNDERTAKINGS OF THE LENDER

**The Lender states and undertakes the following:**

3.1   That it is an active company duly registered under the laws of England and Wales.

3.2   That all of the decisions required by law and according to the Lender's Articles of Association for entering into this Agreement have been accepted by its management and that the signatories on its behalf are entitled to sign on its behalf and obligate it with their signature.

3.3   Each of the Financing Documents constitutes a legal, real, valid, binding, and enforceable undertaking on the Trustee according to its terms and according to its appendices.

3.4   That, as far as the Lender is concerned, there is no restriction and/or prohibition and/or prevention pursuant to any law and/or agreement to enter into this Agreement and to perform his obligations under the provisions of this Agreement in full and on time, and that its engagement in this Agreement and its performance does not constitute and will not constitute a breach of any undertaking by the Lender.

3.5   That the Lender has and/or will have the financial means required to provide the loan principal in accordance with and subject to the provisions of this agreement.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001020

SEC-CELSIUS-E-0000410

4. **THE LOAN**

4.1 Subject to the terms and conditions set forth herein, as of the Effective Date, the Lender shall provide a loan in the total principal amount of 7,020,000 USD to the Borrower (the "**Loan Principal**").

4.2 The Lender shall offset the Loan Principal payment to the Borrower against any amounts previously owed by the Borrower to the Lender as of the Effective Date, in accordance to the Borrower's instructions.

4.3 The Loan Principal or any outstanding amount, in case the Borrower repaid part of the Loan Amount, shall bear annual interest at the rate of 6% per annum (the "**Interest Rate**") commencing from the Effective Date, which will be calculated on an annual basis and added to the Loan Amount, according to the Effective Date (the "**Loan Interest**"), until the full repayment of the Loan Amount.

4.4 The Loan Principal and the Loan Interest will not be linked to any linkage basis. The Loan Principal together with the Loan Interest (including arrears interest if applicable) will be read in this Agreement above and hereinafter together as: (the "**Loan Amount**").

5. **THE TERM OF THE LOAN AND THE LOAN REPAYMENT DATE**

5.1 The Loan term shall commence on the Effective Date, ending with the expiration of 48 months from the Effective Date (the "**Loan Term**").

5.2 The Loan Amount may be repaid before the end of the Loan Term (the "**Maturity Date**").

5.3 Notwithstanding the provisions of Section 5.1 above, the Borrower shall be entitled to repay all or part of the Loan Amount in full before the Maturity Date. The Lender shall offset the Loan Amount from any net amount payable by the Borrower.

5.4 The Loan Amount will be considered settled upon the payment of the Loan Amount in full, and in such case, the Lender undertakes to furnish the Borrower with a written confirmation that the Loan subject of this Agreement is settled, and to sign any document required to remove the liens recorded in favour of the Lender.

5.5 Any Amount on account of repayment of the Loan to be paid shall be transferred to the Lender's account according to the Lender's instructions in writing.

5.6 Payment under this Loan Agreement shall be made in USD.

6. **COLLATERAL**

To secure the payment of the Loan Amount in full in accordance with the provisions of this Agreement, the Borrower hereby delivers the following collaterals to the Lender:

6.1 An exclusive first degree mortgage and pledge on 117,000,000 (in words: one hundred and seventeen million) Celsius Tokens ("**CEL**") to be held in custody by the Lender until the Loan Amount is settled (the "**Collaterals**").

6.2 In the case where the Borrower made a partial payment to the Lender, the Lender will release a proportionate part of the Collaterals (i.e. in case where the Borrower settled 10 percent of the Loan Amount, 10 percent of the Collaterals will be released).

6.3 The Lender undertakes to provide the Borrower with the Collaterals within 7 days of the date of payment of the Loan Amount in full by the Borrower.

## 7. DEFAULT EVENT

7.1 In each of the cases set out below, the Lender will be entitled, at its sole and absolute discretion, to put the Loan Amount up for immediate repayment of the unpaid balance of the Loan Amount (in whole or in part) as it will be on that date, whether the Maturity Date has arrived or not, and to immediately seize all actions it deems fit to secure repayment of the Loan Amount in full and all the expenses incurred as a result of the occurrence of the following cases, in any manner it deems appropriate and useful at its sole discretion, including through the exercise of the Collateral:

(a) If the Borrower does not fulfill and/or breach any of its undertakings in accordance with the Financing Documents and/or any agreement or document that will be signed in pursuance of them, provided that the Borrower has not rectified the breach within 30 days from the date on which it was requested to do so in writing.

(b) If a trustee, receiver, liquidator and/or manager, is appointed, whether temporarily or permanently, or an application of the appointment of such has been filed, for the Borrower's business and/or property, and the appointment of each of the officers listed above or the said applications will not be removed or canceled within 45 days as of the date of appointment or 90 days as of the date of the said application, as the case may be.

(c) If any Execution Office activity is carried out in respect of a debt exceeding USD $3,000,000 (or equivalent) against the assets of the Borrower according to the Financing Documents, and activity of the Execution Office will not be terminated or removed within 45 days as of the Execution Office activity date.

(d) If the Borrower has breached the provisions of this Agreement with a fundamental breach, which has not been rectified within 30 days from the date on which the Borrower received a warning detailing the nature of the breach.

(e) If any Financing Document ceases to be fully valid or ceases to constitute a legal, valid, binding and enforceable undertaking, provided that as far as it is possible, the Borrower will be given written notice and a period of 30 days to remedy this breach.

(f) If the Borrower or any of the Guarantors makes a voluntary liquidation decision.

(g) If an application is made to make an arrangement with the creditors of the Borrower. In the event that the Borrower announces that it intends to oppose to the request to make an arrangement, the cause will be established only if 45 days have elapsed of the date of the request and the request has not been deleted or rejected by the court.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

(h) If there is a change in the control of the Borrower, as specified in Section **Error! Reference source not found.**, directly or indirectly, without the Lender's prior written approval, and such change of control has not been canceled within 30 days of the date of the Lender's written demand.

(i) If, for any reason, one or more of the Collateral in favor of the Lender expires or ceases to exist, and the breach has not been corrected within 30 days.

(j) If it becomes evident that a material statement and/or representation that the Borrower gave and/or will give the Lender is incorrect.

(k) If any action has been taken which, in accordance with the provisions of this Agreement and/or the other Financing Documents, is subject to obtaining the consent of the Lender in advance and in writing, without obtaining such consent, and this breach shall not be amended within 30 days of the date of execution of the action.

(l) In the event that the Borrower is considered "insolvent" within the meaning of this term in the applicable law.

(m) If a "going concern notice" is presented in the Borrower's financial statements, the cause of which is the Borrower's inability to meet its obligations.

7.2 Putting the secured debts up for immediate repayment shall be made by written notice from the Lender to the Borrower. For the avoidance of doubt, in any event of immediate repayment, the Lender is entitled, without derogating from its rights to any relief or remedy under the Financing Documents or the law, to use all the means available to him by law to collect any amount due to the Lender on account of the balance of the Loan Amount, including the exercise of the Collateral, and exercise all of his rights under this Agreement, without the Lender having to exercise any Collateral in any order whatsoever.

7.3 In addition to the Secured Amounts, the Borrower shall indemnify the Lender for any direct damages and expenses that will be incurred as a result of any event from the events listed in Section 7.1, against the presentation of applicable references and/or documentation by the Lender.

## 8. PAYMENTS

8.1 Subject to Section 8.2 below, all payments made by the Borrower to the Lender under this Agreement shall be made without set-off or counterclaim and without any deduction to such bank account as the Lender may from time to time notify in writing to the Borrower.

8.2 Other than with respect to interest payable pursuant to Section 4.3, if the Borrower makes any payment hereunder in respect of which it is required by law to make any deduction or withholding, Borrower shall pay such additional amounts to ensure receipt by the Lender of the full amount that the Lender would have received but for such deduction or withholding.

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001023

SEC-CELSIUS-E-0000413

## 9. INDEMNITY

The Borrower will indemnify the Lender against all direct losses incurred by the Lender arising from the Borrower paying any principal amount to the Lender after the due date.

## 10. COVENANTS

10.1 **Negative pledge**

The Borrower shall not create or permit to subsist any security interest over its assets other than:

(a) any security interest created by operation of law which does not have a Material Adverse Effect; or

(b) otherwise with the prior written consent of the Lender.

## 11. FEES COSTS AND EXPENSES

Each Party shall be responsible for its own costs and expenses (including legal and notarial fees, stamp, registration and other taxes due) incurred in connection with the negotiation, preparation, execution or enforcement of:

(a) this Agreement and any other documents referred to in this Agreement; and

(b) any other Finance Documents executed after the date of this Agreement.

## 12. ASSIGNMENT

Neither Party may assign or transfer any of its rights or obligations under this Agreement.

## 13. WAIVERS

No failure or delay by the Lender in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof or prejudice any other or further exercise by the Lender of any of its rights or remedies under this Agreement. The rights and remedies in this Agreement are (unless otherwise expressly provided in this Agreement) cumulative and not exclusive of any rights or remedies provided by law.

## 14. GOVERNING LAW AND ENFORCEMENT

14.1 This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

14.2 The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").

14.3 The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

14.2  The courts of England have exclusive jurisdiction to settle any dispute arising out of or in connection with this Agreement (including a dispute relating to the existence, validity or termination of this Agreement or any non-contractual obligation arising out of or in connection with this Agreement) (a "**Dispute**").

14.3  The Parties agree that the courts of England are the most appropriate and convenient courts to settle Disputes and accordingly no Party will argue to the contrary.

15. **COUNTERPARTS**

This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

*[Signature page to follow]*

This Agreement has been entered into on the date stated at the beginning of this Agreement.

| | |
|---|---|
| **CELSIUS NETWORK LIMITED** | **AM Ventures Holdings Inc.** |
| S. Daniel Leon | Alex Mashinsky |
| By | By |
| COO | CEO |
| Title | Title |
| | 12/20/2019 |

CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS

CELSIUS_SEC_0001025

SEC-CELSIUS-E-0000415