# LOAN AGREEMENT

dated as of January 17, 2020

among

**AM VENTURE HOLDINGS, INC.,**
as Borrower,

**CELSIUS NETWORK LIMITED,**
as Lender,

and

**ALEX MASHINSKY,**
as Chargor

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS                    CELSIUSNETWORK_00155355

**LOAN AGREEMENT**

**THIS AGREEMENT** is dated January 17, 2020, and made between:

(1) **AM VENTURE HOLDINGS, INC.**, a company duly incorporated under the laws of the State of Delaware, DE Tax No. 134140150, whose registered office is at 16192 Coastal Highway, Lewes, Delaware, 19958-9776.
(the "**Borrower**");

(2) **ALEX MASHINSKY**, U.S. Passport no. 474759049 whose address is at 140 E 63 St. PH4 New York, NY 10065 (the "**Chargor**"); and

(3) **CELSIUS NETWORK LIMITED**, a company duly incorporated under the laws of England and Wales, registration no. 11198050 whose registered office is at 35 Great St. Helen's, London, EC3A 6AP United Kingdom (the "**Lender**").

(4) Each of Borrower, Chargor and Lender being a "**Party**" and together the "**Parties**")

**RECITALS**

**WHEREAS**, the Borrower has entered into a token sale agreement with the Lender dated March 29, 2018 attached hereto as Schedule A (the "**TSA**"), in which the Borrower obtained the right to purchase up to 117 (one hundred and seventeen) Million CEL tokens from the Lender, in consideration for the payment of an aggregate amount of up to US$ 18,000,000 (eighteen million);

**AND WHEREAS**, the Borrower, through an announcement from its authorized signatory, the Chargor, has exercised its right in the TSA and taken an obligation to purchase the full amount of 117 Million CEL tokens (the "**CEL Tokens**") for the full consideration of US$18,000,000 (eighteen million) (the "**Consideration**");

**AND WHEREAS,** by the Effective Date, the Borrower has yet to provide the Lender with the Consideration;

**AND WHEREAS,** the Borrower requested the Lender to provide to the Borrower with a fixed-term loan to be offset against the outstanding Consideration, on an amount equal to the Consideration, bearing an annual interest rate of 6% (six percent), in accordance with the terms set out in this Agreement;

**AND WHEREAS,** the Lender agreed to provide the Borrower with the Loan (as defined in clause 4.1 below), under the terms set forth in this Agreement, against a collateral of the CEL Tokens held by the Borrower, and given the volatility of the CEL tokens and the cryptocurrencies in general;

**WHEREAS**, the Parties agreed on terms of the Loan made available to the Lender from 20 December 2019 ("**Effective Date**"), in return to the collateral of 117 (one hundred and seventeen) Million CEL tokens held by the Borrower on Effective Date to ensure the full repayment of the loan;

**WHEREAS,** the agreement between the Parties dated 20 December 2019, in connection with the Loan included clerical errors, while the Loan and collateral of the 117 Million CEL tokens were already defined and executed by the Parties as a collateral against the Loan;

**WHEREAS,** given the volatility of the CEL tokens and the cryptocurrencies in general, the Parties agreed that the Borrower will deliver an additional collateral in a form of the shares owned by the Chargor in Celsius Network, Inc., as mentioned in clause 6.1 below;

**AND WHEREAS,** the Parties are interested in documenting all the details of the Loan between them, including the date of repayment of the Loan Amount (as defined in clause 4 below) and the Collaterals listed in clause 6 that will be provided to the Lender to ensure the repayment of the Loan Amount by the Borrower in accordance with the terms of this Agreement.

Therefore, it was declared, stipulated and agreed between the parties as follows:

**1.    PREAMBLE AND DEFINITIONS**

1.1    The Preamble to this Agreement and its Appendices constitute an integral part of this Agreement.

1.2    The headings in this Agreement are for convenience only and may not be used for the purposes of interpretation of this Agreement.

1.3    In the event that any lien document and/or any other collateral are used, by virtue of the provisions of this Agreement, as collateral for the repayment of the liabilities and obligations included in this Agreement, it is expressly agreed that the lien document or other security is an integral part of this Agreement and all the provisions, statements or undertakings therein are an integral part of this Agreement, and shall be deemed to be contained therein.

1.4    Any notice, which the Borrower is required to give to the Lender, will be provided in writing in accordance with the addresses specified in the preamble to this agreement.

1.5    In any case whereby a party is entitled to perform any act under the provisions of this Agreement, it is not obligated to perform it.

1.6    A reference to this Agreement (or any provision of it) or any other document shall be construed as a reference to this Agreement, that provision or that document as it is in force for the time being and as amended, varied or supplemented from time to time in accordance with its terms, or with the agreement of the relevant parties.

1.7    A reference to a person shall include a reference to an individual, firm, company, corporation, unincorporated body of persons, or any state or any agency of that person.

1.8    A reference to a statute, statutory provision or subordinate legislation is a reference to it as it is in force for the time being, taking account of any amendment or extension, or re-enactment.

1.9    A reference to writing or written includes e-mail.

1.10 Unless the context otherwise requires, words in the singular include the plural and in the plural include the singular.

1.11 An Event of Default is "continuing" if it has not been remedied or waived.

1.12 Unless otherwise specifically set forth below, any capitalized terms used herein shall have the meanings respectively ascribed to them in the Token Sale Agreement.

1.13 In this Agreement, the following terms shall have the following meanings:

"**Business Day**" means any day, other than a Saturday, Sunday or public holiday on which the banks are open for business in the Unites States of America.

"**Charged Assets**" has the meaning given to it in the Charge attached to this Agreement as **Schedule B**.

" **Collaterals**" means the collaterals listed in clause 6 to this Agreement that will be provided by the Borrower and the Chargor to the Lender to ensure the repayment of the Loan Amount by the Borrower in accordance with the terms of this Agreement.

"**Event of Default**" means any breach as defined in Clause 7 to this Agreement that has not been remedied within thirty (30) business days and/or Insolvency Event.

"**Finance Documents**" means:

(a) this Agreement;

(b) the Charge; and

(c) any other document designated as a Finance Document by the Lender and the Borrower.

"**Liquidation Event**" means: (i) the closing of the sale, transfer, or other disposition of all of the Lender's shares or assets; (ii) the consummation of a merger or consolidation in which the Lender is a constituent party; (iii) Initial Public Offering or any other event resulted in the Lender being a public or a reporting entity under applicable securities regime; or (iv) financing round of at least 15 (fifteen) Million US$ at a company valuation of at least 50 (fifty) Million US$ pre-money

"**Material Adverse Effect**" means a material adverse effect on:

(a) the business, operations, property or financial condition of the Borrower;

(b) the ability of the Borrower to perform its payment obligations under this Agreement;

(c) the rights or remedies of the Lender under any Finance Document.

"**Charge**" means the personal charge entered into by Mr. Alex Mashinsky with U.S. Passport number 474759049, the form of which is attached hereto as **Schedule B** (*Charge*).

"USD", "US$" and "$" mean the lawful currency of the United States of America

2. **STATEMENTS, REPRESENTATIONS AND UNDERTAKINGS OF THE BORROWER**

   **The Borrower states and undertakes the following**:

2.1 That it is legally incorporated and in good standing in the State of Delaware, and that all of the decisions required by law and according to the Borrower's Articles of Association for entering into this Agreement have been accepted and approved by its management and relevant organs and committees (if any), and that the signatories on its behalf are entitled to sign on its behalf and bind it by their signature, and that its engagement in and the execution of this Agreement does not constitute a breach of any undertaking assumed by the Borrower.

2.2 That there is no restriction and/or prohibition and/or prevention according to the provisions of the Borrower's governing documents and there is no impediment under any law and/or agreement as far as it is concerned to enter into this Agreement and to perform its undertakings and obligations under the provisions of this Agreement in full and on time.

2.3 That the Borrower has and/or will have at its disposal the necessary financial means in order to comply and fulfill its undertakings and obligations under this Agreement.

2.4 Until the repayment of the Loan Amount (and unless approved by the Lender by providing the Borrower with a prior written consent), not to sell, transfer, assign, convert, pledge, or to make any disposition in the shares of the Chargor , in the Borrower in such manner that following which the Chargor ceases to be a Controlling shareholder of the Borrower. While Charged Assets are in the custody of the Lender, voting rights shall remain with Chargor. A copy of the Chargor's personal undertaking are attached to this Agreement as **Schedule B** (*Charge*).

2.5 Each of the Financing Documents constitutes a legal, real, valid, binding, and enforceable undertaking on the Borrower according to its terms and according to its appendices, and there is no legal restriction and/or any other restriction to the provision of the Collaterals in accordance with Clause 6 below.

2.6 There is no prohibition pursuant to any law or agreement (including, expressly, any bonds, lien, negative pledge, obligation or covenant given by Borrower and/or the Chargor to any entity or person) to create the liens and to grant the Collaterals and/or the Charged Assets in favor of the Lender pursuant to this Agreement, and the Borrower and Chargor are allowed to give the Lender the said Collaterals and/or Charged Assets in accordance with this Agreement. All the assets which are pledged pursuant to the Agreement and/or the Charge are free of any debt and/or charge and/or mortgage and/or pledge and/or warning and/or note and/or foreclosure and/or any judicial, administrative or other order and/or any right in favor of any third party whatsoever, and such assets shall be preserved in this condition until the repayment of the Loan

Amount and the fulfillment of the other undertakings of the Borrower in accordance with the terms set in this Agreement.

2.7 The Borrower has submitted to the relevant tax authorities all the reports it must submit according to any law on time, and paid, on time, all the taxes and other payments it is obliged to pay according to the said reports or has made proper provision in respect of them in its ledgers, books and records.

2.8 No Event of Default, which enables the Lender to make the Loan immediately payable under the terms of Clause 7 below.

2.9 There is no material information with regards to its activity, which was not brought to the attention of the Lender, and which, to the best of the Borrower's knowledge, had it been brought to the Lender's attention, it would reasonably have led the Lender to refrain from providing the Loan under this Agreement in accordance with the terms of this Agreement.

2.10 That it shall immediately notify the Lender regarding any event of the imposition of foreclosure, an order or right of a third party on any of its assets, and shall immediately, without delay, at its own expense, take all measures to remove such restrictive right as aforementioned.

2.11 That the Borrower and the Chargor are not insolvent and/or liquidation proceedings, and/or a request has been filed against them for declaring them insolvent and/or initiating liquidation proceedings (including recovery proceedings, freezing of proceedings, receivership procedures and/or similar proceedings).

2.12 The undertakings in this Clause 2 remain in force from the date of this Agreement for so long as any amount is outstanding under this Agreement.

2.13 The Borrower will:

(a) promptly upon becoming aware of the same, give the Lender notice in writing of all litigation or arbitration proceedings which are current, threatened or pending against it which, if adversely determined, would have or could reasonably be expected to have a Material Adverse Effect; and

(b) promptly upon becoming aware of any Event of Default or the occurrence of any event which results or may be reasonably likely to result in any of the representations and warranties contained in Clause 2 above being incorrect or untrue, notify the Lender in writing.

3. **STATEMENTS AND UNDERTAKINGS OF THE LENDER**

   **The Lender states and undertakes the following**:

3.1 That it is an active company duly registered under the laws of England and Wales.

3.2 That all of the decisions required by law and according to the Lender's Articles of Association for entering into this Agreement have been accepted by its management and that the signatories on its behalf are entitled to sign on its behalf and obligate it with their signature.

3.3  Each of the Financing Documents constitutes a legal, real, valid, binding, and enforceable undertaking on the Lender according to its terms and according to its appendices.

3.4  That, as far as the Lender is concerned, there is no restriction and/or prohibition and/or prevention pursuant to any law and/or agreement to enter into this Agreement and to perform its obligations under the provisions of this Agreement in full and on time, and that its engagement in this Agreement and its performance does not constitute and will not constitute a breach of any undertaking by him.

**4.   THE LOAN**

4.1  Subject to the terms and conditions set forth herein, as of the Effective Date, the Lender has provided a loan in the total principal amount of US$ 18,000,000 (eighteen million) to the Borrower (the "**Loan Principal**").

4.2  The Lender has offset the Loan Principal payment to the Borrower against the Consideration owed by the Borrower to the Lender as of the Effective Date, in accordance to the Borrower's instructions.

4.3  The Loan Principal, or any outstanding amount, in case the Borrower repay part of the Loan Amount, shall bear annual interest at the rate of 6% (six percent) per annum (the "**Interest Rate**") commencing from the Effective Date, which will be calculated on an annual basis and added to the Loan Amount, according to the Effective Date (the "**Loan Interest**"), until the full repayment of the Loan Amount.

4.4  The Loan Principal and the Loan Interest will not be linked to any linkage basis. The Loan Principal together with the Loan Interest (including arrears interest if applicable) will be read in this Agreement above and hereinafter together as the "**Loan Amount.**"

4.5  All amounts owing under the Agreement will be secured by the Token Collaterals and the Charged Assets as described in Clause 6 below.

4.6  In the event the Loan Amount is not repaid by Borrower in full by the Maturity Date (as defined below), the Lender and the Borrower may enter into a new agreement or amendment within 30 (thirty) calendar days.

4.7  In the event that the Lender and Borrower are unable to reach such agreement and the Borrower has yet to repay the outstanding Loan Amount within 30 (thirty) calendar days of the Maturity Date, and under the condition that the Token Collaterals are equal to and/or greater in value than the outstanding Loan Amount at the Maturity Date, the Token Collaterals shall be granted to the Lender to constitute the full and final repayment of the Loan Amount.

**5.   THE TERM OF THE LOAN AND THE LOAN REPAYMENT**

5.1  The Loan term shall commence on the Effective Date, ending with the expiration of 48 (forty-eight) months from the Effective Date (the "**Loan Term**").

5.2  The Loan Amount shall be repaid in full either by partial repayments OR in one payment during the Loan Term or by the end of the Loan Term (the "**Maturity Date**").

5.3 In the event the Loan Amount is repaid within 24 (twenty-four) months of Effective Date, the first- and second-year's Loan Interest will be waived by the Lender.

5.4 Notwithstanding the provisions of Clause 2.6 above, the Borrower may sell all or part of the Token Collaterals within the Loan Term (the "**Sale**"), for a price that shall not be lower than the average price of the CEL token, as appears in www.coinmarketcap.com in the 7 (seven) days prior to the Sale. For the execution of such Sale, the Borrower shall present the Lender with a sale agreement (the "**Sale Agreement**") and transfer the full consideration received in connection with such Sale (the "**Sale Amount**"), pursuant to which the Lender shall release the amount of CEL tokens as mentioned in the Sale Agreement within 48 hours from when the consideration was fully received by it and offset the consideration received against the outstanding Loan Amount.

5.5 In the event the aggregated Sale Amount received for the Sale of Token Collateral is equal to or greater in value than the outstanding Loan Amount, the Borrower shall be deemed to have satisfied all its obligations under this Agreement. In such event, the Lender shall be entitled to receive all Sale Amount and all remaining Token Collateral (if any) as compensations for the breach the terms of payment as set in the TSA, subject to its waiver on any claim against the Borrower in connection with the TSA.

5.6 At any time during the Loan Term, the Lender shall be entitled to redeem the remaining outstanding Loan Amount by repossessing any remaining Token Collateral and applying the market value to the Loan Amount, subject to the average price of the CEL Token on www.coinmarketcap.com in the 7 (seven) days prior to the Lender exercising this right was 0.154 US$ per CEL Token or more. In such event, the Lender shall be entitled to redeem the remaining outstanding Loan Interest from the Charged Assets in the earliest of a Liquidation Event or the Maturity Date per the valuation of the Charged Assets provided by the Chargor and agreed upon by the Lender. In the event the Lender disagrees with the valuation provided by Chargor, the Lender may appoint a value appraiser on its behalf and the average of both valuations shall constitute the final agreed upon valuation for this purpose. The Borrower shall be deemed to have satisfied all its obligations under this Agreement.

5.7 In the event the outstanding Loan Amount is greater in value than the Sale Amount, the Lender shall be entitled to redeem the remaining outstanding Loan Amount in the earliest of a Liquidation Event or the Maturity Date by repossessing any remaining CEL Tokens and applying the market value to the Loan Amount based on the average price of the CEL token on www.coinmarketcap.com in the past 48 (forty-eight) hours. If such repossession is not sufficient to cover the unpaid Loan Amount, the Lender shall be entitled to redeem the remaining outstanding Loan Interest from the Charged Assets in the earliest of a Liquidation Event or the Maturity Date per the valuation of the Charged Assets provided by the Chargor and agreed upon by the Lender. In the event the Lender disagrees with the valuation provided by Chargor, the Lender may appoint a value appraiser on its behalf and the average of both valuations shall constitute the final agreed upon valuation for this purpose. For the avoidance of doubt, any action taken by the Lender under this clause shall not release The Borrower from its obligations under this Agreement and the Borrower shall be deemed to have satisfied these obligations.Payments under this Loan Agreement shall be made in US$ or another means of payment agreed upon by the Parties, while all such an agreement between the Parties shall state the US$ value of such payments (including in payments made as part

of the Sale), according which the Sale Amount will be offset against the outstanding Loan Amount.

**6.   COLLATERAL**

6.1   To secure the payment of the Loan Amount in full in accordance with the provisions of this Agreement, the Borrower hereby delivers the following collaterals to the Lender:

   (a)   A personal charge and pledge by Mr. Alex Mashinsky of his equity holdings in the Lender (the **"Charged Assets"**) in the form attached to this Agreement as **Schedule B** (*Charge*).

   (b)   An exclusive first-degree mortgage and pledge on 117,000,000 (in words: one hundred and seventeen million) Celsius Tokens (**"CEL"**) to be held in custody by the Lender until the Loan Amount is settled in full (the **"Token Collaterals"**).

6.2   The Lender undertakes to discharge the Charged Assets within 7 days of the date of payment of the Loan Amount in full by the Borrower.

**7.   DEFAULT EVENT**

7.1   In each of the cases set out below, the Lender will be entitled, at its sole and absolute discretion, to put the Loan Amount up for immediate repayment of the unpaid balance of the Loan Amount (in whole or in part) as it will be on that date, whether the Maturity Date has arrived or not, and to immediately seize all actions it deems fit to secure repayment of the Loan Amount in full and all the damages and expenses incurred as a result of the occurrence of the following cases, in any manner it deems appropriate and useful at its sole discretion, including through the exercise of the Token Collaterals and the Charged Assets:

   (a)   If the Borrower and/or Chargor does not fulfill and/or breaches any of its undertakings under the Financing Documents, provided that the Borrower has not rectified the breach within 30 days from the date on which it was requested to do so in writing by the Lender or from the date on which it first learned of the breach, whichever is earlier.

   (b)   If a trustee, receiver, liquidator and/or manager, is appointed, whether temporarily or permanently, or an application of the appointment of such has been filed, for the Borrower's business and/or property and/or to the Borrower and/or to the Guarantor and/or the Guarantor's business and/or property, and the appointment of each of the officers listed above or the said applications will not be removed or canceled within 45 days as of the date of appointment or 90 days as of the date of the said application, as the case may be.

   (c)   If the Borrower has breached the provisions of this Agreement with a fundamental breach, which has not been rectified within 30 days from the date on which the Borrower received from the Lender a warning detailing the nature of the breach.

(d) If any Financing Document ceases to be fully valid or ceases to constitute a legal, valid, binding and enforceable undertaking, provided that as far as it is possible, the Borrower will be given written notice and a period of 30 days to remedy this breach (including by way of providing alternative collateral).

(e) If the Borrower or the Chargor makes a voluntary liquidation decision.

(f) If a court filing and/or official application is made to make an arrangement with the creditors of the Borrower. In the event that the Borrower announces that it intends to oppose to the request to make an arrangement, the cause will be established only if 45 days have elapsed of the date of the request and the request has not been deleted or rejected by the court.

(g) If there is a change in the control of the Borrower, as specified in Clause 2 above, directly or indirectly, without the Lender's prior written approval, and such change of control has not been canceled within 30 days of the date of the Lender's written demand.

(h) If, for any reason, one or more of the Collateral in favor of the Lender expires or ceases to exist, and the breach has not been corrected within 30 days.

(i) If it becomes evident that a material statement and/or representation that the Borrower gave and/or will give the Lender is incorrect. For the avoidance of doubt, any statements and/or representations given under Clause 2 above shall constitute a material statement.

(j) If any action has been taken which, in accordance with the provisions of this Agreement and/or the other Financing Documents, is subject to obtaining the consent of the Lender in advance and in writing, without obtaining such consent, and this breach shall not be amended within 30 days of the date of execution of the action.

(k) In the event that the Borrower is considered "insolvent" within the meaning of this term under the laws of the State of Delaware.

(l) If a "going concern notice" is presented in the Borrower's financial statements, the cause of which is the Borrower's inability to meet its obligations.

7.2 Putting the secured debts up for immediate repayment in accordance with this section shall be made by written notice from the Lender to the Borrower. For the avoidance of doubt, in any event of immediate repayment, the Lender is entitled, without derogating from its rights to any relief or remedy under the Financing Documents or the law, to use all the means available to him by law to collect any amount due to the Lender on account of the balance of the Loan Amount and the other secured charges, including the exercise of the Collateral, and exercise all of his rights under this Agreement, all at the expense of the Borrower, without the Lender having to exercise any Collateral in any order whatsoever.

7.3 In addition to the Secured Amounts, the Borrower shall indemnify the Lender for any direct damages and expenses that will be incurred as a result of any event from the events listed in Section 7.1, against the presentation of applicable references and/or documentation by the Lender.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS                    CELSIUSNETWORK_00155364

8. **LIQUIDATION EVENT**

8.1 The Parties hereby agrees that in a case of a Liquidation Event, the Lender will be entitled, at its sole and absolute discretion, to put the Loan Amount up for immediate repayment of the unpaid balance of the Loan Amount (in whole or in part) as it will be on that date, whether the Maturity Date has arrived or not, and to immediately seize all actions it deems fit to secure repayment of the Loan Amount in full and all the damages and expenses incurred as a result of the occurrence of the following cases, in any manner it deems appropriate and useful at its sole discretion, including through the exercise of the Token Collaterals and the Charged Assets.

8.2 In the event that the Lender decides to execute its right in accordance to clause 8.1 above, it shall notify the Borrower on its decision and the Borrower may decide to instruct the Lender to use the Charged Assets, based on the valuation set in the Liquidation Event, for the repayment of all or part of the outstanding Loan Amount, and release all remaining Token Collateral to the Borrower's possession.

8.3 The Borrower decision should be delivered to the Lender in writing, not later than 5 Business Days from the day when the Lender notified it on executing the Lender's right under clause 8.1 above.

9. **PAYMENTS**

9.1 Subject to Section 9.2 below, all payments made by the Borrower to the Lender under this Agreement shall be made without set-off or counterclaim and without any deduction to such bank account as the Lender may from time to time notify in writing to the Borrower.

9.2 Other than with respect to interest payable pursuant to Section 4.3, if the Borrower makes any payment hereunder in respect of which it is required by law to make any deduction or withholding, it shall pay such additional amounts to ensure receipt by the Lender of the full amount that the Lender would have received but for such deduction or withholding.

10. **INDEMNITY**

The Borrower will indemnify the Lender against all direct losses incurred by the Lender arising from the Borrower paying any principal amount to the Lender otherwise than on the due date.

11. **COVENANTS**

11.1 **Negative pledge**

The Borrower shall not create or permit to subsist any security interest over its assets other than:

(a) any security interest created by operation of law which does not have a Material Adverse Effect; or

(b) otherwise with the prior written consent of the Lender.

12. **FEES COSTS AND EXPENSES**

Each Party shall be responsible for its own costs and expenses (including legal and notarial fees, stamp, registration and other taxes due) incurred in connection with the negotiation, preparation, execution or enforcement of:

(a)   this Agreement and any other documents referred to in this Agreement (including, without limitation, the Personal Guarantee); and

(b)   any other Finance Documents executed after the date of this Agreement.

13. **ASSIGNMENT**

Neither Party may assign or transfer any of its rights or obligations under this Agreement.

14. **WAIVERS**

No failure or delay by the Lender in exercising any right, power or privilege under this Agreement shall operate as a waiver thereof or prejudice any other or further exercise by the Lender of any of its rights or remedies under this Agreement. The rights and remedies in this Agreement are (unless otherwise expressly provided in this Agreement) cumulative and not exclusive of any rights or remedies provided by law.

15. **GOVERNING LAW AND ENFORCEMENT**

15.1   This Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law.

15.2   Any dispute, controversy or claim between or among any parties hereto, in connection with, arising out of or related to this Agreement or any amendment or modification hereof, the subject matter of this Agreement (including, without limitation, any dispute, controversy or claim as to the validity, interpretation, enforceability or breach of this Agreement or the rights and obligations of the parties hereto, or any amendment or modification hereof, or any question as to the scope of arbitrability pursuant to this Section), or any of the transactions contemplated hereby shall be settled exclusively by confidential binding arbitration to be conducted in London, England. To the fullest extent permitted by law, the parties hereby waive any right they or any of them may have to seek resolution of any dispute, controversy or claim between the parties covered by this Article 14 in any forum, whether judicial or otherwise, other than such confidential binding arbitration. No party to any arbitration pursuant hereto shall issue, participate in, or cause any public statement to be made with respect to the underlying dispute or any proceedings, hearings, testimony, documents or decisions relating to the arbitration; provided, however, that such a party may (but only after prior consultation with the other party to the extent practicable under the circumstances) issue or cause the publication of any public statement to the extent required by applicable law or legal process or as may be reasonably necessary in connection with the enforcement of any award. The arbitration award shall be final and binding upon the parties and judgment may be entered thereon by any court of competent jurisdiction.

16. **COUNTERPARTS**

    This Agreement may be executed in any number of counterparts and this has the same effect as if the signatures on the counterparts were on a single copy of this Agreement.

This Agreement has been entered into on the date stated at the beginning of this Agreement.

| | |
|---|---|
| *Daniel Leon*    1/17/2020 | *Alexander Mashinsky*    1/17/2020 |
| **CELSIUS NETWORK LIMITED** | **AM VENTURE HOLDINGS, INC.** |
| Daniel Leon | Alexander Mashinsky |
| **By** | **By** |
| S. Daniel Leon, President/COO | Ceo |
| **Title** | **Title** |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY CELSIUS     CELSIUSNETWORK_00155367