UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ALEXANDER MASHINSKY

               Defendant.

Case No. 23 Cr. 347 (JGK)

 

**REPLY MEMORANDUM IN SUPPORT OF
ALEX MASHINSKY'S SENTENCING SUBMISSION**

Marc L. Mukasey
Torrey K. Young
Michael F. Westfal

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Attorneys for Alex Mashinsky*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................1

I.      The Plea Agreement.......................................................................................................3

II.     Framework To Assess Alex's Character .......................................................................6

      A.      Amount Raised In The ICO ...............................................................................7
      B.      Directional Trading............................................................................................8
      C.      Uncollateralized Loans ......................................................................................9
      D.      Institutional Defaults.........................................................................................9
      E.      Regulatory Clarity...........................................................................................10
      F.      Profitability ......................................................................................................10
      G.      Liquidity and the Lead-Up to the Pause .........................................................11
      H.      Correcting Alex................................................................................................12
      I.      Market Manipulation .......................................................................................13

III.    The Victim Impact Statements....................................................................................17

      A.      Letter From White & Case ..............................................................................18

IV.     Deterrence ....................................................................................................................19

V.      The Government's Sentencing Request Would Create An Unwarranted Disparity.........22

VI.     A Term Of 15 Years Is More Than Necessary To Achieve The Objectives Of
      Sentencing Set Forth In § 3553(A) ..............................................................................25

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

## CASES

*C.F.T.C. v. Wilson*,
  No. 13 Civ. 7884 (RJS), 2018 WL 6322024 (S.D.N.Y. Nov. 30, 2018) .................................. 14

*Concepcion v. United States*,
  597 U.S. 481 (2022) ................................................................................................................... 2

*Kaley v. United States*,
  571 U.S. 320 (2014) ................................................................................................................. 22

*Markowski v. S.E.C.*,
  274 F.3d 525 (D.C. Cir. 2001) ................................................................................................ 14

*S.E.C. v. Masri*,
  523 F.Supp.2d 361 (S.D.N.Y. 2007) ....................................................................................... 14

*United States v. Beasley*,
  490 F. Supp. 1228 (S.D.N.Y. 1980) .......................................................................................... 6

*United States v. Delacruz*,
  862 F.3d 163 (2d Cir. 2017) ...................................................................................................... 5

*United States v. Fahm*,
  13 F.3d 447 (1st Cir. 1994) ....................................................................................................... 5

*United States v. Guzman*,
  282 F.3d 177 (2d Cir. 2002) ...................................................................................................... 5

*United States v. Harris*,
  38 F.3d 95 (2nd Cir. 1994) ........................................................................................................ 5

*United States v. Jabar*,
  19 F.4th 66 (2d Cir. 2021) ......................................................................................................... 2

*United States v. Kukushkin*,
  61 F.4th 327 (2d Cir. 2023) ..................................................................................................... 14

*United States v. Napoli*,
  179 F.3d 1 (2d Cir. 1999) .......................................................................................................... 4

*United States v. Ortiz*,
  218 F.3d 107 (2d Cir. 2000) ...................................................................................................... 5

This Reply Memorandum is respectfully submitted on behalf of defendant Alex Mashinsky, who is scheduled to be sentenced on May 8, 2025. For the reasons set forth below, the Court should impose a sentence of **no more than 366 days**.

## PRELIMINARY STATEMENT

The government's venom-laced submission recasts this case as one involving a predator with an intent to "target" victims, "harm" them, and "steal" their money. It concludes by recommending that a first time, non-violent offender who pled guilty and accepts responsibility receive a death-in-prison sentence.

To get there, the government conspicuously avoids Alex's personal history and characteristics, the better to dehumanize him. So their submission says nothing about the persecution of his Soviet Jewish refusenik family. There is no acknowledgment of the injuries and losses he suffered as a member of the Israeli Defense Forces. There is not even a passing nod to the businesses he founded over thirty years in heavily regulated environments that brought him success well before Celsius, with nary a blemish on his record. The government would have the Court believe that Alex was born at 59 years old, a fiend. Ignoring his background is unsurprising; it renders all the more absurd the notion that a man dedicated to service throughout his life suddenly underwent a Jekyll-to-Hyde transformation.

Much easier for the government to strip away Alex's humanness, to vilify him and demonize his intentions and motivations, his character and personality, and attribute his wrongdoing to a sadistic disposition. The government's submission disregards that Alex is a real-life person with complexities, subtleties and nuances, and instead takes a black-and-white, blunt and reductive approach to describe his conduct in savage and primal terms usually reserved for the most violent criminals: he "deliberately targeted real, 'everyday' people"; he "plundered"

and "preyed" and caused "harm to household after household"; he "destroy[ed] lives"; "does not even feint at contrition" and is "a continuing danger."  *See* Govt. Br. at 83, 87, 91, 92, 97, and 2.

The lion's share of the vitriol relates to Alex's unwillingness to capitulate to the government's exaggerated characterizations of his actions.  But his voluntary plea of guilty and willingness to expose himself to thirty years in prison does not also require him to wholesale surrender to every unfounded accusation the government makes about his character, his motivations, his intent or his family.  Nor is his guilty plea an admission to the elements of the remaining open counts; Alex did not plead guilty to wire fraud, which "contemplate[s] harm to the victim."  *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021).  He was not motivated by malevolence, cruelty, greed or ego.  And his guilty plea most certainly is not an agreement to abandon good faith, zealous advocacy or to present mitigation evidence at sentencing.

\* \* \* \* \* \*

Alex consented to the government's request for an extension of time to file their opposition papers.  To give the Court as much time as possible to consider Alex as a "whole person," *Concepcion v. United States*, 597 U.S. 481, 491 (2022), before the May 8, 2025 sentencing date, he consented without requesting his own extension of corresponding length.  The government's opposition papers then identified *for the first time* the exhibits—144 of them, culled from millions of pages of discovery—that they claim support their sentencing request.

\* \* \* \* \* \*

Alex will appear before this Court on May 8th chastened and humbled.  He loved serving the Celsius community.  He has read every victim letter.  He is profoundly remorseful for violating the law and abusing the trust that the community placed in him.  He is deeply ashamed of, and apologetic for, his conduct.  He is tortured every day by his misdeeds and the pain he

caused.  He is prepared to spend the remainder of his days focused on helping the victims and repaying the losses.  *See* Exh. T.

## I.    The Plea Agreement

The government claims that Alex has "all but walked away from the factual stipulations in his Plea Agreement."  Govt. Br. at 92.  That is false.

Alex stands by the stipulations in the Plea Agreement.  He never "object[ed] to the loss amount calculations, the number of victims, the sophisticated means enhancement, and the organizer/leader enhancement."  Govt. Br. at 6.  The parties do not—and need not—necessarily agree on the precise factual underpinnings for each enhancement, but both agree and stipulate there is a factual basis for them.  Nothing more is required.  *See* Govt. Letter at 5, *United States v. Butselaar*, 22 Cr. 560 (CS) (S.D.N.Y. March 3, 2025)*,* ECF No. 104 ("[A] factual stipulation in a plea agreement is a valid basis for a factual finding relevant to sentencing.") (internal citations omitted).  The government cites no authority otherwise.

Alex's factual bases for the Guidelines stipulations, in brief, are as follows:

> **1.  Loss** – **The parties stipulated to a Guidelines enhancement of loss greater than $550 million.  The Guidelines are not in dispute.**  Probation's loss calculations in the PSR are based on the CEL manipulation allegations, which Alex denies.  PSR ¶¶ 112(d)-(e).  Alex does, however, acknowledge a loss amount of $590 million based on the declaration he submitted in the Celsius bankruptcy.  Declaration of Alex Mashinsky at 7, *In re: Celsius Network LLC*, Case No. 22-10964-mg (Bankr. S.D.N.Y. July 14, 2022), ECF No. 23.  That loss amount reflects the shortfall in Celsius's total available assets on the day of the bankruptcy compared to the $4.72 billion in User Liabilities, after applying the company's $180 million in Custody Assets to its $180 million in Custody Liabilities.  As Alex made clear to Probation, he does not admit to intentionally causing any loss to his customers but concedes that such a loss was reasonably foreseeable.

> **2.  Number of victims** – **The parties stipulated to ten or more victims.  The Guidelines are not in dispute.**  The defense acknowledges ten or more victims based on the review and receipt of the victim impact letters but objects to the specific assertion of 600,000 victims as it conflates all creditors in the Celsius bankruptcy with victims of Alex's crimes.  PSR ¶¶ 113, 146.  The two categories

are not necessarily co-extensive, and the government has offered no legal authority or factual basis to conclude that a Celsius customer who never saw a single AMA, magazine interview, or tweet from Alex is still a victim of his crimes.

**3. Sophisticated means – The parties stipulated to a Guidelines enhancement for sophisticated means. The Guidelines are not in dispute.** The defense objects to the PSR's manipulation-based rationale that Alex "timed trades of CEL tokens which specifically required analysis of the markets to maximize profits but also increase concealability." PSR ¶ 147. The defense theory for the application of the sophisticated means enhancement is as follows: "*Facts including Alex's dissemination of false statements via an online magazine and Twitter, combined with his sales of CEL token via a cryptocurrency exchange, could be used to support this enhancement.*" *See* Application Note 9 to U.S.S.G. § 2B1.1 (locating main office of a telemarketing scheme in one jurisdiction and soliciting operations in another jurisdiction is sufficient to meet sophisticated means standard).

**4. Abuse of position of trust – The parties stipulated to a Guidelines enhancement for abuse of position of trust. The Guidelines are not in dispute.**

**5. Organizer/leader – The parties stipulated to a Guidelines enhancement for Alex as an organizer/leader or otherwise extensive. The Guidelines are not in dispute.** The defense objects to the PSR's manipulation-based factual description that Alex "directed others, including Cohen-Pavon, on specific actions regarding Celsius, its financial transactions, and the sale and purchase of CEL tokens." PSR ¶ 150. That was Alex's job. The defense proposes the following alternative factual basis: "*Mr. Mashinsky was the CEO of Celsius and was responsible for organizing and directing its operations. Celsius was a major cryptocurrency company and its operations were extensive in both scale and geographic scope.*" This language is sufficient under the Guidelines and is consistent with what the government communicated to the defense during the parties' plea negotiations. *See* Application Note 3 to U.S.S.G. § 3B1.1 ("otherwise extensive" analysis not limited to criminal participants but also includes "unknowing" outsiders who were not part of the criminal activity). Case law makes clear that unknowing participants whose activities were organized or led by the defendant can satisfy the "otherwise extensive" enhancement depending on the extent to which their services were peculiar and necessary to the criminal scheme. *See United States v. Napoli*, 179 F.3d 1, 14 (2d Cir. 1999). Here, Alex's crimes depended on continued regular communications with Celsius's customers. Unknowing participants included Celsius's multi-person marketing team that assisted with Alex's preparation for, and participation in, public interviews and Celsius's multi-person AMA team that tackled the herculean task of coordinating his weekly AMAs.

**6. Acceptance of Responsibility - The parties stipulated that "[a]ssuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through the defendant's allocution and subsequent conduct prior to the imposition of sentence, a two-level reduction will be**

**warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional one-level reduction, pursuant to U.S.S.G. § 3E1.l(b), assuming the defendant gives timely notice of the defendant's intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.** The government's memorandum claims that Alex refuses to accept responsibility for his crimes. (Govt. Br. at 92). But the law is clear that Alex qualifies for the full three-point reduction under U.S.S.G. § 3E1.1. As a threshold matter, Alex accepted responsibility for the counts of conviction during his guilty plea allocution. Mashinsky Plea Tr. at 25 (Dec. 3, 2024), ECF No. 112. He has committed no further crimes, nor violated his conditions of release, and he has not engaged in any behavior that typically warrants the denial of acceptance points. *See e.g., United States v. Guzman,* 282 F.3d 177 (2d Cir. 2002) (continued criminal conduct after pleading guilty); *United States v. Edwards,* 836 F.3d 831 (7th Cir. 2016) (continued criminal conduct on pretrial release); *United States v. Ortiz,* 218 F.3d 107 (2d Cir. 2000) (violations of pretrial released conditions); *United States v. Fahm,* 13 F.3d 447 (1st Cir. 1994) (defendant absconded while awaiting sentencing); *United States v. Harris,* 38 F.3d 95 (2nd Cir. 1994) (denying responsibility in chance meeting with victims).

Alex has a due process right to contest alleged factual errors in his PSR, and his good-faith objections do not provide a proper foundation for denial of the acceptance-of-responsibility credit. *See United States v. Delacruz,* 862 F.3d 163, 178 (2d Cir. 2017) (citations omitted). Indeed, Probation resolved most disputes against Alex and still concluded that he was entitled to the full § 3E1.1 reduction. PSR p. 154-55.

To be clear, Alex has never refuted, acted inconsistently with, or breached any aspect of the Plea Agreement.

The government next complains that "Mashinsky appears to have carefully crafted his plea allocution so that he could satisfy the elements of the offenses with the narrowest possible admissions." Govt Br. at 92. But Alex more than satisfied the elements of Counts Two and Five in his allocution and the government indicated on the record its satisfaction at the end of the proceeding. Mashinsky Plea Tr. at 25:1-27:10 and 29:10-15 (Dec. 3, 2024), ECF No. 112. The government's real grievance is that Alex will not embrace the overheated narrative that he ran a "years-long scheme" to defraud. One wonders whether the government will similarly condemn

co-defendant Roni Cohen-Pavon for "carefully craft[ing] his plea allocution so that he could satisfy the elements of the offenses with the narrowest possible admissions." After all, Cohen-Pavon was also charged with operating "a years-long scheme" but allocuted only to doing so for three months. *See* Cohen-Pavon Plea Tr. at 38:17-40:2 (Sep. 13, 2023), ECF No. 32.

*   *   *   *   *   *

The Plea Agreement in this matter was the product of many discussions between defense counsel and the government over Thanksgiving weekend 2024 and continuing into the next week. Alex gave careful and thoughtful consideration to the Plea Agreement and reviewed it extensively with counsel. He bargained for—and should receive—reasonable certainty, finality, conservation of resources, and efficiency from the Plea Agreement. *See, e.g.,* Govt. Letter at 1, *United States v. Butselaar*, 22 Cr. 560 (CS) (S.D.N.Y. March 3, 2025)*,* ECF No. 104 (the government, when it made a plea offer to the defendant, "bargained for, among other things: (i) certainty; and (ii) a final resolution of this matter without further litigation or expense").

## II.     Framework To Assess Alex's Character

"[A] thorough inquiry into the character of a defendant without a prior criminal record proves most revealing and points the proper way at the time of sentence. The law endorses and encourages it… To aid the judge in the exercise of this discretion, the judge is allowed to consider information about the convicted person's past life . . . conduct, and mental and moral propensities." *United States v. Beasley*, 490 F. Supp. 1228, 1231 (S.D.N.Y. 1980) (internal quotes and citations omitted).

The government's case insofar as it describes Alex as "greedy," "predatory," and "dangerous" is a story that starts with a faulty conclusion and works backwards on itself. It starts with Celsius's corporate bankruptcy filing as a proxy for wrongdoing and backfills to an introduction of Alex as a fraud from the get-go. From there, Alex is inserted as the scapegoat for

6

every corporate action, every group decision, every unanimous vote, every market fluctuation, and every employee's watercooler speculation. He is the government's receptacle for anything and everything in a company of near-1,000 employees.

The government's depiction of Alex is derived in large part from what other people say about him, rather than what Alex himself did or saw or believed or intended. Seventy-two communication exhibits appended to the government's submission do not even include Alex. Many are simply slack chats between selected employees. Others belong to people who knew nothing about what information Alex received or when he received it. Wholly ignored are statements by employees that run counter to the government's narrative.

And the Court must consider context. Enclosed is a video compilation of Alex's AMAs over the course of Celsius's existence. *See* Exhs. U-1 through U-5. They demonstrate that Alex was not a swindler who "lured retail investors to place their life's savings onto the Celsius[] platform." Govt. Br. at 96. To the contrary, he repeatedly told his customers they should not invest more than they were able to lose; that they should keep their existing retirement plans in place and only put a fraction of their savings in crypto; that older investors should be more conservative and take less risk than younger investors; and that there were absolutely risks investing in Celsius. In early 2022, Alex worked to restore $50 million in customer coins that were stuck on the blockchain after being mistakenly sent to wrong accounts. *See* Exh. U-5.

The government wants the Court to conclude that Alex is a serial liar but a close examination of his character, his mindset, and his motivations says otherwise. For example:

### A.    Amount Raised in the ICO

The government alleges that Alex lied about the amount raised in the ICO and wants the Court to conclude that the contract to purchase CEL that impacted the ICO amount was just a

sham.  In considering that narrative, note that Alex relied on Celsius's in-house and outside counsel to draft the transaction documents.  And counter to the government's one-note theory, there is evidence that Alex prepared to sell the tokens to complete the AMV transaction just two months before the board's decision to return them to the treasury, consistent with a belief in a real transaction.  Exhs. V and W.  After the board of directors reversed the transaction in reliance on legal advice from Latham & Watkins, Alex also disclosed to a group of customers that the transaction was no more, the CEL tokens had not been burned, and that Celsius had raised $32 million in the ICO.  Objections Table ¶ 35; Exh. B-11.  These actions are inconsistent with the government's depiction of a fraudster who wanted to perpetuate a sham transaction.

### B.    Directional Trading

The government insists that Alex intended to defraud Celsius's customers by touting the company's delta-neutral trading strategy.  But the government says nothing about the parade of witnesses who have confirmed that Celsius in fact employed a delta-neutral trading strategy.  Objections Table ¶ 50.  Instead, the government proceeds with its irrational theory that Alex learned about directional losses in January 2022, immediately ordered his Chief Risk Officer to close all directional positions, (ECF No. 69-1, Exh. 36), then inexplicably continued personally engaging in directional trading in the eight days after that instruction, (Govt. Ex. 102), but also ordered an audit investigation, and proceeded to state in an interview two months later that Celsius was delta-neutral.  Govt. Br. at 21.  The story defies logic.  Common sense counsels that Alex said Celsius was delta-neutral because he believed Celsius was delta-neutral.

### C.    Uncollateralized Loans

The government champions the bi-weekly PowerPoint slides as "overwhelming proof" that Alex knew Celsius accepted uncollateralized loans.  Govt. Br. at 22.  But those PowerPoint slides did not detail anywhere cross-collateralization provisions that Celsius required in its loan agreements, or corporate and parent guarantees that some borrowers provided to secure their loans.  *See* Objections Table ¶ 54(b).

As for the Iterative loan ("Counterparty-1"), the government asserts that "Mashinsky also now denies, without citation, that [Iterative's] loan was uncollateralized."  Govt. Br. at 75.  The citation appears in our objections table.  Objections Table ¶ 56(a).  The government points to a loan report three years *after* the loan was issued to argue it was uncollateralized, but that belated report contradicts the plain language of the loan agreement.  Exh. B-56 at 12.

The defense also presented instances of other senior executives making similar public statements.  Objections Table ¶ 53.  Either these people have not been prosecuted for the same conduct, or Alex and others had a genuine understanding that Celsius required institutional borrowers to post collateral for their loans.

### D.    Institutional Defaults

The government suggests that in advance of AMAs, Alex only distributed the talking points about institutional defaults "to a public relations employee who would not have been in a position to verify their accuracy."  Govt. Br. at 75-76.  That is wrong.  The talking points were circulated to the entire executive team for feedback every week for six months.  *See, e.g.*, Exhs. X and Y.  That is consistent with the CFO nodding affirmatively during Alex's AMA when he said "no defaults" and the Business Development Director also declaring no "institutional

defaults" in October 2021.  Objections Table ¶ 56. These facts undermine the story that Alex is an uncontrollable liar who lured investors with fraudulent tales of no defaults.

### E.    Regulatory Clarity

The government says it is "irrelevant" to the Court's analysis of Alex's conduct that he encouraged Celsius to collaborate and cooperate with regulators in the United States and abroad.  Govt. Br. at 76.  It may be inconvenient for the government, but it surely is not irrelevant.  It illustrates that Alex was not the brazen criminal they claim.  He was not avoiding legal scrutiny, he was welcoming it.

### F.    Profitability

The government's allegations about Celsius's profitability fall into three basic categories: (i) Alex lied generally about Celsius's profitability; (ii) Alex lied about Celsius returning 80% of its revenue to customers; and (iii) Celsius maintained "artificially high rewards rates."  Govt. Br. at 27.

With respect to Celsius's overall profitability, the internal financial records and audited financial statements submitted by the defense show that each time Alex told customers that Celsius was profitable, he had received supporting financial information indicating as much.  *See, e.g.*, Objections Table ¶¶ 36, 38(a), 40.  Yet the government still insists that "Celsius was not profitable during its existence."  Govt. Br. at 77.  The government also has no answer for why someone who is supposedly a liar would candidly announce in January 2020 that Celsius was not yet profitable.  Objections Table ¶ 38(b).

With respect to Celsius's GAAP accounting analysis, even acknowledging a $1.3 billion loss in the first quarter of 2022, that would still put Celsius up $1.3 billion after including the

financial results of 2021.  Govt. Br. at 78.  Yet the government insists that "Celsius was not

profitable during its existence."  Govt. Br. at 77.

With respect to returning 80% of revenue to customers, the government ducks former

CFO Young Cho's statement, (ECF No. 69-1, Exh. 1 at 2), and all the times Alex said, "the 80

20 is not a fixed number . . . it is not a hard commitment," "I want to make sure people

understand that this is not a fixed number" and "what we do promise you is the rate that is

published on the website or in the app."  Objections Table ¶ 42.  Celsius's former CFO told the

government that "Celsius targeted providing 80% of revenue back to users" and that, during his

tenure, "Celsius came close to that goal." ECF No. 69-1, Exh. 1 at 2.

With respect to the allegation that Celsius maintained unsustainable and "artificially high

rewards rates," (Govt. Br. at 27), the government has no answer for Alex's bankruptcy

declaration which makes clear that Celsius's reward rates averaged between 4.5-5% over the life

of the company.  ECF No. 136 at 16.

### G.    Liquidity and the Lead-Up to the Pause

In the end, many of the government's exaggerated allegations in this case come down to

the notion that surely Alex must have anticipated that Celsius was bankrupt in the lead-up to the

Pause.  It now alleges there were "clear signals that Celsius was headed for insolvency, if not

already there" and derives that from Alex withdrawing his assets.  Govt. Br. at 36.  But he did so

to pay taxes.  The government says nothing about the fact that Celsius's Chief Financial Officer

(Bolger) and its own cooperating witness (Cohen-Pavon) said they had no idea Celsius was on

the verge of bankruptcy.  ECF No. 136 at 33-34.  Bolger was talking about Celsius being around

for the next 150 years in May; in June he said that Celsius was "in a strong position to weather

the recent market turbulence and ensure that clients who needed their digital assets could get

them free and clear." *Id.* Cohen-Pavon said that "the consensus" was that a run on the bank would be fine since Celsius had so much undeployed Bitcoin; and in April 2022, he anticipated that, "in a bull market, we are going to print money." *Id.*; Exh. Z.

**H.    Correcting Alex**

To the extent the government lists instances of employees "warning" Alex to stop making certain statements, the contours of those communications are relevant to Alex's character. First, Alex himself invited a process for review of his statements, which speaks to a general goal of compliance rather than recalcitrance. Second, the vast majority of the government's examples were not sent to Alex. Alex should not be viewed as someone who rejects feedback if that feedback never made it to him. *See, e.g.*, Govt. Br. at 39 (citing Govt. Exhs. 79-129); *see also* ECF No. 69-1, Exh. 17 (Celsius's Head of Risk confirming a year into the process that, "It *may* make sense each week to create for Alex a summary . . .") (emphasis added). He also should not be branded with having fraudulently concealed CEL purchases by Celsius, when it was the editors, unbeknownst to Alex, who removed certain disclosures that he made on AMAs. *See* Govt. Br. at 39; Govt. Exhs. 86, 97. Third, when feedback clearly went back to him, Alex complied with it, irrespective of frustration or colorful language. *See* ECF No. 136 at 25-26. For example, the government points to Cohen-Pavon speaking to Alex about his public statements (Govt. Br. at 41; Govt. Exh. 81), but omits that immediately after receiving a disclosure drafted by Celsius's lawyers, Alex read it verbatim on his AMA.[1] *See* Exh. U-3 at 6:02-8:08. This is hardly consistent with being an inveterate fraudster.

---

[1] The government describes Cohen-Pavon as Alex's "most trusted adviser," Govt. Br. at 41, but while serving as Celsius's outside counsel, Cohen-Pavon wrote to co-founder Daniel Leon in June 2020: "Listen, I love this company so much. In certain moment, I am really thinking of expelling Alex (we will find a reason indeed) and execute a hostile takeover[.]" ECF No. 69-1, Exh. 33 at page 3425020.

## I.    Market Manipulation[2]

The government brings an onslaught of criticism against Alex for his failure to concur with their position that he conspired to manipulate the price of CEL token over a period of years. Of course, Cohen-Pavon, the cooperating co-conspirator, only admitted to being part of a three-month manipulation between October 1, 2021 and December 31, 2021.  Hearing Tr. at 38:17-40:2, (Sept. 13, 2023), ECF No. 32.  And his lawyer later walked that back.[3]

The government constructed the manipulation allegations around a promise that Alex never made—*i.e.,* that Celsius would only buy the amount of CEL tokens in the market necessary to pay rewards.  If purchasing CEL in excess of what was necessary to pay rewards was manipulative, then it must follow that the (still-unidentified) co-conspirators spoke openly throughout the company about manipulating the price of CEL; Alex spoke openly about "manipulative" excess purchases on his AMAs; the "scheme" was executed on the immutable ledger of the blockchain through Celsius wallets published on the company's website; and the whole thing was reviewed and approved by counsel—all of which happened.  It defies logic.

The government appears to take the position that any purchase of CEL token executed with the intent to support the price between June 2020 and July 2022 was criminal market manipulation that was directed or condoned by Alex, including: 1) weekly CEL purchases for

---

[2] The defense and government corresponded as to the application of the April 7, 2025 ODAG memo concerning ending regulation by prosecution. Today the US Attorney's Office alerted us of its final decision that moving forward on both counts is consistent with the ODAG memo. The defense intends to contact ODAG directly forthwith.

[3] During a September 2024 arbitration, Cohen-Pavon's lawyer stated: There's a lot of texture and a lot of nuance to my client's decision to plead guilty . . . Now, why do we think he got charged and not others? *I honestly think that the prosecutors charged him to negate a potential advice of counsel defense that they thought Mashinsky would have. To force my client to cooperate and to secure his testimony against Mashinsky, I genuinely believe that.* (emphasis added)

customer rewards; 2) resting buy orders *below* the market price, CEL token purchases during selling pressure, and buybacks of Celsius's OTC sales of CEL token; and 3) Johannes Treutler and Cohen-Pavon's purchases of approximately $240 million worth of CEL in the CNC subaccount on FTX between April and October 2021.[4]  But the purchase of CEL in the market to cover weekly rewards was Celsius's business model.  And setting resting buy orders of CEL on the market when CEL was at its *lowest* supports the price of CEL while also being more beneficial to customers (as opposed to the company spending *more* money buying CEL tokens weekly).  The resting buy orders, purchases during selling pressure, and OTC buybacks were not "secret excess purchase[s]," Govt. Br. at 48, rather, they were reviewed and approved by counsel, executed in publicly disclosed wallets, and discussed by Alex on his AMAs.  The Cohen-Pavon and Treutler purchases were described as manipulation to a *different* colleague, not Alex. ECF No. 69-1, Ex. 25.  But at each step, the government dumps it on Alex.

Insofar as the government presses a story of market manipulation and lays it wholly at Alex's feet, a fair evaluation of his character requires seeing that there is more to the story:

- The government relies on messages that do not include Alex to argue that Celsius used customer funds to buy weekly rewards.  Govt. Br. at 53-55.  But there is not a single message showing Alex directing his employees to use customer funds to buy weekly rewards.

---

[4] The government cites no caselaw on market manipulation.  In this district, the mere intent to affect the market price is not the same as the intent to create an artificially manipulated price.  *C.F.T.C. v. Wilson*, No. 13 Civ. 7884 (RJS), 2018 WL 6322024, at *14-15 (S.D.N.Y. Nov. 30, 2018).  Transactions executed for a legitimate investment purpose are not manipulative even if they were also intended to affect the price.  The government must prove that a transaction was executed for the *sole* purpose of manipulation.  Jury Charge at 7209:21-7210:9, *United States v. Tuzman*, 15 Cr. 536 (PGG) (S.D.N.Y. Jan. 11, 2018), ECF No. 706; *S.E.C. v. Masri*, 523 F.Supp.2d 361, 372-73 (S.D.N.Y. 2007); *see also Markowski v. S.E.C.*, 274 F.3d 525, 528-29 (D.C. Cir. 2001).  Against this legal backdrop, the government must establish that a defendant acted willfully and with knowledge that his conduct was unlawful at the time the transactions were executed.  *United States v. Kukushkin*, 61 F.4th 327, 332 (2d Cir. 2023).

- The government blames "Mashinsky's strategy" for CEL token hitting an all-time high of $8.02 in June 2021, (Govt. Br. at 55-56), disregarding that it was Cohen-Pavon who wrote to Treutler: "Get me to 8." ECF No. 70 at 28.

- The government's summary chart, included for the proposition that "there was almost never a week in which Celsius's purchases of CEL did not far exceed what it needed to pay rewards," (Govt. Br. at 48), claims to reflect "net purchases of CEL" after deducting the company's weekly OTC sales (*id.* at 49 n.12), but the chart does not refer to a source document that contains OTC sales data.

- The government acknowledges that Alex started directing his team "to sell into the market highs to generate additional cash for the company," which was inconsistent with an alleged scheme to inflate the price of CEL. Govt. Br. at 54. But the government fails to acknowledge that Alex's instructions for Celsius to be a net seller started in October 2020 and continued throughout 2021. Objections Table ¶¶ 86, 96; ECF No. 69-1, Exhs. 12, 13.

- The government insists that Alex's "self-dealing" sales of CEL token over a *four-year* period prove manipulation over a *two-year* or *three-month* period. Govt. Br. at 61-64. There is no correlation—Alex often discussed his CEL sales on his AMAs, they were tracked by members of the Celsius community and distributed across Celsius's four years. ECF No. 136 at 32-33.

- Urata-Thompson and Treutler memorialized Celsius's CEL token strategies in written policies and procedures that were reviewed and approved by counsel. Objections Table ¶ 76. Legal approvals came from Celsius's former General Counsel Jeremie Beaudry and Cohen-Pavon. The defense understands the government has never spoken to Beaudry. When Cohen-Pavon learned from Treutler in September 2020 that Celsius was supporting the price of CEL "a lot," he responded that supporting the price "is great." Exh. B-115.

- Celsius's price support was executed through wallets that were publicly viewable on Celsius's website (they remain there to this day). *See* https://celsius.network/cel-token-explained. Alex also openly discussed the buybacks on several of his AMAs, including the fact that Celsius had spent $421 million on CEL token purchases in 2021 alone. Objections Table ¶ 105(c).

- Urata-Thompson and Beaudry both filed answers in federal court denying market manipulation and Treutler is on video doing the same. *Meghji v. Mashinsky, et al.*, Adv. Proc. No. 24-03667-mg, ECF Nos. 1, 40 at ¶¶ 63, 72, 191-208 (Bankr. S.D.N.Y. Feb. 18, 2025); ECF No. 74 at 9.

- Urata-Thompson and Treutler explained to the government that Celsius's so-called excess purchases were buybacks of a percentage of the company's OTC sales of CEL token. Those buybacks were administered to manage Celsius's treasury supply and to ensure that the supply was not depleted too quickly. ECF No. 69-1, Exh. 1 at 11-13 (Under Seal).

15

- In the middle of a supposed three-month manipulation scheme, Cohen-Pavon disclosed to potential equity investor Westcap that Celsius was supporting the price of CEL through market purchases.  ECF No. 69-1, Exh. 35 (Under Seal); Exh. B-88 at 3.  Cohen-Pavon's disclosure undermines the notion that he considered CEL price support to be criminal, especially as he worked to close an investment worth hundreds of millions of dollars.

- If Alex was involved in a criminal market manipulation scheme in February 2021, why did Alex tell Treutler that he (Alex) would not make a proposed CEL buyback announcement because it could be considered market manipulation?  Exh. AA.

All that's left is the guilty plea of Cohen-Pavon.  He allocuted to three months of manipulative conduct and made clear that he was the one directing it.  Hearing Tr. at 38:17-40:2, (Sept. 13, 2023), ECF No. 32. Yet, he also told the government right before his plea that he understood the increase in the price of CEL throughout 2020-2021 was due to the performance of the company—*i.e.*, not manipulation.  ECF No. 69-1, Exh. 1 at 7.  But from April and October 2021, Cohen-Pavon and Treutler communicated regularly about using the company's weekly CEL token purchases to drive the price to particular levels.  ECF No. 70 at 27-30; ECF No. 69-1, Exh. 21.  In the end, Celsius's trading records for these months show that Treutler spent approximately $240 million to purchase approximately 40 million CEL tokens in a Celsius subaccount on FTX where no CEL token purchases should have been made.[5]  Without those purchases by Treutler and Cohen-Pavon, Celsius would have been exactly where Alex instructed the company to be—net sellers of CEL token.  Govt. Br. at 58 (*see* chart without "FTX CNC" line).

*    *    *    *    *    *

---

[5]  The chart excerpted in the government's submission lists an average CEL price of $4.03 throughout 2021.  Govt. Br. at 58.  During the April-October 2021 period, however, when Treutler purchased 39.8 million CEL tokens, the price was closer to $6.00, totaling approximately $240 million in CEL purchases during those months.  Govt. Br. at 58; historical CEL token prices available at: https://coinmarketcap.com/currencies/celsius/historical-data/.

These points are raised not to minimize Alex's crimes, but to humanize Alex the person—and to give the Court more with which to evaluate Alex and his motives. Alex lied about material facts and stands ready to be sentenced for it. But he was most certainly not a rampant teller of untruths or a liar down to his core.

### III.    The Victim Impact Statements

Alex is acutely aware that there are countless victims here, each with a story that is personal and painful in ways that cannot be fathomed. He seeks whatever measure of justice will help the victims. He has done everything he can and given up nearly everything he has, without a fight, toward that end.

The defense respectfully makes the following observations regarding the victim submissions. Several letters include accusations that have never been advanced by the government: one claimed Alex secretly altered the Terms of Use to claim ownership of customers' crypto assets for yield generation; another states that Celsius "never earned any revenue in its lifetime"; yet another claims that Alex said customer deposits were "fully backed by FDIC insurance"; and another that Alex has over $2 billion in a Swiss bank account and $500 million in a French bank account; one claimed that Alex sent over $1 billion to Celsius's UK entity in an effort to hide assets; and one victim wrote that he saw an April 1 video of Alex receiving a pardon from President Trump.[6]

Fifty or so customers submitted letters indicating they are fraud victims because Alex led them to believe that Celsius was "safe." The government points to the bankruptcy declaration of

---

[6] The government submitted one victim letter from a writer who saw fit to post on Twitter the letter Alex's 12-year-old son wrote to the Court in support of his father – using the boy's first name – in what could only be described as a mocking and scornful tone. ECF No. 146-1; https://x.com/camcrews/status/1913320926432669939 (last visited May 2, 2025).

a Celsius customer who says that on April 8, 2022, Alex assured her, in person, that her "funds were safe."  Govt. Br. at 21, n.6.  But in evaluating Alex's character, it is important to know that in the days following that statement, Alex deposited approximately $2.75 million *of his own money*, into his Celsius accounts right alongside that customer.  Exh. BB.

There are also comments in the victim impact letters that demonstrate the nuances of the case.  Some victims reference that: Celsius "never missed a yield payment and I could always withdraw my money without a problem"; "I fully understood the direct risk of crypto investments"; "The yield [at Celsius] was much lower than many other places"; "While I don't believe that Alex Mashinsky intended for things to turn out the way they did . . ."; "[D]espite his mistakes, Mr. Mashinsky was, at times, the more conservative voice in an industry overflowing with unchecked greed."

These points notwithstanding, Alex fully acknowledges the financial harm that Celsius customers have endured.  He has taken full responsibility for the economic and emotional toll that his crimes and Celsius's bankruptcy have taken on Celsius customers and their families.

### A.    Letter from White & Case[7]

Alex recognizes that the bankruptcy has been painful for everyone involved and has taken an appreciable amount of time and effort.  He also knows its outcome does not alter his stipulated Guidelines range.  But the company's emergence from bankruptcy and the payouts the victims have received and will receive is evidence for the Court that there was real value in Celsius.  And Alex hopes the process offers some comfort to victims.

---

[7] Aaron Colodny, an attorney at the law firm of White & Case, is not a victim, and according to his letter, his firm represents a fiduciary for Celsius creditors.  Accordingly, the defense objects to him making any appearance, statement, or presentation at Alex's sentencing.  If the government intends to call Mr. Colodny as a fact witness at sentencing, the defense respectfully requests that the Court order the government to produce any Rule 26.2 material in its possession at least three days before sentencing. Fed. R. Crim. Proc. 32(i)(2).

The defense submits the following concerning the White & Case letter to put Alex's relationship to the bankruptcy in its proper context:

- White & Case was seemingly aware of Celsius's actions with respect to CEL well before the bankruptcy. Govt. Br. at 49 ("The Purchases Were Designed to Support the Price"). Celsius's practices were shared with a potential equity investor in advance of a $700 million investment in December 2021. ECF No. 69-1, Exh. 35 (Under Seal); Exh. B-88 at 3. White & Case represented that investor in connection with the investment and the investor's due diligence process.

- To the extent the letter questions Alex's bankruptcy declaration, (*see, e.g.*, ECF No. 143-1 at 2), that declaration was drafted with assistance from attorneys at Kirkland & Ellis and reviewed and approved by the entire Celsius executive team, not just Alex. Exhs. CC and DD.

- The letter at times characterizes CEL Token as "worthless." Yet the letter cites a bankruptcy court decision that ascribed more than $160 million in value to the CEL tokens that Celsius burned in April 2024. ECF No. 143-1 at 3; ECF No. 136 at 38 n.6.

- The letter appropriately reminds the Court of the continued financial hardship suffered by Celsius customers. The Court should also be aware White & Case has sued nearly 2,500 retail customers in an effort to claw back more than $2 billion dollars from them. *In re: Celsius Network LLC*, Case No. 22-10964-mg, Dkt. No. 8101 at 9 (Bankr. S.D.N.Y. April 30, 2025).

- The letter states that Alex "had no role developing the [bankruptcy] Plan." ECF No. 143-1 at 3. But Alex drafted the first iteration of the Celsius bankruptcy plan. Exh. EE.[8] Alex then presented his plan to Celsius, the UCC, and their lawyers and advisors (including White & Case) in late August/early September 2022 in an effort to maximize customer recovery. Exh. FF.

- The letter leaves out that Celsius has added an extra 5% to all customer claims in the bankruptcy, leading to payments larger than initial claims. Dkt. No. 4289 at 39 (Holders that do not opt out of claim settlement process "shall receive . . . an Allowed Claim in an amount that is 105% of the scheduled amount of such claim[.]").

- The letter omits that Celsius was owed approximately $500 million in collateral that its former lender EFH wrongfully retained. Celsius is pursuing recovery of that remaining collateral in the bankruptcy. *Celsius Network Limited v. Equities First Holdings, LLC*, Case No. 23-01167 (MG), Dkt. No. 57 (Amended Complaint) (Bankr. S.D.N.Y. Dec. 22, 2023) (claim amount redacted). It also omits that the

---

[8]  Given Celsius's potential privilege claim over these communications, the defense has filed redacted versions with this submission.

Litigation Administrator is pursuing an approximately $450 million claw back from FTX, amongst several other recovery proceedings. *In re: Celsius Network LLC*, Case Dkt. No. 8101 at 8.

• The letter ends by claiming that the Celsius bankruptcy plan "estimated" that customers would only receive approximately 79.2% of their claim value and that such recovery would reflect a larger shortfall than the $1 billion estimated in the Plan. ECF No. 143-1 at 3. But there is no reason anymore to discuss early "estimated" recovery or the "estimated" shortfall. On April 21, 2025, Celsius announced that it has paid out $3.5 billion against general unsecured claims to date. *In re: Celsius Network LLC*, Case No. 22-10964-mg, Dkt. No. 8086 at 7 (Bankr. S.D.N.Y. April 21, 2025). When added to the $1.23 billion in assets remaining to be distributed as of March 3, 2025, that is a total distribution of $4.73 billion, *exceeding* the approximately $4.7 billion in customer deposits on the bankruptcy date. ECF No. 1 at ¶ 9. This is after the company also paid more than $270 million in professional fees, including more than $50 million paid to Mr. Colodny's firm as of November 2023. *In re: Celsius Network LLC*, Dkt. No. 8086 at 7; Dkt No. 7776 at 6.

• The letter avoids any reference to Tether, a Celsius lender that liquidated Celsius's loan collateral in the days after Celsius paused withdrawals. This liquidation event occurred before Celsius filed bankruptcy and is the subject of ongoing bankruptcy adversary proceedings. Celsius is currently seeking approximately $4 billion in Bitcoin and damages from Tether.[9] Tether liquidated approximately $3.8 billion worth of collateral at today's prices to satisfy an $800 million debt that Celsius owed. *Celsius Network Limited v. Tether Limited*, Case No. 24-04018 (MG), Dkt. No. 25 (Amended Complaint) (Bankr. S.D.N.Y. Dec. 5, 2024). If Celsius is able recover substantial amounts from EFH, FTX, Tether, and others, customers will continue to receive substantially more distribution payments in the future.

## IV.    Deterrence

The government's arguments concerning deterrence are long on speculation and

short on fact.

The government claims that Alex's "failure to accept full responsibility for his crimes

raises concerns about whether, absent a serious sentence, he will recognize the magnitude of his

crimes and be deterred." Govt Br. at 93. Any "concerns" about Alex not recognizing the

---

[9] The defense's initial submission erroneously estimated that Celsius was seeking approximately $4.9 billion in its action against Tether. ECF No. 136 at 38.

seriousness of this case are imaginary. From the date that agents stormed his home, through the serious and sobering plea hearing, in which, after thoughtful consideration and consultation with counsel, Alex surrendered constitutional rights, admitted guilt on the counts of conviction and subjected himself to a possible 30-year restriction of his liberty, to his review of every last victim letter, Alex more than recognizes the magnitude of this case. That is precisely why he accepted responsibility early on and he has accepted it every day since. A failure to agree with every last loaded accusation is not a failure to accept responsibility for the crimes of conviction or a failure to recognize the gravity of the situation.[10]

Equally off the mark is the government's baseless prognostication that Alex is likely to conclude that "crime does pay." Govt. Br. at 94. Under the Plea Agreement, Alex agreed to forfeit his interest in bankruptcy claims and numerous bank and trust accounts up to $48 million. The Plea Agreement also saddles Alex with the possibility of a money judgment that burdens him for twenty years. He has done nothing inconsistent with those undertakings. But, conjuring up foul play everywhere, the government darkly forecasts that since Alex's "wife has asserted … a …. claim to the property, . . . Mashinsky will continue to be a very wealthy man and could easily conclude that crime does pay." (Govt. Br. at 94).

This has nothing to do with deterrence; it is a gratuitous swipe at Alex and his family. The government knew early on in this case that Alex's wife, Krissy Meehan, claimed a legal interest in various accounts and that she had retained her own well-respected lawyer to protect and/or assert her rights. Indeed, Mrs. Meehan's counsel has been in contact with the government and the Court concerning her client's potential claims. The insinuation of crooked dealing is spurious. The massive forfeiture order undoubtedly serves as a specific deterrent against future

---

[10] In fact, the government has conceded to certain points. *See* Govt. Br. at 17 n.2; Govt. Br. at 78; Govt. Br. at 77-78.

wrongdoing.  *See Kaley v. United States*, 571 U.S. 320, 323 (2014) ("Forfeitures… at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises") (citations omitted).

The government makes similarly unfounded allegations about the Mashinsky trusts, which they have known about since day one of this case.  They mock the trusts' creation as "purportedly" for the benefit of Alex's children, and they intimate that in reality they are part of a wicked effort to shield his assets from victims.  Govt. Br. at 94.  That is bunk.  Alex is neither the trustee nor the beneficiary of the trusts.  His children had trust funds before Celsius was ever created.  His sister was not inserted as a trustee as a pawn -- she has been the trustee of the trust that benefits Alex's wife and kids since 2001.  *See id.*  The government froze and Alex has now forfeited most of his bank accounts, as well as certain assets owned by the trusts.  *See* ECF 28; ECF 109.  Should there be any future dispute, there is a forfeiture litigation process for the government to pursue.

In short, a greater sentence should not be imposed because the government is prophesying a future failure to collect the full forfeiture amount or because it thinks Alex's wife or children may still have assets to their names.  The status of the bank and trust accounts has nothing to do with deterrence and everything to do with the government's inclination to take any fact, no matter how conjectural, and use it to cast aspersions on Alex at every turn.[11]

## V.    The Government's Sentencing Request Would Create An Unwarranted Disparity

There may be no better indication of the government's distorted and merciless view of Alex than their suggestion that he deserves a higher sentence than the defendant in *Bankman-*

---

[11] The desperate effort to cast Alex as someone driven solely by greed should also be rejected.  Over the years, he submits that he has supported charities including the CIA Officers Memorial Foundation, Aish Hatorah, the US Veteran Association, Tunnel to Towers, Goodwill Central Texas, and No Kid Hungry.

*Fried*. Govt. Br. at 95-96. Anyone taking more than a superficial glance knows that *Bankman-Fried* was a fundamentally different case. The essence of the government's case against *Bankman-Fried* was that he was a thief. As noted in our opening brief here, there are no allegations—let alone any proof—that Alex misappropriated, embezzled or stole any customer assets or any Celsius money. He did not. Nor are any of the other crimes and aggravating factors alleged in *Bankman-Fried* present here: election fraud; bribery; obtaining over $1 million from a financial institution; conviction under § 1956; revocation of bail; attempted tampering with witnesses; perjury; and obstruction of justice. Bankman-Fried and Mashinsky are miles apart.

Alex's case is also qualitatively and quantitatively different from *Madoff, Hwang* and *Greenwood*. The comparison to Madoff's 150-year sentence is laughable. Madoff's conduct *dwarfed* the instant matter in duration and dollars. That case involved a decades-long Ponzi scheme that brought $170 billion into a fake business and wrecked generations of investors to the point where not a single person—not even family—submitted a letter of support for the defendant. Case No. 09-CR-213 (DC). Nor is the 18-year sentence imposed after trial on Bill Hwang comparable. Hwang was "a recidivist and unrepentant fraudster…" whose conduct represented his second effort to cheat his way to personal success, and whose personal wealth grew from around $2 billion to more than $30 billion during the fraud and who denied the jury's verdict through sentencing. Case No. 22 Cr. 240 (AKH). *Greenwood* is no more persuasive. Case No. 17 Cr. 630 (ER). The defendants in that case opened a sham company and sold a worthless cryptocurrency as a mechanism to fleece people they callously described as "idiots" and "easy marks," justifying a 20-year sentence. Sentencing Tr. at 37-38, *United States v. Greenwood*, Case No. 17 Cr. 630 (ER) (S.D.N.Y. Sept. 12, 2023), ECF No. 581. As to all three

cases, the scope of conduct, the magnitude of loss, and the defendants' criminal histories are radically different.[12]

As far as the government's allegations and theory of prosecution, this case bears far more resemblance to *United States v. Milton.* The government opened in that case by claiming exactly what they claim here: that Milton "repeatedly lied to investors about his company and he made a billion dollars by doing so." Trial Tr. at 43:1-3, *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Sept. 13, 2022), ECF No. 216. "He started a company . . . and he lied about all of the important parts of the business…. on the backs of those innocent investors taken in by his lies, he became a billionaire virtually overnight." *Id.* at 43.  In summation, they argued that "[Milton] lied over and over again. He lied on Twitter.  He lied on podcasts. He lied on TV interviews. He lied to [an investor] directly.  He was the head of the company, the executive chairman, so they trusted him. They invested and they lost their money." Trial Tr. at 3026:5-16, *United States v. Milton*, 21 Cr. 478 (ER) (S.D.N.Y. Oct. 13, 2022), ECF No. 246.  That's the government's theory here as well.  The distinction the government seeks to draw between the cases—that no victims claimed to have lost significant amounts of their savings to Milton—is revisionist history.  *See* Exh. A to Govt. Ltr, *United States v. Milton,* 21 Cr. 478 (ER) (S.D.N.Y. Dec. 15, 2023), ECF No. 317-1 (victim letters referring to "the loss of $350,000"; the "pilfering of tens of thousands of dollars"; the "impact[] on retirement plans"; "financial implications" of a "significant amount of money" that were "tangible and immediate").  The more significant

---

[12] Similarly unavailing are *United States v. Ilori*, Case No. 21 Cr. 746 (MKV), which involved a recidivist offender who committed COVID relief program fraud while out on bail in a separate case also involving fraud, identity theft, and money laundering, and *United States v. Austin*, Case No. 23 Cr. 508 (PKC), which concerned a defendant who was convicted after trial of wire fraud and interstate transportation of stolen property based on stolen credit cards, forged and fraudulent bank statements large quantities of laundered cash, among other crimes committed with his son.

difference is that Alex admitted his guilt while Milton proclaimed his innocence through trial and at sentencing after a conviction on three counts, including wire fraud, which is not present here. Judge Ramos sentenced Milton to a term of four years.

## VI.    A Term Of 15 Years Is More Than Necessary To Achieve The Objectives Of Sentencing Set Forth In § 3553(A)

A term of 15 years' imprisonment is more than necessary because it would, in effect, be a life sentence for Alex.  According to the Prison Policy Initiative, each year in prison takes 2 years off an individual's life expectancy. *See* Emily Widra, Prison Pol. Initiative, *Incarceration shortens life expectancy,* June 26, 2017, https://www.prisonpolicy.org/blog/2017/06/26/life_expectancy/ (last visited May 2, 2025).  And older adults suffer in prison. "When examining patterns over time . . . the . . . probability of . . . difficulty with cognition, ambulation, independent living, or self-care was consistently and significantly higher for older adults in prison compared with their community-dwelling peers."  Katherine E. M. Miller, Ph.D.; Karen Shen, Ph.D.; Yang Yang, MS; Brie A. Williams, Ph.D.; Jennifer L. Wolff, Ph.D.,  *Prevalence of Disability Among Older Adults in Prison*, Dec. 27, 2024, https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2828503 (last visited May 2, 2025).

Although life sentences are often justified in the name of reducing criminal behavior in reality they deprive people of dignity, they fail as a useful deterrent, they incapacitate people who have aged out of criminal activity, and they divert public resources from more effective crime prevention policies. *See* Ashley Nellis and Celeste Barry, *A Matter of Life: The Scope and Impact of Life and Long Term Imprisonment in the United States*, Jan. 8, 2025, https://www.sentencingproject.org/reports/a-matter-of-life-the-scope-and-impact-of-life-and-long-term-imprisonment-in-the-united-states/ (last visited May 2, 2025).  As noted by the Vera Institute for Justice,

Concepts that have been central to sentencing theory, policy, and practice to date—such as <u>retribution</u>, <u>deterrence</u>, and excessive <u>incapacitation</u>—have been backed by paltry evidence of success, demonstrating, instead, more evidence of harm. States and the federal government have leaned on these principles to justify as much prison time as possible. But doing so has not been effective in delivering accountability and building public safety.[13]

A life sentence is also unnecessary because it would deprive Alex of credit for the noble life of service he led for his first 55 or so years. A life sentence would treat Alex as if his military service, his business service, his charitable works, and his good nature meant nothing in the sentencing scheme. A life sentence is also excessive for someone who has never previously shown contempt or disregard for the law. A life sentence might be appropriate for the brazen, arrogant, scoundrel the government envisions. But that's a caricature, it's not Alex Mashinsky. Alex Mashinsky is a husband whose wife fears the future. He is a father hurting because his young son is getting mocked on Twitter. He is a brother and an uncle who has been unable to see his sisters or nieces and nephews in Israel. He is a son who may not see his 82-year-old father in Israel ever again. He is a man whose heart hurts every day for the pain he has caused. He is a decent man.

Alex still believes that the purpose of human life is to serve and to show compassion and the will to help others. He can still serve and he has the compassion and the will to help the victims. We pray this Court lets him.

---

[13] Nicholas Turner, *Research Shows That Long Prison Sentences Don't Actually Improve Safety*, Feb. 13, 2023, https://www.vera.org/news/research-shows-that-long-prison-sentences-dont-actually-improve-safety (last visited May 2, 2025).

## CONCLUSION

For the reasons set forth below, the Court should impose a sentence of **no more than 366 days**.

Dated: New York, New York
       May 2, 2025

Respectfully submitted,

By:    /s/ Michael F. Westfal
      Marc L. Mukasey
      Torrey K. Young
      Michael F. Westfal

      MUKASEY YOUNG LLP
      570 Lexington Avenue, Suite 3500
      New York, New York 10022
      (212) 466-6400

      *Attorneys for Defendant Alex Mashinsky*