UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

- v. -

ALEXANDER MASHINSKY,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

23 Cr. 347 (JGK)

**THE GOVERNMENT'S OPPOSITION TO ALEXANDER MASHINSKY'S PETITION PURSUANT TO 28 U.S.C. § 2255**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
Attorney for the United States of America

Allison Nichols
Assistant United States Attorney
– Of Counsel –

**Contents**

I. Relevant Background ... 3

A. The *Curcio* Letter and Hearing ... 4

B. The Plea Agreement and Plea Hearing ... 6

C. Sentencing ... 9

II. Applicable Law ... 12

A. 28 U.S.C. § 2255 ... 12

B. Ineffective Assistance of Counsel ... 13

C. Conflicts of Interest ... 14

D. Waivers of Rights to Collateral Review ... 15

III. Discussion ... 16

A. Mashinsky's Ineffective Assistance Claims Are Barred by His Knowing and Voluntary Waivers. ... 16

B. Mashinsky's Ineffective Assistance Claims Are Without Merit. ... 18

1. Claims Related to Conflict and the Attorneys' Firm's Finances ... 18

2. Claims Related to Strategic Choices in Investigation and Discovery ... 21

3. Claims Related to Guideline Loss Amount ... 22

C. Mashinsky's Remaining Claims Are Also Barred and Without Merit. ... 24

The Government respectfully submits this opposition to defendant Alexander Mashinsky's *pro se* petition for relief pursuant to 28 U.S.C. § 2255. (Dkt. 189, with amendment at Dkt. 191, collectively, "Pet."). Mashinsky first argues that his counsel performed so ineffectively as to not constitute counsel within the meaning of the Sixth Amendment, because (1) counsel's firm's "financial duress" caused a conflict of interest with pursuing a rigorous defense for Mashinsky; (2) counsel failed to conduct an adequate investigation; and (3) counsel failed to challenge the appropriate loss amount under the Sentencing Guidelines. (Pet. 4). Mashinsky next argues "fruit of the poisonous tree," his label for an argument in which he explains that the prosecution misunderstood the applicable law and makes other assertions that the illegal activity attributed to Mashinsky was actually the fault of others. (Pet. 5, 19-20). For the reasons that follow, these claims should be denied without a hearing.

## I. Relevant Background

On July 11, 2023, Mashinsky was charged in a seven-count Indictment with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count One"); commodities fraud, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1 ("Count Two"); and wire fraud, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Three"); with conspiracy to commit securities fraud, market manipulation, and wire fraud through the manipulating of the price of CEL, in violation of Title 18, United States Code, Section 371s and 1343; Title 15, United States Code, Sections 78i(a)(2), 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Four"); engaging in a fraudulent scheme to manipulate the price of CEL token, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5 ("Count Five"); market manipulation of CEL token, in violation of Title 15, United

States Code, Sections 78i(a)(2) and 78ff ("Count Six"); and wire fraud in connection with the manipulation of CEL token, in violation of Title 18, United States Code, Sections 1343 and 2 ("Count Seven").

The Indictment included a lengthy recitation of facts describing how, from Celsius's inception and over the course of several years, Mashinsky repeatedly made false and misleading statements about the success and profitability of Celsius and the nature of the investments Celsius made with customer funds. Mashinsky portrayed Celsius as a modern-day bank, where customers could safely deposit crypto assets and earn interest, when in fact Mashinsky operated Celsius as a risky investment fund, taking in customer money under false and misleading pretenses and turning customers into unwitting investors in a business far riskier and less profitable than what he had represented. The Indictment also described the market manipulation scheme, in which Mashinsky and others illicitly manipulated the price of CEL, thereby causing the public to purchase CEL at inflated prices, which personally benefited Mashinsky because he was secretly selling his own CEL at prices that he knew were artificially inflated. The Indictment described how, for years, Celsius employees, at Mashinsky's direction, secretly bought more CEL than what they were disclosing to the market in an intentional effort to support the price of CEL, often using customer money to make these purchases. Mashinsky ultimately profited over $48 million by selling his CEL at these inflated prices, while other CEL investors were left with an almost worthless crypto token when the truth came out.

### A. The *Curcio* Letter and Hearing

On February 6, 2024, the Government wrote the Court requesting a hearing pursuant to *United States v. Curcio*, 680 F.2d 881 (2d Cir. 1982), concerning potential conflicts of interest that could arise from Mashinsky's counsel's representation of Samuel Bankman-Fried, a

defendant in a separate criminal matter.[1] (Dkt. 45, Ex. 1 hereto). Among other things, the Government flagged that "Celsius's status as a victim of the fraud on Alameda Research's lenders may create a conflict in the simultaneous representation of Bankman-Fried" and that "Mashinsky has blamed Celsius's collapse, at least in part, on actions taken by Alameda Research, possibly at Bankman-Fried's direction, to short CEL, the native cryptocurrency token issued by Celsius." (Ex. 1 at 4-5).

On February 20, 2024, the Court convened a hearing, as requested by the Government. The Court placed Mashinsky under oath. (Hrg. Tr., Ex. 2 hereto, at 2). Mashinsky confirmed that he had not taken any drugs, medicine, or pills in the last 24 hours, that his mind was clear, and that he was feeling well. (Hrg. Tr. 6). The Court explained at the outset that: "A defendant in a criminal case has the right to be represented by a lawyer who has absolutely no conflicts of interest. And if a defendant cannot pay the cost of such a lawyer, the defendant is entitled to have counsel appointed for the defendant free of cost." (Hrg. Tr. at 3). Mashinsky affirmed that he understood his right to conflict-free counsel. (*Id.*).

The Court summarized the conflicts between Mashinsky and Bankman-Fried and the divergent interests between Celsius and Alameda Research, and Mashinsky said that he understood. (Hrg. Tr. 3-4). Mashinsky affirmed that he had consulted with his attorneys, had all his questions answered, and wished to waive any possible conflicts. (Hrg. Tr. 6-7). He also told the Court that he had consulted with an independent lawyer, who had advised him prior to the conference, and that he had signed a written waiver agreement after consulting them. (Hrg. Tr. 8-9). Nonetheless, the Court took the additional step of appointing another independent counsel

[1] The Government team with charge of the Bankman-Fried matter also wrote to Judge Kaplan, who held a Curcio hearing in *United States v. Bankman-Fried*, 22 Cr. 673 (LAK) to ensure that Bankman-Fried could likewise knowingly waive any conflicts.

under the Criminal Justice Act ("CJA") so that Mashinsky could consult further about his decision. (Hrg. Tr. 12-14). After consulting further with CJA counsel, Mashinsky again affirmed that he wished to waive any potential conflicts with his counsel. (Hrg. Tr. 15). CJA counsel further represented to the Court, in the defendant's presence, that Mashinsky "fully understands actual conflicts of interest and potential conflicts of interest, and we discussed the potential conflicts of interest in this case, and he fully understands that that is a waivable conflict." (Hrg. Tr. 15-16).

Mashinsky confirmed that no one had made any threats or promises to induce him to waive possible conflicts his attorneys may have. (Hrg. Tr. 8). He further confirmed, twice, that he understood that his waiver would apply to any possible conflict on that day and at all future times in the case, including through any appeals in the matter. (Hrg. Tr. 8, 15).

After hearing from Mashinsky, the Government, Mashinsky's counsel, and the court-appointed CJA counsel, the Court found "that any conflict that Mr. Mukasey and Ms. Young have from representing Mr. Bankman-Fried is only a potential conflict; that it is waivable, and that Mr. Mashinsky has knowingly and voluntarily waived any such conflict." (Hrg. Tr. 17).

**B. The Plea Agreement and Plea Hearing**

On December 3, 2024, Mashinsky pled guilty to Counts Two and Five of the Indictment pursuant to a written plea agreement dated December 2, 2024 (the "Plea Agreement," Ex. 3 hereto). The Plea Agreement provided that in consideration of the defendant's guilty plea on Counts Two and Five, he would not be further prosecuted for (i) the scheme to defraud investors and customers of Celsius from 2018 to June 2022, as charged in Counts One through Three of the Indictment and (ii) conspiring to execute and executing a fraudulent scheme to manipulate the market for CEL token, as charged in Counts Four through Seven of the Indictment. (Plea Agmt. 1-2). Mashinsky also admitted to the forfeiture allegation with respect to Count Five of

the Indictment, agreed that a sum of money equal to $48,393,446 represented proceeds traceable to the commission of Count Five, and consented to the entry of a preliminary forfeiture order. (Plea Agmt. 2; *see also* Dkt. 112 ("CPOF")).

The Plea Agreement set forth the parties' agreement as to the applicable U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") (Plea Agmt. 3-5). The parties agreed that the loss exceeded $550,000,000 (the top Guidelines loss range); that the offense involved ten or more victims; that the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means; and the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive. (Plea Agmt. 4). The parties further agreed that neither would seek a departure or Guidelines adjustment not set forth in the agreement, nor would either party in any way suggest that the Probation Office or the Court consider any other departure or adjustment under the Guidelines. (Plea Agmt. 5). The Plea Agreement further provided that the sentencing range would be life imprisonment, but because the statutorily authorized sentences are less than the minimum of the applicable Guideline range, the Stipulated Guidelines Sentence is 30 years' imprisonment, or the statutory maximum.

Mashinsky acknowledged that he "has accepted this Agreement and decided to plead guilty because [he] is in fact guilty." (Plea Agmt. 6).

At the outset of the plea hearing, the Court placed Mashinsky under oath and confirmed that he understood that any false or untrue answers could be later used against him in a prosecution for perjury or making a false statement. (Plea Tr., Ex. 4 hereto, at 3). Mashinsky affirmed that he had not taken any medicine, drugs, pills, or alcohol in the last 24 hours, that his mind was clear, and that he was feeling well. (Plea Tr. 4). The Court confirmed that Mashinsky

wished to plead guilty to Counts Two and Five of the Indictment, that he had had a full opportunity to discuss the case and the consequences of entering a guilty plea with his attorneys, and that he was satisfied with his lawyers' representation. (Plea Tr. 5). The Court confirmed that Mashinsky understood the rights he would give up by entering a plea. (Plea Tr. 6-9). The Court described the allegations and elements of Counts Two and Five, and Mashinsky confirmed he understood. (Plea Tr. 10-16).

The Court confirmed that Mashinsky understood the Sentencing Guidelines and that he had spoken with his lawyers about the Guidelines. (Plea Tr. 19). Mashinsky affirmed that he understood that the Court would independently calculate the Guidelines but would also have the ability to depart from the Guidelines. (Plea Tr. 19-20). Mashinsky confirmed that he understood that any estimates about his sentence could be wrong, and that no one was in a position to give him any assurances about what his sentence would be. (Plea Tr. 20-21).

Mashinsky confirmed that his written plea agreement encompassed the entire understanding between himself, the Government, and his lawyers. (Plea Tr. 22). He confirmed that no one had offered him any inducements or threatened or forced him to enter the plea agreement or to plead guilty. (Plea Tr. 22). He further confirmed that he understood that he was waiving the right to challenge his conviction on the basis of: "(1) any nonjurisdictional defects in the proceedings before entry of this plea; (2) a claim that the statutes to which the defendant is pleading guilty are unconstitutional; and (3) a claim that the admitted conduct does not fall within the scope of the statutes." (Plea Tr. 22-23). He also agreed that he would not challenge any sentence of 360 months' imprisonment or less. (Plea Tr. 23).

When asked to explain his conduct with respect to Counts Two and Five, Mashinsky stated, among other things, that he knew that misrepresentations he had made both in connection

with Celsius's Earn Program and with respect to his own sales of CEL token would give customers "comfort" and that the misrepresentations would be "material to their decision" to invest and/or to purchase or sell CEL token. (Plea Tr. 25). Mashinsky acknowledged that he knew at the time that his actions were wrong and illegal. (Plea Tr. 26-27). Mashinsky acknowledged that he was pleading guilty because he was in fact guilty and that he was pleading guilty voluntarily and of his own free will. (Plea Tr. 28). He further explicitly admitted the forfeiture allegation in Count Five and acknowledged that he had signed the CPOF. (Plea Tr. 29). The Court accepted Mashinsky's plea. (Plea Tr. 29).

**C. Sentencing**

In advance of the defendant's sentencing, the Probation Office prepared a Presentence Report (the "PSR") describing Mashinsky's criminal conduct at Celsius. The PSR also included a "Defense Version of Events" that was submitted by Mashinsky through counsel. Broadly, this "Version of Events" complained that the Indictment was overbroad, that Mashinsky intended to be transparent in his dealings with Celsius customers, and blamed rogue employees. (PSR ¶¶ 122-41). As relevant here, as to loss amount, the "Defense Version of Events" noted that Mashinsky denied ever acting with subjective intent of causing loss to victims but acknowledged that under the Sentencing Guidelines Mashinsky could be held responsible for actual loss that was reasonably foreseeable to him. (PSR ¶ 141). Mashinsky also submitted to the Probation Office a 92-page letter with 112 exhibits, objecting to the factual recitations in the initial PSR and to several of the Guidelines calculations, which he had already agreed to in his plea agreement. (*See* Dkt. 126 at 5, describing this procedural history). On March 5, 2025, the Probation Office issued the final PSR, and its resolution of the specific defense objections is set forth at pages 78 to 84 of the PSR. Mashinsky continued to press his objections, including in a

71-page exhibit to his sentencing submission containing 101 objections to the PSR. (Dkt. 136-43). Mashinsky requested a sentence of a year and a day. (Dkt. 136).

At the sentencing proceeding, after putting on the record the documents received in connection with sentence, (Sent. Tr., Ex. 5 hereto, at 3), the Court opened by discussing the parties' agreed-upon Guidelines calculations, including the enhancement for loss amount. (Sent. Tr. 4). Noting that the Court was not bound by the parties' Guidelines stipulations, the Court observed that the parties agreed about the appropriate Guidelines calculations. (Sent. Tr. 5). The Court then "independently [found] that the guideline calculation is correct." (Sent. Tr. 6).

The Court also noted that "many of the defendant's arguments are inconsistent with the parties' agreement as to the guidelines and the evidence submitted in connection with sentencing." (Sent. Tr. 6). By way of example, the Court pointed out that Mashinsky had not explained how there could be an agreed-upon actual loss of $590 million if his crime had encompassed merely the two false statements he mentioned in his plea allocution. (Sent. Tr. 6-7).[2] Similarly, the Court noted, the agreed-upon $48 million forfeiture amount for Count Five would not make sense if Mashinsky's conduct with respect to Count Five was an isolated misstatement. (Sent. Tr. 7). The Court indicated that it had carefully considered the defendant's objections to the presentence report and overruled them, with a couple exceptions as stated on the record. (Sent. Tr. 7). The Court further explained that the defendant's objections would not change the Guidelines calculations and would not change his sentence. (Sent. Tr. 7).

[2] The defense had noted, in connection with an objection to paragraph 112(d) of the PSR, "The parties stipulated to a loss exceeding $550 million attributable to MASHINSKY. The guidelines are not in dispute, and so this objection does not affect the sentence. The defense instead subscribes to a reasonable loss estimate of $590 million based on the statement Alex submitted in the bankruptcy." (Dkt. 136-43 at 67).

The Court heard at length from Mashinsky's attorneys on factors relevant to sentencing. Mashinsky's attorneys emphasized his good intentions, the fact that he had staffed Celsius with a team of qualified executives, and attempted to distinguish Mashinsky's actions from that of other similarly situated defendants whom they proposed were more culpable. (Sent. Tr. 15-48). Mashinsky personally addressed the Court at his sentencing. When asked if there were unresolved objections, Mashinsky answered that in his view the $590 million in loss constituted "uncollected funds" that arose because Celsius made the decision, in light of the run on its assets, to freeze withdrawals on the platform so that Celsius's redeeming customers would not have an unfair advantage over "my most loyal customers" who would then have "to wait for the rest of their life for the rest of the coins" when it came to recovering losses. (Sent. Tr. 49-50). The Court said it had taken this view into account but that it did not change the facts in the presentence report. (Sent. Tr. 50).

After hearing from Mashinsky's attorneys, Mashinsky, the Government, and victims, the Court formally adopted the factual findings in the Presentence Report, with a few exceptions, and the Guidelines range. (Sent. Tr. 94-95). The Court found that the offense was "extremely series" as it "resulted in the loss of about $590 million" and that Mashinsky personally profited by "more than $45 million." (Sent. Tr. 95). The Court stated that the letters were "extraordinarily moving," showing "that people lost their life savings, or a substantial portion of them, and that many people suffered severe psychological injuries from their financial losses." (Sent. Tr. 95). The Court further noted that the victim letters "demonstrate that the fact that victims have received some compensation from the bankruptcy process cannot make up for the time that they have been deprived of their savings, and cannot make up for the psychological harm inflicted on them, and do not even make up for the complete monetary losses." (Sent. Tr. 95-96). The Court

found that a substantial sentence was "necessary" because of "the seriousness of the offense and the need for a just punishment measuring the actual offense." (Sent. Tr. 96). The Court imposed a sentence of, principally, 12 years' incarceration. (Sent. Tr. 97). When given a further opportunity to address the Court, Mashinsky complained that he was "taking responsibility for a thousand employees" who had not "come forward and admitted to anything they've done." (Sent. Tr. 98).

## II. Applicable Law

### A. 28 U.S.C. § 2255

"*Habeas* review is an extraordinary remedy and will not be allowed to do service for an appeal." *Bousley v. United States*, 523 U.S. 614, 621 (1998) (quotation marks omitted); *United States v. Frady*, 456 U.S. 152, 165 (1982) ("[W]e have long and consistently affirmed that a collateral challenge may not do service for an appeal."). To obtain relief under 28 U.S.C. § 2255, a petitioner must demonstrate "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000) (quotation marks omitted). The Supreme Court has held that "to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. 152, 166 (1982); *see also Brecht v. Abrahamson*, 507 U.S. 619, 633-34 (1993).

In accordance with the interest in finality in criminal judgments, which has "special force" for convictions based on guilty pleas, *Lucas v. United States*, 963 F.2d 8, 14 (2d Cir. 1992), a court may not consider on a Section 2255 motion a claim that could have been raised, but was not raised, on direct review. Such a claim has been "procedurally defaulted." *Bousley*, 523 U.S. at 622; *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he

failed to raise on direct appeal."). When a convicted defendant seeks collateral relief based on a claim he has procedurally defaulted by failing to raise it at trial, sentencing, or on direct appeal, he generally must show both cause excusing his procedural default and prejudice resulting from the errors of which he complains. *Bousley*, 523 U.S. at 622 (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)); *see also Frady*, 456 U.S. at 167-68. If the defendant cannot show both cause and prejudice, the court may consider his claim only if he establishes that he is "actually innocent." *Bousley*, 523 U.S. at 624.

Where a motion for collateral relief under Section 2255 and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court need not grant a hearing. 28 U.S.C. § 2255(b); *see also Puglisi v. United States*, 586 F.3d 209, 214 (2d Cir. 2009).

**B. Ineffective Assistance of Counsel**

A claim of ineffective assistance of counsel fails unless a defendant: (i) overcomes a "strong presumption" that his counsel's conduct was reasonable and shows that his representation "fell below an objective standard of reasonableness" under "prevailing professional norms," and (ii) "affirmatively prove[s] prejudice," that is, shows that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687-88, 693-94 (1984); *accord United States v. De La Pava*, 268 F.3d 157, 163 (2d Cir. 2001). The burden is on the defendant to establish both elements. *Strickland*, 466 U.S. at 687.

Under the first prong of the *Strickland* analysis, the reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, bearing in mind that [t]here are countless ways to provide effective assistance in any given case and that [e]ven the best criminal defense attorneys would not defend a particular client in the same way." *United State*s *v. Aguirre*, 912 F.2d 555, 560 (2d Cir. 1990) (quotation

marks omitted). A defendant cannot prevail on a claim of ineffective assistance merely because he believes that his counsel's strategy was inadequate. *United States v. Sanchez*, 790 F.2d 245, 253 (2d Cir. 1986).

Under the second prong, a defendant must meet the "heavy burden" of showing "actual prejudice." *Strickland*, 466 U.S. at 692. To satisfy the prejudice prong, the defendant must demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94. A defendant cannot establish prejudice by merely showing that counsel's errors had "some conceivable effect" on the result, for "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693. Only where both prongs of the *Strickland* test are satisfied can it be concluded that "counsel was not functioning as the 'counsel' guaranteed to the defendant by the Sixth Amendment." *Id.* at 687.

**C. Conflicts of Interest**

"A defendant's Sixth Amendment right to effective assistance of counsel includes the right to representation by conflict-free counsel." *United States v. Blau*, 159 F.3d 68, 74 (2d Cir. 1998). When a court becomes aware of a potential conflict of interest, it must "determine whether the attorney has an actual conflict, a potential conflict, or no conflict." *United States v. Kliti*, 156 F.3d 150, 153 (2d Cir. 1998). "If the conflict is so severe that no rational defendant would waive it, the court must disqualify the attorney. If it is a lesser conflict, the court must conduct a *Curcio* hearing to determine whether the defendant will knowingly and intelligently waive his right to conflict-free representation." *Id.* "During a *Curcio* hearing, the District Court must (i) 'advise the defendant about potential conflicts'; (ii) 'determine whether the defendant understands the risks of those conflicts'; and (iii) 'give the defendant time to digest and contemplate the risks, with the aid of independent counsel if desired.'" *Lester v. United States*,

No. 16 Cr. 800 (PGG), 2022 WL 22211375, at *9 (S.D.N.Y. May 4, 2022) (quoting *United States v. Curcio*, 680 F.2d 881, 888–90 (2d Cir. 1982). At the hearing, the court must "fully advise[ ]" the defendant of the facts underlying the potential conflict and "the possibility of prejudice" from the continuing representation, and afford the defendant "the opportunity to express his views." *United States v. Carrigan*, 543 F.2d 1053, 1055 (2d Cir. 1976).

When a defendant waives a potential conflict at a *Curcio* hearing, he may not later claim ineffective assistance of counsel unless he can show that the conflict was so severe as to be unwaivable or that his waiver was not knowing and intelligent with respect to the specific conflict that caused a "lapse" in representation. *United States v. Schwarz*, 283 F.3d 76, 95 (2d Cir. 2002). "As the Sixth Amendment guarantees the defendant the assistance of counsel, the infringement of that right must depend on a deficiency of the lawyer, not of the trial judge. There is no reason to presume this guarantee unfulfilled when the purported conflict has had no effect on the representation." *Amato v. United States*, 763 F. App'x 21, 25 (2d Cir. 2019) (quoting *United States v. Blount*, 291 F.3d 201, 211 (2d Cir. 2002).

**D. Waivers of Rights to Collateral Review**

"Claims of ineffective assistance of counsel can survive § 2255 waivers, but only when the claim relates to the negotiation and entry of a plea or sentencing agreement." *United States v. Cano*, 494 F. Supp. 2d 243, 248 (S.D.N.Y. 2007). The Second Circuit has made clear that appellate waivers should not be applied to review "of the constitutionality of the process by which the plea agreement was consummated. [However, i]f the constitutionality of that process passes muster, the plea agreement's waiver would bar any consideration by the appellate court of issues that fall within the scope of that waiver." *United States v. Hernandez*, 242 F.3d 110, 114 (2d Cir. 2001) (noting that court would not have allowed any sentencing arguments in challenge to effectiveness in deciding to plead guilty); *see also, e.g.*, *United States v. Brickhouse*, No. 09

Cr. 1118 (KMK), 2017 WL 1049509, at *6 (S.D.N.Y. Mar. 16, 2017) ("[T]o the extent that Petitioner quibbles with counsel's advocacy at sentencing, his claim is covered by the waiver in the Plea Agreement."). Nor may a defendant circumvent an otherwise valid waiver by characterizing his sentencing arguments as a challenge to his counsel's effectiveness. *See United States v. Djelevic,* 161 F.3d 104, 107 (2d Cir. 1998) (per curiam) ("A defendant may not 'dress up' a challenge to the correctness of his sentence as a Sixth Amendment claim for ineffective assistance of counsel by arguing the deficiency of his counsel's performance not at the time of the plea, but at sentencing."); *see also United States v. Williams*, 448 F. App'x 156, 157 (2d Cir. 2012).

## III. Discussion

Each of the claims in Mashinsky's petition—those styled as ineffective assistance claims and those styled as fruit of the poisonous tree claims—are barred by his knowing and voluntary waivers in his plea agreement and in his colloquy at his plea hearing. Mashinsky attempts to circumvent those waivers by alleging that a conflict with counsel caused him to plead guilty against his will, an allegation unsupported by any evidence and contradicted by Mashinsky's sworn statements at multiple hearings. Mashinsky has not even submitted a sworn declaration in support of these baseless allegations, and his petition should be denied without a hearing or further fact-finding.

### A. Mashinsky's Ineffective Assistance Claims Are Barred by His Knowing and Voluntary Waivers.

Mashinsky pled guilty pursuant to an agreement in which he waived his right to collaterally attack his conviction and any sentence at or below 360 months' imprisonment. (Plea Agmt. 6). At his plea hearing, he affirmed that he understood his plea agreement generally and this waiver specifically. (Plea Tr. 21-24). This Court found Mashinsky's plea knowing and

voluntary and supported by an independent basis in fact containing each of the essential elements of the offense. (Plea Tr. 29). Mashinsky does not challenge that finding.[3] Instead, he presents a litany of complaints, blaming others for problems at Celsius and rehashing the evidence presented at his sentencing hearing.[4] Though Mashinsky stops short of claiming that he is factually innocent, he blames his lawyers for failing to press certain arguments on his behalf.

Mashinsky cannot circumvent the waiver by "dress[ing] up" challenges to his conviction or sentence as challenges to the effectiveness of his counsel. *Djelevic,* 161 F.3d at 107. Mashinsky does not, and could not reasonably, claim that his counsel failed to explain the waiver of rights in his plea agreement, or otherwise performed ineffectively in counseling him when he agreed to that waiver. (*See* Plea Tr. 5, 9, 21-26, 28). Nor can he attack his below-Guidelines sentence on the grounds that even better lawyering would have gotten him a still-lower sentence. *See Cano*, 494 F. Supp. 2d at 251-52 (court's "sentencing decision was informed by the seriousness of his criminal conduct and his difficulty truly accepting responsibility for his

---

[3] Even if Mashinsky were to more specifically claim that his plea was not knowing and voluntary, the Court should not credit claims that are directly contradicted by the record. A federal *habeas* court is entitled to rely on statements made under oath during a plea allocution even in the face of a later, contrary claim by the defendant that a plea was not knowing or voluntary. *See, e.g., United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001) (testimony at allocution "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made"). Thus, federal courts reviewing *habeas* claims have held that where a defendant affirms during a plea hearing that he or she understands the plea agreement and charges, or other relevant facts, the defendant may not collaterally challenge the plea on those same grounds without a substantial basis. *See, e.g.*, *Hernandez*, 242 F.3d at 112 ("[T]he district court was entitled to rely upon the defendant's sworn statements . . . that he understood the consequences of his plea, had discussed the plea with his attorney, knew that he could not withdraw the plea, understood that he was waiving his right to appeal a sentence below 120 months, and had been made no promises except those contained in the plea agreement.").

[4] By way of just once example, Mashinsky writes: "The government presented a Celsius EXCO slide prepared by a junior Celsius employee from 2020 that listed 70% in 'uncollateralized loans'. This slide is FALSE. . . . All loans issued on Bitfinex were over-collateralized." (Pet. 19).

actions" not counsel's strategic decision regarding pursuing a *Fatico* hearing over drug quantity); *Djelevic,* 161 F.3d at 107 ("If we were to allow a claim of ineffective assistance of counsel at sentencing as a means of circumventing plain language in a waiver agreement, the waiver of appeal provision would be rendered meaningless. This we decline to do.").

**B. Mashinsky's Ineffective Assistance Claims Are Without Merit.**

1. Claims Related to Conflict and the Attorneys' Firm's Finances

Mashinsky attempts to bolster his ineffective assistance claims by arguing for the first time, contrary to his sworn statements at a multi-hour *Curcio* hearing, that he was prejudiced because of an alleged conflict that arose from his counsel's representation of Bankman-Fried at that defendant's sentencing. Mashinsky claims that his counsel engaged in an "unethical and secret effort to secure a conflicting client." (Pet. 13). Mashinsky claims that his counsel "pressured" him to waive the conflict "so that the lucrative engagement with [Bankman-Fried] could proceed" and that fees from Bankman-Fried would "help offset the mounting unpaid bills" in Mashinsky's case. (Pet. 14). This, Mashinsky claims, put him in an "impossible situation" that caused him to waive the potential conflict against his better judgment. (Pet. 14).

Mashinsky's claims of a conflict fail for two independent reasons. *First*, contrary to his absurd allegation that this claimed conflict was "secret," it was this exact issue that was raised at a lengthy *Curcio* hearing. Mashinsky had the benefit of not only his then-current counsel to advise him on the potential conflict with that counsel's representation of Bankman-Fried, he was also advised by an independent counsel of his choice *and* a Court-appointed CJA attorney. The Court advised Mashinsky that he had an absolute right to conflict-free counsel, and that if he could no longer afford counsel, conflict-free counsel would be appointed free of cost. (Hrg. Tr. 3). The Court explained the contours of the potential conflict between counsel's representation of both Bankman-Fried and Mashinsky and invited any questions. (Hrg. Tr. 3-8). The Court

adjourned the hearing to give Mashinsky additional time to consult with the independent CJA attorney. (Hrg. Tr. 13-14). Mashinsky repeatedly affirmed that he understood the potential conflict, that he wished to waive the potential conflict, and that he understood that the waiver would apply to the case in the future. (Hrg. Tr. 8, 14-15).[5] Mashinsky explicitly confirmed that he had not been threatened or given any promises or inducements in exchange for a waiver of the potential conflict. (Hrg. Tr. 8). Mashinsky's waiver of the potential conflict with his counsel's representation of Bankman-Fried was knowing and voluntary and is precisely the same conflict he now claims. He is barred from raising it now. *Schwarz*, 283 F.3d at 95 ("Where an actual or potential conflict has been validly waived, the waiver cannot be defeated simply because the conflict subsequently affects counsel's performance; such a result would eviscerate the very purpose of obtaining the waiver.").

*Second*, even if the Court were to entertain Mashinsky's allegation of a conflict, his claim fails because he has not even asserted, much less established, any prejudice. Where a defendant claims that a court has improperly concluded that there was no conflict, the alleged "error will not establish a violation of the Sixth Amendment right to effective assistance of counsel unless the defendant can demonstrate that the attorney had either (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance." *Kliti*, 156 F.3d at 153. Mashinsky has not made either showing.

Mashinsky says that the conflict was "unwaivable" and that it "impacted [his] defense," (Pet. 13-14), but he offers no explanation for these spare and conclusory assertions. There is no suggestion, for example, that counsel made arguments during sentencing advocacy on behalf of Bankman-Fried that were somehow contrary to Mashinsky's interests, nor that counsel failed to

[5] He also indicated under oath that he had signed a written waiver agreement, (Hrg. Tr. 8),

make arguments on behalf of Mashinsky at his sentencing proceeding because of a divided loyalty to Bankman-Fried. Mashinsky submitted documents showing only what was already known at the time of his *Curcio* hearing; namely, that he and entities he controlled were creditors of FTX and Alameda Research in the FTX bankruptcy proceeding. (Pet. 25).[6]

Mashinsky's further claim that his counsel was facing "financial pressures" that caused "closure of the firm shortly after" his sentencing caused "an irreconcilable conflict between counsel's personal interests and his undivided loyalty" owed to Mashinsky (Pet. 14) is similarly without merit. Mashinsky alleges, without even submitting a sworn declaration attesting to these facts, that his counsel pushed him to accept a plea offer because Mashinsky "could not win at trial" and because counsel was unwilling to continue to represent Mashinsky without payment ("I will not let this case bankrupt my firm."). (Pet. 14). Even if true, these statements do not establish either prong of *Strickland*.

Counsel's alleged statement that he would not bankrupt his firm by representing Mashinsky for free when Mashinsky failed to secure additional funds beyond the initial retainer, if true, do not constitute representation below an objective standard of reasonableness under prevailing professional norms. To the contrary, prevailing professional norms dictate that attorneys are paid for their time. When a defendant cannot afford an attorney, the Sixth

---

although he did not provide that to the Government or attach it to the instant petition.

[6] Mashinsky also submitted an article discussing a claim Celsius filed against FTX, (Pet. 26-28), and a long table purporting to show FTX's creation of "fake CEL tokens" as part of what he contends was FTX's manipulation of the CEL token. (Pet. 13, 29). But neither of these exhibits supports any suggestion of either an actual conflict or of prejudice to Mashinsky from counsel's representation. The status of any litigation between Celsius and FTX has no bearing on any matter related to Mashinsky's plea or sentencing when Mashinsky was terminated as CEO of Celsius years prior. And even assuming that FTX shorted CEL and that this impacted the "run on the bank" that was one of the precipitating factors causing Celsius to slide into bankruptcy, Mashinsky does not explain how those facts are supposed to have prejudiced him or impacted counsel's performance.

Amendment requires one be provided to him free of charge, as Mashinsky was repeatedly advised by this Court, including at his guilty plea hearing. Nor can Mashinsky demonstrate *Strickland* prejudice. According to Mashinsky's own self-serving narrative, his counsel coupled this pressure to plead with advice that Mashinsky "could not win at trial"—an assessment that was, no doubt, informed by counsel's work reviewing the discovery, conducting an investigation, and discussing the charges with Mashinsky and separately with attorneys for the Government. The plea agreement negotiated by counsel dropped Mashinsky's sentencing exposure from life imprisonment to a cap of 30 years' imprisonment. Moreover, Mashinsky does not allege, nor would such an allegation be credible, that he would have rejected the plea offer and proceeded to trial but-for the supposed conflict. Indeed, he had every opportunity to reject the plea and to proceed to trial, as the Court advised him at his plea hearing that he could "change your mind right now and refuse to enter a plea of guilty[.] You don't have to enter this plea if you don't want to for any reason at all. Do you understand that completely?" Mashinsky affirmed that he did. (Plea Tr. 9). Mashinsky has not established any conflict with his counsel or any prejudice resulting therefrom.

2. Claims Related to Strategic Choices in Investigation and Discovery

Mashinsky claims that his counsel "manifested" "grossly ineffective discovery practices." (Pet. 14-17). He asserts, in sum, that counsel wasted time reviewing certain of the discovery material while failing to pursue other avenues that Mashinsky now believes would have been more fruitful—in particular, Mashinsky's claim that his co-defendant and the co-founder of Celsius were in an "illegal conspiracy" to "do a hostile takeover of Celsius." (Pet. 14).[7]

[7] The main thrust of this supposed defense appears to be that Mashinsky was somehow set up—an allegation that is contrary to Mashinsky's sworn statements at his guilty plea proceeding, among other things.

Mashinsky cannot show that counsel deviated from an objective standard of reasonableness by choosing to meticulously review all the Rule 16 discovery produced by the Government. *Strickland*, 466 U.S. at 690 (1984) ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). Moreover, "undetailed and unsubstantiated assertions that counsel failed to conduct a proper investigation have consistently been held insufficient to satisfy either *Strickland* prong." *Polanco v. United States*, 99 Civ. 5739 (CSH), 2000 WL 1072303 at *10. (S.D.N.Y. Aug. 3, 2000) (collecting cases). The law does not "compel defense counsel to investigate comprehensively every lead or possible defense . . . or to scour the globe on the off-chance something will turn up . . . ." *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (internal citations omitted). In short, Mashinsky's claim that his attorneys failed to investigate, or that their investigation was insufficient, is unsupported by the law, the record, and Mashinsky's own petition, which cites to the Rule 16 discovery he and his counsel were provided and that he acknowledges counsel reviewed carefully.

3. Claims Related to Guideline Loss Amount

Mashinsky next complains that his counsel agreed to a loss amount under the Sentencing Guidelines that was incorrect, that Mashinsky did not appreciate that he would not later have an opportunity to challenge this Guidelines enhancement, and that the loss amount was incorrectly calculated. (Pet. 17-18). As with his other claims, Mashinsky attempts to "dress up" a challenge to his sentence as a challenge to the effectiveness of his counsel. *Djelevic,* 161 F.3d at 107. Mashinsky's plea agreement listed the agreed-upon Sentencing Guidelines computation, including the agreement as to loss amount. (Plea Agmt. 4). The agreement further stated that neither party would argue for a different calculation of the Sentencing Guidelines than the one set forth in the agreement. (Plea Agmt. 5). Mashinsky affirmed under oath that he had reviewed the plea agreement with his attorneys, that he understood it, and that he was satisfied with his

attorneys' representation. He affirmed that he understood that the Court would independently calculate the Sentencing Guidelines before determining an appropriate sentence. Having sworn otherwise, and having received the benefit of his bargain under the plea agreement, he cannot now say that he did not appreciate that his counsel could not challenge the Guidelines calculation set forth in the plea agreement.

Moreover, any ineffective assistance claims regarding the loss amount are without merit. Mashinsky's counsel in fact did raise numerous factual and legal objections to the loss amount, and make arguments about the loss amount, including in letters to the Probation Office, discussions with Government counsel, and in advocacy to the Court. (*E.g.*, Dkt. 136 at 35 ("any loss associated with the bankruptcy does not fairly or accurately reflect the nature and seriousness of Alex's crimes or moral culpability."); Dkt. 136 at 36 ("the Court should not associate Celsius's bankruptcy with permanent customer loss."); Dkt. 136-43 at 67 (objecting to a particular methodology for calculating Guideline loss)). His attorneys stopped short, however, of seeking a *Fatico* hearing on the loss amount because to do so would violate the express terms of the plea agreement in which they and Mashinsky agreed not to present a contrary Guidelines calculation to the Court. It was not ineffective to avoid a direct breach of the plea agreement and subject Mashinsky to a recission of the plea agreement and trial—which he does not now even claim to have wanted.

Nor can Mashinsky show any prejudice. The facts related to the loss amount set forth in his petition—largely focused on the recovery of funds through the bankruptcy—were already before the sentencing Court.[8]

[8] Mashinsky's supplemental filing with an update on the bankruptcy proceedings (Dkt. 191) is irrelevant to any loss amount calculation. While the Guidelines permit "credits against loss" where the "money [is] returned . . . by the defendant or other persons acting jointly with the

### C. Mashinsky's Remaining Claims Are Also Barred and Without Merit.

Mashinsky next presses an assortment of claims that CEL was not a security, that he acted on advice of counsel, that outside factors were to blame for Celsius's bankruptcy, that he was set up or manipulated by other Celsius executives, and that the Government's "charges rested on improperly applied legal theories." (Pet. 19-20). These claims are each barred by the waiver in his plea agreement in which he agreed he would not challenge his conviction. (Plea Agmt. 6). If they were not so barred, which they plainly are, then they are procedurally defaulted because Mashinsky failed to raise them directly on appeal. To the extent that Mashinsky intends to argue that these claims suggest he is factually innocent of the charges, which is not at all clear from the face of his petition, such an argument would fly in the face of not only his sworn plea allocution but extensive fact-finding at his deeply contested sentencing hearing. (*See* Sent. Tr. 8-14, overruling various defense factual objections to the Presentence Report and noting that the objections do not make the facts in the Presentence Report untrue, nor do they indicate that the conduct was insufficient to support the agreed-upon the Guidelines calculations).

---

defendant," such return must take place "before the offense was detected." U.S.S.G. § 2B1.1, cmt. 3(E)(i).

**Conclusion**

For the foregoing reasons, the Court should deny the Petition. The Court should also deny a certificate of appealability because the petitioner has not made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c).

Dated: New York, New York
August 14, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney
for the Southern District of New York

Allison Nichols
Assistant United States Attorney
Tel: (212) 637-2366

cc: Alexander Mashinsky (by certified mail)
Register Number: 68096-510
FCI Otisville
Federal Correctional Institution
Satellite Camp
P.O. Box 1000
Otisville, NY 10963